UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
LISA MCQUEEN-STARLING,                        :    Civil Action No. 08-4885 (JGK/RLE)
                                              :    ECF Case
                          Plaintiff,          :
                                              :
            v.                                :
                                              :
UNITEDHEALTH GROUP, INC. AND,                 :
OXFORD HEALTH PLANS                           :
                                              :
                          Defendant.          :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**DEFENDANT'S RESPONSE TO PLAINTIFF'S**
**<u>PETITION TO VACATE ARBITRATION AWARD</u>**


Christopher Lowe (CL-0218) (clowe@seyfarth.com)
James R. Cho (JC-4678) (jcho@seyfarth.com)
Seyfarth Shaw LLP
620 Eighth Avenue, 32nd floor
New York, New York 10018
212-218 5500
212-218-5526 (fax)
Attorneys for Defendant

July 8, 2008

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

SUMMARY OF RELEVANT FACTS ............................................................................ 3

ARGUMENT .................................................................................................................. 6

    A.    Applicable Standard of Review .................................................................. 6

    B.    The Arbitrator Properly Found That Golden Had A Legitimate, Non-Discriminatory Reason For Terminating McQueen's Employment ....................... 9

    C.    The Arbitrator Properly Found That McQueen Could Not Establish A Failure To Promote Claim ............................................................................ 12

        1.    McQueen Did Not Satisfy Golden's Criteria For Promoting Employees From 2001 Until 2005 ...................................................... 12

        2.    Golden Recommends McQueen For A Promotion In 2005 ..................... 13

    D.    The Arbitrator Properly Found That McQueen's Alleged Comparators Were Not Similarly Situated To Her .............................................................. 14

    E.    The Arbitrator Considered And Properly Rejected McQueen's Alleged "Evidence" Of Golden's Alleged Biased Comments ............................................ 17

    F.    The Arbitrator Properly Rejected McQueen's Claim That Golden Retaliated Against Her .......................................................................... 24

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*Abdu-Brisson v. Delta Air Lines, Inc.*,
   239 F.3d 456 (2d Cir. 2001).............................................................................14

*Anderson v. Anheuser-Busch, Inc.*,
   No. 00-7089, 2000 U.S. App. LEXIS 23763 (2d Cir. Sept. 19, 2000) ............................16

*Benette v. Cinemark U.S.A., Inc.*,
   295 F. Supp. 2d 243 (W.D.N.Y. 2003) ..............................................................23

*Brown v. Coach Stores*,
   163 F.3d 706 (2d Cir. 1998)..............................................................................23

*Bush v. Fordham Univ.*,
   452 F. Supp. 2d 394 (S.D.N.Y. 2006) ...............................................................15

*Calire v. Taylor Staffing Servs.*,
   No. 02-cv-0166E, 2004 WL 625274 (W.D.N.Y. Feb. 17, 2004) ....................................23

*Capgemini v. Sorensen*,
   No. 04 Civ. 7584, 2005 WL 1560482 (S.D.N.Y. July 1, 2005) ....................................7, 8

*Cole v. Burns Int'l Sec. Servs.*,
   105 F.3d 1465 (D.C. Cir. 1997) ..........................................................................8

*Conigliaro v. Horace Mann Sch.*,
   No. 95-civ.-3555, 2000 U.S. Dist. LEXIS 556 (S.D.N.Y. Jan. 18, 2000) ........................15

*Cosgrove v. Sears, Roebuck & Co.*,
   9 F.3d 1033 (2d Cir. 1993)................................................................................24

*County of Washington v. Gunther*,
   452 U.S. 161 (1981)........................................................................................16

*DiCola v. SwissRe Holding*,
   996 F.2d 30 (2d Cir. 1993)...............................................................................9

*Donaldson v. Merrill Lynch & Co.*,
   794 F. Supp. 498 (S.D.N.Y. 1992)......................................................................9

*Dunhill Franchisees Trust v. Dunhill Staffing Sys.*,
   513 F. Supp. 2d 23 (S.D.N.Y. 2007)....................................................................7

*E.I. duPont de Nemours & Co. v. Jo Tankers, B.V.*,
    172 F. Supp. 2d 405 (S.D.N.Y. 2001)..............................................................................3

*Faragher v. City of Boca Raton*,
    524 U.S. 775 (1998)..............................................................................................20

*Fears v. Heritage Ctrs.*,
    No. 02-cv-639S, 2004 WL 1824126 (W.D.N.Y. Aug. 15, 2004).....................................19

*Figueroa v. N.Y. City Health & Hosps.*,
    500 F. Supp. 2d 224 (S.D.N.Y. 2007)..............................................................................14

*Georgy v. O'Neill*,
    No. 00-cv-0660(FB), 2002 WL 449723 (E.D.N.Y. Mar. 25, 2002) ..................................19

*Halbrook v. Reichhold Chems., Inc.*,
    766 F. Supp. 1290 (S.D.N.Y. 1991)..............................................................................9

*Hall Street Associates, LLC v. Mattel, Inc.*,
    128 S. Ct. 1396 (2008)........................................................................................6, 7

*Hansberry v. Father Flanagan's Boys' Home*,
    No. CV-03-3006, 2004 WL 3152393 (E.D.N.Y. Nov. 28, 2004).....................................22

*Henry v. Champlain Enters., Inc.*,
    445 F.3d 610 (2d Cir. 2006)........................................................................................7

*Koveleskie v. SBC Capital Mkts., Inc.*,
    167 F.3d 361 (7th Cir. 1999) ........................................................................................8

*Leibovitz v. New York City Transit Auth.*,
    252 F.3d 179 (2d Cir. 2001)........................................................................................22

*Longmire v. Wyser-Pratte*,
    No. 05-civ.-6725, 2007 WL 2584662 (S.D.N.Y. Sept. 6, 2007) ......................................15

*Malarkey v. Texaco, Inc.*,
    983 F.2d 1204 (2d Cir. 1993)........................................................................................2

*Mandell v. County of Suffolk*,
    316 F.3d 368 (2d Cir. 2003)........................................................................................14

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)..............................................................................................9

*Miller-El v. Dretke*,
    545 U.S. 231 (2005)................................................................................16

*Nelson v. Beechwood Org.*,
    No. 03-civ.-4441, 2006 WL 2067739 (S.D.N.Y. July 26, 2006).................................23

*Newsom-Lang v. Warren Int'l, Inc.*,
    No. 03-7372, 2003 U.S. App. LEXIS 22732 (2d Cir. Nov. 4, 2003) ...............................13

*Paladino v. Avnet Computer Techs., Inc.*,
    134 F.3d 1054 (11th Cir. 1998) ...................................................................8

*Phansalkar v. Andersen Weinroth & Co.*,
    344 F.3d 184 (2d Cir. 2003).......................................................................7

*Ramirez v. N.Y. City Health & Hosps., Corp.*,
    No. 05-0906-CV, 2006 WL 156879 (2d Cir. Jan. 19, 2006) ...........................................19

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000)................................................................................23

*Roa v. Mineta*,
    No. 01-6216, 2002 U.S. App. LEXIS 22338 (2d Cir. Oct. 23, 2002) ...............................15

*Rose v. AmSouth Bank*,
    391 F.3d 63 (2d Cir. 2004).........................................................................7

*Saulpaugh v. Monroe Cmty. Hosp.*,
    4 F.3d 134 (2d Cir. 1993) .........................................................................9

*Shannon v. Nicholson*,
    No. 05-civ.-3604, 2006 U.S. Dist. LEXIS 14253 (S.D.N.Y. Mar. 31, 2006)...................16

*Shumway v. UPS*,
    118 F.3d 60 (2d Cir. 1997)........................................................................15

*Simpson v. Metro-North Commuter R.R.*,
    No. 04-civ.-2565, 2006 WL 2056366 (S.D.N.Y. July 20, 2006)......................................15

*St. Mary's Honor Ctr. v. Hicks*,
    509 U.S. 502 (1993)................................................................................9

*Steinberg v. St. Regis/Sheraton Hotel*,
    583 F. Supp. 421 (S.D.N.Y. 1984)................................................................22

*Stone v. Bd. of Educ.*,
    No. 05-2480-cv, 2005 U.S. App. LEXIS 23703 (2d Cir. Nov. 2, 2005) ..........................13

*Texas Dep't of Cmty. Affairs v. Burdine*,
    450 U.S. 248 (1981)...........................................................................................................9

*Thomas v. iStar Fin., Inc.*,
    448 F. Supp. 2d 532 (S.D.N.Y. 2006)..............................................................................24

*Tripp v. Long Island Univ.*,
    48 F. Supp. 2d 220 (E.D.N.Y. 1999) ...............................................................................19

*Vail-Ballou Press, Inc. v. Graphic Commc'ns Int'l Union, Local 898-M*,
    480 F. Supp. 2d 568 (N.D.N.Y. 2007) ..............................................................................7

*Wedbush Morgan Secs. v. Robert W. Baird & Co.*,
    320 F. Supp. 2d 123 (S.D.N.Y. 2004)..........................................................................3, 17

*Weinstock v. Columbia Univ.*,
    224 F.3d 33 (2d Cir. 2000)...............................................................................................14

## STATUTES

9 U.S.C. § 9  ................................................................................................................................25

9 U.S.C. § 10(a) ...........................................................................................................................7

Defendant, United HealthCare Services, Inc.,[1] submits this response to Plaintiff's Petition To Vacate Arbitration Award as follows:

## PRELIMINARY STATEMENT[2]

UHG terminated the employment of Plaintiff Lisa McQueen-Starling ("McQueen") on April 6, 2006, as part of a reduction in force. Pursuant to an employment arbitration agreement, McQueen filed with the American Arbitration Association ("AAA") an "Amended Statement of Claim" on June 7, 2006, alleging that UHG discriminated against her based on her race (African American) and sex in violation of 42 U.S.C. § 1981, New York Executive Law § 290 *et seq.* ("Human Rights Law"), and the Administrative Code of the City of New York § 8-101 *et seq.* (the "City Law"), and that UHG retaliated against her for allegedly opposing discriminatory employment practices in violation of the Human Rights Law and the City Law. Op. at 1. McQueen essentially claims that her former supervisor William Golden ("Golden") discriminated against her based on her race and sex when he failed to promote her and eventually terminated her employment.[3]

---

[1] Plaintiff incorrectly identified defendants UnitedHealth Group, Inc. ("UHG") and Oxford Health Plans ("Oxford"). The correct defendant is United HealthCare Services, Inc. ("UHC"), as recognized by the Arbitrator. Tr. 3. For the sake of consistency, Defendant will continue using the names of the respondents (*i.e.*, UHG and Oxford) as used during the arbitration proceedings.

[2] References to the Arbitrator's Opinion; McQueen's Memorandum of Law In Support of Petition To Vacate Arbitration Award; the hearing transcript; McQueen's Post-Hearing Memorandum; Respondent's Post-Hearing Brief; McQueen's and Defendant's Exhibits used at the arbitration hearing appear as "Op. at __[page]," "Pet. at __[page]," "Tr.__[page]," "Cl. Mem. at __[page]," Resp. Br. at __[page]," "Cl. Ex.__," and "Resp. Ex.__," respectively. Referenced materials not attached to the "Affirmation of Debra L. Raskin In Support Of Petition To Vacate Arbitration Award" ("Raskin Ex. __[exhibit number]") filed with Defendant's Notice of Removal are contained in the "Appendix of Materials In Support of Defendant's Response."

[3] McQueen now alleges that Golden also retaliated against her *after* her termination by failing to provide her with a job reference, although she never raised this allegation in her Amended Claim. Raskin Ex. 18. McQueen does not allege in her petition that Golden retaliated against her as a result of any alleged complaint she may have made while employed by UHG or Oxford.

From a list of nine Arbitrators, the AAA appointed experienced Arbitrator Susan Mackenzie ("Arbitrator") to hear this case—neither party objected.  The Arbitrator presided over six days of hearings wherein both parties had the full opportunity to present all pertinent evidence.  Op. at 1.  After full, post-hearing briefing, the Arbitrator held that McQueen failed to meet her burden of proof and that Golden never exhibited any discriminatory animus or retaliated against her.  Op. at 1, 4.  Dissatisfied, McQueen filed a petition to vacate the Arbitrator's well-reasoned decision.  UHC removed this case to this Court on May 27, 2008.

In her petition, McQueen raises a litany of comments allegedly made by Golden that she claims create an inference that he discriminated against her.  As to her race claim, McQueen relies almost exclusively on a few unsubstantiated stray remarks, which Golden vehemently denies.  Even if accepted, these comments are of little probative value having been allegedly uttered nearly *three* years prior to her termination.[4]  Moreover, McQueen presented no credible evidence of comments made about her gender.  In the end, none of the comments McQueen attributes to Golden, whether based on race, gender or otherwise, occurred within a *year* of McQueen's termination -- even by her own self-serving estimation.

McQueen simply ignores the fact that Golden both hired her and fired her and, that throughout her employment Golden gave her annual pay increases, stock options and bonuses, including a retention bonus, and ultimately recommended her for a promotion.  Op. at 2, 3. Instead, McQueen repeatedly argues that the Arbitrator failed to make factual findings with

---

[4] The Human Rights Law and the City Law have a three-year statute of limitations period. McQueen may raise claims dating only as far back as *April 13, 2003* (three years before she filed her initial demand for arbitration on April 13, 2006).  *See Malarkey v. Texaco, Inc*., 983 F.2d 1204, 1211 (2d Cir. 1993) (evidence pertaining to time-barred claims inadmissible).

respect to the allegedly biased comments made by Golden.[5]  The Arbitrator, having considered all of McQueen's evidence, reached the correct decision in discrediting the stray remarks as neither actionable nor raising an inference of discrimination where they had nothing to do with McQueen's race or sex; were not directed toward her; lacked any temporal proximity to any adverse employment action; were not reported to Human Resources ("HR"); were not recorded in any of the voluminous daily notes maintained by McQueen; or were not corroborated by even McQueen's own witnesses.  Op. at 8.  McQueen alleged that she repeatedly complained to Audrey Julien ("Julien"), a Black female in Human Resources, but Julien, who the Arbitrator credited, denied any knowledge of these alleged complaints except for one, allegedly made more than 5 years before her termination.  Op. at 8, 9.  Notably, at the time she testified, Julien no longer worked for the Company and had no motivation to testify on behalf of Defendant.  Op. at 9.  Thus, there was more than sufficient basis for the Arbitrator's finding that the weight of the evidence and credibility of the witnesses favored the Defendant.

## SUMMARY OF RELEVANT FACTS[6]

Golden, currently CEO of the New York Health Plan, first joined Oxford in November 1997.  Tr. 602.  During his tenure, he made employment decisions without regard to race or sex, hiring and promoting numerous women and minorities, including McQueen, and awarding them substantial pay increases, stock options and bonuses in the process.  Op. at 1-2; Resp. Br. at 1.

---

[5] A petitioner's disagreement as to certain findings of fact is not a basis for overturning an arbitrator's decision.  *See E.I. duPont de Nemours & Co. v. Jo Tankers, B.V.*, 172 F. Supp. 2d 405, 409-10 (S.D.N.Y. 2001).  Moreover, the Court should defer to the Arbitrator's credibility determinations and the weight given to the evidence because the Arbitrator had the opportunity to observe and assess the witnesses as they testified.  *See Wedbush Morgan Secs. v. Robert W. Baird & Co.,* 320 F. Supp. 2d 123, 127-28 (S.D.N.Y. 2004) (Koeltl, J.) (challenging the credibility of the evidence is not a proper basis upon which to vacate an arbitration award).

[6] *See* Arbitrator's Opinion and Defendant's Post-Hearing Brief for a detailed account of the facts.

Golden hired McQueen not once, but twice; first as HR Manager and later as his Manager of Account Management.  Op. at 1.  Golden hired McQueen over male, Caucasian candidates, notwithstanding her lack of training and experience with insurance products and customer service -- McQueen having worked all of her professional career in HR.  *Id.*  McQueen's considerable HR experience failed her, however, because she never reported to HR any of Golden's alleged transgressions, but for one five years before her termination-- and on that occasion UHG took prompt corrective action.  Even more curious is the fact that McQueen took hundreds of pages of notes recording every workplace event of significance, yet failed to make any notation of Golden's allegedly offensive conduct, or of her purported complaints to HR. Indeed, this dearth of evidence only confirms the propriety of the Arbitrator's finding that Golden did not engage in any unlawful conduct.

Golden annually awarded McQueen salary increases and bonuses, going so far as to recommend her for one of only three retention bonuses granted out of more than 200 employees under his supervision when UHG acquired Oxford in 2004, notwithstanding McQueen's claim that "[w]hen Oxford reorganized under UnitedHealth, Golden found ways to retain each and every white man who worked for him."  Pet. at 3; Op. at 3; Tr. 185, 630, 811.  Golden made no such recommendation for Paul Marden ("Marden") or Sean Tahany ("Tahany"), who McQueen identifies as her purported comparators.  Tr. 630.  (The Arbitrator correctly found that they are not her comparators.)  Tellingly, Golden recommended McQueen for a retention bonus at the same time she alleges he made comments about her sex and race.

Belying McQueen's allegation that Golden unlawfully passed her over for promotions is considerable evidence that Golden not only articulated his criteria for promotion and applied them to all of his reports, but also that McQueen never qualified for a promotion until 2005.

4

When she actually did qualify, *Golden* communicated to HR his request for McQueen's elevation to Director.  Cl. Ex. 132; Tr. 843.  Consistent with the practice he applied to Tahany, Marden and Lori Adler ("Adler") (two Caucasian males and a Caucasian female), Golden requested McQueen's promotion approximately six months after she had proven herself capable of handling additional responsibility.  Indeed, McQueen would have received that promotion but for a Company-wide, expense-reduction initiative -- Powerforward.

As part of the post-merger integration, Golden received in early 2006 a directive from his boss Michael Turpin ("Turpin"), UHG's CEO for the Northeast Region, to reduce expenses and *eliminate duplicative positions*.  Op. at 4; Tr. 700-01, 1319-22.  Although Golden initially resisted, Turpin held firm, ordering Golden to "look deep" and do his part in this Company-wide initiative.  Tr. 702-03, 1321.  Golden identified the only duplicative position in his department, Manager of Account Management -- this fact is undisputed -- and, after careful consideration and consultation with his peer, Michael McGuire ("McGuire"), selected Jean McGann ("McGann") -- a *woman* -- to assume McQueen's responsibilities.  Op. at 6-7.  With more than 20 years of relevant industry experience in sales and service of health insurance products to large, sophisticated clients, McGann was the obvious choice.  *See id*.  McQueen, in contrast, had been a HR professional until February, 2001 and never supported a business unit as complex as McGann's.  *See id*.  Furthermore, McGann was "more familiar with UHG products and procedures, the system to which Oxford employees had to conform."  Op. at 7.

McQueen's claim that Golden discriminated against her based on her race and sex, simply ignores overwhelming evidence that Golden favored her throughout her career.  She also erroneously assumes that after five years, Golden suddenly became motivated by racism and sexism, notwithstanding his record of having hired, promoted and accommodated numerous

5

women and minorities; including McQueen and McGann, or his decisions to terminate the
employment of male Caucasians in other reductions in force.  Resp. Br. at 9.  In view of this
overwhelming evidence, and as properly found by the Arbitrator, McQueen did not prove by a
preponderance of the evidence race or sex discrimination and, it cannot be said now that the
Arbitrator manifestly disregarded the law.  Indeed, McQueen's own admissions in this case
vitiate any finding of gender bias.  For example, McQueen cited to the Arbitrator as evidence of
gender animus Golden's decision to select Kimberly Santillo as Manager Small Business
Accounts and McGann for the position of Manager of Account Management.  Both are *women*.
Op. at 3, 7.  As to her race claim, McQueen relies almost exclusively on a few unsubstantiated
stray remarks allegedly made by Golden years prior to her termination and which Golden denies.

## ARGUMENT

McQueen has no basis for vacating the arbitration award where the Arbitrator's conduct
was beyond reproach and she considered all applicable law.  The evidence at hearing showed
that Golden was not motivated by race or gender, and that McGann was, in fact, more qualified
for the combined account management positions than McQueen.  Similarly, McQueen was not
eligible for a promotion until 2005, at which time Golden submitted her name for a promotion.
Finally, McQueen failed to establish her retaliation claim because there was no causal connection
between her outburst at her termination meeting and Golden's subsequent refusal to provide her
with a job reference.

### A.    Applicable Standard of Review

In light of the Supreme Court's recent decision in *Hall Street Associates, LLC v. Mattel,
Inc.*, 128 S. Ct. 1396 (2008), the Court should adopt the standard of review set forth in the

Federal Arbitration Act ("FAA").[7]  As the Supreme Court held, courts have only limited review

of arbitration proceedings; noting, that "[a]ny other reading opens the door to the full-bore legal

and evidentiary appeals that can 'rende[r] informal arbitration merely a prelude to a more

cumbersome and time-consuming judicial review process'" *Id*. at 1405 (citations omitted); *see*

*also Capgemini*, 2005 WL 1560482, at *3 (Koeltl, J.).[8]  Federal courts reviewing petitions to

vacate arbitration awards removed from New York state court apply the standards set forth in the

FAA.[9]  *See Dunhill Franchisees Trust v. Dunhill Staffing Sys.*, 513 F. Supp. 2d 23, 26 (S.D.N.Y.

2007); *Vail-Ballou Press, Inc. v. Graphic Commc'ns Int'l Union, Local 898-M*, 480 F. Supp. 2d

568, 571 (N.D.N.Y. 2007).  Under the FAA, a district court may vacate an award only if:  (1) the

award was procured by corruption, fraud, or undue means; (2) there is evidence of partiality or

corruption among the arbitrators; (3) the arbitrators were guilty of misconduct which prejudiced

the rights of one of the parties; or (4) the arbitrators exceeded their powers.  *See* 9 U.S.C. §

---

[7] Courts apply the FAA in employment cases.  *See Capgemini v. Sorensen*, No. 04 Civ. 7584,
2005 WL 1560482, at *1, *3 (S.D.N.Y. July 1, 2005) (Koeltl, J.).

[8] The parties' arbitration agreement provided that the standard of review "to be applied to the
arbitrator's findings of facts and conclusions of law will be the same as that applied by an
appellate court reviewing a decision of a trial court sitting without a jury."  Raskin Ex. 3 ¶ 24(b).
A court's findings of fact following a bench trial will be set aside only if those findings are
clearly erroneous.  *See Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 617-18 (2d Cir. 2006).
"Under this standard, factual findings by the district court will not be upset unless we are left
with the definite and firm conviction that a mistake has been committed."  *Id*. at 617 (quotations
omitted).  District courts are given "due regard" to their credibility determinations.  *See*
*Phansalkar v. Andersen Weinroth & Co.*, 344 F.3d 184, 199 (2d Cir. 2003).  The district court's
application of law to those facts, however, is subject to *de novo* review.  *See id.*; *see also Rose v.*
*AmSouth Bank*, 391 F.3d 63, 65 (2d Cir. 2004) (same).  Even if the Court were to adopt this
standard of review as contained in the parties' arbitration agreement, the Court should deny
McQueen's petition to vacate for the same reasons that McQueen cannot establish a basis for
vacating the award under the FAA.

[9] McQueen mistakenly claims that even under *Hall Street*, the Court should adopt a
"irrationality" standard as applicable under New York law.  Pet. at 13-16.  Even if the Court
were to adopt the "irrationality" standard, McQueen's claim still fails because the award was not
irrational.

10(a); *see also Capgemini*, 2005 WL 1560482, at *3-*5 (Koeltl, J.).  Courts may also vacate an

award if the arbitrator acted in "manifest disregard of the law" where the arbitrator "knew of a

governing legal principle yet refused to apply it or ignored it altogether, and the law ignored by

the arbitrators was well defined, explicit, and clearly applicable to the case." *Capgemini*, 2005

WL 1560482, at *3-*5 (Koeltl, J.) (quotations omitted).

     McQueen cannot establish any basis under the FAA to vacate the Arbitrator's award.

First, McQueen raises no allegation that the award was procured by corruption, fraud or other

undue means.  Second, McQueen has no basis for alleging the Arbitrator was biased.[10]  Third,

there exists no evidence of arbitral misconduct.  The Arbitrator provided both sides ample

opportunity to presents their evidence and arguments.  Fourth, McQueen does not allege that the

Arbitrator exceeded her authority.  Finally, McQueen cannot satisfy her burden of establishing

that the award was issued in "manifest disregard of the law."  Review under this doctrine is not

an "inquiry into the correctness of the decision, and the 'erroneous application of rules of law is

not a ground for vacating an arbitrator's award, nor is the fact that an arbitrator erroneously

decided the facts.'" *Capgemini*, 2005 WL 1560482, at *4 (Koeltl, J.).  For the reasons discussed

below, the Arbitrator correctly determined that McQueen could not establish that Golden had

discriminated or retaliated against her.

---

[10] Contrary to McQueen's claim, the Arbitrator is not biased even though UHC paid for the
arbitration.  Pet. at 3.  Prior to the Arbitrator's appointment, both parties had an opportunity to
strike three arbitrators, rank the remaining six in order of preference and otherwise object to the
appointment of any arbitrator.  Moreover, Courts regularly enforce agreements where the
employer pays for the cost of arbitration and McQueen fails to mention that UHC still would
have paid the Arbitrator even if it had lost.  *See, e.g., Koveleskie v. SBC Capital Mkts., Inc.,* 167
F.3d 361, 366 (7th Cir. 1999) (standard procedure for employer to pay the arbitration fees); *Cole
v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1484-85 (D.C. Cir. 1997) (enforcing arbitration
agreement where arbitration fees borne by employer); *Paladino v. Avnet Computer Techs., Inc*.,
134 F.3d 1054, 1062 (11th Cir. 1998).

### B.    The Arbitrator Properly Found That Golden Had A Legitimate, Non-Discriminatory Reason For Terminating McQueen's Employment

Despite McQueen's claim, she cannot prevail simply by establishing a *prima facie* case of discrimination where, as here, UHG had a legitimate, non-discriminatory reason for terminating her employment.  Op. at 6-7.  McQueen failed to establish by a preponderance of the evidence that her termination was unlawful, and UHG presented overwhelming evidence to the contrary.[11]

As the Arbitrator correctly found, UHG offered substantial credible evidence of its legitimate, non-discriminatory reason for terminating McQueen; namely, that in connection with a reduction-in-force to eliminate redundancies, Golden selected the more qualified candidate, McGann, who, like McQueen, is *female;* McGann had more experience, including financial

---

[11] Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), McQueen must first establish a *prima facie* case of race and sex discrimination.  *See id.* at 802.  To establish a *prima facie* case of discrimination in a reduction in-force, McQueen must establish:  (1) she is a member of a protected class; (2) she was qualified for the position from which she was discharged; (3) she was terminated; and (4) under circumstances giving rise to an inference of discrimination.  *See Donaldson v. Merrill Lynch & Co.*, 794 F. Supp. 498, 504 (S.D.N.Y. 1992).  McQueen cannot establish her *prima facie* case because she was not more qualified than McGann for the combined account management position and cannot present any circumstances giving rise to an inference of discrimination.  Once she establishes her *prima facie* case, the burden of production shifts to UHG to articulate a "legitimate nondiscriminatory reason" for its employment actions. *See* 411 U.S. at 802.  UHG's burden is simply one of articulation -- it is *not* required to prove the absence of a discriminatory motive in its decisions regarding McQueen.  *See DiCola v. SwissRe Holding*, 996 F.2d 30, 32 (2d Cir. 1993).  Once UHG proffers a legitimate, non-discriminatory reason for its employment actions, "the presumption raised by the *prima facie* case is rebutted, and drops from the case," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993), and McQueen shoulders the ultimate burden of proving, through pretext or otherwise, that the real reasons for UHG's actions was discrimination.  *See id.*  Where, as here, UHG does more than merely articulate a plausible non-discriminatory reason for its employment actions, and actually "'substantiat[es] that reason by proving that it has a sound and factually supported basis, [McQueen's] task of showing that this reason was a pretext will be more difficult.'"  *Halbrook v. Reichhold Chems., Inc.*, 766 F. Supp. 1290, 1295 (S.D.N.Y. 1991), *aff'd*, 956 F.2d 1159 (2d Cir. 1992).  McQueen failed to establish intentional discrimination by a *preponderance* of the evidence.  *See* 411 U.S. at 802-03 (plaintiff must prove by a preponderance of the evidence that defendant's conduct was discriminatory); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 142 (2d Cir. 1993) (same).

experience; McGann oversaw complex self-funded plans for UHG, as opposed to Oxford's cookie-cutter products that McQueen handled; McQueen had experienced team leaders in place that could assist McGann in assuming McQueen's role (*i.e.*, McQueen's department could function without her) whereas McGann, a legacy UHG employee, was in a better position to navigate the complex UHG system as opposed to McQueen who worked on the Oxford platform, which was being phased out in the post-merger company-- a view shared by McGuire.  Op. at 6-7; Resp. Br. at 12-14.  The Arbitrator properly found that McGann and McQueen held redundant positions and this was unrebutted.  Thus, contrary to McQueen's claim, the Arbitrator specifically found that her position was "redundant."  Pet. at 11-12 (citing Op. at 4, 6-7).

Nevertheless, McQueen claims that Golden failed to follow Company procedures establishing "span of control" as the objective criteria for selecting individuals to layoff.  Pet. at 12, 20.  Golden, however, never received the "span of control" memo (which was not addressed to employees at his level) and, thus, could not have failed to follow Company procedures of which he was admittedly unaware.  Pet. at 12, 20; Cl. Mem. at 25; Tr. 854.  Golden's directive from Turpin was to simply eliminate duplicative positions, which he did.  Both Golden and Turpin testified to this fact, and their testimony was unrebutted.  Op. at 4.

McQueen further claims the Arbitrator made no findings about the "redundancy" of positions filled by "white men at McQueen's level."  Pet. at 11-12 (citing Op. at 4, 6-7). Notably, McQueen fails to identify the other "white men" who allegedly received more favorable treatment.  Nevertheless, the Arbitrator properly discounted any alleged redundancy as it relates to Marden, Darrel Farkus ("Farkus") or Tahany because they worked in sales, not in customer service like McQueen, and, as such, were not similarly situated to her.  Pet. at 12-13; Op. at 7-8; *see* Section D, below.  Even if the "span of control" memorandum applied to Golden, which it

did not, McQueen's span of control argument relating to the number of individuals supervised by

Marden, Farkus and Howard Margolies ("Margolies") misses the mark because McQueen

similarly had only three direct reports (the three team leaders reporting up to her).[12]  Moreover,

the number of direct reports was not the sole criterion for making lay off decisions.

Contrary to McQueen's claim, Golden had not decided to "fire her" a year earlier.  Pet. at

12 (citing Op. at 10).  Golden's email that McQueen likely would be gone by 2006, related not to

the fact that Golden had targeted her for termination, but to his belief that McQueen was

pursuing other opportunities outside his department or the Company, because of the uncertainty

associated with the merger and the possibility of reporting to someone other than Golden.  Op. at

10; Tr. 875-76.  Golden also believed that McQueen was not integrating well with UHG

employees post-merger.  Tr. 875-76.  Indeed, on or about October 5, 2005, McQueen applied for

the Vice President of Integration position -- a position outside of Golden's group.  Tr. 285-86.

There was no evidence that Golden had decided by March, 2005 to "fire McQueen."  Pet. at 12.

As the Arbitrator properly found, that email did not create an inference of discrimination where

Golden subsequently moved McQueen to the more prestigious Key Accounts position; discussed

her promotion to the Director position in December, 2005; and sent her an email indicating that

he would be speaking to HR about her promotion.  Golden's actions rebut any inference that he

did not support her promotion or that he was "setting her up."  Op. at 10.

---

[12] Although McQueen may attempt to minimize the importance of team leaders, suggesting that
they were merely "mentors" -- not supervisors -- in an attempt to create the false impression that
she had a high number of "direct reports," the testimony is clear that team leaders were *more
than simply "mentors."*  They were high-level supervisors who directed the work of other
account managers; prepared performance evaluations of the account managers; and considered
the move from account manager to team leader a promotion.  Tr. 354-55, 490, 493, 505-06, 511,
624, 892.  Team Leader Adler testified that she "manage[d]" a team of account managers and
made sure they were "performing their job responsibilities."  Tr. 493.  Coleman testified that she
reported to her team leader, Adler, that Adler prepared her evaluation and reviewed it with her
without McQueen present.  Tr. 1188, 1198.

### C.    The Arbitrator Properly Found That McQueen
Could Not Establish A Failure To Promote Claim

#### 1.    McQueen Did Not Satisfy Golden's Criteria For
Promoting Employees From 2001 Until 2005

While the Arbitrator found legitimate justification for the failure to promote McQueen in

the spring of 2003, Pet. at 17 (citing Op. at 6), McQueen erroneously contends the Arbitrator did

not find that the reason for failing to promote did not extend past that time, stating Golden failed

to articulate "any reason that McQueen was not promoted during periods the Arbitrator found

that she met the standards for promotion."  Pet. at 3-4, 10 (citing Op. at 6), 17, 18.  Contrary to

McQueen's claim, the Arbitrator never held that McQueen satisfied the standards for promotion

after the spring of 2003.  In fact, McQueen did *not* satisfy Golden's criteria for promoting

employees until 2005, at which time he recommended her for a promotion.

The factors Golden considered when making promotion decisions, which he shared with

McQueen, included assuming more responsibility; performing at a high level in a position for a

period of time; how the promotion would be perceived and supported by her team or other

people in the organization; continuing to expand responsibilities; and being seen as a resource

(*i.e.*, the "person to go to") to the team, to Account Executives, the brokerage community and

clients. Tr. 679-80.  Furthermore, Golden's practice was not to grant promotions immediately,

but to give employees "increased responsibilities" first and to promote only after the individual

had "proven" him or herself in the job over a period of approximately six months -- a practice

confirmed by Adler, a witness called by McQueen.  Op. at 6; Tr. 568, 569; *see also* Tr. 672.

As the Arbitrator found, Golden did not promote McQueen in the spring of 2003 because

he had received complaints about her management style and he did not view her as a "resource"

to her team or to clients, who generally turned to Adler, not McQueen for assistance.  Op. at 6; Tr. 680-81.  This reasoning is consistent with Golden's criteria.[13]

### 2.    Golden Recommends McQueen For A Promotion In 2005

In 2005, after McQueen became responsible for the Long Island office, Golden considered her for a promotion, though, consistent with his practice, waited several months to see how she performed in her new role.  Op. at 3; Tr. 568, 569, 672, 691-92.  Golden also had serious reservations about McQueen unrelated to either her sex or race; namely, that McQueen did not want to change her reporting relationship -- she wanted to continue reporting to Golden -- which would not have been possible following her promotion.  Nevertheless, Golden submitted McQueen's name for a promotion in December, 2005.  Op. at 3, 10; Tr. 843, 844.  It is undisputed that it was only after Golden had sent the email to McQueen notifying her that he was recommending her for a promotion, that he learned of Powerforward.[14]

---

[13] McQueen claims that because Marden, Tahany and Margolies were promoted ahead of her, she should have been promoted as well.  Pet. at 10-11.  As the Arbitrator aptly noted, these individuals who worked in Sales are not proper comparators.  Op. at 7-8; *see also* Section D, below.  Regardless, Golden promoted Marden and Tahany to the director position in March, 2003 because they satisfied his criteria for granting promotions.  Op. at 2; Tr. 671-74, 673 (Tahany had performed well with "good results" and had expanded responsibilities within the Company), 674, 1096 (Marden was performing well and had previously taken on additional responsibilities).  At the time, though, they did not receive any change in compensation.  Op. at 2; Tr. 672-74, 1004, 1095.  When he promoted Marden and Tahany, Golden explained to McQueen his reasons for promoting them and that he would be promoting her in the future, but not at that time.  Op. at 2; Tr. 676.

[14] The six month rule was not a hard and fast rule and the Court should not draw any negative inference because Golden made the recommendation to promote McQueen a little more than six months after she took over the Long Island office.  The role of the Court is not to second-guess UHG's legitimate business decisions.  *See Stone v. Bd. of Educ.,* No. 05-2480-cv, 2005 U.S. App. LEXIS 23703, at *5 (2d Cir. Nov. 2, 2005) (court "will not act as a super personnel department that second guesses employers' business judgments"); *Newsom-Lang v. Warren Int'l, Inc.,* No. 03-7372, 2003 U.S. App. LEXIS 22732, at *4 (2d Cir. Nov. 4, 2003) (same).  Golden did not promote McQueen in 2004 because not only did McQueen fail to satisfy his criteria for promotions, but there was significant uncertainty in the structure of the organization as a result of the acquisition by UHG of Oxford during that time period.  Tr. 193-95.

### D.    The Arbitrator Properly Found That McQueen's Alleged Comparators Were Not Similarly Situated To Her

The Arbitrator did not err by dismissing "evidence of the same decisionmaker's retaining white men subject to the same layoff standard as McQueen who had 'some overlap in functions' with her." Pet. at 4.[15] The Arbitrator properly found that Marden and Tahany (her alleged comparators) were not similarly situated to McQueen because they worked in different departments; performed vastly different duties; were compensated differently; and had different levels of experience prior to joining Oxford. Op. at 7-8; *see also* Resp. Br. at 22-26. The roles Marden and Tahany played as Sales Executives differed significantly from McQueen's role in Account Management -- a customer service based position.[16] Op. at 7-8. Marden and Tahany were responsible for selling insurance, developing new client relationships, managing a block of business, growing existing accounts and ensuring clients renewed their accounts with a focus on revenue and financial performance. Op. at 7-8; Tr. 665-66, 786-87. They dealt with the underlying financial transaction including negotiating rates and conducting financial analysis. Op. at 7-8; Tr. 620-22, 635-39, 784-86, 1008-10, 1060-62, 1067. McQueen, on the other hand,

---

[15] McQueen incorrectly claims that the Arbitrator suggested that "Federal law limits the <u>City</u> Law." Pet. at 16 (emphasis in original). The Arbitrator made no such suggestion. As the Arbitrator correctly noted, the analytical framework in analyzing federal, state and *city* discrimination statutes is the same. Op. at 5 n.1 (citing *Figueroa v. N.Y. City Health & Hosps.*, 500 F. Supp. 2d 224 (S.D.N.Y. 2007) (claims under City and State law follow the analytical framework under federal law); *Abdu-Brisson v. Delta Air Lines, Inc*., 239 F.3d 456 (2d Cir. 2001) (same); *Weinstock v. Columbia Univ*., 224 F.3d 33 (2d Cir. 2000) (same); *Mandell v. County of Suffolk*, 316 F.3d 368 (2d Cir. 2003) (Title VII and claims under the City code analyzed under the same framework)). McQueen fails to identify in her petition how the Arbitrator's decision failed to comport with applicable "City Law." Even if the City law claim has a lower threshold, which Defendant denies, McQueen still cannot prevail as the Arbitrator held her claims were not actionable claim under the City law either.

[16] McQueen has also pointed to the promotion of Howard Margolies, who previously reported to Tahany, as evidence that she should have been promoted as well. Margolies, like Marden and Tahany, however, performed sales functions and, thus, is not similarly situated to McQueen.

dealt with *existing* clients' customer service issues, and provided *support* for the sales function. Op. at 7-8; Tr. 40, 41, 50, 51, 786-87, 1251-52. Her function was after the sale. The account management function -- performed by McQueen's team -- dealt little with the financial aspects of the transactions, Tr. 639; rather it involved servicing the accounts Marden and Tahany sold. Op. at 7-8; Tr. 620-22, 1008, 1060-62, 1067, 1099-1100. The Arbitrator's certainly did not disregard applicable case law.[17]

While there may exist some overlap in duties in terms of management responsibilities, that alone does not make Marden and Tahany proper comparators. *See Bush*, 452 F. Supp. 2d at 410 (performance of some common tasks does not make jobs substantially equal); *Conigliaro v. Horace Mann Sch.*, No. 95-civ.-3555, 2000 U.S. Dist. LEXIS 556 (S.D.N.Y. Jan. 18, 2000). Indeed, there was a significant difference in the type of individuals managed by Marden, Tahany and McQueen. Account Executives, managed by Marden and Tahany, had significant sales experience and earned approximately $275,000 per year; McQueen's team members had little to no sales experience and earned approximately $50-$75,000 per year. Op. at 7-8; Tr. 786-87. Moreover, as discussed above, the teams supervised by Marden and Tahany, performed significantly different functions than the team managed by McQueen. Op. at 7-8. The cases cited by McQueen in support of her claim that "some overlap in function" makes Marden and

---

[17] *See Bush v. Fordham Univ.,* 452 F. Supp. 2d 394, 410 (S.D.N.Y. 2006) (not comparators even though they held same title and reported to same dean where responsibilities differed); *Roa v. Mineta*, No. 01-6216, 2002 U.S. App. LEXIS 22338 (2d Cir. Oct. 23, 2002) (comparators not similarly situated even though they worked in the same department and reported to the same supervisor because duties were different); *Shumway v. UPS*, 118 F.3d 60, 64 (2d Cir. 1997) (comparators must be "similarly situated in all material respects"); *Longmire v. Wyser-Pratte*, No. 05-civ.-6725, 2007 WL 2584662, at *13-*14 (S.D.N.Y. Sept. 6, 2007) (not similarly situated because duties differed); *Simpson v. Metro-North Commuter R.R.*, No. 04-civ.-2565, 2006 WL 2056366, at *7 (S.D.N.Y. July 20, 2006) (comparators must have similar work duties, education, seniority, and performance history).

Tahany similarly situated lack merit and are distinguishable.[18]  Thus, the Arbitrator properly held

that Golden's treatment of Marden and Tahany is not probative of McQueen's discrimination

claim because they are not similarly situated to her.[19]  Op. at 7-8.

       The Arbitrator found that McQueen's position was eliminated because "Golden was

directed to eliminate duplicative positions to reduce unnecessary layers of management . . . ."

Pet. at 19 (citing Op. at 4).  McQueen claims there was no finding and no evidence that "white

male managers" who worked for Golden were not subject to the same standard of examination of

"unnecessary layers" as McQueen's position.  Pet. at 19.  It was unnecessary for the Arbitrator to

determine whether the positions of the other "white male managers" was redundant (*i.e.*,

Marden, Farkus and Margolies) because they were not similarly situated to McQueen.  As the

Arbitrator correctly found, the Sales and Account Management departments are different.  They

are separately recognized departments within UHG, with different day-to-day management and

business functions.  Op. at 7-8.

       McQueen further argues that the Arbitrator should not have relied on Golden's testimony

that the positions held by these individuals "were not duplicative."  Pet. at 19-20.  McQueen,

however, presented no evidence even remotely suggesting that their positions, unlike her

---

[18] McQueen cites *Miller-El v. Dretke*, 545 U.S. 231 (2005), Pet. at 21, which involved an issue of discriminatory jury selection, not whether individual employees are similarly situated in the context of an employment discrimination case.  McQueen also cites *County of Washington v. Gunther*, 452 U.S. 161 (1981), finding guards to be similarly situated even though they worked at different facilities but performed the same duties.  Here, however, unlike the guards in *County of Washington*, McQueen and her alleged comparators did not perform the same duties.

[19] *See Anderson v. Anheuser-Busch, Inc*., No. 00-7089, 2000 U.S. App. LEXIS 23763, at *3-*4 (2d Cir. Sept. 19, 2000) (treatment of other employees not similarly situated found "not relevant" to plaintiff's claim); *Shannon v. Nicholson*, No. 05-civ.-3604, 2006 U.S. Dist. LEXIS 14253, at *6 (S.D.N.Y. Mar. 31, 2006) (same)

position, were duplicative.[20]  She simply failed to meet her burden of proof and the weight given

by the Arbitrator in crediting Golden's testimony is not a basis for vacating the award.  *See*

*Wedbush Morgan Secs.,* 320 F. Supp. 2d at 127-28 (Koeltl, J.).

> **E.    The Arbitrator Considered And Properly Rejected McQueen's
> Alleged "Evidence" Of Golden's Alleged Biased Comments**

McQueen claims "the Arbitrator dismissed extensive evidence of Golden's biased

comments and ignored the law establishing the relevance of such remarks."  Pet. at 4.  The

Arbitrator did not ignore the law, she simply did not afford those alleged comments the weight

McQueen wanted, which is not a basis for vacating the award.  *See Wedbush Morgan Secs.,* 320

F. Supp. 2d at 127-28 (Koeltl, J.).  In any event, the Arbitrator got it right.  McQueen sets forth a

plethora of allegedly discriminatory comments and acts, both directed toward her or that she

heard second hand.  Pet. at 5.  A close examination reveals only three race-based comments

allegedly made by Golden[21] and no comments about her gender.  The other alleged comments

were either not corroborated or not directed toward McQueen.  More importantly, perhaps, few,

if any, of the alleged comments were recorded in the voluminous notes McQueen maintained

daily or were contradicted by McQueen's own witnesses.  In the end, they are all untimely and of

---

[20] The Court should also disregard McQueen's contention that the Arbitrator failed to address
Farkus and Margolies, Pet. at 20, because McQueen did not even raise the possibility that Farkus
was a comparator before the Arbitrator.  Moreover, Farkus and Margolies, like Marden and
Tahany, worked in sales, not in sales support, like McQueen, and, as such, were not similarly
situated for the same reasons as Marden and Tahany.  Tr. 686-87, 1059.

[21] Golden denies making the three race-based comments (*i.e.*, you can't be 100 percent black;
blacks' don't do well in sales; and am I going to be the only white person at your wedding) and
McQueen failed to offer any corroborating evidence.  Tr. 352-53, 734-35, 737-39, 747.  The
Arbitrator addressed the alleged race-based comments and discounted them.  Specifically, the
Arbitrator discredited the March 2001 comment about Black men in sales.  Op. at 9.  Denying
the comment, Golden explained that he had expressed disappointment to McQueen that African
Americans were under-represented in the sales industry.  Tr. 737-38.  Furthermore, Golden
approved the hiring of Greg Maulpin (African American), Tr. 352-53, 738-39, and McQueen, not
Golden, commenced proceedings to terminate Maulpin's employment.  Op. at 9; Tr. 739.

little probative value and, thus, properly discredited by the Arbitrator. Similarly, the Arbitrator credited Julien's testimony that McQueen had not repeatedly complained to HR about Golden.[22] Op. at 9. The Court should give the Arbitrator due deference in crediting Julien because the Arbitrator observed the witnesses, assessed their credibility and appropriately weighed the credible evidence. The fact that McQueen is unhappy with the weight the Arbitrator gave her evidence is not a basis to upset such a well-reasoned award supported by UHG's substantial evidence.

Moreover, Golden recommended McQueen for both a retention bonus and a promotion to Director *after* these comments were alleged to have been made. Nonetheless, isolated remarks, like those alleged here, are insufficient to create an inference of discrimination, especially those made remote in time to McQueen's termination. Op. at 8-9.

Even if all of the allegedly biased comments raised in McQueen's petition were considered, McQueen admitted in her brief to the Arbitrator that all of the comments were made over a span of three years, between *2001 and April, 2005*, Cl. Mem. at 43. Notably, the overwhelming majority of the alleged "biased" comments were made between 2001 and 2003 -- three years before her termination -- with the last one in *April, 2005* -- about one year prior to her termination. Cl. Mem. at 43. None of the alleged comments occurred during the time when

---

[22] McQueen claimed she repeatedly complained to Julien about other allegedly 'biased' comments, but neither Julien's testimony nor McQueen's "contemporaneous" notes support her claim. McQueen relies extensively on hundreds of pages of "contemporaneous" notes she maintained while employed by UHG, yet fails to explain the absence of any record therein of the alleged "biased" comments of Golden. Tr. 432-35, 449-50. (The only "incident" that she recorded in her notes was related to a blow-job comment made to Adler by someone outside of UHG and outside of McQueen's presence. *See* Resp. Br. at 35.) McQueen's failure to either complain to Julien or to go over Julien's head to higher management, does not explain the absence of any personal notes of Golden's alleged comments, when she apparently wrote down every other matter of any significance. Indeed, her failure to complain about the alleged "comments" further raises doubt as to whether the alleged comments directed toward her were even made.

18

McQueen was eligible for a promotion in late 2005.  Given that the alleged race-based comments are remote in time to McQueen's termination, they are not probative and certainly do not create an inference that Golden discriminated against her based on her race.[23]

McQueen's allegations of sex-based comments directed at her by Golden similarly lack probative value because they were allegedly made, if at all, in 2001 and 2002[24] -- again remote in time to any alleged adverse employment actions.[25]  In any event, this case cannot be about gender because, as discussed above, Golden replaced McQueen with another woman – McGann

---

[23] *See Fears v. Heritage Ctrs.*, No. 02-cv-639S, 2004 WL 1824126, at *3 (W.D.N.Y. Aug. 15, 2004) (no weight given to remark made at least eight months prior to termination); *Georgy v. O'Neill*, No. 00-cv-0660(FB), 2002 WL 449723, at *6 (E.D.N.Y. Mar. 25, 2002) (six months); *see also Tripp v. Long Island Univ.*, 48 F. Supp. 2d 220, 225 (E.D.N.Y. 1999) (stray remarks without a nexus to the adverse actions do not create an inference of discrimination).

[24] McQueen incorrectly states in her brief that Golden continued making comments about her marital status and relationships in 2003.  Pet. at 5.  She specifically testified, however, that these comments were only made in 2001 and 2002, not 2003.  Tr. 147.  To the extent any of these alleged comments were made in 2003, they occurred before May, 2003 (the time she got engaged), as she admitted the comments were made prior to her engagement.  Tr. 147.

[25] McQueen relies heavily on hearsay evidence of alleged "biased" comments made by Golden to which the Arbitrator appropriately gave little weight particularly where the alleged hearsay evidence was not contained in McQueen's own "contemporaneous" notes and relates to conversations that were "overheard" by others.  *See Ramirez v. N.Y. City Health & Hosps., Corp*., No. 05-0906-CV, 2006 WL 156879, at *2 (2d Cir. Jan. 19, 2006) (plaintiff's hearsay proffers insufficient to establish pretext).  For example, McQueen fails to specify when Golden allegedly told her that Kevin Hill would not let him promote women but admitted he approved her retention bonus and told her he would make her a vice president.  Tr. 365.  McQueen also admitted that she did not record in her notes that she had reported the incident to HR about the "yes or no" comment.  Tr. 433-34.  Moreover, Jill Stewart ("Stewart") testified that McQueen told her that Golden had asked her, "yes or no," around the time that McQueen got engaged.  Tr. 421.  Stewart's unreliable hearsay testimony should be disregarded.  Assuming Stewart is correct on the timing, McQueen claims she got engaged in May, 2003 (Pet. at 6), thus McQueen allegedly reported this comment to Stewart on or about May, 2003; McQueen, however, testified Golden made this comment during the Christmas party in 2002 (months earlier than Stewart claims).  As further evidence of Stewart's unreliability as a witness, she also testified that McQueen told her she prepared her own performance evaluations and brought them to Golden for his signature, which he refused to sign.  Tr. 421-22.  McQueen, however, never testified about this.

– and, to the extent that McQueen claims she should have been given the Manager of Account

Management position, Golden awarded the position to Kimberly Santillo, also a woman.[26]

Even if true (Golden denied them all), the few sex or race-based comments allegedly

made by Golden amount to stray, offhand and isolated comments that do not give rise to an

actionable claim. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). This ensures

that Title VII does not become a code of civility for the workplace, censuring people for

behavior that is merely inappropriate. *See id*.[27] McQueen further claims the Arbitrator erred as

follows:

- McQueen claims that other than one comment that Golden made about hiring a "nice looking" applicant, the Arbitrator failed to make any "factual findings" about the evidence of other discriminatory comments and incidents. Pet. at 22. Contrary to McQueen's claim, the Arbitrator specifically considered the numerous allegedly "biased comments" made by Golden and considered and discredited much of the alleged "evidence" on various grounds. Op. at 8-10. The single alleged stray comment by Golden -- the only comment arguably attributable to Golden and of which McQueen actually complained -- cannot give rise to an inference of discrimination. Stray remarks are not evidence of discrimination particularly if they are not temporally linked to an adverse employment action.[28]

---

[26] McQueen references a golf outing sponsored by Golden. Pet. at 8. Golden held the golf outing in 2002 and 2003. Tr. 778; Cl. Ex. 122 (referring to golf outing in 2003). He did not invite women because he did not believe women played golf and also because he had rented a small house and did not feel it was appropriate for men and women from the office to sleep together at the overnight outing. Tr. 779. Golden, however, immediately stopped holding the golf outing when he received complaints about the outing. Tr. 780. While there may have been a picture on the bulletin board of an employee wearing a golf outfit at a golf event, as alleged by McQueen, Pet. at 8, there is no evidence that Golden ever saw the picture or whether he was aware that Liz Pandolfi played golf. Also, nowhere in the record does it state that Pandolfi was in "golf attire" or "holding a golf club" in the picture as stated in her Petition. Tr. 1361; Pet. at 8.

[27] McQueen alleges without any basis that Golden had a "decades-long history of overtly racist and sexist behavior and employment decisions." Pet. at 1. McQueen, however, only worked for UHG and Oxford for a total of six years.

[28] Significantly, UHG and Oxford had in place a clearly explained policy of what constitutes impermissible workplace conduct, as well as procedures for reporting harassment. McQueen was fully aware of these complaint procedures, inasmuch as she was responsible for the training on and enforcement of the policies during her time in Human Resources. Tr. 167, 446. The

- McQueen faults the Arbitrator for failing to determine whether comments actually occurred. Pet. at 24. The Arbitrator properly discounted these alleged comments because they "were not the type of comments that a reasonable person in Claimant's position would consider as degrading to [McQueen] based on her sex or race." Pet. at 25 (citing Op. at 9).[29]

- McQueen contends the Arbitrator failed to address other comments in evidence including Golden's statement that McQueen's replacement was a "good girl" in support of her claim that Golden was somehow motivated by a discriminatory motive. Pet. at 23. Contrary to McQueen's claim, the Arbitrator considered and held "[t]he source and nature of the comments cited, their remoteness in time and the context in which individual comments were made taken together fail to support a finding of pretext." Op. at 8. Furthermore, the "good girl" comment fails to support McQueen's position sufficient to raise an inference of discriminatory animus.[30]

- McQueen faults the Arbitrator for failing to consider comments that McQueen failed to complain to human resources or were "never the subject of formal complaints." Pet. at 26 (citing Op. at 8-10). The Arbitrator found these comments did not create an inference of discrimination as evidenced by McQueen's decision not to report these alleged

---

extent to which she failed to complain draws into serious doubt whether the allegedly inappropriate comments were made in the first instance. McQueen admits she did not complain to Julien's boss, Lee or anyone else above Lee in human resources, even though McQueen knew Lee and previously worked with her, further raising doubts as to McQueen's credibility. Tr. 450, 468. In fact, Julien testified that McQueen *never complained to her of discrimination or retaliation by Golden*. Tr. 923-24.

[29] For example, McQueen alleges that Golden made the comment that "Black men don't do well in sales comment." Pet. at 23. McQueen claims the Arbitrator failed to determine whether Golden actually made that statement. Pet. at 23 (citing Op. at 9). The Arbitrator specifically found, contrary to McQueen's claim, that Golden was commenting on the fact that there were few African-Americans in Sales, not about the "quality of their work." Op. at 9. The Arbitrator further noted that McQueen had documented the conversation with Golden but that her notes contained "no reference to any comment about Golden" relating to his comment about "Black men . . . in sales." It was McQueen, not Golden, that initiated the termination of the African-American male working under her supervision. Op. at 9. In light of this information, the Arbitrator concluded, as she did with McQueen's other allegedly discriminatory comments, that the remarks were insufficient to demonstrate any discriminatory intent. Op. at 8-9.

[30] McQueen's allegations of an alleged sex stereotype, Pet. at 23 n. 9 (*e.g.*, alleged comments about McQueen's romantic life, family, returning to work after marriage), fail to establish that Golden was motivated by a discriminatory animus toward women. The Arbitrator noted that when Golden apparently questioned McQueen about why she was not "married" or that her "standards were too high," she neither reported the comments to Human Resources or otherwise indicated to Golden that she considered them offensive – they were not. Op. at 8-9.

comments because even McQueen did not consider the comments offensive enough to justify complaining to HR.

McQueen's laundry list of alleged biased comments by Golden and others is nothing more than a series of unsubstantiated, self-serving allegations, which, in all but one instance, she failed to report to HR, are time barred or of little probative value. Golden denies them all. Tr. 453-54 (McQueen admitted Golden did not make any cat noises), 627-28, 734-47, 778-83. The Court should discount McQueen's alleged evidence for the following reasons:

- McQueen relies on a number of inappropriate comments allegedly made by Golden that have nothing to do with her race or sex. For example, she states that at one point, Golden asked McQueen whether she was going to get her fiancé to "beat him up" and allegedly asked her whether she was "rich" because she was holding her wedding at the same place where Tahany had held his reception. Pet. at 5-7. These comments are facially neutral and do not support McQueen's claims.[31]

- McQueen relies on alleged comments related to groups of individuals outside of her protected class (*e.g.*, alleged comments about Jews, Asians, Liz Socci's age). Pet. at 8-9. Courts have repeatedly refused to permit a plaintiff to assert discrimination claims based solely on conduct directed at a class to which she did not belong (here, Jews, Asians, older employees).[32] The Arbitrator properly refused to infer that an employer who comments on Jews, Asians and older employees is likely to discriminate against African American women. Op. at 9.[33]

---

[31] McQueen's claim that Golden "insisted" that McQueen dance with him mischaracterizes the record. Pet. at 6. McQueen simply testified, "[Golden] asked me to dance and I danced with him." Tr. 146.

[32] *See Leibovitz v. New York City Transit Auth*., 252 F.3d 179, 186 (2d Cir. 2001) (refusing to permit claimant to assert discrimination claims based solely on conduct directed toward other protected classes); *Hansberry v. Father Flanagan's Boys' Home*, No. CV-03-3006, 2004 WL 3152393, at *5 (E.D.N.Y. Nov. 28, 2004) (same); *see also Steinberg v. St. Regis/Sheraton Hotel*, 583 F. Supp. 421, 423 (S.D.N.Y. 1984) (same).

[33] The alleged comments about categories of individuals outside of McQueen's protected class, also should be disregarded as unreliable. For example, Julie Oberhand ("Oberhand") testified that Golden mocked the accent of Asian employees. On the first occasion, McQueen did not personally hear Golden "mock" the accent of Mr. Law. She testified that Golden's assistant came to her and said she heard Golden mock Law's Asian accent. This amounts to double hearsay. Tr. 163. Similarly, Stewart's hearsay testimony on the same allegation should be disregarded. Stewart testified that McQueen told Golden that mocking Asian accents "was inappropriate and she didn't like it" and in response, Golden said he was "just kidding." Tr. 423-

- McQueen refers to alleged comments that were directed at individuals other than her, that had nothing to do with her, or were made by individuals other than Golden. The Court should similarly disregard these allegedly biased comments that have no relation to McQueen, because they are irrelevant in establishing that *Golden* discriminated against *her*.[34] McQueen, for example, alleges that Golden engaged in an intimate discussion with Erica Torres at the 2002 Christmas party[35] and participated in a discussion about

---

24. McQueen, however, never testified that she told Golden that mocking Asian accents was inappropriate. Furthermore, McQueen never testified that Golden mocked the accent of African American employees despite Stewart's testimony to the contrary. Lisa Coleman testified that she never heard Golden make any racist or sexist comments nor did she hear him make fun of anyone's accent. Tr. 1199. Equally unreliable is McQueen's allegation that Golden commented about Jews living in Dix Hills. Contrary to McQueen's testimony, Adler testified that McQueen told her about the conversation McQueen had with Golden about Dix Hills, but in recounting that conversation, Adler made no mention about "Jews" living there. Tr. 532-33. Also unreliable is Oberhand's comment that she heard Golden refer to Jews living in Dix Hills. This constitutes inadmissible hearsay because she admitted she did not hear Golden make the comment about Jews. Tr. 389, 406. Moreover, Oberhand and McQueen gave conflicting testimony regarding Golden's alleged comment. McQueen testified that Golden made the comment to her *while she was in the office*; Oberhand, on the other hand, testified that McQueen told her that Golden had made the comment to her *while she was out of the office looking at houses*. *Compare* Tr. 154 (McQueen), *with* 389 (Oberhand). McQueen even admits she did not take any notes regarding this alleged comment made by Golden about Jews or reflecting that she complained to Julien. Tr. 435. To the extent Adler testified that she should not plan a meeting on a Jewish holiday, even if true, the inference to draw from Golden's comment is that he wanted to ensure people attended the meeting and that it did not conflict with any holidays. The comment certainly had nothing to do with any purported bias on the part of Golden. Furthermore, there is no evidence that McQueen was aware of the comment that they not schedule a meeting on a Jewish holiday. Tr. 537-38, 743; *see also* Tr. 531-32 (no allegation that McQueen was aware of Golden's comment about Emilia Estrella). Contrary to McQueen's claim, Marden never told McQueen that the "Drama Queen" bar of soap he brought to work was for her. Tr. 1138-39. Marden did not leave the bar of soap on McQueen's desk. Tr. 1138-39.

[34] *See Brown v. Coach Stores*, 163 F.3d 706, 713 (2d Cir. 1998) (dismissing hostile work environment claim where supervisor made racist comments, only one of which was directed at plaintiff); *Nelson v. Beechwood Org.*, No. 03-civ.-4441, 2006 WL 2067739, at *5 (S.D.N.Y. July 26, 2006) (comments directed at plaintiff's coworkers only minimally relevant); *Calire v. Taylor Staffing Servs.*, No. 02-cv-0166E, 2004 WL 625274, at *4 (W.D.N.Y. Feb. 17, 2004) (granting summary judgment where inappropriate and offensive remarks directed at other employees, not plaintiff); *Benette v. Cinemark U.S.A., Inc.*, 295 F. Supp. 2d 243, 248 (W.D.N.Y. 2003) (same); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 152-53 (2000) (testimony of allegedly discriminatory comments made by other, non-decision makers amounts to *inadmissible stray remarks*).

[35] Even if true, it was Torres, not Golden, who engaged in the allegedly inappropriate behavior as even Adler testified, it was Torres who propositioned Golden. Tr. 535. Adler's testimony is also

undergarments and thongs.  Pet. at 6, 9.  None of these comments, however, was directed toward McQueen and, as such, are not probative of establishing animus on the part of Golden.[36]

The Arbitrator clearly did not disregard the evidence or the law in determining that Golden had not exhibited any bias toward McQueen based on the evidence presented at hearing.

### F.    The Arbitrator Properly Rejected McQueen's Claim That Golden Retaliated Against Her

McQueen alleges Golden retaliated against her because he "refused to give [her] a job recommendation because she questioned him on his racism and asked if he fired her because she was black."  Pet. at 3.  Golden's alleged failure to "recommend her," even if true, was not unlawful.  Pet. at 4.  First, McQueen offered no evidence that Golden's alleged failure to provide her a recommendation caused or contributed to her failure to receive an offer of employment. *See, e.g., Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1042 (2d Cir. 1993) (claim of post-termination retaliation without merit where plaintiff offered no substantive evidence or proof that Sears in any way lied about her performance at Sears); *Thomas v. iStar Fin., Inc.*, 448 F. Supp. 2d 532, 536 (S.D.N.Y. 2006) (plaintiff's "bare assertion that he was unable to obtain employment after his termination at iStar is not sufficient to support an inference that iStar

---

unreliable despite her claim that she could "hear" Torres speaking because she admitted it was loud in the bar, there was music playing in the background, and Torres was not shouting at Golden.  Tr. 574-75.  Furthermore, to the extent Adler testified that Golden told McQueen she was wearing a "beautiful suit" and asked if he "paid her enough to afford a suit like that," McQueen did not corroborate this allegation.

[36] McQueen's claim about Marden and Tahany making catfight comments and noises is not supported by the record.  Pet. at 9.  Adler contradicted McQueen testifying that only Marc Herold, not Marden, Tahany or Golden, made "catfight noises."  Tr. 547-49; 1023, 1141-42 (Marden and Tahany deny making catfight noises).  Adler's account of the "catfight" noises, however, is still unreliable in that she testified she heard the noises coming from the area outside McQueen's office while she was inside McQueen's office.  Tr. 548-49.  As further evidence that Stewart's testimony is unreliable, Stewart testified that McQueen told her that Golden had given the powerpoint presentation depicting McGann and McQueen.  Tr. 424-45.  It is undisputed, even by McQueen, that Golden did not give the powerpoint presentation.  Tr. 430.

provided negative references to potential employers").  More importantly, McQueen did, in fact,

secure employment after her termination rebutting her retaliation claim.  Pet. at 13.  Furthermore,

to the extent McQueen contends Golden retaliated against her by not finding her another position

with UHG, Golden had no obligation to find a job for her in the Powerforward environment

where UHG was seeking to reduce costs Company-wide.

## CONCLUSION

For the foregoing reasons, McQueen's petition should be dismissed with prejudice, her

request to vacate the award should be denied, and the Court should grant UHC's request that the

Arbitrator's award be confirmed and judgment entered in accordance with her Opinion.[37]

Respectfully submitted,

UNITED HEALTHCARE SERVICES, INC.

By:  s/ Christopher Lowe
                One of Its Attorneys

Christopher Lowe (CL-0218) (clowe@seyfarth.com)
James R. Cho (JC-4678) (jcho@seyfarth.com)
Seyfarth Shaw LLP
620 Eighth Avenue, 32nd floor
New York, New York 10018
212-218 5500
212-218-5526 (fax)
Attorneys for Defendant
July 8, 2008

---

[37] As permitted by the FAA, Defendant respectfully requests that the Court confirm the
Arbitrator's award.  *See* 9 U.S.C. § 9.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 8, 2008, I electronically filed DEFENDANT'S RESPONSE TO PLAINTIFF'S PETITION TO VACATE ARBITRATION AWARD and APPENDIX OF MATERIALS IN SUPPORT OF DEFENDANT'S RESPONSE TO PLAINTIFF'S PETITION TO VACATE ARBITRATION AWARD with the Clerk of the District Court for the Southern District of New York using the CM/ECF system, which sent notification of such filings to the following:

> Debra L. Raskin (DR 5431)
> draskin@vladeck.com
> Maia Goodell  (MG 8905)
> mgoodell@vladeck.com
> Vladeck, Waldman, Elias & Engelhard, P.C.
> 1501 Broadway, Suite 800
> New York, NY 10036
> 212-403-7300
> 212-221-3172 (fax)
> Attorneys for Plaintiff

> s/ Christopher Lowe
> Christopher Lowe

NY1 26519294.5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
LISA MCQUEEN-STARLING,                        :    Civil Action No. 08-4885 (JGK/RLE)
                                              :    ECF Case
                                Plaintiff,    :
                                              :
                    v.                        :
                                              :
UNITEDHEALTH GROUP, INC. AND,                 :
OXFORD HEALTH PLANS                           :
                                              :
                                Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**APPENDIX OF MATERIALS IN SUPPORT OF DEFENDANT'S RESPONSE
TO PLAINTIFF'S PETITION TO VACATE ARBITRATION AWARD**


Christopher Lowe (CL-0218) (clowe@seyfarth.com)
James R. Cho (JC-4678) (jcho@seyfarth.com)
Seyfarth Shaw LLP
620 Eighth Avenue, 32nd floor
New York, New York 10018
212-218 5500
212-218-5526 (fax)
Attorneys for Defendant

July 8, 2008

# INDEX

**No.**  **Document**

1.  Declaration of James R. Cho

2.  Respondent's Post-Hearing Brief submitted to the Arbitrator on October 9, 2007

3.  Respondent's sur-reply submitted to the Arbitrator on November 5, 2007.

4.  Claimant's Exhibit 132

5.  *Anderson v. Anheuser-Busch, Inc.*, No. 00-7089, 2000 U.S. App. LEXIS 23763 (2d Cir. Sept. 19, 2000)

6.  *Calire v. Taylor Staffing Servs.*, No. 02-cv-0166E, 2004 WL 625274 (W.D.N.Y. Feb. 17, 2004)

7.  *Capgemini v. Sorensen*, No. 04 Civ. 7584, 2005 WL 1560482 (S.D.N.Y. July 1, 2005)

8.  *Conigliaro v. Horace Mann Sch.*, No. 95-civ.-3555, 2000 U.S. Dist. LEXIS 556 (S.D.N.Y. Jan. 18, 2000)

9.  *Fears v. Heritage Ctrs.*, No. 02-cv-639S, 2004 WL 1824126 (W.D.N.Y. Aug. 15, 2004)

10.  *Georgy v. O'Neill*, No. 00-cv-0660(FB), 2002 WL 449723 (E.D.N.Y. Mar. 25, 2002)

11.  *Hansberry v. Father Flanagan's Boys' Home*, No. CV-03-3006, 2004 WL 3152393 (E.D.N.Y. Nov. 28, 2004)

12.  *Longmire v. Wyser-Pratte*, No. 05-civ.-6725, 2007 WL 2584662 (S.D.N.Y. Sept. 6, 2007)

13.  *Nelson v. Beechwood Org.*, No. 03-civ.-4441, 2006 WL 2067739 (S.D.N.Y. July 26, 2006)

14.  *Newsom-Lang v. Warren Int'l, Inc.*, No. 03-7372, 2003 U.S. App. LEXIS 22732 (2d Cir. Nov. 4, 2003)

15.  *Ramirez v. N.Y. City Health & Hosps., Corp.*, No. 05-0906-CV, 2006 WL 156879 (2d Cir. Jan. 19, 2006)

16.  *Roa v. Mineta*, No. 01-6216, 2002 U.S. App. LEXIS 22338 (2d Cir. Oct. 23, 2002)

17.  *Shannon v. Nicholson*, No. 05-civ.-3604, 2006 U.S. Dist. LEXIS 14253 (S.D.N.Y. Mar. 31, 2006)

18.  *Simpson v. Metro-North Commuter R.R.*, No. 04-civ.-2565, 2006 WL 2056366 (S.D.N.Y. July 20, 2006)

19.    *Stone v. Bd. of Educ.*, No. 05-2480-cv, 2005 U.S. App. LEXIS 23703 (2d Cir. Nov. 2, 2005)

Dated: July 8, 2008
New York, New York

UNITED HEALTHCARE SERVICES, INC.

By:  s/ Christopher Lowe
One of Its Attorneys

Christopher Lowe (CL-0218) (clowe@seyfarth.com)
James R. Cho (JC-4678) (jcho@seyfarth.com)
Seyfarth Shaw LLP
620 Eighth Avenue, 32nd floor
New York, New York 10018
212-218 5500
212-218-5526 (fax)
Attorneys for Defendant

July 8, 2008

2

# EXHIBIT 1

Christopher Lowe (CL-0218)
James R. Cho (JC-4678)
Seyfarth Shaw LLP
620 Eighth Avenue, 32nd floor
New York, New York 10018
212-218-5500
Attorneys for Defendant

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
LISA MCQUEEN-STARLING,                    :    Civil Action No. 08-4885 (JGK/RLE)
                                          :    ECF Case
                            Plaintiff,    :
                                          :
            v.                            :
                                          :
UNITEDHEALTH GROUP, INC. AND,             :
OXFORD HEALTH PLANS                       :
                                          :
                            Defendant.    :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF JAMES R. CHO

I, James R. Cho, based on my personal knowledge and pursuant to 28 U.S.C. § 1746,

declare as follows:

1.      I am an attorney with the law firm of Seyfarth Shaw LLP, and serve as one of the

attorneys for the Defendant, United HealthCare Services, Inc.

2.      I make this declaration in support of Defendant's Response to Plaintiff's Petition

to Vacate Arbitration Award ("Response").

3.      Exhibits referenced in the Response that are not attached to the Affirmation of

Debra L. Raskin In Support of Petition to Vacate Arbitration Award are contained in the

Appendix of Materials in Support of Defendant's Response ("Appendix").

4.      Exhibit 2 is a true and correct copy of Respondent's Post-Hearing Brief submitted

to the Arbitrator on October 9, 2007.

5.      Exhibit 3 is a true and correct copy of Respondent's sur-reply submitted to the Arbitrator on November 5, 2007.

6.      Exhibit 4 is a true and correct copy of Claimant's Exhibit 132.

7.      Exhibits 5 through 19 are copies of materials reported only in electronic databases cited in support of Defendant's Response.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on July 8, 2008 in New York, New York.

s/  James R. Cho

James. R. Cho

2

# EXHIBIT 2

<u>AMERICAN ARBITRATION ASSOCIATION</u>

| | | |
|---|---|---|
| LISA MCQUEEN-STARLING, | : | |
| | : | |
| Claimant, | : | Arbitration No. 13 160 01224 06 |
| | : | |
| v. | : | |
| | : | |
| UNITEDHEALTH GROUP, INC. AND | : | |
| OXFORD HEALTH PLANS, | : | |
| | : | |
| Respondents. | : | |
| _____ | : | |

<u>**RESPONDENT'S POST-HEARING BRIEF**</u>

Christopher H. Lowe
James R. Cho
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018-1405
(212) 218-5500

Attorneys for Respondent

October 9, 2007

# TABLE OF CONTENTS

I.      Introduction ................................................................................................. 1

II.     McQueen's Claims ...................................................................................... 4

III.    Factual Overview ........................................................................................ 4

        A.      McQueen's Employment History with Oxford and UHG ..................... 4

        B.      Golden Promotes McQueen To The Position Of Manager of Account
                Management ....................................................................................... 5

        C.      Jeannie Rudell Intervenes In A Dispute Between McQueen and Paul Marden ..... 6

        D.      Investigation Into McQueen's Management Style ................................. 7

        E.      McQueen Receives A Retention Bonus .................................................. 8

        F.      Post-Merger Organizational Restructuring:  Kimberly Santillo Selected To
                Manage Small Group Accounts and McQueen Assigned To Key Accounts ......... 9

        G.      McQueen Assumes The Long Island Office in April, 2005 ................................ 10

        H.      Patti Avin Complains About McQueen on February 10, 2006 ............................ 10

        I.      Termination of McQueen's Employment ......................................................... 11

                1.      McGann Was More Qualified Than McQueen  For The Combined
                        Account Management Position ................................................................. 12

                2.      Golden Prepares A Memorandum And Competency Worksheet Relating
                        To the Elimination of McQueen's Position ............................................... 13

                3.      Termination Meeting ............................................................................... 14

IV.     Argument .................................................................................................... 15

        A.      McQueen's Unlawful Termination Claim ........................................................ 15

                1.      UHG Had A Legitimate, Non-Discriminatory Business  Reason For
                        Terminating McQueen's Employment ..................................................... 16

                2.      McQueen's Evidence That Golden Terminated  Her For Discriminatory
                        Reasons ................................................................................................. 17

        B.      McQueen's Failure To Promote Claim ............................................................ 19

1.    McQueen's Alleged Failure To Promote Claims Prior To April 13, 2003 Are Untimely .......................................................................... 19

2.    McQueen Did Not Satisfy Golden's Criteria For Promoting Employees From 2001 Until 2005 ............................................................... 20

3.    Golden Considers Promoting McQueen In 2005 ...................................... 21

4.    McQueen's Alleged Peers Are Not Comparable To Her .......................... 22

5.    Change In Title To Vice President Was To Conform To UHG's Model . 26

C.    McQueen's Allegations Of Inappropriate Conduct By Golden Fail To Raise An Inference Of Discrimination ..................................................... 27

    1.    Alleged Biased Comments Fail To Establish Animus On The Part Of Golden ............................................................................ 27

    2.    Serious Questions Remains As To Whether The Alleged Offensive Remarks Were Made In The First Place ................................ 33

D.    McQueen's Other Allegations Relating To Golden Fail To Create An Inference Of Discrimination ........................................................... 36

    1.    Golden Did Not Lay In Wait To Terminate McQueen Especially Where He Could Have Terminated Her During Prior Layoffs ........................... 36

    2.    Allegations Relating To Jill Hutton Are Irrelevant ................................ 37

    3.    McQueen Was Not The Only Employee Impacted By Powerforward ..... 39

    4.    Golden Never Wavered From His Testimony That He Consulted With Others Before Terminating McQueen's Employment ............................. 39

    5.    McQueen's Attempt To Establish That Her Selection For Termination Was A Bad Business Decision Fails .......................................... 40

    6.    Golden Had No Reason To Consider McQueen For Santillo's Position .. 40

    7.    McQueen Fails To Discredit Golden's Testimony ................................... 40

    8.    The "New Jersey Posting" Was Not A Posting For McQueen's Old Position .......................................................................... 41

    9.    The Arbitrator Should Draw No Inference By The Fact That Deb Lee Did Not Testify At The Hearing .................................................... 41

E.    UHG Did Not Retaliate Against McQueen ........................................ 42

V.      McQueen Not Entitled To The Damages She Seeks .......................................................... 43

        A.      McQueen Not Entitled To Front Pay Damages ..................................................... 43

        B.      McQueen Not Entitled To "Unvested" Stock Options ........................................ 45

        C.      McQueen Erroneously Calculates The Stock Options She Claims She Should
                Have Received Had She Been Promoted................................................................ 45

        D.      McQueen Not Entitled To The Same Compensation As Marden........................ 46

        E.      McQueen Not Entitled To An Award Of Punitive Damages .............................. 47

        F.      Assuming The Arbitrator Finds McQueen's Termination Lawful, Her Damages
                Are Limited As Of The Date Of Her Termination ............................................... 47

        G.      McQueen Cannot Establish She Is Entitled To Emotional Distress Damages ..... 48

CONCLUSION................................................................................................................................ 50

## TABLE OF AUTHORITIES

*Abramson v. American University,*
    No. 86-1413, 1988 WL 152020 (D.C.C. June 13, 1988)....................................................28

*Ahmad v. Nassau Health Care Corp.,*
    234 F. Supp. 2d 185 (E.D.N.Y. 2002) ...........................................................................18

*Anderson v. Anheuser-Busch, Inc.,*
    No. 00-7089, 2000 U.S. App. LEXIS 23763 (2d Cir. Sept. 19, 2000) .............................27

*Annis v. Cty. of Westchester,*
    136 F.3d 239 (2d Cir. 1998)...........................................................................................48

*Bagdasarian v. O'Neill,*
    No. 00-cv-0258E(SC), 2002 WL 1628722 (W.D.N.Y. July 17, 2002) ............................31

*Barbour v. Merrill,*
    48 F.3d 1270 (D.C. Cir. 1995) .......................................................................................45

*Benette v. Cinemark U.S.A., Inc.,*
    295 F. Supp. 2d 243 (W.D.N.Y. 2003) ..........................................................................30

*Borja-Fierro v. Girozentrale Vienna Bank,*
    No. 91-Civ.-8743(CMM), 1994 WL 240360 (S.D.N.Y. May 27, 1994)..........................49

*Brady v. Wal-Mart Stores, Inc.,*
    No. CV 03-3843(JO), 2005 U.S. Dist. LEXIS 12151 (E.D.N.Y. June 21, 2005) ............44

*Breeding v. Cendant Corp.,*
    No. 01 Civ. 11563 (GEL), 2003 U.S. Dist. LEXIS 6558 (S.D.N.Y. Apr. 17, 2003).........36

*Brown v. Coach Stores,*
    163 F.3d 706 (2d Cir. 1998)...........................................................................................30

*Brown v. Soc'y for Seaman's Children,*
    194 F. Supp. 2d 182 (E.D.N.Y. 2002) ...........................................................................33

*Bush v. Fordham Univ.,*
    452 F. Supp. 2d 394 (S.D.N.Y. 2006)......................................................................22, 24

*Calire v. Taylor Staffing Serv.,*
    No. 02-cv-0166E(SR), 2004 WL 625274 (W.D.N.Y. Feb. 17, 2004)..............................30

*Campbell v. Daytop Vill. Inc.,*
    No. 97-Civ.-4362 (JSM), 1999 U.S. Dist. LEXIS 6943 (S.D.N.Y. May 7, 1999) ...........32

*Carter v. New York*,
    310 F. Supp. 2d 468 (N.D.N.Y. 2004)................................................................43

*Chetal v. BLS Funding Corp.*,
    No. 05-CV-3014 (DRH)(ARL), 2007 U.S. Dist. LEXIS 52058
    (E.D.N.Y. July 18, 2007)...............................................................................13

*Clark v. New York State Elec. & Gas Corp.*,
    67 F. Supp. 2d 63 (N.D.N.Y. 1999)................................................................19

*Clarke v. One Source, Inc.*,
    No. 99-CIV.-2323(RPP), 2002 U.S. Dist. LEXIS 21195 (S.D.N.Y. Nov. 1, 2002).........47

*Conigliaro v. Horace Mann Sch.*,
    No. 95-civ.-3555(CSH), 2000 U.S. Dist. LEXIS 556 (S.D.N.Y. Jan. 18, 2000)..............24

*Cooper v. Morgenthau*,
    No. 99 CIV. 11946 (WHP), 2001 WL 868003 (S.D.N.Y. July 31, 2001).......................18

*Crawford-Mulley v. Corning Inc.*,
    194 F. Supp. 2d 212 (W.D.N.Y. 2002)...........................................................31

*David v. Children's Vill.*,
    No. 04-2550-cv, 2005 U.S. App. LEXIS 9435 (2d. Cir. May 23, 2005)..........................13

*DiCola v. SwissRe Holding*,
    996 F.2d 30 (2d Cir. 1993)..............................................................................16

*Donaldson v. Merrill Lynch & Co.*,
    794 F. Supp. 498 (S.D.N.Y. 1992)................................................................15

*Ekwegbalu v. Central Parking Sys.*,
    No. 97-civ.-9477(MGC), 2000 WL 1371335 (S.D.N.Y. Sept. 22, 2000) ........................31

*Faragher v. City of Boca Raton*,
    524 U.S. 775 (1998)......................................................................................33

*Fears v. Heritage Centers*,
    No. 02-cv-639S, 2004 WL 1824126 (W.D.N.Y. Aug. 15, 2004).....................................31

*Feingold v. New York*,
    366 F.3d 138 (2d Cir. 2004).........................................................................18

*Figueroa v. New York Health & Hospitals Corp.*,
    500 F. Supp. 2d 224 (S.D.N.Y. 2007)...........................................................18

*Finnerty v. William H. Sadlier, Inc.*,
No. 05-4494-cv, 2006 U.S. App. LEXIS 8620 (2d Cir. Apr. 7, 2006)..............................36

*Fitzgerald v. Stanley Roberts, Inc.*,
186 N.J. 286 (2006) .................................................................................................38

*Georgy v. O'Neill*,
No. 00-cv-0660(FB), 2002 WL 449723 (E.D.N.Y. Mar. 25, 2002) ................................31

*Greenbaum v. Svenska Handelsbanken*,
979 F. Supp. 973 (S.D.N.Y. 1997)...............................................................................44

*Halbrook v. Reichhold Chems., Inc.*,
766 F. Supp. 1290 (S.D.N.Y. 1991)..............................................................................16

*Hansberry v. Father Flanagan's Boys' Home*,
No. CV-03-3006(CPS), 2004 WL 3152393 (E.D.N.Y. Nov. 28, 2004)...........................28

*Haskell v. Kaman Corp.*,
743 F.2d 113 (2d Cir. 1984).........................................................................................38

*Hatter v. New York City Hous. Auth.*,
No. 97-CIV.-9351, 1998 U.S. App. LEXIS 27571 (2d Cir. Oct. 22, 1998) .....................47

*Hill v. Airborne Freight Corp.*,
No. 97-CV-7098 & 98-CV-6249(FB), 2003 U.S. Dist. LEXIS 2379
(E.D.N.Y. Feb. 20, 2003)............................................................................................44

*Hine v. Mineta*,
238 F. Supp. 2d 497 (E.D.N.Y. 2003) ..........................................................................44

*Hite v. Biomet, Inc.*,
53 F. Supp. 2d 1013 (N.D. Ind. 1999) ..........................................................................48

*Hollander v. American Cyanamid Co.*,
895 F.2d 80 (2d Cir. 1990)...........................................................................................43

*Holt v. KMI-Continental, Inc.*,
95 F.3d 123 (2d Cir. 1996)...........................................................................................43

*Hong v. Children's Mem. Hosp.*,
993 F.2d 1257 (7th Cir. 1993) .....................................................................................38

*Hueston v. City of New York*,
No.-00 Civ.-9512 (RCC), 2005 U.S. Dist. LEXIS 253 (S.D.N.Y. Jan. 7, 2005) ..............18

*Johnson v. Cty. of Nassau*,
    480 F. Supp. 2d 581 (E.D.N.Y. 2007) ............................................................13

*Jowers v. DME Interactive Holdings, Inc.*,
    No. 00-Civ.-4753 (LTS)(KNF), 2006 WL 1408671 (S.D.N.Y. May 22, 2006)...............49

*Kaplan v. Multimedia Entm't, Inc.*,
    No. 02-cv-00447C(F), 2005 U.S. Dist. LEXIS 40351 (W.D.N.Y. Oct. 27, 2005)...........19

*Kemp v. Metro-North R.R.*,
    No. 04-civ.-9926(RWS), 2007 WL 1741256 (S.D.N.Y. June 14, 2007)..........................43

*Kidder, Peabody & Co. v. IAG Int'l Acceptance Group, N.V.*,
    No. 94-Civ.-4725(CSH), 1999 U.S. Dist. LEXIS 132 (S.D.N.Y. Jan. 12, 1999).............38

*Kodengada v. IBM*,
    242 F.3d 366 (2d Cir. 2000)...........................................................................43

*Kolstad v. American Dental Ass'n*,
    527 U.S. 526 (1999)....................................................................................47

*LaScala v. Scrufari*,
    330 F. Supp. 2d 236 (W.D.N.Y. 2004) ..........................................................42

*Lapham v. Vanguard Cellular Sys., Inc.*,
    102 F. Supp. 2d 266 (M.D. Pa. 2000) ...........................................................48

*Ledbetter v. Goodyear Tire & Rubber Co.*,
    127 S. Ct. 2162 (2007)................................................................................19

*Leibovitz v. New York City Transit Auth.*,
    252 F.3d 179 (2d Cir. 2001).........................................................................28

*Leopold v. Baccarat, Inc.*,
    239 F.3d 243 (2d Cir. 2001).........................................................................36

*Levy v. Powell*,
    No. CV-00-4499 (SJF), 2005 U.S. Dist. LEXIS 42180 (E.D.N.Y. July 7, 2005) ............46

*Lizardo v. Denny's, Inc.*,
    270 F.3d 94 (2d Cir. 2001)...........................................................................42

*Longmire v. Wyser-Pratte*,
    No. 05-civ.-6725(SHS), 2007 WL 2584662 (S.D.N.Y. Sept. 6, 2007) ...........................22

*Malarkey v. Texaco, Inc.*,
    983 F.2d 1204 (2d Cir. 1993).................................................................19

*Manhattan & Bronx Surf. Trans. Operating Auth. v. New York State Exec. Dep't*,
    194 A.D.2d 610, 632 N.Y.S.2d 642 (2d Dep't 1995).........................................49

*Martin v. Reno*,
    No. 96-civ.-7646(NRB), 2000 U.S. Dist. LEXIS 18278 (S.D.N.Y. Dec. 18, 2000) .........38

*Matya v. United Ref. Co.*,
    480 F. Supp. 2d 678 (W.D.N.Y. 2007) ......................................................42

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)........................................................................42

*McGrory v. City of New York*,
    No. 99-civ.-4062(FM), 2004 WL 2290898 (S.D.N.Y. Oct. 8, 2004) ..........................49

*Meacham v. Knolls Atomic Power Lab.*,
    461 F.3d 134 (2d Cir. 2006)...............................................................40

*Mendoza v. SSC&B Lintas*,
    No. 96-7327, 1997 U.S. App. LEXIS 27259 (2d Cir. Oct. 3, 1997) .........................42

*Muse v. New York City Dep't of Hous. Preservation & Dev.*,
    No. 96-cv-6221(FB)(ASC), 2000 WL 1209427 (E.D.N.Y. Aug. 22, 2000) .....................31

*Nelson v. Beechwood Org.*,
    No. 03-civ.4441(GEL), 2006 WL 2067739 (S.D.N.Y. July 26, 2006).........................30

*Newsom-Lang v. Warren Int'l, Inc.*,
    No. 03-7372, 2003 U.S. App. LEXIS 22732 (2d Cir. Nov. 4, 2003) ........................40

*Orisek v. American Inst. of Aero. & Astronautics*,
    938 F. Supp. 185 (S.D.N.Y. 1996)..........................................................32

*Patrick v. New York City Trans. Auth.*,
    No. 03-cv-0584(JFB)(LB), 2007 WL 2071555 (E.D.N.Y. July 16, 2007) .....................43

*Patterson v. CBS, Inc.*,
    No. 94-civ.-2562(KTD), 2000 WL 666337 (S.D.N.Y. May 22, 2000) .........................32

*Payton v. City Univ. of N.Y.*,
    453 F. Supp. 2d 775 (S.D.N.Y. 2006)......................................................42

*Petrovits v. New York City Trans. Auth.*,
    No. 95-civ.-9872(DFE), 2003 WL 22349676 (S.D.N.Y. Oct. 15, 2003) ........................49

*Quality Care v. Rosa*,
    599 N.Y.S.2d 65 (2d Dep't 1993) ....................................................................49

*Rainone v. Potter*,
    388 F. Supp. 2d 120 (E.D.N.Y. 2005) ..............................................................49

*Ramirez v. New York City Health & Hosp. Corp.*,
    No. 05-0906-CV, 2006 WL 156879 (2d Cir. 2006) ...........................................32

*Rauh v. Coyne*,
    744 F. Supp. 1181 (D.D.C. 1990) ....................................................................29

*Reed v. A.W. Lawrence & Co.*,
    95 F.3d 1170 (2d Cir. 1996).............................................................................44

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    120 S. Ct. 2097 (2000)....................................................................................30

*Reiter v. Metropolitan Transp. Auth. of New York*,
    No. 01-C 2003 WL 22271223 (S.D.N.Y. Sept. 30, 2003)..................................49

*Roa v. Mineta*,
    No. 01-6216, 2002 U.S. App. LEXIS 22338 (2d Cir. Oct. 23, 2002) ..............22

*Sagendorf-Teal v. County of Rensselaer*,
    100 F.3d 270 (2d Cir. 1996)....................................................................41, 42, 43

*Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*,
    183 F.3d 155 (2d Cir. 1999).............................................................................32

*Saulpaugh v. Monroe Community Hosp.*,
    4 F.3d 134 (2d Cir. 1993) ...............................................................................16

*Shannon v. Nicholson*,
    No. 05-civ.-3604(DLC), 2006 U.S. Dist. LEXIS 14253 (S.D.N.Y. Mar. 31, 2006) .........27

*Shumway v. UPS, Inc.*,
    118 F.3d 60 (2d Cir. 1997).............................................................................22

*Simpson v. Metro-North Commuter R.R.*,
    No. 04-civ.-2565(PAC), 2006 WL 2056366 (S.D.N.Y. July 20, 2006) ............22

ix

*Smith v. Monsanto Co.*,
    9 F. Supp. 2d 1113 (E.D. Mo. 1998)................................................................45

*St. Mary's Honor Ctr. v. Hicks*,
    509 U.S. 502 (1993)..........................................................................................16

*Staff v. Pall Corp.*,
    233 F. Supp. 2d 516 (S.D.N.Y. 2002)..............................................................42

*Steinberg v. St. Regis Sheraton Hotel*,
    583 F. Supp. 421 (S.D.N.Y. 1984) ..................................................................29

*Stone v. Bd. of Educ.*,
    No. 05-2480-cv, 2005 U.S. App. LEXIS 23703 (2d. Cir. Nov. 2, 2005) ..........40

*Texas Dep't of Cmty. Affairs v. Burdine*,
    450 U.S. 248 (1981)..........................................................................................16

*Thomas v. Istar Fin., Inc.*,
    No. 05 Civ. 606 (VM), 2007 U.S. Dist. LEXIS 67856 (S.D.N.Y. Sept. 7, 2007)............44

*Tomassi v. Insignia Financial Group, Inc.*,
    478 F.3d 111 (2d Cir. 2007)..............................................................................18

*Tomka v. Seiler Corp.*,
    66 F.3d 1295 (2d Cir. 1995)..............................................................................42

*Tripp v. Long Island Univ.*,
    48 F. Supp. 2d 220 (E.D.N.Y. 1999) ...............................................................32

*Whidbee v. Garzarelli Food Specialties, Inc.*,
    223 F.3d 62 (2d Cir. 2000)................................................................................28

*Zubulake v. UBS Warburg LLC*,
    382 F. Supp. 2d 536 (S.D.N.Y. 2005)..............................................................28

This firm represents UnitedHealth Group ("UHG") in the above-referenced arbitration and respectfully submits this Post-Hearing Brief.

## I.    Introduction[1]

William Golden ("Golden") first joined Oxford Health Plans ("Oxford") in November 1997, holding various leadership positions in the Company's New York region.[2]  Throughout his tenure, Golden made employment decisions without regard to race or sex, hiring and promoting numerous women and minorities and awarding them substantial pay increases and bonuses in the process.  Tr. 414, 435-36, 568-69, 624, 625, 698, 1188-89, 1198-99.[3]  McQueen was no exception.

Golden hired McQueen not once, but twice; first as a Human Resources ("HR") Manager and later as his Manager of Account Management.  Golden hired McQueen over male, Caucasian candidates, notwithstanding her total lack of training and experience with insurance products and customer service -- McQueen having worked all of her professional career in HR.  McQueen's considerable HR experience failed her, however, because she never reported to HR any of Golden's alleged transgressions, but for one -- and on that occasion UHG took prompt corrective action.  Even more curious is the fact that McQueen took hundreds of pages of notes recording every workplace event of significance, yet at the hearing, she failed to point to any notation of Golden's allegedly offensive conduct.  Indeed, this dearth of evidence only confirms Golden's testimony that he did not engage in any unlawful conduct.

---

[1] References to the hearing transcript, Claimant's Post-Hearing Memorandum, Claimant's Exhibits, Respondent's Exhibits, and the Amended Statement of Claim appear as "Tr.__[page]," "Mem. at __[page]," "Cl. Ex.__," "Resp. Ex.__" and "Am. Claim at ¶ __," respectively.  Unpublished cases cited herein are contained in the "Appendix of Unpublished Cases Cited in Support of Respondent's Post-Hearing Brief."

[2] Golden currently holds the position of CEO of the New York health plan.  Tr. 602.

[3] As further evidence that Golden did not hold any bias toward women, when Account Manager Team Leader Lori Adler ("Adler") asked him permission to use a private office, he granted her request, as well as her request to work a flexible work schedule.  Tr. 580-81.

Golden annually awarded McQueen salary increases and bonuses, going so far as to recommend her for one of only a handful of retention bonuses granted when UHG acquired Oxford in 2004. Tr. 185, 630. Golden made no such recommendation for the Caucasian, males (*i.e.*, Paul Marden ("Marden") or Sean Tahany ("Tahany")) who McQueen now identifies as her purported comparators. Tr. 630. Tellingly, Golden's recommendation of McQueen occurred at the time he is alleged to have made comments about McQueen's sex and race which undermines her contention that Golden was motivated by discriminatory animus and was laying in wait for the first opportunity to terminate her employment.

Belying McQueen's allegation that Golden unlawfully passed her over for promotions, is considerable evidence that Golden not only articulated his criteria for promotion and applied them to all of his reports, but also that McQueen never qualified for a promotion until 2005. And, when she actually did qualify, *Golden* having assigned her additional responsibility for the Long Island Account Management functions, put in writing to HR a request for McQueen's elevation to Director. Cl. Ex. 132. Consistent with the practice he applied to Tahany, Marden and Adler (two Caucasian males and a Caucasian female), Golden requested McQueen's promotion approximately six-months after she satisfied his criteria and had proven herself capable of handling the additional responsibility. Indeed, McQueen would have received that promotion but for a Company-wide, expense-reduction initiative -- Powerforward.

As part of the post-merger integration, Golden received in early 2006 a directive from his boss Michael Turpin ("Turpin"), UHG's CEO for the Northeast Region, to reduce expenses and eliminate duplicative positions. Although Golden initially resisted, insisting that he had already made sufficient cuts, Turpin held firm, ordering Golden to "look deep" and do his part in this Company-wide initiative.

2

Golden identified the only duplicative position in his department, Manager of Account Management -- this fact is undisputed -- and, after careful consideration and consultation with his peer, Michael McGuire ("McGuire"), selected Jean McGann ("McGann") -- a *woman* -- to assume McQueen's responsibilities.  With more than 20 years of relevant industry experience in sales and service of health insurance products to large, sophisticated clients, McGann was the obvious choice.  McQueen, in contrast, had been a Human Resources professional until February, 2001 and never supported a business unit as complex as McGann's.  Neither McQueen's race nor sex had any bearing on Golden's decision and McQueen's contention to the contrary simply ignores the evidence that Golden favored her throughout her career, and it erroneously assumes that after five years, as if flipping a switch, Golden became motivated by racist and sexist animus.  McQueen's alternative theory that Golden's motives changed over time such that he retaliated against her for lodging complaints about him is similarly unsupported by the record.  McQueen did not offer a scintilla of evidence that Golden became aware of her complaints, even accepting that she made them (which she did not).  Indeed, McQueen's testimony that her purported complaints to Audrey Julien fell on deaf ears, and that Julien took no action, only confirms that Golden was unaware of her complaints and could not therefore have retaliated against her.

McQueen's baseless allegations also fly in the face of Golden's record of having hired, promoted and accommodated numerous women and minorities; most notably, McQueen and McGann, as well as his decisions to terminate the employment of Caucasians and men in other reductions in force.  In view of this overwhelming evidence, McQueen has failed to prove by a preponderance of the evidence race or sex discrimination and, it cannot be inferred from these facts that Golden harbored any discriminatory animus whatsoever.  Indeed, McQueen's own

3

admissions in this case vitiate any gender bias.  For example, McQueen cites as evidence of

gender animus Golden's decision to select Kimberly Santillo as Manager Small Business

Accounts and McGann for the position of Manager of Account Management.  Both are *women*.

As to her race claim, McQueen relies almost exclusively on a few of stray remarks she attributes

to Golden without substantiation and which Golden vehemently denies.  Even if accepted, these

comments are of little probative value having been allegedly uttered nearly *three* years prior to

her termination.  In the end, none of the comments McQueen attributes to Golden, whether based

on race, gender or otherwise occurred within a *year* of McQueen's termination -- even by her

own estimation.  Lastly, McQueen simply cannot ignore the fact that Golden both hired her and

fired her.

## II.     McQueen's Claims

McQueen initially filed a "Demand for Arbitration" on April 13, 2006 and an "Amended

Statement of Claim" on June 7, 2006.  McQueen alleges UHG discriminated against her based

on her race (African American) and sex in violation of 42 U.S.C. § 1981, New York Executive

Law § 290 *et seq.* ("Human Rights Law"), and the Administrative Code of the City of New York

§ 8-101 *et seq.* (the "City Law"); and that UHG retaliated against her for allegedly opposing

discriminatory employment practices in violation of the Human Rights Law and the City Law.[4]

## III.    Factual Overview

### A.     McQueen's Employment History with Oxford and UHG

McQueen was hired on June 19, 2000 by Golden,[5] among others, as a Human Resources

Manager II,[6] reporting to Deborah Lee ("Lee"), Director of Human Resources.  Tr. 26, 34, 35.

---

[4] McQueen has clarified that she is not alleging a sexual harassment or hostile work environment claim.
[5] McQueen initially interviewed with Golden for the HR position.  Tr. 39, 355-56.
[6] McQueen's offer letter states she was hired as an "HR manager," but when she started work, she was given the higher position of HR Manager II.  Tr. 446-48.

McQueen performed Human Resources functions for New York supporting Golden's sales group.  Tr. 36, 37, 40, 603.

### B. Golden Promotes McQueen To The Position Of Manager of Account Management

In February, 2001, Golden, who, at the time, was Vice President of Sales for the New York office, hired McQueen as his Manager of Account Management.[7]  Tr. 37, 49, 51, 356, 357. Golden rejected two male Caucasian candidates and one female Caucasian applicant in favor of McQueen.  Tr. 613-14.  At the time, McQueen had no prior Account Management experience; no prior experience with customer service; no background in finance or underwriting; and no college degree.  Tr. 357-59, 609-12.[8]  McQueen managed three team leaders, who in turn managed a group of approximately 20-25 Account Managers responsible for providing customer service.  Tr. 65, 66, 79, 80, 87, 618-19.  The team leaders handled the "day to day" activities of account managers.  Tr. 79.  Account Managers were responsible for servicing and educating existing clients, offering Q&A sessions, and discussing different policies and procedures that affect the servicing of accounts.  Tr. 40, 41, 50, 51, 618-19, 635.

McQueen, her team leaders and Account Managers also supported the Sales Executives during sales pitches, informing prospective clients about their customer service functions and attending "finalist meetings."  Tr. 89 (*e.g.,* McQueen testified that at finalist meetings, she would "present to [prospective clients] the Oxford account management structure"); 618-19.  The role

---

[7] McQueen incorrectly stated in her Amended Complaint that she was hired as a "director."
[8] In her brief, McQueen states she "relied" on "promises" made by Golden in deciding to accept the Manager of Account Management position and that Golden testified that "McQueen deliberated before taking the job" citing Golden's hearing testimony (Tr. 609).  Mem. at 4.  The cited reference does not support McQueen's claim.  McQueen, citing her own testimony (Tr. 53) further claims that Kevin Hill ("Hill") assured her that account management "would provide opportunities for promotion that were not present in human resources."  Mem. at 4.  Contrary to the cited reference, McQueen did not testify that account management would provide opportunities for promotion or that there were no promotion opportunities in human resources.  Tr. 53.

of Account Managers at finalist meetings, according to McQueen, was to "explain in detail the *services* that Oxford was presenting and providing and to really go over what the next steps were after they came onto Oxford."  Tr. 90 (emphasis added).  Golden did not consider the participation of account managers at finalist meetings "selling" in the traditional sense.  Tr. 822, *see also* Tr. 1114-19.  It was the role of the account management to ensure customer service issues were addressed, after the sale had been consummated.  Tr. 620.

Three to four months after McQueen assumed the account management position in 2001, she also began supervising the sales administrative support staff or Sales Assistants.  Tr. 76, 77, 78.  When Golden promoted McQueen, he approved her salary increase from $80,000 to $90,000.  Tr. 614-16, 625.  He approved subsequent pay increases for her in 2002 (to $105,000), and in 2003 (to $115,000) and all subsequent annual pay increases.  Tr. 130-32, 364-65, 625, 829, 830.  In 2003, 2004 and 2005, McQueen also received bonuses and "performance-based options," which Golden recommended.  Tr. 176, 625, 826-27.

### C.    Jeannie Rudell Intervenes In A Dispute Between McQueen and Paul Marden

During McQueen's tenure, she had difficulty with one of her co-workers, Marden, currently Vice President of Sales and Account Management.  Tr. 115-17.  McQueen and Marden frequently disagreed about the way in which they interacted and Golden advised them both that they needed to learn how to get along and work together.  Tr. 115-17, 639-40.  Nonetheless, the tension between Marden and McQueen escalated to the point where then-Vice President of Human Resources Jeannie Rudell ("Rudell") intervened in about July, 2002.  Tr. 115-17; 640-41.  At bottom, Rudell simply advised them that they needed to work better together.  Tr. 641.  McQueen never voiced concerns of discrimination in connection with this incident.  *See, e.g.,* Tr. 115-17, 369.  McQueen's difficulties with Marden demonstrated to Golden that she was not working performing at a high level.

**D.    Investigation Into McQueen's Management Style**

In or about April, 2003, members of McQueen's staff complained to Golden about her management style and asked to meet with him privately.[9]  Tr. 646, 648.  Approximately 15-20 of McQueen's Account Managers attended the meeting, claiming that McQueen was heavy handed and demeaning, rather than constructive.  Tr. 649, 650-53, 657, 1191-92.  For example, Joanne Santini told Golden that McQueen had said "uncomfortable things" about either her "dress" or "jewelry."  Tr. 650-51.  Coleman complained about being "watched like a hawk," not having any "flexibility," "negative" comments made by McQueen, lack of communication, direction and leadership from McQueen and retaliation from McQueen for complaining.  Tr. 651, 1190, 1195, 1197.  Account Managers Lisa Greenberg and Ali Lupiano complained about the general "tone of the department" and concerns about retribution if they did anything wrong.  Tr. 652.

The Account Managers felt McQueen managed through "fear"; that they would suffer major punishment if they made a mistake; that they were not given the opportunity to grow; and that McQueen's management style was "forceful" and "intimidating."  Tr. 897.  Even McQueen's witness Lori Adler admitted that morale was not high in the department.  Tr. 567.  Golden shared these concerns with Julien[10] and asked her to investigate the complaints further.  Tr. 653-54.  In a separate conversation with Golden, Account Manager Sharon Wilson confirmed the complaints that were raised at the meeting.  Tr. 661-62.

In sum, Golden understood, based in part on Julien's investigation and the complaints, that McQueen's team perceived her as being overly critical and not delivering her message in a

---

[9] McQueen mischaracterizes the testimony of Account Manager Lisa Coleman ("Coleman"), Tr. 1189-90, and incorrectly states that Golden "went to her staff and solicited complaints about her."  Mem. at 13.  Golden approached McQueen's staff only after it had been brought to *his attention* and to the attention of human resources about concerns with McQueen's heavy-handed management style, not the other way around.  As Adler testified, the investigation was initiated as a result of complaints raised by the account managers and was not driven by Golden.  Tr. 567.

[10] Julien filled McQueen's job after her promotion and Julien worked for the Company until July, 2005.

manner that was business appropriate and that they wanted to be treated more fairly.  Tr. 655-58.

Golden opted not to place McQueen on a corrective action, but advised her that he wanted her to

change the way in which she managed her team, that she needed to improve the "tone of the

office," that the Account Managers needed to be treated "with respect," and that they should

institute "flexible hours."  Tr. 655-60.  Golden had reservations about promoting McQueen at

that time because of how the team would react to her promotion in light of the complaints he had

received about her -- one of the factors Golden considered important when making promotion

decisions.  Tr. 679.

Although McQueen testified that she informed Julien the investigation was "being made

up" by Golden *in retaliation for having rejected Golden's sexual advances at the 2002

Christmas party*, Mem. at 14; Tr. 181,[11] Julien, who is no longer employed by UHG, testified

that she never received any such complaint from McQueen.[12]  McQueen also admitted that her

"contemporaneous" handwritten notes do not reflect this incident on her report.  Tr. 433-34.

### E.    McQueen Receives A Retention Bonus

In connection with its acquisition by UHG in 2004, Oxford offered retention bonuses to

select individuals to ensure management stability; maintain consistency; and reward those who

did not benefit as greatly from stock options they received.  Tr. 192-93, 629-31.  At Golden's

recommendation, McQueen received a $20,000 retention bonus.  Tr. 192-93, 630, 829-30.  None

---

[11] McQueen cites page 328 in support of her claim that she told Julien that she believed Golden "instigated the investigation into alleged staff complaints in retaliation for her refusing his proposition at the Christmas party."  The cited reference, however, does not support McQueen's claim.  Furthermore, to the extent McQueen believes the 2003 investigation stemmed from her earlier rejection of Golden at the Christmas party, the party occurred in 2002 and, as discussed below, her complaint is time-barred.
[12] McQueen relies on hearsay evidence in support of her claim that Sharon Wilson and Trumbley told her they would not participate in a "witch hunt" against her.  The Arbitrator should disregard these hearsay statements.  Mem. at 13.

of the individuals McQueen alleges to be her comparators received a retention bonus, including

the Caucasian men of that group (*i.e.*, Marden and Tahany).  Tr. 630.

After the merger, a number of employees were laid off under the direction of Golden,

including Michael Lenahan in October, 2004 and Karen Mark and Melissa Dobkin in February,

2005 -- all of whom are Caucasian.  Tr. 729-31, 1028.  Similarly, in or about June, 2006, Sales

Operation Specialists Martha Kuinlan ("Kuinlan") and Patrice Hayward ("Hayward"), both

Caucasian, were laid off.  Tr. 1024-27; Cl. Ex. 98.  Golden found Kuinlan and Hayward to be the

lowest performers in their group, while; other females and an African American employee were

retained.  Tr. 1027-28; Cl. Ex. 98.

### F.    Post-Merger Organizational Restructuring:  Kimberly Santillo Selected To Manage Small Group Accounts and McQueen Assigned To Key Accounts

Prior to the merger, Oxford organized Account Management functions into groups of "50

plus lives" and "2-50 lives."   In late 2005 and early 2006, UHG reorganized this structure

Company-wide into Key Accounts, defined as "100 plus lives," and Small Business accounts,

defined as "2-99" lives.  Tr. 213, 362-63, 692-93.  Golden assigned McQueen to handle the more

prestigious Key Accounts and Kimberly Santillo ("Santillo") to the Small Business accounts.  Tr.

213-15, 363, 694, 695. 696.

On December 8, 2005, Golden approved the selection of Santillo (with a start date of

January 9, 2006).  Tr. 1017-21.  He did not consider McQueen for this position, however,

because he had already assigned McQueen to the higher-level Key Accounts position.  Tr. 696-

97 1022.  Indeed, McQueen would have taken a pay cut had she been assigned the Small

Business role.  Tr. 1022.  (*Compare* Santillo's compensation of $105,000, *to* McQueen's

compensation of $155,500.  Cl. Ex. 21; Tr. 136.)  Although McQueen now contends that had

Golden offered her the Small Business Accounts position she would not have lost her job in Powerforward, the record is clear that Golden only learned of Powerforward after the fact.

### G.    McQueen Assumes The Long Island Office in April, 2005

McQueen testified that during the merger, Golden told her that she was being moved to the Long Island office and that her position in New York would be assumed by Tom Rogalsky ("Rogalsky") from UHG.  Tr. 193-94.  McQueen purportedly asked Golden why she was being "bumped" and he stated he was trying to find roles for everyone.  Tr. 196.

Golden, however, did not move McQueen to Long Island full time; rather, he merely asked her to work from the Long Island office two days a week and to take on responsibility for that office in addition to New York beginning April, 2005.  Tr. 196, 265, 687-88.[13]  While working in Long Island, McQueen had the same title, pay and job duties -- she was merely working from a different office for part of the week (an office that was closer to her home on *Long Island*).  Tr. 373-74, 687-89.  Even McQueen did not consider this a demotion.  Tr. 375. This assignment also marked the first time McQueen was performing well with increased responsibilities -- the criteria Golden set for promotions.  Accordingly, consistent with his practice of placing individuals in expanded roles prior to promoting them, Golden recommended her for a promotion in December, 2005.  Tr. 691-92, 843; Cl. Ex. 132.

### H.    Patti Avin Complains About McQueen on February 10, 2006

On or about February 10, 2006, Patti Avin ("Avin"), an Account Manager who worked under McQueen, complained to Golden that she had an incident with McQueen during which she felt "physically threatened."  Tr. 697-99, 1227-29, 1233-34.  Because of the seriousness of McQueen's conduct, Avin told Golden she had reported the incident to HRDirect (UHG's third-

---

[13] When Santillo became Manager of Account Management for the Small Business Account, she too had responsibility over the Long Island office.  Tr. 237.

party human resources arm).  Tr. 1228-29.[14]  This was yet another example of McQueen's

inappropriate conduct in the workplace of which had been brought to Golden's attention.

### I.    Termination of McQueen's Employment

In about February, 2006, Turpin charged Golden with eliminating duplicative positions to

reduce unnecessary layers of management.  Tr. 699-701, 1319-22.  Turpin told Golden:

> Mike [Turpin] told me it was real.  That we had to look deep into the
> organization.  Look at duplicative jobs.  We needed to do our part.  The rest of the
> organization was doing their part.  We needed to look -- he felt that with the
> continuation of the merger or the acquisition that there had to be some positions
> that were available to be looked at very closely for elimination.

Tr. 702.  Although Golden pushed back, Turpin ordered Golden to "[l]ook deep."  Tr. 702-03,

1321.  Golden also talked to Craig Anderson, CFO of the Northeast Region, who told Golden

that Powerforward was going to "affect all types of departments" and positions were being

consolidated Company-wide.  Tr. 723-25; *see also* Tr. 1315-18, 1322.

Golden met with Marianne Aponte ("Aponte") in Human Resources and identified the

positions held at the time by McGann and McQueen as the only duplicative positions, since they

were both performing Account Management functions -- McGann was Vice President of

Account Management for New Jersey and New York.  Tr. 705, 713.  Golden then consulted with

McGuire, Vice President of the Sales Office in New York, who told Golden that he too believed

McGann was better equipped to run the New York and New Jersey accounts and to manage the

staff.  Tr. 705-11, 173, 1333-37.

---

[14] To the extent McQueen alleges in her brief that she had problems with Avin's performance, Golden
testified that he asked McQueen to work with Avin since she was a new team leader.  Tr. 787-88.
Golden, however, previously had positive experiences with Avin as an account manager and had such
confidence in her that she was assigned to manage Oxford's largest client -- United Welfare Fund.  Tr.
788-89.

### 1. McGann Was More Qualified Than McQueen For The Combined Account Management Position

After comparing the performance, skill sets, current staffing and roles and responsibilities of the two individuals within their departments, Golden decided to eliminate McQueen's position. Tr. 705-11. At the time, McQueen had strong team leaders who would be able to assist McGann, while McGann directly supervised her account managers and had the assistance of only one supervisor/team leader.[15] Tr. 711-12. Golden also believed McGann was able to assume the functions previously performed by McQueen, while McQueen did not have the ability to perform McGann's job. McGann had nearly 20 years of experience in the sale and service of health insurance products, including experience in finance, managed a large, complex and sophisticated business of public and private self-funded plans[16] and, unlike McQueen, had the ability to address difficult customer issues without assistance. Tr. 705-11, 1241-49, 1252-53, 1268-69, 1334-37. Self-funded plans are controlled by clients, not by UHG, and, are subject to significant variation in how the plans are administered and implemented. Tr. 1252-53, 1258. Moreover, UHG's operations were generally more complex than Oxford's "cookie cutter" system[17] and McGann had experience navigating UHG's organization -- this was an important characteristic because as Golden testified, the Oxford model was being phased out. Tr. 711, 1252-53, 1257-58, 1334-37.

---

[15] McGann only had one supervisor under her, not multiple "team leaders" as incorrectly stated by McQueen in her brief. *Compare* Mem. at 29 *with* Tr. 1262. At the time McGann assumed McQueen's responsibilities, McGann supervised 11 account managers, 8 service consultants, three implementation employees and one supervisor, Tr. 1256; she assumed responsibility over 11 account managers and two team leaders and administrative staff from McQueen, Tr. 1257.

[16] McQueen's argument in her brief that the complexity of accounts depends on the "size" of the account does not contradict UHG's position that self-funded plans were more complicated than fully-insured accounts. UHG's accounts were generally larger with more members; Oxford's accounts were generally smaller. Tr. 1255.

[17] McQueen incorrectly states in her brief that UHG "proffered yet another newly-minted reason for firing McQueen." Mem. at 32. To the extent McQueen takes credit for "streamlining" Oxford account management, this claim merely supports Respondent's position that due to efficiencies in Oxford, she was no longer needed anyways. Mem. at 32.

McQueen, on the other hand, had only worked in Account Management for
approximately four years -- having worked almost exclusively in HR throughout her career --
had not developed the skills or in-depth understanding of the healthcare business possessed by
McGann and worked with far less sophisticated clients.  Tr. 705-07, 1251-53, 1334-37.  Oxford's
fully-insured, cookie-cutter plans, were not customized like UHG's self-funded plans.  Tr. 1252-
53, 1258, 1334-37.  *Cf.* Mem. at 30.  Although McQueen alleges that she too worked on self-
funded plans, her handful of self-funded accounts (*i.e.*, Columbia University, NYU, Weil
Gotshal) pales in comparison to the hundred-plus accounts McGann managed, the majority of
which were self-funded accounts.  Tr. 1255-56, 1259, 1336-37, 1381-82.  Finally, McQueen also
had performance issues and complaints about her management style, which McGann did not.[18]

## 2. Golden Prepares A Memorandum And Competency Worksheet Relating To the Elimination of McQueen's Position

On March 2, 2006, Golden identified McQueen to HRDirect as potentially being
impacted by the downsizing.  On March 7, 2006, Golden, with the assistance of Aponte, drafted

---

[18] In her brief, McQueen attempts to demonstrate that she was more qualified than McGann.  Mem. at 29.
McQueen contends that Golden had told her that McGann was "unable to perform McQueen's role,"
which Golden denies.  Similarly, McQueen misinterprets Turpin's broad statement that UHG could learn
from Oxford account management to somehow suggest that McQueen was more qualified than McGann.
Mem. at 29.  Turpin did not single out McQueen and admittedly did not even know McQueen.  Tr. 1311.
Furthermore, in her brief, she mischaracterizes Adler's testimony that she heard "complaints from brokers
and customers about McGann" and about problems with her "management abilities."  McQueen's cites to
the record, *i.e.*, Tr. 554-55, 558, do not support this claim.  The only concerns raised by clients was that
*service may decline as a result of McQueen's termination*, *but they raised no concerns that McQueen was
more qualified than McGann*.  Tr. 554-55.  Furthermore, Adler testified of only one complaint by one
individual, Paula Boyd, who allegedly said she believed McGann was too hands off.  Tr. 557-58.  There
were no complaints from customers or brokers about McGann's management abilities.  In any event, even
if there have been, such evidence cannot be used to second guess management's decision.  "It is not a
court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-
discriminatory."  *Johnson v. Cty. of Nassau*, 480 F. Supp. 2d 581, 594 (E.D.N.Y. 2007); *David v.
Children's Vill.*, No. 04-2550-cv, 2005 U.S. App. LEXIS 9435, at *3-*4 (2d. Cir. May 23, 2005) ("[W]e
do not second-guess an employer's personnel decision so long as it is based on something other than a
prohibited ground."); *Chetal v. BLS Funding Corp.*, No. 05-CV-3014 (DRH)(ARL), 2007 U.S. Dist.
LEXIS 52058, at *10 (E.D.N.Y. July 18, 2007) ("Federal courts do not have a roving commission to
review business judgments, and may not sit as super personnel departments, assessing the merits -- or
even the rationality -- of employers' non-discriminatory business decisions.").

a memorandum memorializing his reasons for eliminating McQueen's position (referred to as "business case") and a spreadsheet comparing the performance of McGann and McQueen (referred to as "competency worksheet"). Tr. 713-15. In the competency worksheet, Golden ranked the candidates based on a number of factors and skill sets. Tr. 713-15; Resp. Ex. 26. Golden ranked McGann higher than McQueen. Tr. 713-15. In the business case memorandum, Golden wrote that the Manager of Key Accounts (referring to McQueen) has three team leaders reporting into that position and that there is a director of account management service (referring to McGann). Resp. Ex. 25. The team leaders will remain and report to McGann after the consolidation. By March 7, 2006, Golden had decided that McGann would remain and McQueen's employment would be terminated.[19] Tr. 715. Notably, after McQueen's employment was terminated, Golden had to call only two clients and two brokers to let them know about her termination -- she had not built relationships with clients or brokers. Tr. 722-23.

### 3.    Termination Meeting

On March 29, 2006, Golden and Lee informed McQueen that her employment was being terminated due to the elimination of her position.[20] Tr. 26, 716, 718. When McQueen asked whether it was because she was "black," Golden immediately left the meeting because he felt his continued presence was not appropriate. Tr. 716-17.

---

[19] On March 8, 2006, Aponte sent to Michelle Tzannis ("Tzannis"), HRDirect, the business case memorandum and the competency worksheet. On March 10, 2006, Tzannis wrote to Golden and Aponte that they needed to use an updated competency worksheet and also suggested they include the notification date and termination date in the business case memo. On March 13, 2006, Tzannis also inquired as to whether there were documents to support the rankings on the competency worksheet. They were unable to locate performance reviews for McQueen because Golden did not prepare evaluations of his subordinates. Aponte, however, wrote on March 15, 2006 that Golden had communicated "performance reviews to [McQueen] in the past." Aponte sent the revised business case and competency worksheet to Tzannis on March 15, 2006.

[20] McQueen's termination was effective April 6, 2006.

According to McQueen, after Golden left the meeting, she allegedly told Lee that Golden promised to promote her and was retaliating against her for rejecting him at the 2002 Christmas party.[21]  Tr. 326-29.  Post-termination was the first time McQueen had complained of any of this.

## IV.     Argument

McQueen failed to establish by a preponderance of the evidence that her termination was unlawful, because the evidence showed that Golden was not motivated by race or gender, and that McGann was more qualified for the combined account management positions than McQueen.  Similarly, McQueen failed to establish her failure to promote claim because she was not eligible for a promotion until 2005, at which time Golden submitted her name for a promotion.  Finally, McQueen failed to establish her retaliation claim because there was no causal connection between her purported complaints and any allegedly adverse employment actions made by Golden.

### A.     McQueen's Unlawful Termination Claim

McQueen has failed to establish by a preponderance of the evidence that her termination was unlawful, and UHG presented substantial evidence to the contrary.  Under the three-part test articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), McQueen must first establish a *prima facie* case of race and sex discrimination.  *See* 411 U.S. at 802.[22]  Once she establishes her *prima facie* case, the burden of production shifts to UHG to articulate a "legitimate nondiscriminatory reason" for its employment actions.  *See* 411 U.S. at 802.  UHG's

---

[21] McQueen erroneously testified that the Christmas party occurred in 2003 even though she had previously confirmed that the party took place in 2002.  Tr. 328.  *See* note 11, above.

[22] To establish a *prima facie* case of discrimination in a reduction-in-force, McQueen must establish:  (1) she is a member of a protected class; (2) she was qualified for the position from which she was discharged; (3) she was terminated; and (4) under circumstances giving rise to an inference of discrimination.  *See Donaldson v. Merrill Lynch & Co.*, 794 F. Supp. 498, 504 (S.D.N.Y. 1992).  As discussed, below, McQueen cannot establish her *prima facie* case because she cannot establish that she was more qualified than McGann for the combined account management position and has failed to present any circumstances giving rise to an inference of discrimination.

burden is simply one of articulation -- it is *not* required to prove the absence of a discriminatory

motive in its decisions regarding McQueen. *See DiCola v. SwissRe Holding*, 996 F.2d 30, 32 (2d

Cir. 1993). Once UHG proffers a legitimate, non-discriminatory reason for its employment

actions, "the presumption raised by the *prima facie* case is rebutted, and drops from the case," *St.*

*Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993), and McQueen shoulders the ultimate

burden of proving, through pretext or otherwise, that the real reasons for UHG's actions was

discrimination. *See id.* Where, as here, UHG does more than merely articulate a plausible non-

discriminatory reason for its employment actions, and actually "'substantiat[es] that reason by

proving that it has a sound and factually supported basis, [McQueen's] task of showing that this

reason was a pretext will be more difficult.'" *Halbrook v. Reichhold Chems., Inc.*, 766 F. Supp.

1290, 1295 (S.D.N.Y. 1991), *aff'd*, 956 F.2d 1159 (2d Cir. 1992). McQueen cannot prevail,

however, without establishing intentional discrimination by a *preponderance* of the evidence.

*See* 411 U.S. at 802-03 (plaintiff must prove by a preponderance of the evidence that defendant's

conduct was discriminatory); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981);

*Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 142 (2d Cir. 1993) (discriminatory intent must be

proved by a preponderance of the evidence).

### 1. UHG Had A Legitimate, Non-Discriminatory Business Reason For Terminating McQueen's Employment

UHG offered substantial credible evidence of its legitimate, non-discriminatory reason

for terminating McQueen; namely, that in connection with a reduction-in-force to eliminate

redundancies, Golden selected the more qualified candidate, McGann, who, like McQueen, is

*female;* McGann had more experience, including financial experience; MGann oversaw largely

complex, sophisticated self-funded plans for UHG, as opposed to Oxford's cookie-cutter

products that McQueen handled; McQueen had experienced team leaders in place that could

16

assist McGann in assuming McQueen's role whereas McGann, a legacy UHG employee, was in a better position to navigate the complex UHG system as opposed to McQueen who worked on the Oxford platform, which was being phased out -- a view shared by McGuire.  *See also* Section III.I.1, above (discussing McGann's qualifications).

### 2. McQueen's Evidence That Golden Terminated Her For Discriminatory Reasons

McQueen's three arguments -- (1) "respondents ignored the sole layoff criterion;" (2) "generated post-hoc evidence;" and (3) "failed to follow their own procedures" -- fail to support a finding of pretext.

McQueen claims that Golden failed to follow Company procedures establishing "span of control" as the "sole criterion for determining whether supervisory layoffs are needed."  Mem. at 25.  Golden, however, never received the "span of control" memo and, thus, could not have failed to follow Company procedures of which he was admittedly unaware.  Mem. at 25; Tr. 854. Golden's directive from Turpin, was to simply eliminate duplicative positions, which he did.[23]

McQueen further contends that Golden prepared documentation "after the fact" to paper over his discriminatory reasons for terminating McQueen's employment.  Mem. at 26.  The business case memorandum and competency worksheet that Golden prepared with the assistance

---

[23] In any event, McQueen's span of control argument as it relates to the number of individuals supervised by Marden, Darrel Farkus and Tahany misses the mark because McQueen similarly had only three direct reports (the three team leaders reporting up to her).  Mem. at 27-28.  Although McQueen attempts to minimize the importance of team leaders, suggesting they were merely "mentors" -- not supervisors -- in an attempt to create the false impression that she had a high number of "direct reports," Mem. at 25, the testimony is clear that these team leaders were *more than simply "mentors."*  They were high-level supervisors who directed the work of other account managers; prepared performance evaluations of the account managers; and considered the move from account manager to team leader a promotion.  Tr. 354-55, 490, 493, 505-06, 511, 624, 892.  Team Leader Adler testified that she "manage[d]" a team of account managers and made sure they were "performing their job responsibilities."  Tr. 493.  Coleman testified that she reported to her team leader, Adler, that Adler prepared her evaluation and reviewed it with her without McQueen present.  Tr. 1188, 1198.

of Aponte, were not post-hoc justifications for selecting McQueen, but rather memorialized

Golden's legitimate, non-discriminatory reasons for selecting McQueen.[24]

Indeed, the undisputed evidence rebuts any inference that Golden discriminated against

McQueen based on her race and sex.  First, the "same actor inference" rebuts any negative

inference that Golden discriminated against McQueen, even crediting McQueen's claims that

Golden made comments about her race and sex.  *See Figueroa v. New York Health & Hospitals

Corp.*, 500 F. Supp. 2d 224 (S.D.N.Y. 2007) (applying the same actor inference); *Cooper v.

Morgenthau*, No. 99 CIV. 11946 (WHP), 2001 WL 868003 (S.D.N.Y. July 31, 2001) (same).[25]

Golden hired McQueen, not once, but twice.  The first time when she first joined Oxford and the

second time when she became Manager of Account Management.[26]

---

[24] The absence of performance evaluations, Mem. at 26, does not make Golden's decision suspect.  It is undisputed that Golden did not prepare evaluations for any of his employees.  Furthermore, Golden's comment to Tahany in an email that McQueen's termination meeting "should be interesting" has nothing to do with the suspect nature of the termination as McQueen alleges, but is based simply on the fact that McQueen's employment was going to be terminated and Golden reasonably expected that she, like any other employee, would not be happy about her termination.

[25] *See also Hueston v. City of New York*, No. 00-Civ.-9512(RCC), 2005 U.S. Dist. LEXIS 253 (S.D.N.Y. Jan. 7, 2005) (applying same actor inference); *Ahmad v. Nassau Health Care Corp.*, 234 F. Supp. 2d 185 (E.D.N.Y. 2002) (same).

[26] McQueen's misplaced reliance on *Tomassi v. Insignia Financial Group, Inc.*, 478 F.3d 111, 112 (2d Cir. 2007), and *Feingold v. New York*, 366 F.3d 138, 155 n.16 (2d Cir. 2004), is unpersuasive.  Mem. at 36, 41.  In *Tomassi*, the supervisor that terminated the plaintiff did not make the decision to hire plaintiff. *See* 478 F.3d at 112.  The record revealed a concerted effort on the part of that supervisor to hire "younger, energetic, [and] attractive" employees, an effort at odds with the continued employment of a 63-year old plaintiff whom he did not hire.  *See id*.  Here, Golden hired McQueen, doubtlessly aware of both her race and gender at the time, and a fact at odds with the ulterior motive rendering the same-actor inference inapplicable in *Tomassi*.  Similarly, in *Feingold*, the supervisor that recommended plaintiff's dismissal had not hired him.  *See* 366 F.3d at 155 n.16.  The "complaints of discrimination" found to have "altered the circumstances of employment" -- and vitiated application of the same-actor inference -- were lodged directly with the supervisor that fired the plaintiff.  *See id*. at 145-46.  Thus, the Court held because the purported same-actor was both aware and charged with resolving the complaints of discrimination, the professed same-actor's perception of the plaintiff had changed, rendering the same-actor inference inapplicable.  *See id*. at 155-56.  Here, Golden hired McQueen and was not aware of any complaints of discrimination made by McQueen.  *See* Section IV.E, below.  Accordingly, Golden's perception of McQueen remained unchanged.  Thus, in the absence of any significant parallels between the cited cases and the circumstances of McQueen's employment, the same-actor inference remains the controlling law of this Circuit and compels a finding in UHG's favor.  Furthermore, the same actor

18

Second, there can be no finding of gender discrimination where, as here, the individual Golden selected over McQueen is also a woman.[27]  This evidence is particularly probative given McQueen's contention that Golden had previously assigned unqualified men to open positions. The Arbitrator should further note that Golden previously selected Santillo (female) to fill an open position.  Under McQueen's theory, Golden easily could have filled her position and the position currently filled by Santillo with an unqualified male employee instead.[28]  He did not.

**B.    McQueen's Failure To Promote Claim**

    **1.    McQueen's Alleged Failure To Promote Claims Prior To April 13, 2003 Are Untimely**

To the extent McQueen claims Golden failed to promote her at any time prior to April 13, 2003,[29] her claims are untimely (*i.e.*, McQueen claims she should have been promoted six months after she began working as an Account Manager in 2001 and promoted to director at the same time as Marden and Tahany in February, 2003).  *See, e.g., Ledbetter v. Goodyear Tire & Rubber Co.*, 127 S. Ct. 2162 (2007) (employee must file a claim after each allegedly discriminatory act).

---

inference still applies even though McQueen alleges Golden made biased comments against her.  *See* Section IV.C relating to alleged comments made by Golden, below.

[27] *See Kaplan v. Multimedia Entm't, Inc.*, No. 02-cv-00447C(F), 2005 U.S. Dist. LEXIS 40351, at *25-*27 (W.D.N.Y. Oct. 27, 2005) (replacement by member of protected class undermines discrimination claim), *aff'd*, 216 F.3d 1071 (2d Cir. 2000); *Clark v. New York State Elec. & Gas Corp.*, 67 F. Supp. 2d 63, 73 (N.D.N.Y. 1999) (same).

[28] McQueen inexplicably states that she was replaced by "*two white employees, McGann and Santillo*." Mem. at 39 (emphasis added).  The record is clear that Santillo *never replaced McQueen* who started in the manager of account management position months before McQueen was terminated.  Tr. 1017-21.

[29] The Human Rights Law and the City Law have a three-year statute of limitations period.  McQueen may raise claims dating only as far back as *April 13, 2003* (three years before she filed her initial demand for arbitration on April 13, 2006).  *See Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1211 (2d Cir. 1993) (evidence pertaining to time-barred claims inadmissible).

## 2.    McQueen Did Not Satisfy Golden's Criteria For Promoting Employees From 2001 Until 2005

McQueen cannot establish a failure to promote claim because she did not satisfy Golden's criteria for promotion until 2005, at which time Golden recommended her for a promotion.  The factors Golden considered when making promotion decisions, which he shared with McQueen, included assuming more responsibility; performing at a high level in a position for a period of time; how the promotion would be perceived and supported by her team or other people in the organization; continuing to expand responsibilities; and being seen as a resource (*i.e.*, the "person to go to") to the team, to Account Executives, the brokerage community and clients.  Tr. 679-80.  Furthermore, Golden's practice was not to grant promotions immediately, but to give employees "increased responsibilities" first and to promote only after the individual had "proven" him or herself in the job over a period of approximately six months -- a practice confirmed by Alder.  Tr. 568, 569; *see also* Tr. 672.

Even assuming the Arbitrator finds timely McQueen's claim that Golden failed to promote her in March 2003, at the time he promoted Marden and Tahany -- UHG maintains this claim is untimely -- Golden did not promote McQueen then because he had received complaints about her management style and he did not view her as a "resource" to her team or to clients, who generally turned to Adler, not McQueen for assistance.  Tr. 680-81.  This reasoning is consistent with Golden's criteria.

Golden promoted Marden and Tahany to the director position in March, 2003 because they satisfied his criteria for granting promotions.  Tr. 671-74; 673 (Tahany had performed well with "good results" and had expanded responsibilities within the Company); 674, 1096 (Marden was performing well and had previously taken on additional responsibilities).  At the time, though, they did not receive any change in compensation.  Tr. 672-74, 1004, 1095.  When he

20

promoted Marden and Tahany, Golden explained to McQueen his reasons for promoting them

and that he would be promoting her in the future, but not at that time.  Tr. 676.

McQueen attempts to criticize Marden's promotion on the grounds that he had

performance problems.  She relies on the testimony of Adler stating, "[c]ustomers and brokers

found Marden's performance to be sub-par."  Mem. at 18.  Adler, however, never worked as

Marden's supervisor and was not in a position to assess Marden's performance.  Moreover,

Adler relies on hearsay testimony of others which the Arbitrator should disregard.

Adler also testified about complaints from Kaye Scholer in 2002[30] and Cravath in 2002 or

2003.[31]  Tr. 523-24.[32]  Golden, however, testified he was not aware of Cravath having problems

with Marden specifically, but rather was unhappy with Oxford overall because Cravath wanted

to deal with only one decision maker -- Golden.  Tr. 644.  Despite Marden's alleged performance

problems with two accounts, Marden had 140-175 accounts, Tr. 634, and participated in

hundreds of renewal meetings.  There is no evidence that any of these other clients found

Marden's performance to be "sub-par."  Tr. 1146-47.[33]

### 3.    Golden Considers Promoting McQueen In 2005

In 2005, after McQueen became responsible for the Long Island office, Golden

considered her for a promotion, though, consistent with his past practice, did not actually

---

[30] Kaye Scholer decided not to renew due to "financial reasons," Tr. 583, not because of Marden.  UHG did not lose Cravath as a client.  Tr. 109, 576-77.

[31] Cravath also requested that Adler not return either.  Tr. 524, 524, 571, 644-45.

[32] McQueen testified that the complaint from Cravath was made in either 2002 or 2003.  Tr. 109.

[33] McQueen mischaracterizes the record when she states that on May 22, 2001, Golden asked McQueen to "step in and negotiate with Marden to resolve the problems" because "account managers were having difficulty communicating with Marden and [Lorraine] White, his supervisee."  Mem. at 12.  The record does not state that account managers "were having difficulty communicating with Marden and [Lorraine] White," nor does it state that Golden asked McQueen to "negotiate with Marden to resolve the problems." Tr. 111-12.  McQueen also incorrectly states, Mem. at 12, that Marden admitted to his staff's improper and missing documentation as that claim is not supported by the record.  Tr. 1128.  McQueen also contends without citation to any record evidence that "[b]oth Marden and Golden failed to resolve the problems."  Mem. at 12.

promote, waiting for a few months to see how she performed in her new role.  Tr. 568, 569, 672, 691-92.

Although Golden still had serious reservations about McQueen, which were unrelated to either her sex or race; namely, that McQueen did not want to change her reporting relationship -- she wanted to continue reporting to Golden -- which would not have been possible following her promotion, he submitted McQueen's name for a promotion in December, 2005.  Tr. 843, 844.[34]

### 4.     McQueen's Alleged Peers Are Not Comparable To Her

McQueen alleges Golden failed to promote her to the "Director" position, but promoted Marden and Tahany instead.  They are not comparators.  McQueen has no evidence that Marden and Tahany held the same position or performed the same job duties as her.[35]  Tr. 786.

### a.     Account Management and Sales Were Different Functions

The roles Marden and Tahany[36] played as Sales Executives differed significantly from McQueen's role in Account Management -- a customer service based position.[37]  Marden and Tahany were responsible for selling insurance, developing new client relationships, managing a block of business, growing existing accounts and ensuring clients renewed their accounts with a focus on revenue and financial performance.  Tr. 665-66, 786-87.  McQueen, on the other hand,

---

[34] Even though McQueen began to oversee more account managers in the Long Island office, in early 2006, the number of account managers in her group dropped after the 2-50 to 2-99 reorganization.

[35] *See Bush v. Fordham Univ.*, 452 F. Supp. 2d 394, 410 (S.D.N.Y. 2006) (not comparators even though they held same title and reported to same dean where responsibilities differed); *Roa v. Mineta*, No. 01-6216, 2002 U.S. App. LEXIS 22338 (2d Cir. Oct. 23, 2002) (comparators not similarly situated even though they worked in the same department and reported to the same supervisor because duties were different); *Shumway v. UPS, Inc.*, 118 F.3d 60, 64 (2d Cir. 1997) (comparators must be "similarly situated in all material respects"); *Longmire v. Wyser-Pratte*, No.05-civ.-6725(SHS), 2007 WL 2584662, at *13-*14 (S.D.N.Y. Sept. 6, 2007) (not similarly situated because duties differed); *Simpson v. Metro-North Commuter R.R.*, No.04-civ.-2565(PAC), 2006 WL 2056366, at *7 (S.D.N.Y. July 20, 2006) (comparators must have similar work duties, education, seniority, and performance history).

[36] Tahany left the Company in late 2006.

[37] McQueen has also pointed to the promotion of Howard Margolies, who previously reported to Tahany, as evidence that she should have been promoted as well.  Margolies, like Marden and Tahany, however, performed sales functions and, thus, is not similarly situated to McQueen.

dealt with *existing* clients customer service issues, and provided *support* for the sales function. Tr. 40, 41, 50, 51, 786-87, 1251-52. Her function was after the Sale. McQueen's contention that she is similarly situated to Marden and Tahany demonstrates a clear lack of understanding of UHG's alignment of its business by function. These are two different departments reporting to Golden.

The sales function performed by Marden and Tahany -- whether related to the sale of products to new customers or to renewals -- dealt with the underlying financial transaction including negotiating rates and conducting financial analysis. Tr. 620-22, 635-39, 784-86, 1008-10, 1060-62, 1067. The account management function -- performed by McQueen's team -- dealt little with the financial aspects of the transactions, Tr. 639; rather it involved the servicing the accounts, Marden and Tahany sold. Tr. 620-22, 1008, 1060-62, 1067, 1099-1100. McQueen ignores the fact that Marden was responsible for generating nearly a billion dollars of revenue for UHG. Tr. 1093-94. There is no evidence that McQueen was responsible for generating anywhere near that type of revenue.

McQueen testified in describing the difference between account managers (who reported to McQueen) and account executives (who reported up to Marden and Tahany):

> The account manager and account executive shared the account. The account manager was fully -- was responsible for developing the relationship, making sure that the account was flowing properly, and then the account executive handled the financial piece.

Tr. 92. Similarly, Account Manager Coleman testified that account managers played "[a] small role in that [they] would maybe just provide the account executives with leads or feedback on a client . . . ." Tr. 1187-88.

McQueen's attempt to demonstrate that she performed some "sales" functions akin to the work performed by Marden and Tahany fails. Mem. at 21. Noticeably absent from her alleged

23

"sales" work was any negotiation with potential or existing clients regarding the financial piece of the transaction or internal negotiation with the underwriting department -- critical components of the sales function.  Tr. 636.  While Account Managers certainly talk to clients about other benefit options in an attempt to sell "ancillary products," the testimony at the hearing makes clear that Account Managers would put any interested client in touch with a member of the sales force.[38]

          **b.**     **Any Overlap In Duties Does Not Make Marden and Tahany Proper Comparators**

While there may exist some overlap in duties between Marden, Tahany and McQueen in terms of management responsibilities, Mem. at 19, that alone does not make them proper comparators.  *See Bush*, 452 F. Supp. 2d at 410 (performance of some common tasks does not make jobs substantially equal); *Conigliaro v. Horace Mann Sch.*, No. 95-civ.-3555(CSH), 2000 U.S. Dist. LEXIS 556 (S.D.N.Y. Jan. 18, 2000).  Indeed, there was a significant difference in the type of individuals managed by Marden, Tahany and McQueen.  Account executives, managed by Marden and Tahany, with significant sales experience earn approximately $275,000 per year; McQueen's team members had little to no sales experience and earned approximately $50-$75,000 per year.  Tr. 786-87.  Moreover, as discussed above, the teams supervised by Marden and Tahany, performed significantly different functions than the team managed by McQueen.

          **c.**     **Marden, Tahany and McQueen Were Compensated Under A Different Scheme**

Contrary to McQueen's claim, the compensation plan for sales executives (*i.e.*, Marden and Tahany) differed from those of Account Managers (*i.e.*, McQueen, McGann and Santillo).  Mem. at 21, 23.    For example, while Marden and McGann (an Account Manager) may have

---

[38] McQueen relies on a job description of account managers prepared by Marden as evidence that account managers perform sales functions.  Mem. at 21.  Marden, however, testified that the account managers did not actually perform those functions; even McQueen admitted she did not perform those functions either.

fallen under the same Incentive Compensation Plan in 2006, Mem. at 21, the components of their plan varied and, as such, they would have received different compensation. Tr. 836-37; Cl. Ex. 154. McGann's plan included a factor for "persistency;" this factor did not apply to Marden. Similarly, Marden's plan included a "gross sales incentive," while McGann did not have this component as part of her compensation plan. Tr. 836-37; Cl. Ex. 154. Similarly, McQueen's broad generalization that Santillo fell under the same bonus plan as Tahany and Margolies is inaccurate. Santillo received an incentive for "persistency" while the others did not. In contrast, Tahany received a greater percentage for "net membership" than Santillo and; Margolies received an incentive for "monthly medical gross adds," Santillo did not. Tr. 839-40; Cl. Ex. 153. As such, McQueen's attempt to compare her compensation plan to those of Marden and other sales executives does not make sense given that the components of their plans differed. *See, e.g.,* Tr. 622-23 (difference in compensation plan for account executives and account managers), 1098-99. Furthermore, to the extent McQueen seeks to compare her salary to those of others, the more appropriate comparison would be to compare her salary to those in account management (*i.e*., McGann and Santillo), who, incidentally, both had base salaries lower than McQueen. Cl. Ex. 149.

> **d.    McQueen Lacked Experience in Sales, Finance And Underwriting, Key Aspects Of The Job Performed By Marden And Tahany**

Marden and Tahany also had different educational and industry experience compared to McQueen. At the time she was hired as Manager of Account Management, McQueen had not yet earned a college degree. Tr. 27 (McQueen earned her college degree in May, 2004). Tahany earned a college degree from SUNY Oneonta in 1991 and an MBA from Baruch College in 1999. Tr. 996-97. After graduating from college and until he joined Oxford in 1997, Tahany worked in the insurance industry as an underwriter and a broker. Tr. 997. Similarly, Marden has

an undergraduate degree in economics from Trinity College.  Tr. 1080.  From 1986 until 1996

when he joined Oxford, Marden worked in the insurance industry for Prudential in sales,

underwriting and health care management.  Tr. 1080-83.

McQueen admittedly had no prior experience in the sale, underwriting, development or

pricing of insurance products; all primary functions of a sales executive.  Tr. 357-59, 609-12.

McQueen's claim that she "oversaw the more seasoned account managers who coordinated with

underwriting to determine rate increases for renewals or benefit changes (T1367-70)"

mischaracterizes the record and demonstrates a fundamental lack of understanding of the

sophisticated interaction Marden and Tahany had with underwriting.  Mem. at 22.  Account

managers do not "determine rate increases" as she states.  Marden and Tahany had significant

daily interaction with underwriting in negotiating pricing of products that they would in turn

justify to customers.  Tr. 666-70, 790-91, 1009-11.  Account Managers, on the other hand, had

only minimal contact with underwriting and did not deal with pricing issues for customers.  Tr.

670, 790-91, 1011.

### 5.    Change In Title To Vice President Was To Conform To UHG's Model

Marden's and Tahany's title change from Director to Vice President was not a promotion.

Tr. 681-85.  Their titles, which they obtained under Oxford, were merely changed to reconcile

with their peers who worked at UHG.  Tr. 682-85, 828, 909.  McQueen and Adler agree that

after the merger UHG was, in fact, trying to conform titles Company-wide.  Tr. 1122-23.

Notably, neither Marden nor Tahany received any additional job responsibilities, nor any

increase in pay as a result of the title change.[39]  Tr. 681-85, 1123.  As even Julie Oberhand

testified, when she was given the title of Sales Support Coordinator, this was not a promotion but

---

[39] When Tahany became Vice President of Small Business Sales, he received less compensation because his "target pay" amount was less.  Tr. 1039-40.

a change to conform titles.  Tr. 414-15.  In sum, the only real commonality here lies in the fact

that they all, for a period of time, reported to Golden.[40]  Thus, evidence concerning Golden's

treatment of Marden and Tahany is not probative of McQueen's discrimination claim because

they are not similarly situated to her[41] and the Arbitrator should find that McQueen failed to

establish her failure to promote claim.

   C.   **McQueen's Allegations Of Inappropriate Conduct By Golden Fail To Raise An Inference Of Discrimination**

      1.   **Alleged Biased Comments Fail To Establish Animus On The Part Of Golden**

   Because of the lack of evidence to support her discrimination claims, McQueen takes a

shotgun approach, alleging that she was subjected to biased comments by Golden and others.

Notably, McQueen's claim in this regard is largely nothing more than a series of unsubstantiated,

self-serving allegations, which, in most instances, she failed to report to Human Resources, are

time barred or of little probative value.  Golden denies them all.  Tr. 453-54 (McQueen admitted

Golden did not make any cat noises), 627-28, 734-47, 778-83.

   First, McQueen relies on a number of inappropriate comments allegedly made by Golden

that have nothing to do with her race or sex and that the Arbitrator should disregard.  For

example, she states that at one point, Golden asked McQueen whether she was going to get her

fiancé to "beat him up" and allegedly asked her whether she was "rich" because she was holding

---

[40]  For a period of time after the merger, Marden and Tahany reported to McGuire.  Tr. 1006, 1119.

[41]  *See Anderson v. Anheuser-Busch, Inc.*, No. 00-7089, 2000 U.S. App. LEXIS 23763, at *3-*4 (2d Cir. Sept. 19, 2000) (treatment of other employees not similarly situated found "not relevant" to plaintiff's claim); *Shannon v. Nicholson*, No. 05-civ.-3604(DLC), 2006 U.S. Dist. LEXIS 14253, at *6 (S.D.N.Y. Mar. 31, 2006) (same).

her wedding at the same place where Tahany had held his reception.[42]  Mem. at 5.  These comments are facially neutral and do not support McQueen's claims.[43]

Second, McQueen relies on alleged comments related to groups of individuals outside of her protected class (*e.g.*, alleged comments about Jews, Asians, Liz Socci's age).  Courts have repeatedly refused to permit a claimant to assert discrimination claims based solely on conduct directed at a class to which McQueen did not belong (here, Jews, Asians, older employees).  *See Leibovitz v. New York City Transit Auth.*, 252 F.3d 179, 186 (2d Cir. 2001) (refusing to permit a claimant to assert discrimination claims based solely on conduct directed at a class to which McQueen did not belong); *Hansberry v. Father Flanagan's Boys' Home*, No. CV-03-3006(CPS), 2004 WL 3152393, at *5 (E.D.N.Y. Nov. 28, 2004) (comments about Puerto Ricans of no probative value in context of African American-based race claim).

Although McQueen claims that remarks about "other groups" can help prove discrimination against "women or African Americans", Mem. at 37, the cases she references are inapposite.[44]  Here, the Arbitrator should not infer that an employer who comments on Jews,

---

[42] McQueen further claims she mentioned to Julien that she did not appreciate her "personal business being discussed in the office."  Tr. 451-52.  McQueen's testimony, however, contradicts her deposition testimony in response to the question, "When he made the comment about your parents owning an oil company, did you report that to HR?  No."  Tr. 452.

[43] McQueen's claim that Golden "insisted" that McQueen dance with him mischaracterizes the record.  Mem. at 6.  McQueen simply testified, "[Golden] asked me to dance and I danced with him."  Tr. 146.

[44] McQueen cited three cases.  In *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 71 n.9 (2d Cir. 2000), plaintiff referenced allegedly offensive remarks made about individuals outside of plaintiff's protected class in support of her hostile work environment claim -- here McQueen is not alleging a hostile work environment claim.  In *Zubulake v. UBS Warburg LLC*, 382 F. Supp. 2d 536, 544 (S.D.N.Y. 2005), the court admitted evidence relating to an Asian women not because it was directed toward an Asian (outside of plaintiff's protected category), but because it was directed toward another woman.  *Id.* at 544-46.  The court note that there must exist a "common thread," in this case a manager's treatment of "individuals based on their gender."  *Id.* at 545.  Finally, McQueen's case is not similar to *Abramson v. American University*, No. 86-1413, 1988 WL 152020 (D.C.C. June 13, 1988), where the basis for the discrimination as between the plaintiff (Jewish and Eastern European origin) and the proposed witnesses (Muslim, Black and Belgian), was similar, in a context where the university dean allegedly was seeking to reimpose a Christian ethnic and homogeneous faculty that excluded those who were not White, Christian,

Asians and older employees is likely to discriminate against African American women who have

an entirely different history in this country in general and in geographical sections and particular

industries.  *See, e.g., Rauh v. Coyne,* 744 F. Supp. 1181, 1183 (D.D.C. 1990); *see also Steinberg*

*v. St. Regis Sheraton Hotel*, 583 F. Supp. 421, 423 (S.D.N.Y. 1984) (precluding evidence of

employees under 40 in ADEA case as outside the protected class).[45]

Third, McQueen refers to alleged comments that were directed at individuals other than

her, that had nothing to do with her, or were made by individuals other than Golden.  The

---

and Anglo-Saxon in origin.  Here, there is a weak correlation, if any, between discrimination against an
African American women and Asians, Jews and older employees.

[45] To the extent the Arbitrator considers the alleged comments about categories of individuals outside of
McQueen's protected class, the Arbitrator should disregard McQueen's evidence as unreliable.  For
example, Oberhand testified that Golden mocked the accent of Asian employees.  On the first occasion,
McQueen did not personally hear Golden "mock" the accent of Mr. Law.  She testified that Golden's
assistant came to her and said she heard Golden mock Law's Asian accent.  This amounts to double
hearsay and the Arbitrator should disregard this unreliable testimony.  Tr. 163.  The Arbitrator similarly
should disregard Stewart's hearsay testimony on the same allegation.  Stewart testified that McQueen told
Golden that mocking Asian accents "was inappropriate and she didn't like it" and in response, Golden
said he was "just kidding."  Tr. 423-24.  McQueen, however, never testified that she told Golden that
mocking Asian accents was inappropriate.  Furthermore, McQueen never testified that Golden mocked
the accent of African American employees despite Stewart's testimony to the contrary.  Lisa Coleman
testified that she never heard Golden made any racist or sexist comments nor did she hear him make fun
of anyone's accent.  Tr. 1199.  Equally unreliable is McQueen's allegation that Golden commented about
Jews living in Dix Hills.  Contrary to McQueen's testimony, Adler testified that McQueen told her about
the conversation McQueen had with Golden about Dix Hills, but in recounting that conversation, Adler
made no mention about "Jews" living there.  Tr. 532-33.  Also unreliable is Oberhand's comment that she
heard Golden refer to Jews living in Dix Hills.  The Arbitrator should reject her testimony as inadmissible
hearsay because she admits she did not hear Golden make the comment about Jews.  Tr. 389, 406.
Moreover, Oberhand and McQueen gave conflicting testimony regarding Golden's alleged comment.
McQueen testified that Golden made the comment to her *while she was in the office*; Oberhand, on the
other hand, testified that McQueen told her that Golden had made the comment to her *while she was out
of the office looking at houses.  Compare* Tr. 154 (McQueen) *with* 389 (Oberhand).  McQueen even
admits she did not take any notes regarding this alleged comment made by Golden about Jews or
reflecting that she complained to Julien.  Tr. 435.  To the extent Adler testified that she should not plan a
meeting on a Jewish holiday, Mem. at 6, even if true, the inference to draw from Golden's comment is
that he wanted to ensure people attended the meeting and that it did not conflict with any holidays.  The
comment certainly had nothing to do with any purported bias on the part of Golden.  Indeed, Golden has
admittedly hired a number of Jewish employees.  Tr. 743.  Furthermore, there is no evidence that
McQueen was aware of the comment that they not schedule a meeting on a Jewish holiday.  Tr. 537-38,
743.  *See also* Tr. 531-32 (no allegation that McQueen was aware of Golden's comment about Emilia
Estrella).  Contrary to McQueen's claim, Marden never told McQueen that the "Drama Queen" bar of
soap he brought to work was for her.  Tr. 1138-39.  Marden did not leave the bar of soap on McQueen's
desk.  Tr. 1138-39.

Arbitrator should disregard these allegedly biased comments that have no relation to McQueen, because they are irrelevant in establishing that *Golden* discriminated against *her*. *See Brown v. Coach Stores*, 163 F.3d 706, 713 (2d Cir. 1998) (dismissing hostile work environment claim where supervisor made racist comments, only one of which was directed at plaintiff); *Nelson v. Beechwood Org*., No. 03-civ.4441(GEL), 2006 WL 2067739, at *5 (S.D.N.Y. July 26, 2006) (comments directed at plaintiff's coworkers only minimally relevant); *Calire v. Taylor Staffing Serv*., No.02-cv-0166E(SR), 2004 WL 625274, at *4 (W.D.N.Y. Feb. 17, 2004) (granting summary judgment where inappropriate and offensive remarks directed at other employees, not plaintiff); *Benette v. Cinemark U.S.A., Inc*., 295 F. Supp. 2d 243, 248 (W.D.N.Y. 2003) (same); *see also Reeves v. Sanderson Plumbing Prods., Inc.,* 120 S. Ct. 2097, 2111 (2000) (testimony of allegedly discriminatory comments made by other, non-decision makers amounts to *inadmissible stray remarks*). McQueen, for example, alleges that Golden engaged in an intimate discussion with Erica Torres at the 2002 Christmas party[46] and participated in a discussion about undergarments and thongs. None of these comments, however, was directed toward McQueen and, as such, are not probative of establishing animus on the part of Golden.[47]

---

[46] Even if true, it was Torres, not Golden, who engaged in the allegedly inappropriate behavior as even Adler testified, it was Torres who propositioned Golden. Tr. 535. Adler's testimony is also unreliable despite her claim that she could "hear" Torres speaking because she admitted it was loud in the bar, there was music playing in the background, and Torres was not shouting at Golden. Tr. 574-75. Furthermore, to the extent Adler testified that Golden told McQueen she was wearing a "beautiful suit" and asked if he "paid her enough to afford a suit like that," Mem. at 5, McQueen did not corroborate this allegation.

[47] McQueen's claim about Marden and Tahany making catfight comments and noises is not supported by the record. Mem. at 8. Adler contradicted McQueen testifying that only Marc Herold, not Marden, Tahany or Golden, made "catfight noises." Tr. 547-49; 1023, 1141-42 (Marden and Tahany deny making catfight noises). Adler's account of the "catfight" noises, however, is still unreliable in that she testified she heard the noises coming from the area outside McQueen's office while she was inside McQueen's office. Tr. 548-49. As further evidence that the Arbitrator should disregard Stewart's testimony as unreliable, Stewart testified that McQueen told her that Golden had given the powerpoint presentation depicting McGann and McQueen. Tr. 424-45. It is undisputed, even by McQueen, that Golden did not given the powerpoint presentation. Tr. 430.

After sifting through McQueen's irrelevant and non-probative evidence of allegedly offensive comments, what remains are just three race-based comments allegedly made by Golden to McQueen (*i.e*., you can't be 100 percent black; blacks' don't do well in sales;[48] and am I going to be the only white person at your wedding) all of which Golden denies and for which McQueen fails to offer any corroborating evidence.  Tr. 352-53, 734-35, 737-39, 747.

Even if the Arbitrator were to consider these race-based comments, they are of little probative value as even McQueen admits the last comment was made in *November, 2003* – nearly three years before her termination.  Mem. at 5.  Moreover, Golden recommended McQueen for both a retention bonus and a promotion to Director *after* these comments were alleged to have been made.  Nonetheless, isolated remarks, like those alleged here, are insufficient to create an inference of discrimination, especially those made remote in time to McQueen's termination.  *See Fears v. Heritage Centers*, No. 02-cv-639S, 2004 WL 1824126, at *3 (W.D.N.Y. Aug. 15, 2004) (affording no weight to remark made at least eight months prior to termination); *Georgy v. O'Neill*, No. 00-cv-0660(FB), 2002 WL 449723, at *6 (E.D.N.Y. Mar. 25, 2002) (six months prior to termination); *Bagdasarian v. O'Neill*, No. 00-cv-0258E(SC), 2002 WL 1628722, at *4 (W.D.N.Y. July 17, 2002) (one-year before decision not to promote); *Ekwegbalu v. Central Parking Sys.*, No. 97-civ.-9477(MGC), 2000 WL 1371335, at *4 (S.D.N.Y. Sept. 22, 2000) (same); *Muse v. New York City Dep't of Hous. Preservation & Dev.*, No.96-cv-6221(FB)(ASC), 2000 WL 1209427, at *4 (E.D.N.Y. Aug. 22, 2000) (eight months prior to termination); *Crawford-Mulley v. Corning Inc.*, 194 F. Supp. 2d 212, 222-23 (W.D.N.Y.

---

[48] McQueen's notes do not reflect the comment Golden allegedly made about "Black men" in sales.  Tr. 433; Cl. Ex. 124 at 734.  Denying the comment, Golden explained that he had expressed disappointment to McQueen that African Americans were under-represented in the sales industry.  Tr. 737-38.  Furthermore, McQueen admitted that Golden approved the hiring of Greg Maulpin (African American), Tr. 352-53, 738-39, and it was McQueen who commenced proceedings to terminate Maulpin's employment, not Golden.  Tr. 739.

2002) (three-years before commenced action); *Patterson v. CBS, Inc.*, No. 94-civ.-2562(KTD),

2000 WL 666337, at *3 (S.D.N.Y. May 22, 2000) (remarks made outside the statute of

limitations period); *see also Tripp v. Long Island Univ.*, 48 F. Supp. 2d 220, 225 (E.D.N.Y.

1999) (holding that stray remarks without a demonstrated nexus to the challenged adverse

actions do not create an inference of discrimination), *aff'd*, 201 F.3d 432 (2d Cir. 1999); *Orisek

v. American Inst. of Aero. & Astronautics*, 938 F. Supp. 185, 192 (S.D.N.Y. 1996), *aff'd*, 162

F.3d 1148 (2d Cir. 1998); *Campbell v. Daytop Vill. Inc.*, No. 97-Civ.-4362 (JSM), 1999 U.S.

Dist. LEXIS 6943, at *8-*9 (S.D.N.Y. May 7, 1999), *aff'd*, 201 F.3d 430 (2d Cir. 1999).[49]

Given that the alleged race-based comments are remote in time to McQueen's termination, they

are not probative and certainly do not create an inference that Golden discriminated against her

based on her race.

McQueen's allegations of sex-based comments directed at her by Golden similarly lack

probative value because they were allegedly made, if at all, in 2001 and 2002[50] -- remote in time

to any alleged adverse employment actions.[51]  In any event, this case cannot be about gender

---

[49] Even if the Arbitrator were to consider all of the allegedly biased comments raised in McQueen's brief, McQueen admits that all of the comments were made over a span of three years, between *2002 and April, 2005*, Mem. at 43.  Notably, the last alleged "biased" comment Golden made was in *April, 2005* – about one year prior to her termination in 2006.  Mem. at 43.  As such, none of these alleged comments made by Golden are probative and should be disregarded.  The Arbitrator should further note that none of the alleged comments occurred during the time when McQueen was eligible for a promotion in late 2005.

[50] McQueen incorrectly states in her brief that Golden continued making comments about her marital status and relationships in 2003.  Mem. at 4.  She specifically testified, however, that these comments were only made in 2001 and 2002, not 2003.  Tr. 147.  To the extent any of these alleged comments were made in 2003, they occurred before May, 2003 (the time she got engaged), as she admitted the comments were made prior to her engagement.  Tr. 147.

[51] McQueen fails to specify when Golden allegedly told her that Kevin Hill would not let him promote women but admitted he approved her retention bonus and told her he would make her a vice president.  Tr. 365.  McQueen also relies extensively on hearsay evidence of alleged "biased" comments made by Golden.  The Arbitrator should give such evidence little weight particularly where the alleged hearsay evidence is not contained in her own "contemporaneous" notes and relates to conversations that were "overheard" by others.  *See Ramirez v. New York City Health & Hosp. Corp.*, No. 05-0906-CV, 2006 WL 156879, at *2 (2d Cir. 2006) (finding plaintiff's hearsay proffers insufficient to establish pretext for purposes of race claim); *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir.

because, as discussed above, Golden replaced McQueen with another woman – McGann – and, to the extent McQueen claims that she should have been given the Manager of Account Management position Golden awarded to Santillo, Santillo is also a woman.[52]

Even if true, the few sex or race-based comments allegedly made by Golden amount to stray, offhand and isolated comments that do not give rise to an actionable claim. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). This ensures that Title VII does not become a code of civility for the workplace, censuring people for behavior that is merely inappropriate. *See id*.

## 2. Serious Questions Remains As To Whether The Alleged Offensive Remarks Were Made In The First Place

McQueen claims she reported "many of the above incidents to Julien" but that no action was taken against Golden. Mem. at 8. McQueen's claim, however, is not supported by the

---

1999) (same); *Brown v. Soc'y for Seaman's Children*, 194 F. Supp. 2d 182, 193 (E.D.N.Y. 2002) (same). McQueen admitted that she did not make a notation in her notes that she had reported the incident to Julien in HR about the "yes or no" comment. Tr. 433-34. Moreover, Stewart testified that McQueen told her that Golden had asked her, "yes or no," around the time that McQueen got engaged. Tr. 421. The Arbitrator should disregard Stewart's unreliable hearsay testimony. Assuming Stewart is correct on the timing, McQueen claims she got engaged in May, 2003 (Mem. at 5), thus McQueen allegedly reported this comment to Stewart on or about May, 2003; McQueen, however, testified Golden made this comment during the Christmas party in 2002 (months earlier than Stewart claims). As further evidence of Stewart's unreliability as a witness, she also testified that McQueen told her she prepared her own performance evaluations and brought them to Golden for his signature, which he refused. Tr. 421-22. McQueen, however, never testified about this.

[52] McQueen references a golf outing sponsored by Golden. Mem. at 7. Golden held the golf outing in 2002 and 2003. Tr. 778; Cl. Ex. 122 (referring to golf outing in 2003). He did not invite women because he did not believe women played golf and also because he had rented a small house and did not feel it was appropriate for men and women from the office to sleep together at the overnight outing. Tr. 779. Golden, however, immediately stopped holding the golf outing when he received complaints about the outing. Tr. 780. While there may have been a picture on the bulletin board of an employee wearing a golf outfit at a golf event, as alleged by McQueen, Mem. at 7, there is no evidence that Golden ever saw the picture or whether he was aware that Liz Pandolfi played golf. In fact, simply because an individual wearing a golf outfit was pictured at a golf event does not necessarily mean she plays golf. Recognizing this fatal fact, McQueen embellishes the record by stating in her brief that Pandolfi was in "golf attire" and "holding a golf club." Nowhere in the record does it state that she was in "golf attire" or "holding a golf club" in the picture. *See* Tr. 1361.

33

record evidence.  Indeed, her failure to complain about the alleged "comments" further raises doubt as to whether the alleged comments directed toward her were even made.

Of all the comments alleged to have been made during McQueen's employment, she complained of only one -- notwithstanding her considerable experience as a Human Resources professional at UHG and elsewhere.  Tr. 454-55, 449-50, 451, 914-24, 932-33, 966.  And, in that instance, Julien took prompt corrective action by verbally reprimanding Golden.

Specifically, McQueen maintains that when she was interviewing a female applicant, Golden purportedly remarked afterwards that McQueen should hire the applicant because she was "nice looking."  The single alleged stray comment by Golden -- the only comment arguably attributable to Golden and of which McQueen actually complained -- cannot give rise to an inference of discrimination.  Stray remarks are not evidence of discrimination particularly if they are not temporally linked to an adverse employment action.  *See* discussion above.

Significantly, UHG and Oxford had in place a clearly explained policy of what constitutes impermissible workplace conduct, as well as procedures for reporting harassment. McQueen was fully aware of these complaint procedures, inasmuch as she was responsible for the training on and enforcement of the policies during her time in Human Resources.  Tr. 167, 446.  To the extent she failed to complain draws into serious doubt whether the allegedly inappropriate comments were made in the first instance.  McQueen admits she did not complain to Julien's boss, Lee or anyone else above Lee in human resources, even though McQueen knew Lee and previously worked with her, further raising doubts as to McQueen's credibility.  Tr. 450, 468.  In fact, Julien testified that McQueen *never complained to her of discrimination or retaliation by Golden*.  Tr. 923-24.

To the extent that McQueen contends she complained to Julien about other allegedly 'biased" comments, neither Julien's testimony nor McQueen's "contemporaneous" notes support her claim.  McQueen relies extensively on hundreds of pages of "contemporaneous" notes she maintained while employed by UHG, yet fails to explain the absence of any record therein of the alleged "biased" comments of Golden.  Tr. 432-35, 449-50.

The only "incident" that she recorded in her notes was related to a blow-job comment made to Adler by someone outside of UHG and outside of McQueen's presence.[53]  McQueen attempts to counter the fact that there are no complaints reflected in her thousand-plus pages of notes by stating that "Julien's assurance that Golden was 'protected' persuaded McQueen not to put any complaints in writing."  Mem. at 9.  McQueen testified, however, that "Julien's assurance" was made on or about *April, 2004, well after the overwhelming majority of offensive comments are alleged to have been made*.  Tr. 153-55.  Julien, for her part, denies that she ever told McQueen that Golden was protected.  Tr. 918.  Furthermore, McQueen's failure to either complain to Julien or to go over Julien's head to higher management, does not explain the absence of any personal notes of Golden's alleged comments, when she apparently wrote down every other matter of any significance.

---

[53] McQueen was not present when the alleged comment was made by the broker.  Tr. 448-49.  Contrary to McQueen's characterization of the lunch, Marden was not "engaged in a discussion" about "blow jobs" as she incorrectly states in her brief.  Tr. 120-21, 526-28.  In McQueen's handwritten notes, while she made a notation about Adler's complaint about the blow-job comment, her notes do not reflect that she spoke to either Golden or Julien about the alleged comment.  Tr. 432; Cl. Ex. 124 at 1155.  In her brief, McQueen states that Adler told her a broker mentioned blow jobs and Marden "laughed."  In her notes, though, McQueen noted that Lorraine White also "laughed" at the comment.  Cl. Ex. 124 at 1155; Tr. 526.  Moreover, McQueen and her witness, Adler, cannot agree on the date when the alleged blow-job comment was made.  On cross examination, McQueen testified that the discussion regarding blow jobs occurred in 2002 (McQueen also noted in her amended complaint the comment was made in 2002, Am. Compl. ¶ 9); on direct examination, however, she said based on her notes (Cl. Ex. 124 at 1155), she spoke with Golden about the incident on December 17, 2003.  Tr. 120-21.  Adler, however, testified that the luncheon with the broker took place in 2004.  Tr. 525.  The Arbitrator should disregard Adler's comment about the blow-job comment and her discussion with McQueen about the comment as inadmissible hearsay.  Tr. 528-29, 572-73.  Marden denies that McQueen or Adler ever came to him to complain about the alleged joke.  Tr. 1142-43.

McQueen relies on Julien's deposition testimony in response to a leading question that it was "possible" that she expressed frustration about her power to act on concerns about discrimination by Golden. Julien clarified at the hearing that her frustration stemmed not from any inability on her part to discipline Golden, if necessary, but that to address employment issues with higher-level management, she had to go through Rudell. Tr. 964-66. Indeed, Julien testified that on the one occasion she believe Golden had acted inappropriately, she still approached him about the issue.[54] In sum, as discussed above, there were no sex-based comments made about McQueen by Golden and little, if any, evidence in support of her race discrimination claim.

### D. McQueen's Other Allegations Relating To Golden Fail To Create An Inference Of Discrimination

#### 1. Golden Did Not Lay In Wait To Terminate McQueen Especially Where He Could Have Terminated Her During Prior Layoffs

First, McQueen claims Golden "waited until he could seize the excuse of company-wide layoffs to purport to eliminate McQueen's position." Mem. at 25. McQueen, however, ignores the undisputed facts that (i) Golden gave her a retention bonus after most of the purportedly

---

[54] As further evidence of her alleged fear of complaining, in her brief, McQueen refers to an incident in "*late 2006*," Mem. at 9, involving Howard Margolies taking a number of employees to a strip club. First, to the extent McQueen is referring to an incident post-termination, it is irrelevant to her claim. It should be noted that McQueen testified that she had this conversation with Santillo on or about *January or February, 2006*. Tr. 234. Second, Santillo was recounting to McQueen complaints she had received from other employees and, as such, the alleged complaint is double hearsay. Tr. 234-35. Third, this alleged incident could not have deterred McQueen from making her own complaints as this incident occurred long after McQueen had been subjected to the alleged biased comments. Finally, the incident involving Tahany and Margolies allegedly getting upset at Santillo for allegedly complaining to HRDirect is irrelevant as it has nothing to do with Golden or McQueen and there is no evidence that Golden had knowledge of this alleged incident. Fear of retaliation alone does not excuse plaintiff's failure to complain to her employer about violations of Title VII. *See Finnerty v. William H. Sadlier, Inc.*, No. 05-4494-cv, 2006 U.S. App. LEXIS 8620, at *13 (2d Cir. Apr. 7, 2006) (plaintiff's alleged fear of retaliation did not justify her failure to report discriminatory conduct, where employer had not been shown to have ignored or resisted similar complaints, or taken adverse action against employees in response to similar complaints); *Leopold v. Baccarat, Inc.*, 239 F.3d 243, 246 (2d Cir. 2001) (same); *Breeding v. Cendant Corp.*, No.01 Civ. 11563 (GEL), 2003 U.S. Dist. LEXIS 6558, at *20-*21 (S.D.N.Y. Apr. 17, 2003) (same).

36

offensive conduct occurred, and after she allegedly complained to Julien; and (ii) Golden participated in prior lay offs related to UHG's merger through which he could have terminated McQueen. Despite the prior layoffs, Golden opted not to "target" McQueen. Instead, Golden terminated male and female Caucasian employees, thus rebutting any inference that Golden lay in wait to terminate McQueen's employment. Tr. 727, 729-31 (*e.g.*, Golden laid off Michael Lenahan, Karen Mark and Melissa Dobkin).

Second, McQueen claims Golden had a history of "discriminatory firings." Mem. at 26. She refers to two women in 2004 who were terminated, which Julien considered "troubling." Mem. at 26-27. McQueen provides no basis for claiming these firings were "discriminatory," and Julien testified that she did not consider the terminations inappropriate because both individuals had documented performance problems. Tr. 958. Similarly, McQueen references the transfer of Junior Harewood, but does not allege that the transfer was inappropriate in any way other than to say the Long Island office was a smaller office. Mem. at 27.

Third, Golden's email that McQueen likely would be gone by 2006, Mem. at 24, related not to the fact that Golden had targeted her for termination, but to his belief that McQueen was pursuing other opportunities outside his department or the Company, because of the uncertainty associated with the merger and the possibility of reporting to someone other than Golden. Tr. 875-76. Furthermore, Golden felt that McQueen was not integrating well with UHG employees post-merger. Tr. 875-76. Indeed, on or about October 5, 2005, McQueen applied for the Vice President of Integration position -- a position outside of Golden's group. Tr. 285-86. Contrary to McQueen's claim, Golden had *not* decided by March, 2005 to "fire McQueen." Mem. at 24.

### 2.    Allegations Relating To Jill Hutton Are Irrelevant

In or about July, 2000, during the time McQueen worked in human resources, she investigated a complaint made by Hutton against Golden. Tr. 42-49. Hutton complained to

37

McQueen that Golden retaliated against her by placing her on a "corrective action" because she had rebuffed his advances. Tr. 42-49. Notably, however, McQueen admitted at the hearing that she was *unable to substantiate Hutton's claims nor did she recommend that Golden be disciplined*. Tr. 42-49, 359-60, 361.[55] Indeed, Golden had no knowledge that Hutton ever complained of sexual harassment, Tr. 607, and, as such, could not have unlawfully terminated Hutton in retaliation for her complaint. Moreover, contrary to McQueen's claim, Golden never directed that Hutton be fired. This allegedly unlawful "directive" occurred many years before the allegations raised here and should be disregarded. *See* Section IV.E regarding McQueen's retaliation claim, below (citing cases).

Even if credited, evidence relating to Hutton is not probative because it occurred years before any alleged adverse action against McQueen. Indeed, Golden promoted McQueen to the position of Manager of Account Management after McQueen's investigation. *See Haskell v. Kaman Corp.*, 743 F.2d 113, 120 (2d Cir. 1984) (evidence of discrimination toward other individuals not relevant); *Martin v. Reno*, No. 96-civ.-7646(NRB), 2000 U.S. Dist. LEXIS 18278, at *10 (S.D.N.Y. Dec. 18, 2000) (same); *see also Hong v. Children's Mem. Hosp.*, 993 F.2d 1257, 1266 (7th Cir. 1993) (same).

Simply stated, the evidence relating to Hutton constitutes nothing more than allegations of "prior bad acts," which are inadmissible to show that Golden acted in conformity therewith with respect to his conduct toward McQueen. Fed. R. Evid. 404(b).[56] Despite the allegations

---

[55] McQueen attempted to downplay her finding that Golden had not engaged in any wrongdoing with respect to Hutton by testifying at the hearing that her investigation was "incomplete." Tr. 360. Yet, she contradicts her deposition testimony where she testified that she had conducted a complete investigation by questioning Hutton and other employee witnesses, but was unable to reach a conclusion. Tr. 360-61.
[56] *See, e.g., Fitzgerald v. Stanley Roberts, Inc.*, 186 N.J. 286, 319 (2006) ("[G]ossip evidence was not admissible to prove defendant's propensity to harass women or as evidence of his general bad character. . . . Like all evidence of prior bad acts, that evidence had a strong potential to prejudice the defendant . . ."); *Kidder, Peabody & Co. v. IAG Int'l Acceptance Group, N.V.*, No. 94-Civ.-4725(CSH), 1999 U.S.

made by Hutton, McQueen still accepted a position working directly for Golden when she became the Manager of Account Management.  Tr. 359-60.

### 3.    McQueen Was Not The Only Employee Impacted By Powerforward

McQueen alleges this was a reduction of one (confined to Golden's department),[57] but to the extent McQueen asks the Arbitrator to examine the demographics of the entire Northeast Region (outside of Golden's department), Mem. at 24, the Arbitrator cannot ignore the fact that Powerforward was a Company-wide initiative (not confined to Golden's department).  Tr. 1315, 1322.

### 4.    Golden Never Wavered From His Testimony That He Consulted With Others Before Terminating McQueen's Employment

McQueen asks the Arbitrator to discredit Golden's testimony because, as she incorrectly claims, Golden "changed his story about the process" presumably referring to the decision to terminate McQueen's employment.  Golden's testimony did not change; rather, McQueen mischaracterizes an interrogatory response to suggest that "only Golden was consulted about McQueen's firing."  Mem. at 26.  Golden was identified in that interrogatory response because he was the individual responsible for terminating McQueen's employment.  Golden discussed the decision to terminate McQueen with Aponte and McGuire and his testimony at the hearing does not contradict his deposition testimony.  Tr. 849-50; 704, 710, 716.

---

Dist. LEXIS 132, at *39 (S.D.N.Y. Jan. 12, 1999) ("Evidence of prior bad acts is precluded under Rule 404(b) when it is sought to be admitted for the purpose of proving action . . . in conformity therewith.").
[57] Contrary to McQueen's claim of a "reduction of one," there were other individuals in Golden's department that were laid off including Sales Operation Specialists Kuinlan and Hayward, both Caucasian, while other female and an African American employee were retained.  Tr. 1024-28; Cl. Ex. 98.  Golden was aware of the decision to terminate Kuinlan and Hayward.  Tr. 1028.

### 5.    McQueen's Attempt To Establish That Her Selection For Termination Was A Bad Business Decision Fails

McQueen speculates that Golden could have achieved greater cost savings by eliminating Marden's position rather than her position.  Mem. at 29 n.7.  The role of the Arbitrator, however, is not to second-guess UHG's legitimate business decisions.  *See Stone v. Bd. of Educ.,* No. 05-2480-cv, 2005 U.S. App. LEXIS 23703, at *5 (2d. Cir. Nov. 2, 2005) (The court "will not act as a super personnel department that second guesses employers' business judgments."); *Meacham v. Knolls Atomic Power Lab.,* 461 F.3d 134, 144 (2d Cir. 2006) (same); *Newsom-Lang v. Warren Int'l, Inc.,* No. 03-7372, 2003 U.S. App. LEXIS 22732, at *4 (2d Cir. Nov. 4, 2003) (same).

### 6.    Golden Had No Reason To Consider McQueen For Santillo's Position

Although McQueen attempts to paint a picture of Golden as unfairly "setting" her up by dissuading her from applying for the Santillo position, Golden had no reason to consider McQueen for the Santillo position, because he had already assigned her to the more prestigious Key Accounts position with higher compensation.  Tr. 216, 866, 1030.  Indeed, McQueen likely would have considered Santillo's position a demotion.  Moreover, at that point, Golden was not even aware of Powerforward.

### 7.    McQueen Fails To Discredit Golden's Testimony

In her brief, McQueen contends that Golden should not be believed due to "repeated contradictions."  She references page 27 of her brief, but that section does not describe any contradictions allegedly made by Golden.  One example given by McQueen that Golden contradicted himself and should not be credited involved his knowledge of UHG's discrimination policies.  At the hearing, Golden said he was familiar with the policy while at his deposition, he said he did not know whether such policies were contained in the handbook.

These statements are in fact not contradictory as the former deals with the existence of such policies and the latter their location.

8.    **The "New Jersey Posting" Was Not A Posting For McQueen's Old Position**

To the extent that McQueen argues UHG's legitimate business reason for her termination is pretextual on the basis of a job posting for a "Director of Account Management, Key Accounts-Iselin, NJ" posted shortly *after* her termination, UHG presented substantial evidence that the position relates to the management of Account Executives who perform *sales functions* and *not Account Managers* -- McQueen's former position.  McQueen did not perform any sales functions while working in Account Management, nor was she qualified to perform such functions because she lacked the requisite background in finance and insurance underwriting. Tr. 790-91, 1063-67, 1073.  The functions identified in the New Jersey posting did not relate to McQueen's former position, the position did not report to Golden and was based in New Jersey, not New York City.  Tr. 790-91, 1065-67, 1073, 1074-75.  As Farkus noted and Adler admitted, the position required financial and underwriting experience -- none of which McQueen had.  Tr. 564-65, 1073.  Moreover, the position, which was filled by Tom Rogalsky, who had substantial financial and underwriting experience, was not a new position, but rather became available when Vance Sible resigned after McQueen's termination.  Tr. 865-66, 1063-65, 1067-71.

9.    **The Arbitrator Should Draw No Inference By The Fact That Deb Lee Did Not Testify At The Hearing**

McQueen's claim that the Arbitrator should draw an adverse inference from UHG's decision not to call Lee is improper.  She cites *Sagendorf-Teal v. County of Rensselaer*, 100 F.3d 270 (2d Cir. 1996), a First Amendment case which is entirely inapposite to the instant facts.  In that case, each of the witnesses that were not called by the employer were responsible for informing the employer of the plaintiff's misconduct, which formed the basis for Plaintiff's

41

termination.  *See id*. at 275-76.  Here, Lee is merely alleged to have been present at a meeting *after* the termination decision had been made.  Mem. at 40.  McQueen has not shown that Lee has any "special knowledge of material facts" as would justify an adverse inference.  *See, e.g., LaScala v. Scrufari*, 330 F. Supp. 2d 236, 253 (W.D.N.Y. 2004) (declining to draw adverse inference based on failure to call attendee at critical meeting).

### E.    UHG Did Not Retaliate Against McQueen

Even assuming, *arguendo*, that McQueen timely complained of discrimination (which she did not), she cannot establish a causal connection between her alleged complaints and her termination.[58]  First, McQueen failed to present any credible evidence that she complained about Golden, which is confirmed by the absence of any such incidents in her thousand-plus pages of notes.  Furthermore, Julien testified that McQueen did not complain to her of discrimination.[59]  Even if McQueen had complained to Julien, however, she offered no evidence her complaints were even brought to Golden's attention.  Indeed, McQueen contends that Julien did nothing.

Second, to the extent McQueen claims she engaged in protected activity when she complained of offensive comments allegedly made by Marden and Tahany, she has no evidence that Golden was aware of these alleged complaints either.  A decision-maker unaware of complaints by a plaintiff precludes a finding of retaliation.[60]

---

[58]  Retaliation claims under Title VII are evaluated under the *McDonnell Douglas* three-step burden shifting analysis.  *See Lizardo v. Denny's, Inc*., 270 F.3d 94 (2d Cir. 2001).  To establish a *prima facie* retaliation claim, claimant must show that (1) she engaged in an activity protected under anti-discrimination statutes; (2) respondent was aware of claimant's participation in the protected activity; (3) respondent took adverse action against claimant, and (4) a causal connection existed between claimant's protected activity and the adverse action taken by the respondent.  *Id*. at 105;  *Tomka v. Seiler Corp*., 66 F.3d 1295, 1308 (2d Cir. 1995).

[59] The Arbitrator should credit Julien's testimony who is also African, is no longer employed by UHG, and has no stake in this case.

[60] *See Mendoza v. SSC&B Lintas*, No. 96-7327, 1997 U.S. App. LEXIS 27259, at *8-*9 (2d Cir. Oct. 3, 1997); *Matya v. United Ref. Co*., 480 F. Supp. 2d 678, 687 (W.D.N.Y. 2007); *Payton v. City Univ. of N.Y.*, 453 F. Supp. 2d 775, 785 (S.D.N.Y. 2006) (no causal connection where decision-makers unaware of complaint); *Staff v. Pall Corp*., 233 F. Supp. 2d 516, 543 (S.D.N.Y. 2002) (same).

Third, the timing of her termination precludes a finding of a causal connection. *See Carter v. New York*, 310 F. Supp. 2d 468, 478 n.5 (N.D.N.Y. 2004) (requiring showing "a very close connection, typically on the order of *days or weeks, not months*, between the protected activity and the alleged retaliation").[61]  McQueen describes the instances in which she alleged complained from 2002-April, 2005, Mem. at 43.  Her last alleged complaint, admittedly was made nearly one year before her termination.  Thus, she cannot establish any causal connection between her complaints and her termination.

Fourth, to the extent McQueen contends Golden retaliated against her by not finding her another position with UHG, Golden had no obligation to find a job for her in the Powerforward environment where UHG was seeking to reduce costs company-wide.  Mem. at 33, 43.  Contrary to McQueen's claim, Golden's treatment of Tahany is not comparable to McQueen's because Tahany was not terminated as part of a reduction in force.  Tr. 841.

## V.      McQueen Not Entitled To The Damages She Seeks

### A.      McQueen Not Entitled To Front Pay Damages

Even assuming McQueen establishes liability (which she cannot), she fails to provide a reasonable basis for computing her alleged damages.  A front pay award is a proper measure of damages only when "the factfinder can reasonably predict that the plaintiff has no reasonable prospect of obtaining comparable alternative employment."  *Sagendorf-Teal*, 100 F.3d at 277. "Because of the potential for windfall, the use of front pay must be tempered and the court

---

[61] *See also Kodengada v. IBM*, 242 F.3d 366, 368 (2d Cir. 2000) (finding five month period sufficient to sever causal nexus between plaintiff's complaints and decision to terminate him); *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85 (2d Cir. 1990) (three and one-half months); *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 130 (2d Cir. 1996) (between one and three months); *Patrick v. New York City Trans. Auth.*, No. 03-cv-0584(JFB)(LB), 2007 WL 2071555, at *12 n.9 (E.D.N.Y. July 16, 2007) (citing a multitude of cases and noting that "a passage of two months between the protected activity and the adverse employment action seems to be the dividing line"); *Kemp v. Metro-North R.R.*, No. 04-civ.-9926(RWS), 2007 WL 1741256, at *18 (S.D.N.Y. June 14, 2007) (declining to find causal connection where plaintiff's transfer occurred fifteen months after her internal complaint).

should employ the equitable principles of discretion, restraint, and balance in assessing whether to award front pay, and, if so, in what amount." *Hill v. Airborne Freight Corp.*, No. 97-CV-7098 & 98-CV-6249(FB) , 2003 U.S. Dist. LEXIS 2379, at *13 (E.D.N.Y. Feb. 20, 2003), *aff'd*, 2004 U.S. App. LEXIS 2650 (2d Cir. Feb. 18, 2004).  Further, even in the rare instances where front pay is appropriate, a court may deny front pay where the proposed method for calculating the award is too speculative, *Hine v. Mineta*, 238 F. Supp. 2d 497 (E.D.N.Y. 2003), or the term of payment exceeds one or two years, *Thomas v. Istar Fin., Inc*., No. 05 Civ. 606 (VM), 2007 U.S. Dist. LEXIS 67856, at *19 (S.D.N.Y. Sept. 7, 2007).  Here, McQueen is not entitled to any front pay because she found work approximately five months after her termination and earned unemployment compensation benefits in the interim (which she failed to include in her "mitigation" calculation).  *See* Cl. Ex. 21; Resp. Ex. 12; Tr. 24-25.  Because McQueen found comparable employment after her termination, there is no reason for the Arbitrator to award any front pay damages.  *See Reed v. A.W. Lawrence & Co*., 95 F.3d 1170, 1182 (2d Cir. 1996) (finding front pay only appropriate where plaintiff has been unable to find another job); *Brady v. Wal-Mart Stores, Inc*., No. CV 03-3843(JO), 2005 U.S. Dist. LEXIS 12151, at *19 (E.D.N.Y. June 21, 2005) (finding front pay is only an available remedy where plaintiff has been unable to find another job, and has no reasonable prospect of obtaining comparable alternative employment); *Greenbaum v. Svenska Handelsbanken*, 979 F. Supp. 973, 988 (S.D.N.Y. 1997) (denying award of front pay where plaintiff has found comparable employment).

Furthermore, in calculating her expected "future earnings," she erroneously claims she would have received annual pay increases of $10,000, when the record makes clear that she averaged pay increases of $6,375 per year.

44

**B.     McQueen Not Entitled To "Unvested" Stock Options**

The Arbitrator should not award McQueen any "unvested" stock options as this award is too speculative.  Courts have denied awards of unvested stock options where plaintiff's ability to use those options is too speculative.  *See Smith v. Monsanto Co.*, 9 F. Supp. 2d 1113 (E.D. Mo. 1998) (finding plaintiff's unsupported assumptions that she would have remained employed through the present, that her stock options would have vested and she would have liquidated them only when they reached a specified per share gain far too speculative to support a damages award).  At issue are the 900 unvested stock options reflected in Cl. Ex. 66 (granted November 4, 2004).[62]  Here, there is no evidence that McQueen has in the past or intends to in the future to exercise her options.  As such, the Arbitrator should not award any damages for the unvested stock options.

**C.     McQueen Erroneously Calculates The Stock Options She Claims She Should Have Received Had She Been Promoted**

To the extent the Arbitrator finds liability as to McQueen's failure to promote claim, she erroneously calculates the amount of stock options she claims she *should have received* had she been promoted.  As an initial matter, McQueen inappropriately uses Marden, Tahany and Margolies -- Sales Executives -- as her comparators.  *See* discussion in Section IV.B.4 , above.

The appropriate measure of damages in a failure to promote claim is what the claimant would have received in salary and benefits had she received the promotion.  The salary package paid to the successful candidate, however, is not necessarily the appropriate measure of damages where the employer can articulate reasons why the successful applicant was paid more.  *See Barbour v. Merrill*, 48 F.3d 1270, 1278 (D.C. Cir. 1995) (calculation of back pay awarded on

---

[62] To the extent McQueen claims she has 500 "unvested" options pursuant to Cl. Ex. 67, she is mistaken as those allegedly "unvested" options vested at the time of the merger due to the "Change in Control" provision contained in the agreement.  Cl. Ex. 67 at 2, ¶ 3.  Accordingly, her calculation of $32,000 as the amount of her unvested stock options is incorrect.  Mem. at 46; Claimant's Appendix 2.

basis of $70,000 annual salary was not abuse of discretion where plaintiff was unable to establish that employer would have offered him higher salary offered to successful applicant).  Similarly, the performance bonus paid to the successful applicant is not the appropriate measure of plaintiff's damages.  Rather, plaintiff's earlier performance ratings in the previous position applied to the higher bonus scale are more appropriate.  *Levy v. Powell*, No. CV-00-4499 (SJF), 2005 U.S. Dist. LEXIS 42180, at *8 (E.D.N.Y. July 7, 2005).  Here, McQueen is not entitled to $80,000[63] as compensation for options not granted because she is similarly situated to her alleged comparators who generated billions in revenue for UHG.

The Arbitrator should disregard McQueen's erroneous valuation of her lost "stock options" because Appendix 3 contains a number of critical mathematical mistakes, is based on false assumptions, is inaccurate and misleading.  An annotated version of McQueen's "stock option value comparison" chart attached hereto as Appendix 1 identifies the inaccuracies with McQueen's calculation.  Lastly, McQueen references a number of different stock option plans given to Marden, Tahany and Margolies, but failed to provide any evidence that *had she been promoted or not terminated, that she too would have qualified for any of these stock option agreements*.

### D.    McQueen Not Entitled To The Same Compensation As Marden

McQueen arbitrarily believes she should have received the same compensation as Marden had she been promoted.  McQueen's comparison is neither reasonable nor sound.  In terms of base salary, the more appropriate comparator would be McGann who performed the same account management functions as McQueen, not sales functions like Marden.  In claiming that she should have received the same compensation as Marden, McQueen ignores the fact that

---

[63] The average difference in options is approximately $66,000, not $80,000 as incorrectly calculated by McQueen.

Marden's compensation was based largely on incentive compensation and reaching certain sales targets. There is no evidence that McQueen would have reached these same targets or that she could have in her non-sales position. Thus, the basis for her claim for damages in lost salary is purely speculative.

### E.     McQueen Not Entitled To An Award Of Punitive Damages

The Arbitrator should deny McQueen's request for punitive damages as a matter of law. Regardless of whether McQueen can prevail as to liability, the facts demonstrate that UHG did not discriminate against her "with malice or with reckless indifference" to her protected rights, as necessary for the imposition of punitive damages. *See Kolstad v. American Dental Ass'n*, 527 U.S. 526, 530 (1999) (internal quotation and citation omitted). To the contrary, the evidence shows that UHG implemented in good faith an anti-discrimination policy and, in this case, acted consistent with Company policies. Among other things, Golden granted her annual pay increases, stock options, bonuses, and hired and promoted her. These are hardly the acts of a manager bent on violating her protected rights with malice and reckless indifference.

### F.     Assuming The Arbitrator Finds McQueen's Termination Lawful, Her Damages Are Limited As Of The Date Of Her Termination

Assuming the Arbitrator finds UHG liable on McQueen's failure to promote claim, but finds her termination lawful, McQueen cannot recover any damages incurred as a result of her termination. *See Clarke v. One Source, Inc*., No. 99-CIV.-2323(RPP), 2002 U.S. Dist. LEXIS 21195, at *14 (S.D.N.Y. Nov. 1, 2002) (employer may only be liable for damages resulting from a lawful termination where such damages were "proximately caused by a prior unlawful employment action."); *Hatter v. New York City Hous. Auth*., No. 97-CIV.-9351, 1998 U.S. App. LEXIS 27571, at *4 (2d Cir. Oct. 22, 1998) (plaintiff not entitled to damages under the ADEA "after the time of her proper, non-discriminatory termination . . . . Such remedies are only

47

available when the employee's separation from employment results from the discriminatory conduct."); *Lapham v. Vanguard Cellular Sys., Inc.*, 102 F. Supp. 2d 266, 269 (M.D. Pa. 2000) ("Because the lawful termination of the employment relationship extinguishes the mutual obligations of employer and employee, a 'valid termination is, essentially, a superseding cause which relieves [the employer] from further liability for backpay awards.'") (*citing Hite v. Biomet, Inc*., 53 F. Supp. 2d 1013, 1025 (N.D. Ind. 1999) ("[c]ommon senses dictates that a valid discharge subsequent to a discriminatory act cuts off the employer's liability for backpay arising out of discriminatory conduct occurring prior to the discharge."). Thus, the Arbitrator should not award her any "unvested" stock options or front pay as a result of her termination, and may only award pay increases during the time period the Arbitrator believes McQueen should have been promoted, up until her termination. Furthermore, the Arbitrator should not award any emotional distress damages as McQueen asserted that her alleged emotional distress damages stem from her termination, not as a result of any failure to promote. Tr. 333, 462 ("it's the whole embarrassment of the whole firing."), 463; *see also* Tr. 428.

### G.    McQueen Cannot Establish She Is Entitled To Emotional Distress Damages

McQueen is not entitled to emotional distress damages where she did not seek medical treatment and cured her medical condition (headaches) with Aleve or Advil. Tr. 333. As a matter of law, there is insufficient evidence in the record to support a claim for emotional distress damages. *See Annis v. Cty. of Westchester*, 136 F.3d 239, 249 (2d Cir. 1998) (finding plaintiff's testimony alone was insufficient to support an award of emotional distress damages where she did not allege any physical manifestations of her emotional distress and could not corroborate her testimony regarding medical treatment). To the extent the Arbitrator finds McQueen suffered from emotional distress, McQueen can only establish "garden variety" emotional distress damages based on her testimony alone because she has not established the

alleged conduct was egregious or caused any significant injury to her health. *See Rainone v. Potter*, 388 F. Supp. 2d 120 (E.D.N.Y. 2005) (garden variety emotional distress damages are often awarded in cases where the plaintiff does not seek medical attention and does not receive treatment, but only self-medicates); *McGrory v. City of New York*, No. 99-civ.-4062(FM), 2004 WL 2290898 (S.D.N.Y. Oct. 8, 2004); *Petrovits v. New York City Trans. Auth.*, No. 95-civ.-9872(DFE), 2003 WL 22349676 (S.D.N.Y. Oct. 15, 2003).[64]

To the extent McQueen reserved argument on the amount of attorneys fees to which she is entitled in the event she prevails on her claims, UHG similarly reserves rights to respond to her claim at the appropriate time.

---

[64] *See Jowers v. DME Interactive Holdings, Inc.*, No. 00-Civ.-4753 (LTS)(KNF), 2006 WL 1408671, at *13 (S.D.N.Y. May 22, 2006) (limiting garden variety emotional distress award to $15,000); *Reiter v. Metropolitan Transp. Auth. of N.Y.*, No. 01-Civ.-2762(JGK), 2003 WL 22271223, at *9 (S.D.N.Y. Sept. 30, 2003) (reducing jury award of $140,000 for garden variety emotional distress to $10,000); *Borja-Fierro v. Girozentrale Vienna Bank*, No. 91-Civ-8743(CMM), 1994 WL 240360, at *3-*4 (S.D.N.Y. May 27, 1994) (reducing emotional distress award from $160,000 to $15,000 where distress was garden variety); *Manhattan & Bronx Surf. Trans. Operating Auth. v. New York state Exec. Dep't*, 194 A.D.2d 610, 610-11, 632 N.Y.S.2d 642, 644 (2d Dep't 1995) (reducing $30,000 award for garden variety emotional distress to $7,500); *Quality Care v. Rosa*, 599 N.Y.S.2d 65, 66 (2d Dep't 1993) (reducing award of $10,000 for garden variety emotional distress to $5,000).

## <u>CONCLUSION</u>

Accordingly, based on the foregoing facts, authorities, and arguments, the Arbitrator

should find in favor of UHG.

Dated: New York, New York
        October 9, 2007

                                Respectfully submitted,

                                UNITED HEALTHCARE, INC.


                                By:  s/ Christopher H. Lowe
                                        One of Its Attorneys


Christopher H. Lowe
James R. Cho
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018-1405
(212) 218-5500

Attorneys for Respondent

**APPENDIX 1:  Response to McQueen's Appendix 3 (Stock Option Value Comparison)**

| | McQueen | Tahany | Marden | Margolies |
|---|---|---|---|---|
| 3/2/2004[65] | | 6834@47.91 (Ex. 81, 82, 83)[66] | 5970@47.91 (Ex. 73, 74, 75)[67] | 1500@47.91 (Ex. 91, 92, 93)[68] |
| Value | | 59360 | 28834 | 11130[69] |
| 11/4/2004 | 1200@38.88 (Ex. 66) | 2400@38.88 (Ex. 80) | 1200@77.75 (Ex. 72) | 3000@38.88 (Ex. 90) |
| Value | 19740[70] | 39480[71] | 0 | 49350 |
| 5/2/2005 | n/a | n/a | 2000@47.34 (Ex. 71) | n/a |
| Value | | | 15,980 | |
| 10/31/2005 | n/a | 1000@57.89 (Ex. 79) | 1500@57.89 (Ex. 70) | 1000@57.89 (Ex. 89) |
| Value | | 0 | 0 | 0 |
| 5/2/2006[72] | n/a | 2500@48.58 (SARS) (Ex. 78)[73] | 3000@48.58 (SARS) (Ex. 69) | 2500@48.58 (SARS) (Ex. 88) |

[65] With respect to Tahany, Marden and Margolies, McQueen inappropriately combines the shares awarded and purchase price of three different plans to determine a total value of the stock option agreements.  This was an inappropriate calculation because the plans have distinct provisions and different tax treatment.

[66] McQueen references three different stock option plans -- the "Incentive Stock Option Agreement, 1991 Stock Option Plan" "Non-Qualified Stock Option Agreement, 1991 Stock Option Plan" and "Non-Qualified Stock Option Agreement, 2002 Equity Incentive Compensation Plan."

[67] McQueen references three different stock option plans -- "Non-Qualified Stock Option Agreement, 2002 Equity Incentive Compensation Plan," "Non-Qualified Stock Option Agreement, 1991 Stock Option Plan," and "Incentive Stock Option Agreement, 1991 Stock Option Plan."

[68] McQueen references three different stock option agreements -- "Incentive Stock Option Agreement, 2002 Equity Incentive Compensation Plan," "Incentive Stock Option Agreement, 1991 Stock Option Plan," and "Incentive Stock Option Agreement, 1991 Stock Option Plan."  Cl. Ex. 93 refers to a stock option agreement awarded *on February 2, 2004 at a purchase price of $48.19 per share*, not March 2, 2004 at a purchase price of $47.91 as incorrectly stated in Appendix 3.

[69] Using the correct numbers from the various agreements, this figure should be 10,990.

[70] This figure inappropriately takes into account McQueen's unvested stocks.

[71] This figure incorrectly takes into account the number of *unvested* options Tahany had at the time he left the Company in 2006.

[72] The agreements referenced as "SARS" refer to "Stock Appreciation Rights Award (Stock Settled)" plans, not stock option plans.

[73] This figure incorrectly takes into account the number of *unvested* options Tahany had at the time he left the Company in 2006.

| Value | | 16,875 | 20,250 | 16,875 |
|---|---|---|---|---|
| TOTAL | 19740[74] | 115.715 | 65064 | 126705[75] |
| Difference v. McQueen | | 95975 | 45324 | 106965[76] |

---

[74] McQueen values her options at $19,740.  McQueen inaccurately based this figure on the assumption that all of 1200 her shares had vested.  At the time of her termination, only 25 percent of her options had vested.

[75] McQueen calculated this number incorrectly.  Using McQueen's number, the total should be 77215 (not 126705), for a difference of 57,475 (not 106965).

[76] *See* footnote 75, above.

2

# EXHIBIT 3

**SEYFARTH**
ATTORNEYS **SHAW** LLP

620 Eighth Avenue

New York, New York 10018-1405

(212) 218-5500

fax (212) 218-5526

www.seyfarth.com

Writer's direct phone
212-218-5500

Writer's e-mail
clowe@seyfarth.com

Writer's direct fax

BRUSSELS

WASHINGTON, D.C.

SAN FRANCISCO

SACRAMENTO

NEW YORK

LOS ANGELES

HOUSTON

CHICAGO

BOSTON

ATLANTA

November 5, 2007

**VIA EMAIL AND FEDERAL EXPRESS**

Susan T. Mackenzie, Arbitrator
c/o Joseph P. Conlon, Case Manager
American Arbitration Association
Northeast Case Management Center
950 Warren Avenue
East Providence, RI 02914

> Re:     McQueen-Starling v. United Healthcare
>           13 160 01224 06

Dear Arbitrator Mackenzie:

Respondent writes to request leave to file a sur-reply in the above-referenced matter in light of the mischaracterization of applicable law and the factual record raised in Claimant's Post-Hearing Reply Memorandum as well as new matters first asserted in the Reply.[1]  The following letter sets forth the basis for this request.

First, Lisa McQueen ("McQueen") repeatedly mischaracterizes the factual record.  For example, McQueen dismisses Bill Golden's practice of placing employees in expanded roles before promoting them.  Regardless of whether Golden specifically stated he waited "six months" before promoting employees, he along with McQueen's witness, Lori Adler ("Adler"), specifically testified as to this practice of not granting promotions immediately, but to give employees "increased responsibilities" first and to promote only after the individual had "proven" him or herself in the job over a period of approximately six months.  Tr. 568 ("Once we demonstrated . . . for six months we could perform in that function, then Bill Golden approved it."), 569; *see also* Tr. 672.  Adler's testimony contradicts McQueen's claim in her Reply that Adler "testified that Golden had <u>approved</u> her promotion six months earlier when McQueen recommended it, but gave her the

---

[1] References to McQueen's "Reply Memorandum," "Respondent's Post-Hearing Brief," and hearing transcript appear as "Reply at __[page]," "Resp. Br. at __[page]," and "Tr.__[page]," respectively.



title six months after she began work as a team leader." *Compare* Reply at 6, *with* Tr. 568. Although McQueen contends the "six month promotion" criteria is a "fabrication," she cannot get around Adler's undisputed testimony regarding the six-month probationary period as one of the factors Golden considered when making promotion decisions.

McQueen's claim that it is "undisputed" that "Golden solicited complaints about McQueen from her staff" is contrary to the record evidence. Reply at 2. Contrary to McQueen's claim, Golden approached McQueen's staff only after McQueen's heavy-handed management style had been brought to his attention and to that of human resources, not the other way around. As Adler testified, the investigation was initiated as a result of complaints raised by the account managers and was not driven by Golden. Tr. 567. McQueen also claims it is undisputed that "Julien heard that Golden made discriminatory comments about [Liz] Socci's age and was concerned, but took no action," Reply at 3, yet Julien denied that McQueen complained to her about the alleged comments made by Golden, saying she did not recall McQueen complaining to her about Socci. Tr. 924.

In addition, McQueen's "statement of facts" ignores contrary evidence. For example, McQueen states, "In response to McQueen's complaints about Golden's discriminatory comments, [Audrey] Julien told McQueen that he was 'protected.'" Reply at 3. McQueen, however, fails to acknowledge that Julien, for her part, denies that she ever told McQueen that Golden was protected. Tr. 918. McQueen also alleges as "fact" that "Golden asked McQueen when she planned to start a family, said she was 'getting up there in age,' and implied that she should hurry to avoid needing fertility treatment." Reply at 3. McQueen, however, ignores Golden's testimony denying that he talked about her "having a family," Tr. 743-44, and further ignores Julien's testimony that McQueen never complained to her about the alleged comment Golden made about starting a family or that she better "hurry up." Tr. 918-19.

Second, McQueen's claim that the "Second Circuit has never adopted the 'same actor' inference" is inaccurate. *See Grady v. Affiliated Cent., Inc*., 130 F.3d 553, 560 (2d Cir. 1997) (applying same actor inference); *Anderson v. Hertz Corp*., No. 03 Civ. 9131 (SCR), 2007 U.S. Dist. Lexis 63092, at *21-*22 (S.D.N.Y. July 30, 2007) (citing cases adopting same actor inference). In her Reply, McQueen alleges "the 'same actor' inference is *only* 'accorded substantial weight where the time period between the hiring and firing is less than two years.'" Reply at 11 (emphasis added). By adding the word *only*, McQueen misrepresents the holdings of the cases cited (*i.e.*, *Cooper v. Morgenthau*, No. 99-Civ.-11946, 2001 WL 868003 (S.D.N.Y. July 31, 2001) and *Hueston v. City of N.Y*., No. 00-Civ.-9512, 2005 U.S. Dist. Lexis 253 (S.D.N.Y. Jan. 10, 2005)), Reply at 11, which held that the inference is substantially stronger where less than two years have elapsed between the events, but that inference remains *strong generally*. Furthermore, McQueen relies on cases, not cited previously, in support of her claim that the same actor inference does not apply in this case all of which are distinguishable. Reply at 10 n.18.

Third, McQueen's response to Respondent's reliance on the business judgment rule misses the point. Reply at 11-12. McQueen relies on *Byrnie v. Town of Cromwell Bd. of Educ*., 243 F.3d 93 (2d Cir. 2001), and *DeMarco v. Holy Cross High Sch*., 4 F.3d 166 (2d Cir. 1993), both of which support the use of the business judgment rule. *See Byrnie*, 243 F.3d at 103 ("the court must respect the employer's unfettered discretion to choose among qualified candidates."); *DeMarco*, 4 F.3d at



170-71 ("fact-finder need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable").

Fourth, *Gordon v. New York City Bd. Of Educ*., 232 F.3d 111 (2d Cir. 2000), Reply at 17, which McQueen cites for the proposition that "general corporate knowledge is sufficient to make out a claim of retaliation" plainly misstates the law. To establish the *causal connection* between McQueen's alleged protected activity and the adverse action taken against her, McQueen must establish that the *decision-maker -- Bill Golden* -- had knowledge of her complaints. Resp. Br. at 42 n.60. As the Court stated in *Gordon*, relied on by McQueen, "[t]he lack of knowledge on the part of particular *individual agents* is admissible as some evidence of a lack of a causal connection . . . " *Id*. at 117 (emphasis in original).

Finally, McQueen misapplies the law with respect to her damages claim. McQueen states that she seeks only a "single year of front pay," Reply at 19, although her "revised summary of damages chart" (Appendix 1) runs until *April, 2009*.

In attempting to distinguish *Hine v. Mineta*, 238 F. Supp. 2d 497 (E.D.N.Y. 2003), Reply at 20 n.32, McQueen mischaracterizes the case. Contrary to McQueen's claim, the status of the plaintiff in *Hine* as a trainee was not the basis for refusing to award front pay and, thus, is not a distinguishing factor. Moreover, McQueen mischaracterizes *Hill v. Airborne Freight Corp*., No. 97-CV-7098 & 98-CV-6249(FB), 2003 U.S. Dist. Lexis 2379 (E.D.N.Y. Feb. 20, 2003), in her attempt to distinguish the case. Reply at 20. McQueen alleges the Court in *Hill* awarded front pay damages to a plaintiff who had found a lower paying job, despite the fact that overtime earnings available at the new job resulted in the same compensation. This misstates the facts. One of the three plaintiffs in *Hill* went from working as a manual laborer to working as a drug counselor, taking an almost 50 percent pay cut. *See Hill*, 2003 U.S. Dist. Lexis 2379, at *15. The court found that he was capable of finding higher paying work, and limited front pay to one year. *Id*. at *19.

With respect to her claim for emotional distress damages, McQueen's reliance on *Rainone v. Potter*, 388 F. Supp. 2d 120 (E.D.N.Y. 2005), Reply at 22, in support of an award of $50,000 for non-garden variety damages, is contrary to prevailing law. McQueen also relies on new cases (*i.e*., *Courtney v. City of New York*, 20 F. Supp. 2d 655, 660-62 (S.D.N.Y. 998); *Ikram v. Waterbury Bd. of Educ*., No. 3:95-cv-2477, 1997 WL 59711 (D. Conn. Sept. 9, 1997); *Bick v. City of New York*, No. 95-civ.-8781, 1998 WL 190283 (S.D.N.Y. Apr. 21, 1998); *Osorio v. Source Enters., Inc*., No. 05-civ.-10029, 2007 WL 683985 (S.D.N.Y. Mar. 2, 2007); *Patterson v. Balsamico*, 440 F.3d 104 (2d Cir. 2006); *Bogle v. McClure*, 332 F.3d 1347 (11th Cir. 2003)), which McQueen had not raised previously and that are distinguishable from this case. Reply at 22-23 and n.35. McQueen further argues, that under New York state law, she is entitled to "larger emotional distress awards," Reply at 23-24 and n.37 -- an argument she failed to raise previously, relying on cases not previously cited, and to which Respondent has not had an opportunity to respond. In addition, McQueen misstates the facts of *Petrovits v. New York City Transit Auth*., No. 95-civ.-9872, 2003 WL 22349676 (S.D.N.Y. Oct. 15, 2003). The plaintiff in *Petrovits had physical symptoms* and was *never called insubordinate or stupid* as alleged by McQueen. Reply at 23. To the extent McQueen admits she has submitted a revised damages chart, Respondent requests an opportunity to address her revisions.



Ms. Susan Mackenzie
November 5, 2007
Page 4

      For the foregoing reasons, Respondent respectfully requests an opportunity to respond to the mischaracterizations of the applicable law and factual record and the new legal arguments raised in McQueen's reply brief.

                              Very truly yours,

                              SEYFARTH SHAW LLP


                              s/ Christopher Lowe

cc:    Debra Raskin (via email)
       Maia Goodell (via email)
       James R. Cho (via email)

# EXHIBIT 4

## Mcqueen-Starling, Lisa A.

**From:** Golden, Bill J.
**Sent:** Thursday, December 01, 2005 1:19 PM
**To:** Mcqueen-Starling, Lisa A.
**Subject:** RE:

speaking to HR about promotion today

unapproved yet but comp for next year will be

Base   115,500 (4/1 review)
Target  40,000

---

**From:** Mcqueen-Starling, Lisa A.
**Sent:** Thursday, December 01, 2005 1:14 PM
**To:** Golden, Bill J.
**Subject:** FW:

Do you believe this!!!!!!!!!!!

I believe you had given her a monetary award during the summer.   This is the reason why I should be
compensated above and beyond.

---

**From:** Covington, Charline E.
**Sent:** Thursday, December 01, 2005 11:50 AM
**To:** Mcqueen-Starling, Lisa A.
**Subject:**

Good Morning,

        I noticed I did not receive a 'Go for the Gold' reward.  Is my job performance less than what is expected of
me? Is there anything I can do to improve my work habits in order to be considered for this reward in the future?

Thank you

```
Charline Covington
Senior Administrative Assistant
914-467-1633
```



C01464

# EXHIBIT 5

LEXSEE 2000 US APP LEXIS 23763

**JOSEPH ANDERSON, JR., Plaintiff-Appellant, -v.- ANHEUSER-BUSCH, INC., Defendant-Appellee.**

**No. 00-7089**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

*2000 U.S. App. LEXIS 23763*

**September 19, 2000, Decided**

**NOTICE:**    [*1] RULES OF THE SECOND CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:**    Reported in Table Case Format at: *2000 U.S. App. LEXIS 29262.*

**PRIOR HISTORY:**    Appeal from a judgment of the United States District Court for the Southern District of New York (Robert W. Sweet, Judge).

**DISPOSITION:**    AFFIRMED.

**COUNSEL:**    APPEARING FOR APPELLANT: JOSEPH ANDERSON, JR., pro se, Raleigh, NC.

APPEARING FOR APPELLEE: JOHN K. BENNETT, Roseland, NJ (Maureen McLoughlin, on the brief).

**JUDGES:**    PRESENT: Wilfred Feinberg, Jose A. Cabranes, Fred I. Parker, Circuit Judges.

**OPINION**

**SUMMARY ORDER**

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of said District Court be and it hereby is **AFFIRMED.**

Plaintiff *pro se* Joseph Anderson, Jr. appeals from a

judgment, entered October 20, 1999, granting defendant Anheuser-Busch, Inc.'s ("ABI") motion for summary judgment and dismissing his complaint. For the reasons stated below, we affirm the judgment of the District Court.

Anderson worked in ABI's sales force from 1981 until October 23, 1985, when he was suspended from the company for thirty days on suspicion that he had submitted false expense reports [*2] and false "call reports," which indicate when an ABI salesman has met with one of his accounts. Anderson was instructed not to contact any of his accounts during the thirty day suspension period. Following an internal investigation, Anderson was fired on November 25, 1985, for submitting false expense and call reports, and for insubordination--namely, for contacting accounts while he was suspended.

Anderson, who is black, initiated this action on January 7, 1998, claiming that his termination violated Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e-1, et seq.* [1] ABI subsequently moved for summary judgment, and the District Court granted its motion. In relevant part, the District Court held that ABI's reasons for discharging Anderson were legitimate and nondiscriminatory, and that Anderson had not demonstrated that those reasons were a mere pretext for discrimination.

1    The Equal Employment Commission ("EEOC") issued Anderson a right-to-sue letter on October 6, 1997. The District Court held that the EEOC did not exceed its authority in issuing the letter nearly twelve years after Anderson was terminated, and that the doctrine of laches did not

require dismissal of Anderson's complaint. ABI does not challenge these rulings here, and we do not consider them.

[*3] Anderson now brings this timely appeal. Construing his briefs liberally, *see Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)*, Anderson presses two substantial arguments. First, he contends that ABI's reasons for firing him were "bogus." However, there is ample evidence that Anderson submitted false expense reports and false call reports, and that he violated the terms of his suspension.

Second, Anderson argues that ABI's reasons for terminating him were pretextual. In support of this argument, Anderson claims that a white ABI employee, Gene Tucker, was fired only after years of "poor performance," and that another white ABI employee, Joe Martinez, was discharged only after the company had received three complaints that he had sexually harassed co-workers. Moreover, Anderson contends that three other white ABI employees--Thomas Forget, Douglas Mackey, and Randall White--submitted erroneous expense reports but were neither terminated nor subjected to a vigorous internal investigation.

To establish pretext based on a "selective enforcement" theory, a plaintiff employee must show that he was treated differently than other "similarly situated" employees. *See Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d. Cir. 1999)*. [*4] Employees are similarly situated when they are "similarly situated in all material respects." *Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997)*.

Applying these principles to this case, it is clear that ABI's treatment of Tucker and Martinez is not relevant to Anderson's selective enforcement claim. Those employees were not similarly situated to Anderson because they did not "engage[] in the same misconduct as []he." *Id.* Similarly, ABI's treatment of Forget, Mackey, and White has no bearing on Anderson's claim--although they may have submitted false expense reports, there is no evidence that Forget, Mackey, or White also submitted false call reports and behaved in an insubordinate manner. [2] *Cf. Cruz v. Coach Stores, Inc., 202 F.3d 560, 567-68 (2d Cir. 2000)* (holding that a Hispanic employee fired for physically assaulting a co-worker in violation of a no "physical or verbal assaults" policy "failed to create a jury question as to pretext" by showing that non-Hispanic employees who "verbally assaulted" co-workers were not fired).

> 2  Anderson asserts that in addition to submitting incorrect expense reports, White "received documents suggesting insubordination, [and] call report violations." However, the ABI internal memorandum that Anderson points to in support of this assertion contains no reference to insubordination, and states that "we . . . reviewed Mr. White's call reports noting no unusual items."

[*5] We have carefully considered Anderson's other arguments, and conclude that they are without merit.

For the reasons stated above, the judgment of the District Court is **AFFIRMED**.

# EXHIBIT 6

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2004 WL 625274 (W.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 625274 (W.D.N.Y.))**

Calire v. Taylor Staffing Services
W.D.N.Y.,2004.
Only the Westlaw citation is currently available.
United States District Court,W.D. New York.
Cheryl CALIRE, Plaintiff,
v.
TAYLOR STAFFING SERVICES, Defendant.
No. 02-CV-0166E(SR).

Feb. 17, 2004.

Jeffrey J. Signor, Moriarty & Dee, Buffalo, NY, for
Plaintiff.
Philip H. McIntyre, Jaeckle, Fleischmann & Mugel,
Buffalo, NY, for Defendant.

MEMORANDUM and ORDER [FN1]

FN1. This decision may be cited in whole
or in any part.ELFVIN, J.

**\*1** Plaintiff commenced this employment discrim-
ination action March 4, 2002 alleging that defend-
ant had violated Title VII of the Civil Rights Act of
1964 ("Title VII"), 42 U.S.C. § 2000e*et seq.* De-
fendant has moved for summary judgment pursuant
to Rule 56 of the Federal Rules of Civil Procedure
("FRCvP") dismissing plaintiff's Complaint. For
the reasons stated hereinbelow, defendant's motion
will be granted.

The following facts, construed favorably for
plaintiff, are undisputed unless otherwise noted.
Calire was hired by Taylor Staffing Services
("Taylor Staffing") in April 2000 to work as a Sales
Consultant. Taylor Staffing is a Professional Em-
ployer Organization that provides employment-re-
lated services to employers. [FN2]Mark Taylor is
Taylor Staffing's President and Dawn Taylor is its
Vice President and Secretary. Keith Kuehlewind is
Taylor Staffing's General Manager and also a share-
holder. Kuehlewind's duties included, *inter alia,*
sales, the hiring of sales representatives and servi-
cing Taylor Staffing's customers by managing their

human resources function. Kuehlewind hired Calire
at a salary of $40,000 per annum. [FN3]In addition,
Kuehlewind and Calire agreed to a commission
schedule whereby Calire would earn a one-time
commission for each customer that she was re-
sponsible for signing up with Taylor
Staffing.[FN4]Calire's yearly salary was almost twice
as much as the highest salary paid to any of Taylor
Staffing's previous four sales representatives.
Plaintiff received a salary increase in July 2000 - to
$46,800 per annum - and again in October 2000 - to
$52,000 per annum. At a December 2000 staff
meeting, Kuehlewind indicated that Taylor Staffing
was losing money. Apparently, some of Taylor
Staffing's customers had either terminated its ser-
vices without fully paying their bills or fallen be-
hind on scheduled payments.[FN5]One such custom-
er that fell behind on their payments was Step By
Step Day Care, Inc. ("SBS"), which, at one point,
owed Taylor Staffing more than $30,000 for payroll
costs, other advances and administrative fees. As a
result, Kuehlewind spent a lot of time prodding
SBS to become current on its payments. SBS con-
sidered          Kuehlewind's          manner
unprofessional.[FN6]Rita Molino, SBS's owner,
called Mark Taylor in January 2001 to complain
about Kuehlewind and to terminate SBS's relation-
ship with Taylor Staffing.[FN7]Shortly thereafter,
Taylor Staffing suspended its services to SBS and
terminated their relationship. Taylor Staffing also
lost its two largest customers - *viz.,* Avery Den-
nison and The Pier Restaurant - sometime in the be-
ginning of 2001. Defendant asserts that the loss of
these and other customers substantially reduced its
revenues and profits. As a result, Taylor Staffing's
owners took steps to reduce its costs by, *inter alia,*
reducing their personal compensation. In addition,
Kuehlewind agreed to reduce his own compensa-
tion by receiving his compensation in the form of a
salary with no additional commissions. Mark
Taylor and Kuehlewind subsequently decided, in
April 2001, to reduce Calire's salary to $30,000 per
annum and to revise the structure of her commis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-04885-JGK     Document 7-3     Filed 07/08/2008     Page 80 of 204

Not Reported in F.Supp.2d                                                                                           Page 2
Not Reported in F.Supp.2d, 2004 WL 625274 (W.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 625274 (W.D.N.Y.))**

sion pay-outs so that she would earn commissions only when her customers paid their fees instead of receiving it up front.FN8Defendant asserts that the decision to reduce and restructure plaintiff's compensation was done in order to save on its costs and in consideration of its impending financial difficulties. Def.'s Mem. of Law, at 14. On or about April 30, 2001, Mark Taylor and Kuehlewind met with Calire to discuss the new compensation plan.FN9 After mulling over the newly proposed compensation plan for a few days, plaintiff agreed to the reduced compensation but requested that she be paid at a $40,000 salary rate for one month in order to give her some time to become acclimated to the new plan. Kuehlewind and Mark Taylor agreed to the proposal and the parties signed the new compensation plan on May 7, 2001. Plaintiff's reduced salary was still more than the highest salary that Taylor Staffing had ever paid to a previous sales representative.FN10The circumstances surrounding plaintiff's subsequent departure from Taylor Staffing is in dispute. Defendant asserts that, on June 4, 2001, Kuehlewind met with Calire and that Calire walked out of the office sometime during the meeting and quit her employment with Taylor Staffing.FN11Calire counters that sometime at the end of May of 2001, Kuehlewind had told her that things were not working out and that her employment was terminated. Calire Aff. ¶ 24. In addition, Calire alleges that Kuehlewind followed her downstairs after the meeting and informed the rest of the staff that she had been fired. *Ibid.*

> FN2. Taylor Staffing is not an employment agency inasmuch as it does not recruit employees to work for its customers. Rather, Taylor Staffing hires a customer's existing employees and leases them back to that customer. Taylor Staffing then carries out all of the necessary employment-related functions for the customer - i.e., payroll, benefit administration, human resources, personnel administration, legal compliance, record-keeping and safety management. In exchange, Taylor Staffing re-

ceives an administrative fee equal to a certain percentage of the customer's payroll.

> FN3. Calire asserts that it was agreed between her and Kuehlewind that the $40,000 salary would be increased to $50,000 after a satisfactory review that was to occur 90 days later. Pl.'s Statement of Facts ¶ 1.

> FN4. Plaintiff's commission structure was front-loaded, which meant that she was paid her commission as soon as she made a sale - i.e., when a customer that she had solicited signed up for Taylor Staffing's services.

> FN5. Such delinquencies were a particular problem for Taylor Staffing because it paid out large amounts of money on behalf of its customers for their payroll and benefit costs and therefore depended on prompt payment to recoup such outlays.

> FN6. Plaintiff objects to defendant's characterization that its customers had found Kuehlewind's manner unprofessional because he prodded them to pay bills. Plaintiff alleges that the customers found his manner unprofessional because Kuehlewind had made "sexually inappropriate comments and jokes." Pl.'s Statement of Facts ¶ 3.

> FN7. Molino subsequently sent a letter to Mark and Dawn Taylor wherein she had provided some specific examples of Kuehlewind's unprofessional behavior. Def.'s Ex. R.

> FN8. Plaintiff asserts that her compensation was reduced shortly after she reported Kuehlewind's sexually harassing behavior and that no other employee's salary was reduced in response to the alleged financial difficulties. Pl.'s Statement of Facts ¶ 4.

Not Reported in F.Supp.2d                                                                   Page 3
Not Reported in F.Supp.2d, 2004 WL 625274 (W.D.N.Y.).
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 625274 (W.D.N.Y.))**

FN9. On or about that same day, plaintiff asked Chris Senecal for a letter of reference as she apparently intended to start looking for a new job.

FN10. The highest salary that Taylor Staffing had paid any previous sales representative was $23,400. Kuehlewind Aff. ¶ 27.

FN11. Specifically, Kuehlewind states: "I started to say that it 'was not working out.' I intended to say that her financial performance did not justify more money and talk with her about possible ways to increase sales, but I only got out the first words. She was upset and said something I do not remember, got up and walked out of my office. I learned later from other employees that she told them I had fired her."Kuehlewind Aff. ¶ 41.

*2 Calire also alleges that (1) Kuehlewind continually subjected her to inappropriate comments and unprofessional behavior,^FN12 (2) Kuehlewind made various derogatory comments about other female employees, (3) she was offended by an incident where Kuehlewind yelled at another female employee to such a degree that she was crying hysterically and referred to an outside caller as a "black asshole," (4) Kuehlewind referred to the all-female office staff as a "henhouse," (5) Kuehlewind called another female employee a "real looker," and (6) Kuehlewind once grabbed her shoulders while speaking to her and put his face very close to hers in order to make a point. Calire Aff. ¶¶ 5-14. Plaintiff asserts that she made several informal complaints about Kuehlewind's allegedly inappropriate behavior towards female employees and clients. *Id.* ¶ 17.Plaintiff bases her retaliation claim on a January 2001 meeting that she had with Mark Taylor regarding Kuehlewind's behavior. Plaintiff asserts that Molino had previously called her to report that Kuehlewind had told sexually inappropriate jokes to Molino's female employees and that Molino wanted to terminate her relationship with Taylor Staffing. Plaintiff subsequently relayed the

conversation to Mark Taylor and also complained to him about "some of the other client incidents involving Mr. Kuehlewind and other incidents between Mr. Kuehlewind and my female co-workers that I considered harassing."*Id.* ¶ 18.Plaintiff contends that, after this meeting, Kuehlewind's attitude towards her had changed and that their working relationship deteriorated over time to the point of outright hostility during the last month of her employment. *Id.* ¶ 19.

FN12. According to plaintiff, the behavior, which occurred "on a regular basis at least once every week or every other week," consisted of "sexually inappropriate jokes and comments, such as about the length of women's skirts or their legs. These comments were directed at both employees and people coming into the office."Calire Aff. ¶ 6.

Plaintiff filed a September 13, 2001 Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff received her right-to-sue letter on December 4, 2001. Plaintiff subsequently filed the instant action pursuant to Title VII asserting a hostile work environment claim and a retaliation claim.

FRCvP 56(c) provides that summary judgment shall be entered where the movant demonstrates that there is "no genuine issue as to any material fact" and that "the moving party is entitled to judgment as a matter of law."*Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether summary judgment is appropriate this Court must draw all factual inferences in favor of the nonmoving party.^FN13 *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-04885-JGK    Document 7-3    Filed 07/08/2008    Page 82 of 204
Not Reported in F.Supp.2d                                                                      Page 4
Not Reported in F.Supp.2d, 2004 WL 625274 (W.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 625274 (W.D.N.Y.))**

FN13. Nevertheless, the non-moving party must rebut the motion for summary judgment with more than conclusory allegations and general denials. FRCvP56(e); *see also Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) ("Conclusory allegations, conjecture and speculation * * * are insufficient to create a genuine issue of fact."). Furthermore, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."*Celotex,* at 322.

Of course, the summary judgment standard applies to discrimination cases with the same force as it does in other cases. *See Ashton v. Pall Corp.,* 32 F.Supp.2d 82, 87 (E.D.N.Y.1999) ("[T]he salutary purposes of summary judgment -avoiding protracted, expensive and harassing trials - apply no less to discrimination cases than to commercial or other areas of litigation ."). However, courts must be aware of the fact that evidence of discrimination is rarely overt. *See Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 448 (2d Cir.1999) ("[E]mployers are rarely so cooperative as to include a notation in the personnel file that the [adverse employment action] is for a reason expressly forbidden by law."). In addition, courts must "also carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture."*Ibid.* Thus, the issue for the court is "whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances."*Ibid.*

**\*3** Title VII states that "[i]t shall be an unlawful employment practice for an employer * * * to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."42 U.S.C. § 2000e-2(a)(1)(2003). In the absence of direct evid-

ence of discrimination, Title VII claims are analyzed pursuant to burden-shifting framework as espoused in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its offspring. In bringing a case under Title VII, plaintiff bears the initial burden of making out a *prima facie* case of discrimination.FN14

FN14. The plaintiff's burden of proof in establishing a *prima facie* case of discrimination is "minimal." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

For plaintiff to establish a Title VII violation based on a hostile work environment claim, she must show "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer."*Richardson v. N.Y. Dep't of Corr. Serv.,* 180 F.3d 426, 436 (2d Cir.1999) (quotations and citations omitted). The discriminatory intimidation alleged by plaintiff must be "offensive or pervasive enough that a reasonable person would find it hostile or abusive and must have been actually perceived by plaintiff as abusive."*Horsford v. Salvation Army,* 2001 WL 1335005, at \*9 (S.D.N.Y.2001) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). In determining whether an environment is hostile, this Court must look at the totality of the circumstances of the alleged conduct including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."*Harris,* at 23."To withstand summary judgment, a 'plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous or concerted to have altered the conditions of [his] working environment." ' *Horsford,* at \*9 (quoting *Whidbee v. Garzarelli*

*Food Specialties, Inc.,* 223 F.3d 62, 69 (2d Cir.2000)). Isolated incidents of discriminatory comments or conduct -unless extremely serious - is not sufficient to establish a hostile working environment. *See Horsford,* at *9 (citing numerous cases as examples for such a proposition).

Defendant contends that plaintiff has not demonstrated that Kuehlewind's conduct was frequent or severe enough to raise a genuine issue of material fact with regard to her hostile work environment claim. In support, defendant points out the fact that plaintiff testified that she had considered her relationship with Kuehlewind to be cordial until the last month of her employment. *See* Def.'s Mem. of Law, at 7 (citing Calire Dep., at 52-53). The Court agrees.

*4 Plaintiff's evidence falls short of raising a triable issue of fact that she suffered from a hostile work environment. To begin, plaintiff's own evidence shows that she did not feel that there was any hostility between herself and Kuehlewind until approximately the last month of her employment. *See* Calire Dep., at 52-53 (stating that she considered her relationship with Kuehlewind to be cordial and that she had not experienced any "hostility" until the last month of her employment). Such an admission by plaintiff not only belies her allegation that Kuehlwind had engaged in sexually inappropriate and offensive behavior throughout her employment but also negates her ability to show that she perceived Kuehlewind's conduct as either offensive or pervasive. In addition, plaintiff's evidence is insufficient to show an objectively hostile work environment. Kuehlewind's alleged conduct was neither frequent nor severe enough to rise to the level of an actionable hostile work environment claim. Plaintiff's own allegations regarding Kuehlewind's conduct shows that most of his allegedly inappropriate comments were directed at other employees or clients. Furthermore, some of the alleged incidents had nothing to do with plaintiff's gender and, of those that did, they occurred with neither the requisite degree of frequency nor severity. *See Sales*

*v. YM & YWHA of Washington Heights and Inwood,* 2003 WL 164276, at *2-6 (S.D.N.Y.2003) (granting summary judgment to defendant with regard to plaintiff's Title VII claim where plaintiff's evidence consisted of eight incidents including sexual advances, an attempted hug and a marriage proposal by a co-worker); *O'Dell v. Trans World Entertainment Corp.,* 153 F.Supp.2d 378, 385-386 (S.D.N.Y.2001) (granting summary judgment to defendant where plaintiff's evidence comprised repeated requests for a date, comments about plaintiff's appearance, declarations of love, gifts and a song played by a coworker that offended plaintiff); *Feliciano v. Alpha Sector, Inc.,* 2002 WL 1492139, at *8 (S.D.N.Y.2002) (granting summary judgment to defendant where plaintiff's evidence consisted of compliments, repeated requests to date, an attempted hug, a kiss and a stated desire to "lay with" plaintiff by her supervisor). In addition, plaintiff has not shown that Kuehlewind's behavior interfered with her work performance or that any single incident was extraordinarily severe. Thus, summary judgment must be granted to defendant with regard to plaintiff's hostile work environment claim.

Turning to plaintiff's retaliation claim,[FN15] in order to establish a *prima facie* case, she must show "(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging [her]; and (3) a causal connection between the protected activity and the adverse employment action."*Terry v. Ashcroft,* 336 F.3d 128, 141 (2d Cir.2003) (quotation marks and citation omitted). Plaintiff has not satisfied her burden.

> FN15. Title VII prohibits an employer from "discriminat[ing] against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter ."42 U.S.C. § 2000e-3(a)(2003).

*5 Plaintiff has not shown that she engaged in protected activity. Her allegation is that she was retaliated against after the January 2001 meeting that she

Not Reported in F.Supp.2d                                                          Page 6
Not Reported in F.Supp.2d, 2004 WL 625274 (W.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 625274 (W.D.N.Y.))**

had with Mark Taylor by which she had relayed Molino's, as well as other customer's, complaints about Kuehlewind.[FN16]However, in the absence of any proof that plaintiff complained of Kuehlewind's conduct with regard to herself or other employees, such a complaint cannot be considered protestation of an unlawful *employment practice*[FN17] under Title VII. *See Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 134-136 (2d Cir.1999) (holding that a retaliation claim that is premised on a plaintiff's opposition to discrimination by a co-employee against a non-employee is not cognizable under Title VII); *see also Kunzler v. Canon, USA, Inc.,* 257 F.Supp.2d 574, 579-583 (E.D.N.Y.2003) (analyzing *Wimmer* and relevant cases in holding that plaintiff had not established that he engaged in protected activity by opposing his supervisor's alleged harassment of a customer). Plaintiff apparently attempts to salvage her retaliation claim by asserting in her September 26, 2003 Affidavit that, in addition to relaying the various customer complaints, she complained to Mark Taylor about "incidents between Mr. Kuehlewind and [her] female co-workers that [she] considered harassing."Calire Aff. ¶ 18. However, such a statement conflicts with her prior deposition testimony by which she (1) had repeatedly stated that her complaint to Mark Taylor in January 2001 was with regard to *customer* complaints about Kuehlewind and (2) had answered "no" to the question as to whether she had ever complained to Dawn or Mark Taylor or to any other manager about Kuehlewind's alleged sexually related comments that are alleged in her Complaint. *See* Calire Dep., at 53-54, 58-63, 183-184, 202, 214. "It is beyond cavil that a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that contradicts the affiant's previous deposition testimony."*Bickerstaff,* at 455 (punctuation marks and citation omitted); *see also Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 572 (2d Cir.1991) ("The rule is well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disput-

ing his own prior sworn testimony.") Thus, plaintiff's affidavit neither serves as a basis to refute defendant's contention that her retaliation claim is based solely on her complaints that she had made about Kuehlewind's conduct towards customers nor raises a genuine issue of material fact whether she engaged in Title VII-protected activity. Accordingly, summary judgment must be granted to defendant with regard to plaintiff's retaliation claim because she cannot establish a *prima facie* case of retaliation.[FN18]

> FN16. There is no doubt that plaintiff bases her retaliation claim, and her alleged protected activity, solely on the January 2001 meeting with Mark Taylor. *See* Calire Dep., at 202; Pl.'s Mem. of Law, at 14.

> FN17. An "unlawful employment practice" is defined as follows: "It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges *of employment,* because of such individual's race, color, religion, sex, or national origin * * *."42 U.S.C. § 2000e-2(a)(1) (emphasis added).

> FN18. The Court is aware that plaintiff need only show that she had a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law."*Wimmer,* at 134.However, plaintiff could not have reasonably believed that Kuehlewind's conduct that occurred outside of the workplace towards Taylor Staffing's customers was an unlawful *employment* practice. *See id.* at 136 (holding that plaintiff could not have reasonably believed that he was opposing an employment practice because his evidence did not address a discriminatory employment practice); *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons,* 842 F.2d 590,

594 (2d Cir.1988) (same).

Accordingly, it is hereby ORDERED that defend-
ant's motion for summary judgment is granted and
that the Clerk of this Court shall close this case.

W.D.N.Y.,2004.
Calire v. Taylor Staffing Services
Not Reported in F.Supp.2d, 2004 WL 625274
(W.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 7

Not Reported in F.Supp.2d                                                                                           Page 1
Not Reported in F.Supp.2d, 2005 WL 1560482 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1560482 (S.D.N.Y.))**

Capgemini v. Sorensen
S.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
CAPGEMINI U.S. LLC (f/k/a/ Capgemini Ernst &
Young U.S. LLC), Petitioner,
v.
Niels SORENSEN, Respondent.
**No. 04 Civ. 7584(JGK).**

July 1, 2005.

*OPINION & ORDER*

KOELTL, J.

*1 The petitioner Capgemini U.S. LLC ("Capgemini"), a limited liability company incorporated in Delaware with its principal place of business in New York, has filed a petition to vacate, modify, or correct an award (the "award") entered by a panel (the "Panel") of the American Arbitration Association ("AAA") in favor of the respondent, Niels Sorensen ("Sorensen"), a citizen of Denmark. (*SeeIn the Matter of the Arbitration between Niels Sorensen and Cap Gemini Ernst & Young U.S., LLC,* Award of Arbitrator dated July 25, 2004 ("Arbitration Award"), attached at Exhibit 9 to Declaration of Christoph C. Heisenberg in Support of Petition to Vacate, Modify, or Correct Arbitration Award, dated Sept. 22, 2004 ("Heisenberg Decl.").) Sorensen opposes the petition and has cross-petitioned to modify the Award or, in the alternative, to confirm the Award. The petition and cross-petition have been brought pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 10 and 11 Jurisdiction is based on diversity of citizenship.^FN1 28 U.S.C. § 1332(a)(2).

> FN1. There is complete diversity of citizenship under 28 U.S.C. § 1332(a)(2). The respondent is a citizen of a foreign state and Capgemini has advised the Court that no member of Capgemini is a citizen of a

foreign state.

**I.**

The following facts are undisputed unless otherwise noted.

The arbitration that is the subject of this motion arose out of the discharge of Sorensen from his employment with Capgemini in January 2002. (Demand for Arbitration, attached at Ex. 4 to Heisenberg Decl.) Upon hiring Sorensen, Capgemini had granted him 18,000 shares of its stock. (Transcript dated Mar. 31, 2004 at 1326, attached at Ex. B to Declaration of Michael E. Peterella in Opposition to Capgemini's Petition to Vacate, Modify, or Correct Arbitration Award, dated Oct. 25, 2004 ("Petrella Decl.").) All shares immediately vested. (Transcript of June 10, 2005 Proceedings at 8.) At the time of his discharge, 10,201 of these shares (the "shares") remained held in escrow by Capgemini. Although these shares had vested, they were subject to a forfeiture schedule that restricted Sorensen's ability to sell his shares to fixed percentages at fixed time periods. (Heisenberg Decl., Ex. 1 at Ex. D, p. 19.) The shares were also subject to forfeiture under several conditions specified in the Consulting Partner Transaction Agreement (the "Agreement") that Sorensen signed upon accepting employment with Capgemini. (Consulting Partner Transaction Agreement at 9, attached at Ex. 1 to Heisenberg Decl.) The Agreement provided that Sorensen would forfeit a percentage of his Capgemini stock in the event he voluntarily left Capgemini or in the event that he was terminated for poor performance. (*Id.*) When Capgemini terminated Sorensen in January 2002, Capgemini refused to transfer the 10,201 shares to Sorensen, arguing that, because it was discharging him for poor performance, he had forfeited his shares. Because Sorensen's employment agreement required him to arbitrate any employment disputes with the AAA pursuant to AAA's Commerical Dispute Resolution Rules (the "AAA Rules"), Sorensen filed a State-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1560482 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1560482 (S.D.N.Y.))**

ment of Claim (the "Statement of Claim") with the AAA on July 23, 2002, seeking damages and related relief. (Agreement for Ernst & Young Consulting Partners Who Join Cap Gemini, Ernst & Young U.S. LLC ("Arbitration Agreement"), attached to Supplemental Declaration of Christoph C. Heisenberg dated June 9, 2005; Statement of Claim, dated July 23, 2002 ("Statement of Claim"), attached at Ex. 4 to Heisenberg Decl.) The Statement of Claim sought damages in the form of his bonus for the year 2001, losses that Sorensen alleged resulted from Capgemini's failure to sell his shares according to his instructions, "the balance of [Sorensen's Capgemini] stock (10,206 shares) [sic]", and other damages. (Statement of Claim at 7-8.)

**\*2** The hearings took places from December 2003 through April 2004. During the course of his opening statement on the first day of the hearing, Sorensen's counsel stated, "Cap Gemini Ernst & Young confiscated stock worth approximately 1.164 million, that's the 10,201 shares."(Transcript dated Dec. 15, 2003 at 13, attached at Ex. B. to Petrella Decl.) During closing arguments, Sorensen's counsel discussed the monetary value of the 10,201 shares of stock, submitting alternative theories for the measurement of monetary damages resulting from the seizure of the shares. (*See* Transcript dated Apr. 23, 2004 ("4/23/04 Tr.") at 2179-2180, attached at Ex. B to Petrella Decl.) Later, in response to a question from the Panel as to whether either party had additional evidence or witnesses, the following exchange occurred:

"[Counsel for Sorensen]: I'm told there's an e-mail from Mr. Gordon that gives a price of a stock that we may need to do this calculation that we're going to give you. Is it an email?

"[Co-counsel for Sorenson]: It just lists objective numbers for values.

"[Counsel for Sorensen]: That's the only thing I can think of. It's an email from Mr. Gordon with some stock prices on it.

"[Panel member]: Mr. Chairman, is that okay?

"[Counsel for Capgemini]: I don't know what they're talking about, I guess, is my response."

*See* 4/23/04 Tr. at 2194-95.

After a discussion regarding the email, the following exchange occurred:

"[Counsel for Sorensen]: Not only that, it's not going to be used for purposes of some sort of-to contest credibility or anything like that. It's being used to convey, just figures, objective figures that were sent from the other side to us.

"[Counsel for Capgemini]: It sounds as if he's trying to found a whole damage theory on it, and I haven't had the opportunity to see it, cross-examine Mr. Sorensen on it, or what not, so....

"The Chairman: The panel is not inclined to grant that.

"[Co-counsel for Sorensen]: Okay."

4/23/04 Tr. at 2196-97

The parties did not offer additional evidence or call additional witnesses, and the proceeding ended shortly thereafter. *Id.* at 2197.

On May 25, 2004, the parties submitted their "post-hearing" memoranda. AAA Rules R-34 and R-37 authorize the Panel to receive and accept documents and other evidence after the hearing, and provide that a hearing is not deemed closed until the receipt of those documents. (Heisenberg Decl., Ex. 3.) In his brief, Sorensen argued that he was entitled to "an award of damages that fairly compensates him for the 10,201 shares ... wrongfully revoked...." (Post-Hearing Brief for Claimant Niels Sorensen at 58, attached at Ex. K to Petrella Decl.) In its post-hearing memorandum, Capgemini argued that Sorensen had improperly requested damages in the form of the monetary value of the 10,201 shares. (Capgemini's Post-Hearing Memor-

Not Reported in F.Supp.2d                                                                 Page 3
Not Reported in F.Supp.2d, 2005 WL 1560482 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1560482 (S.D.N.Y.))**

andum at 61-64, attached at Ex. 7 to Heisenberg Decl.) Capgemini argued that the request for monetary damages was improper because Sorensen had failed to request that specific remedy earlier and that, consequently, the Panel had no proof as to the value of the shares. (*Id.*) Capgemini also argued that the allegedly untimely request prejudiced Capgemini because Capgemini had introduced no evidence on the subject. (*Id.* at 63.)Capgemini did not introduce any evidence on the value of the stock in its post-hearing memorandum. (*Id.* at 61-64.)

**\*3** On June 8, 2004, Capgemini moved to strike Sorensen's request for a remedy in the form of the monetary value of the 10,201 shares of stock, and to strike the damage calculation that Sorensen proposed in his post-hearing memorandum. (Heisenberg Decl., Ex. 8, at 1-2.) The motion argued that Capgemini would be prejudiced by the damages request because Sorensen had never sought monetary damages in his Statement of Claim or presented evidence on monetary damages during the hearing. (*Id.*)

On July 25, 2004, the Panel issued the Award finding that Capgemini breached its contract with Sorensen by terminating Sorensen's employment for alleged poor performance and asserting a forfeiture of the 10,201 shares. (Arbitration Award at 1.) The Panel awarded damages of $687,955 for this breach. (*Id.*) The Award was based on a share price of $67.44 per share, which was the share price for the last sale of Sorensen's Capgemini stock in August 2001. (*Id.*) The Panel also awarded prejudgment interest of $163,248 calculated at 9% from January 1, 2002, to August 21, 2004, on the award of $687,955. (*Id.*)

On August 4, 2004, Capgemini moved to modify the Award. (Petrella Decl., Ex. F.) Capgemini argued that the award of $687,955 miscalculated the value of the 10,201 shares because it did not take into account the restrictions to which the stock was subject. (*Id.*) Capgemini also argued that it was improper to calculate the interest on the Award from January 1, 2002, because, due to the restrictions on

the shares of stock, Sorensen was not entitled to sell a portion of the shares until later periods. (*Id.*) On August 24, 2004, the Panel denied the motion. (*See* Petrella Decl ., Ex. G.)

II.

The task for a party seeking to vacate an arbitration award is a formidable one. The party challenging an arbitration award generally bears a heavy burden of proof, and limited review of arbitration decisions is necessary both to effectuate the parties' agreement to submit their disputes to arbitration and to avoid costly and protracted litigation about issues the arbitrators have already decided. *See,e.g.,DiRussa v. Dean Witter Reynolds Inc.,* 121 F.3d 818, 821 (2d Cir.1997); *Willemijn Houdstermaatschappij, BV v. Standard Microsys. Corp.,* 103 F.3d 9, 12 (2d Cir.1997); *In re Arbitration Between Space Sys./Loral, Inc. and Yuzhnoye Design Office,* 164 F.Supp.2d 397, 403 (S.D.N.Y 2001); *seealso,Wedbush Morgan Securities, Inc. v. Robert W. Baird & Co.,* 320 F.Supp.2d 123, 126 (S.D.N.Y.2004).

A federal court may vacate an arbitration award only on specified grounds: either those contained in the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10, or under the severely limited doctrine of manifest disregard of the law. *SeeWallace v. Buttar,* 378 F.3d 182, 189 (2d Cir.2004); *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S,* 333 F.3d 383, 388-89 (2d Cir.2003); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker,* 808 F.2d 930, 933 (2d Cir.1986) (explaining judicially created doctrine of manifest disregard of the law). The petitioner argues that the Award should be vacated because it violated 9 U.S.C. § 10(a)(3) and (4) and because the Panel manifestly disregarded the law in reaching its decision.

**\*4** An arbitration award may be vacated pursuant to § 10(a)(3)"where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of

Not Reported in F.Supp.2d                                                                                          Page 4
Not Reported in F.Supp.2d, 2005 WL 1560482 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1560482 (S.D.N.Y.))**

any other misbehavior by which the rights of any party have been prejudiced."9 U.S.C. § 10(a)(3). Courts have interpreted § 10(a)(3) to mean that, "except where fundamental fairness is violated, arbitration determinations will not be opened up to evidentiary review."*Tempo Shain Corp. v. Bertek, Inc.,* 120 F.3d 16, 20 (2d Cir.1997). In making evidentiary decisions, "an arbitrator must give each of the parties to the dispute an adequate opportunity to present its evidence and argument," but, in doing so, the arbitrator is not required to hear all the evidence proffered by a party or to "follow all the niceties observed by the federal courts."*Id. at 20* (internal quotation marks and citations omitted).

An arbitration award may be vacated pursuant to § 10(a)(4)"where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."9 U.S.C. § 10(a)(4). The Court of Appeals for the Second Circuit has "consistently accorded the narrowest of readings" to the FAA's authorization to vacate awards pursuant to § 10(a)(4).*Banco de Seguros del Estados v. Mutual Marine Office, Inc.,* 344 F.3d 255, 262 (2d Cir.2003); *Westerbeke Corp v. Daijatsu Motor Co., Ltd.,* 304 F.3d 200, 220 (2d Cir.2002) (citation omitted). The court's inquiry under § 10(a)(4)"focuses on whether the arbitrators had the power based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue."*Westerbeke,* 304 F.3d at 220 (quoting *DiRussa,* 121 F .3d at 824). The Court must determine "whether the arbitrator[s] acted within the scope of [their] authority," or whether the arbitral award is merely the "arbitrator[s'] own brand of justice." *Banco de Seguros del Estados,* 344 F.3d at 262 (citing *Local 1199 v. Brooks Drug Co.,* 956 F.2d 22, 25 (2d Cir.1992)).

In addition to its power under 9 U.S.C. § 10, a federal court may also vacate an arbitration award that was issued in manifest disregard of the law. The Court of Appeals for the Second Circuit has re-

peatedly emphasized that review of an arbitration award for manifest disregard of the law is "severely limited," and "to modify or vacate an award on this ground, a court must find both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case."*Halligan v. Piper Jaffray, Inc.,* 148 F .3d 197, 202 (2d Cir.1998) (internal quotations omitted); *see also Duferco,* 333 F.3d at 388-89; *DiRussa,* 121 F.3d at 821; *Wedbush,* 320 F.Supp.2d at 126-27. Review under the doctrine of manifest disregard of the law is not an inquiry into the correctness of the decision, and the "erroneous application of rules of law is not a ground for vacating an arbitrator's award, nor is the fact that an arbitrator erroneously decided the facts."*Siegel v. Titan Indus. Corp.,* 779 F.2d 891, 892-93 (2d Cir.1985) (citations omitted); *see Bobker,* 808 F.2d at 933-34 (explaining that court is "not at liberty to set aside an arbitration panel's award because of an arguable difference regarding the meaning or applicability of laws urged upon it"); *see also, Wedbush,* 320 F.Supp.2d at 127. Instead, the error must be "plainly evident from the arbitration record,"*Duferco,* 333 F.3d at 388, such that it is "obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator."*Bobker,* F.2d at 933; *see also Wedbush,* 320 F.Supp.2d at 127.

**\*5** Vacating an award for manifest disregard is appropriate only in "those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent, but where none of the provisions of the FAA apply."*Duferco,* 333 F.3d at 389.

### III.

### A.

Capgemini argues that the Award should be vacated or modified pursuant to § 10(a)(3) and § 10(a)(4)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-04885-JGK   Document 7-3   Filed 07/08/2008   Page 91 of 204   Page 5

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1560482 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1560482 (S.D.N.Y.))**

because the Panel failed to provide Capgemini with notice or an ability to be heard on the issue of monetary damages. Capgemini argues that Sorensen failed to provide notice that he was seeking the remedy of the monetary value of the stock, and that the Panel failed to indicate that it was considering such a remedy. Capgemini argues that Sorensen's Statement of Claim indicated that Sorensen was seeking only the return of the stock, because the first page of Sorensen's Statement of Claim lists "$6,675,000 + stock" under "claim or relief sought." (Statement of Claim at 1.) Capgemini also argues that, even if Sorensen's opening statement passage mentioning the value of the 10,201 shares hinted that he was seeking this remedy, Sorensen failed to follow-up adequately on this statement by seeking to amend his Statement of Claim. Moreover, Capgemini argues that Sorensen failed to provide any evidence in support of a monetary remedy during the eight days on which oral hearings were held. Capgemini argues that it had no notice that Sorensen was seeking this remedy until Sorensen's closing argument, when Sorensen's attorney attempted to introduce an email providing evidence of the proper value of the stock. (4/23/04 Tr. at 2194-97.) Capgemini argues that the Panel's response that it was "not inclined to grant that," indicated that such a remedy could not be pursued at that point, and thus failed to put Capgemini on notice that the Panel was considering such a remedy. (*Id.* at 2197.)

Capgemini argues that, because it did not have notice, it was deprived of an opportunity to submit witnesses and evidence as to the remedy. Capgemini argues that it was again refused the opportunity to be heard by the Panel's denial of its post-hearing motion to strike Sorensen's request for monetary damages. Capgemini argues that this lack of opportunity to be heard deprived it of a fundamentally fair hearing, and that the Court should therefore vacate or modify the Award pursuant to § 10(a)(3).*See,e.g.,Tempo Shain,* 120 F.3d at 20 (vacating arbitration award where there was no reasonable basis for arbitration panel's decision to

refuse to hear testimony of witness); *Kaplan v. Alfred Dunhill of London, Inc.,* No. 96 Civ. 0258, 1996 WL 640901, at *5-6 (S.D.N.Y. Nov. 4, 1996) (vacating award for fundamental unfairness where party had not received notice of arbitration and was therefore unable to present any evidence, and where panel refused to reopen the arbitration after party informed panel of failure of notice).

Sorensen's counsel referred to his claim for damages in his opening statement. At closing argument, Sorensen's attorney again raised and discussed the issue of monetary damages and the proper measurement of such damages, and stated his intention "to document this in the trial brief."(4/23/04 Tr. at 2179.) After outlining Sorensen's proposed measurement of monetary damages for the 10,201 shares, Sorensen's attorney stated that, "[w]e will provide detail and backup for both alternative measures of damages and as well as attorneys' fees and costs, cost shifting that we've talked about in this case, and prejudgment interest."(*Id.* at 2181.)This clearly provided Capgemini with adequate notice as to the issue of monetary damages, as well as an opportunity to be heard. Capgemini, however, chose not to offer an alternative argument for the measurement of damages.

**\*6** Capgemini argues that the exchange between the Panel, Capgemini's attorneys, and Sorensen's attorneys after Sorensen's closing argument established that Capgemini objected to the issue of monetary damages being raised, and that the Panel indicated that it would not consider such an argument, depriving Capgemini of notice that monetary damages were at issue. However, the thrust of the objection was not the issue of monetary damages but the introduction into evidence of an email from Capgemini to Sorensen that would allegedly provide evidence of the monetary value of the stock. (*Id .* at 2194-97.)Sorensen's attorney, arguing for the admission of the email, stated, "it's not going to be used ... to contest credibility.... It's being used to convey, just figures, objective figures that were sent from the other side to us."(*Id.* at

2196-97.)Capgemini responded by stating, "[I]t sounds as if he's trying to found a whole damage theory on it, and I haven't had the opportunity to see it, cross-examine Mr. Sorensen on it...." It is clear from the transcript that the "it" to which the attorneys are referring is the email, and thus that Capgemini is objecting to the introduction of the email, and not to the "damage theory" that it would allegedly support. The Panel then stated that it was not inclined to allow the introduction of the email, Sorensen's attorney stated that he had no additional evidence to present, and the hearing concluded. (*Id.* at 2197.)At no point did the Panel state that it would not consider monetary damages. Capgemini, on notice that monetary damages were sought, chose not to present any evidence on the value of the 10,201 shares of stock.

Capgemini had additional opportunities to be heard on the issue of monetary damages after the hearing. On May 25, 2004, Capgemini filed its post-hearing memorandum. Although such memoranda are referred to as being "post-hearing," the AAA Rules make clear that, after the oral hearing, parties may submit additional documents and that the hearing is not closed until all such documents have been submitted. (AAA Rules, R-34, R-37, attached at Ex. 3 to Heisenberg Decl.) Indeed, the Panel did not close the hearing until June 21, 2004. (Letter from Aileen Rocheleau, Supervisor for American Arbitration Association, dated June 28, 2004, attached at Ex. E to Petrella Decl.) On notice that monetary damages were sought and would be addressed in Sorensen's post-hearing memorandum, Capgemini's post-hearing memorandum argued that the Panel should not consider Sorensen's request for monetary damages because it had been argued too late, and because it was unsupported by the evidence. (Capgemini's Post-Hearing Memorandum at 61-64, attached at Ex. 7 to Heisenberg Decl.) Capgemini did not offer any evidence of its own as to the value of the stock. (*Id.*) On June 8, 2004, Capgemini moved to strike portions of Sorensen's post-hearing memorandum that addressed damage remedies. (Heisenberg Decl., Ex. 8.) Again, Capgemini did

not submit any evidence on the value of the 10,201 shares. (*Id.*) Capgemini did not submit any additional documents pursuant to Rule R-34 before the close of the hearing.

**\*7** Because Capgemini had adequate notice that monetary damages were sought and an opportunity to be heard before the close of the hearing, it cannot now argue that its failure to take advantage of those opportunities requires that this Court vacate the Award pursuant to § 10(a)(3).See*Yonir Techs. v. Duration Sys. Ltd.,* 244 F.Supp.2d 195, 209 (S.D.N.Y.2002) (refusing to vacate award pursuant to 9 U.S.C. § 10(a)(3) where petitioner had adequate opportunity to be heard through written submissions to panel); *Asturiana de Zinc Marketing, Inc. v. LaSalle Rolling Mills, Inc.,* 20 F.Supp.2d 670, 672-73 (S.D.N.Y.1998) (finding panel's acceptance of new calculations for damages after hearing when petitioner lacked opportunity to cross-examine or present new evidence did not require vacatur pursuant to 9 U.S.C. § 10(a)(3)); *In the Matter of Arbitration Between Carina Int'l Shipping Corp. and Adam Maritime Corp.,* 961 F.Supp. 559, 567 (S.D.N.Y.1997) (refusing to vacate award pursuant to 9 U.S.C. § 10(a)(3) for hearing in which panel had considered what petitioner argued was new claim after close of hearing because petitioner had failed to request additional discovery or reopening of hearing).

Capgemini made the tactical decision to limit its post-hearing submissions to the argument that Sorensen's request for monetary damages was untimely and not supported by the evidence, a claim that the Panel ultimately rejected. Capgemini was free to argue, in the alternative, for what it believed was the proper value of the 10,201 shares, and to submit supporting evidence. Having chosen not to make those alternative arguments, it cannot now argue that it was denied notice and opportunity to be heard. *See Carina Int'l Shipping,* 961 F.Supp. at 567.

Capgemini also failed to take advantage of a potential opportunity to be heard when it failed to request

Case 1:08-cv-04885-JGK    Document 7-3    Filed 07/08/2008    Page 93 of 204    Page 7

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1560482 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1560482 (S.D.N.Y.))**

that the hearing be re-opened. AAA Rule R-38 allows the hearing to be re-opened at any time before the award is made upon application of a party. (AAA Rules, R-38, attached at Ex. 3 to Heisenberg Decl.) Even after the Panel closed the arbitration on June 21, 2004, Capgemini could have applied to re-open the hearing to hear additional evidence on the issue of monetary damages before the Award was made over one month later on July 25, 2004. Instead, Capgemini chose to rely solely on its arguments in its post-hearing submissions, which the Panel subsequently rejected in the Award. Capgemini cannot now argue that it was denied a fundamentally fair hearing when it did not avail itself of the opportunity to be heard. *See Carina Int'l Shipping,* 961 F.Supp. at 567 (finding that party, "by its own tactical choice ... waived the right to argue that the awarding panel committed misconduct under 9 U.S.C. § 10(a)(3) by not re-opening the evidentiary hearings").

### B.

Capgemini argues that the Panel's subsequent consideration of Sorensen's request for monetary remedies exceeded their powers and that therefore the Court should vacate or modify the arbitration award pursuant to § 10(a)(4). Capgemini argues that, because Sorensen's Statement of Claim sought the return of the 10,201 stock and not its monetary value, the Panel essentially allowed him to modify his claim after the hearings by allowing him to seek the monetary value of the 10,201 shares of stock in his post-hearing memorandum. Capgemini argues that this violated the AAA Rules governing the arbitration by allowing Sorensen to change his claim after the close of the hearing. (AAA Rules, R-6, attached at Ex. 3 to Heisenberg Decl.) Capgemini argues that, because the arbitration agreement stated that the Panel would be bound by the AAA Rules, the Panel exceeded its powers by choosing to ignore the AAA Rules guiding the amendment of claims. Capgemini also argues that the Panel exceeded its authority by awarding damages and providing a measure of monetary damages, because

the issue was not before the Panel. *See,e.g.,Totem Marine Tug & Barge, Inc. v. North Am. Towing, Inc.,* 607 F.2d 649, 651 (5th Cir.1979) (vacating arbitration award where arbitration panel awarded unrequested damages about three times larger than any item claimed). Therefore, Capgemini argues, the Court should vacate the arbitration award pursuant to § 10(a)(4).

**\*8** Capgemini has not demonstrated that the Panel exceeded its powers such that the Court should vacate the Award pursuant to § 10(a)(4). The Arbitration Act was intended to give arbitrators wide latitude in resolving contractual disputes. *SeeSouth East Atlantic Shipping Ltd. v. Garnac Grain Co.,* 356 F.2d 189, 192 (2d Cir.1966). Sorensen's employment agreement provided that the Panel would follow the AAA Rules. (Arbitration Agreement.) Capgemini has shown no specific AAA rule that the Panel violated by finding an award of monetary damages. On the contrary, the AAA Rules provide that "[t]he arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract."(AAA Rules, R-45, attached at Ex. 3 to Heisenberg Decl.) In this case, Sorensen's claim to the 10,201 shares was plainly at issue in the arbitration and the award did no more than provide a remedy for those allegedly wrongfully withheld shares.

Capgemini's reliance on *Totem Marine Tug & Barge, Inc. v. North Am. Towing, Inc.* is misplaced. In *Totem,* the parties, Totem and North American, entered into a charter agreement for a vessel owned by Totem, which Totem terminated before the agreement expired. *Totem,* 607 F.2d at 650. North American requested arbitration, and provided an itemized statement of the losses for which it sought damages. *Id.* The itemized statement did not contain a request for damages for charter hire, and North American conceded that charter hire was "not an issue in the arbitration."*Id.* at 650-51.Nonetheless, the arbitration panel provided damages for charter hire that totaled three times the

Not Reported in F.Supp.2d                                                                                    Page 8
Not Reported in F.Supp.2d, 2005 WL 1560482 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1560482 (S.D.N.Y.))**

amount of any item on the itemized list that North American had provided.*Id.* The Court found that the arbitration panel had exceeded its powers under § 10(a)(4) (formerly 9 U.S.C. § 10(d)).*Id.*

Here, unlike in *Totem,* the Panel did not decide a separate theory of liability that was not at issue in the arbitration. Although Capgemini disputes the form that the damages for the 10,201 shares took, it does not dispute that liability for the shares was a central issue in the arbitration and was fully litigated. Therefore, *Totem* does not provide support for the argument that the Court should for vacate the Award based pursuant to § 10(a)(4).

### C.

Capgemini argues that the Court should vacate or modify the Award because the Panel exceeded its powers by ignoring the forfeiture schedule of the 10,201 when valuing the shares. The Employment Agreement by which the Panel was bound states that "[t]he arbitrators have no power ... to alter, amend, or otherwise affect the terms of the employment Agreement."(Arbitration Agreement, Annex 4.) Capgemini argues that, by ignoring the restrictions on the shares, the Panel altered the Employment Agreement and therefore exceeded the scope of their authority.

**\*9** The Court may only vacate or modify the Award pursuant to § 10(a)(4) if the Panel did not have the power to reach a certain issue. *SeeDiRussa, 121 F.3d at 824.* The inquiry under § 10(a)(4) focuses on whether "the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach an issue, not whether the arbitrators correctly decided the issue."*Id.*

As explained above, it is clear that the issue of the 10,201 shares and the value of the stock was properly before the Panel in deciding liability and appropriate damages. The Panel therefore had the power to calculate damages based upon the value of the stock. In doing so, the Court was bound by

AAA Rule R-45, which gave the Panel the power to fashion "any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract."(AAA Rule R-45, attached at Ex. 3 to Heisenberg Decl.) Capgemini has put forth no evidence indicating that the Panel did not deem the remedy just, equitable, or within the scope of the agreement. Capgemini only argues that the Panel mistakenly failed to account for the restrictions on the stock when calculating its value. But, the Panel valued the stock based upon the best evidence in the record-the sale price of the last sale of Sorensen's stock some months before the date of the breach. There is no evidence that Capgemini presented any evidence of any appropriate reduction in the value of the stock based on any restrictions on its sale. In any event, the issue under § 10(a)(4) is whether the arbitrators had the power to grant damages for the wrongful withholding of the stock, and they did.

### D.

### 1.

Capgemini argues that the Award should be vacated or modified for manifest disregard of the law. It is undisputed that New York law, which the parties agree applies,[FN2] calculates damages for the withholding of stock in breach of a contract based on the price of the stock on the date of the breach. *SeeOscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 196-97 (2d Cir.2003); Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 262 (2d Cir.2002); Scully v. U.S. WATS, Inc., 238 F.3d 497, 512 (2d Cir.2001).* Capgemini argues that, while New York contract law requires that monetary damages be measured from the date of the breach, here January 11, 2002, the Panel improperly calculated the value of the stock using the date of Sorensen's last sale in August 2001.

FN2. The parties do not dispute that New

Not Reported in F.Supp.2d                                                                                                  Page 9
Not Reported in F.Supp.2d, 2005 WL 1560482 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1560482 (S.D.N.Y.))**

York law should be applied and the Court can accept the agreement of the parties. See *Hannex Corporation v. GMI, Inc.,* 140 F.3d 194, 203 n. 7 (2d Cir.1998); *Bhandari v. The Trustees of Columbia University,* No. 00 Civ. 1753, 2000 WL 310344, at *5 n. 1 (S.D.N.Y. March 27, 2000).

As explained above, review of an arbitration award for manifest disregard of the law is "severely limited," and "to modify or vacate an award on this ground, a court must find both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." *Halligan,* 148 F.3d at 202 (internal quotations omitted); *see also Duferco,* 333 F.3d at 388-89; *DiRussa,* 121 F.3d at 821; *Wedbush,* 320 F.Supp.2d at 126-27.

**\*10** Capgemini's argument that the Panel incorrectly calculated the value of the stock by using a date other than the date of breach does not provide grounds for vacatur. Under New York law, "[a]rbitrators have power to fashion remedies appropriate to the resolution of the dispute between the parties before them." *SCM Corp. v. Fisher Park Lane Co.,* 358 N.E.2d 1024, 1028 (N.Y.1976); *see also, Matter of Paver & Wildfoerster (Catholic High School Assn.),* 345 N.E.2d 565, 569 (N.Y.1976). It is undisputed that the parties did not provide the Panel with the price of the stock on the date of the breach. The Panel arrived at its calculation for the value of the stock using the best evidence submitted, which was the price of the stock at Sorensen's last sale of the stock in August 2001. There was no evidence of any changes in the price of the stock. Here, the Panel fashioned an appropriate remedy based upon the facts and law before it. Therefore, this Court cannot conclude that there was no colorable basis for the Award. *See Hoeft v. MVL Group, Inc.,* 343 F.3d 57, 70 (2d Cir.2003) (finding no manifest disregard of law where arbitrator calculated primary year earnings in accordance with his understanding of parties' intent in

face of conflicting evidence from parties); *Getko Group, Inc. v. Amica Mutual Ins. Co.,* No. 03 Civ. 5876, 2003 WL 22455303, at *3 (S.D.N.Y. Oct. 28, 2003) (finding no manifest disregard of law where record provided no evidence of expenses or losses, because support exists for proposition that "New York law permits imprecise and even somewhat speculative contract damages in arbitration proceedings").

Moreover, Capgemini did not argue for a measure of damages based on the value of the shares at the time of breach and present evidence as to that value. Hence Capgemini cannot point to any clear law that was brought to the arbitrators' attention that they disregarded. *See GMS Group LLC v. Benderson,* 326 F.3d 75, 78 (2d Cir.2003). Capgemini cannot, having failed to take advantage of its opportunity at the arbitration to raise this issue and offer evidence supporting it, now claim that the Award was in manifest disregard of the law because the Panel did not consider evidence that the parties failed to provide.

### 2.

Capgemini also argues that the value of the stock as calculated by the Panel should have been adjusted for the stock restrictions, which would have prohibited Sorensen from selling portions of the 10,201 shares until specific dates. Again, there can be no manifest disregard of the law because Capgemini never argued to the arbitrators that the value of the shares should be reduced by restrictions on the shares, and thus the arbitrators never disregarded a clear rule of law.

Moreover, the case Capgemini cites to support its assertion that the stock should have been discounted because of its restrictions, *Lucente v. International Business Machines Corporation,* establishes no clear rule of law supporting Capgemini. In *Lucente,* the district court had measured damages for restricted stock eight months after the breach occurred, reasoning that the plaintiff would not have

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1560482 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1560482 (S.D.N.Y.))**

Case 1:08-cv-04885-JGK    Document 7-3    Filed 07/08/2008    Page 96 of 204    Page 10

been able to sell the stock until a future date. *Lucente v. Int'l Bus. Machs. Corp.,* 117 F.Supp.2d 336, 358-59 (S.D.N.Y.2000), *rev'd,* 310 F.3d 243 (2d Cir.2002). Although the Court of Appeals ultimately reversed this finding on different grounds, it explicitly called into question the district court's reasoning without deciding the issue of whether the valuation based on the sale price of the stock eight months after the breach was correct. *Lucente,* 310 F.3d at 261. The Court of Appeals found that "New York Courts have rejected awards based on what the actual economic conditions and performance were in light of hindsight," and that "New York's rule for measuring contract damages by the value of the item at the time of the breach is eminently sensible and actually takes expected lost future profits into account." *Id.* at 262 (internal quotation marks and citations omitted). The Court of Appeals noted that, although none of the cases it cited supporting that proposition dealt with restricted stock, "we have found no New York cases suggesting that a different rule would apply to restricted stock." *Id.* More recently, the Court of Appeals for the Second Circuit cited *Lucente* while rejecting a measurement of damages for undelivered warrants that adjusted the value of the warrants according to the Court's estimation of how long the plaintiff would have held the warrants before exercising them. *See Oscar Gruss,* 337 F.3d at 196-97. The Court of Appeals stated that the proper measurement for damages was the value of the warrants on the date the defendant breached the contract. *See id.* at 196-97.

**\*11** Because the legal principle that Capgemini argues the Panel should have applied is not defined, explicit, or clearly applicable, Capgemini has failed to demonstrate a manifest disregard of the law. *See Duferco,* 333 F.3d at 388-89; *GMS Group,* 326 F.3d at 78; *Goldman,* 306 F.3d at 1216; *Halligan,* 148 F.3d at 202; *DiRussa,* 121 F.3d at 821; *Wedbush,* 320 F.Supp.2d at 126-27. The Panel's award of monetary damages is not in manifest disregard of the law.

3.

Capgemini argues that the Panel also acted in manifest disregard of the law when it calculated the prejudgment interest from January 11, 2002 for stock that Sorensen would not have been able to sell until later dates.

Capgemini provides no evidence that it brought this legal argument to the attention of the Panel, or that the Panel was otherwise aware of it. Having failed to raise the argument regarding the proper judgment of prejudgement interest, Capgemini may not now raise the issue in support of the proposition that, by ignoring the principle it failed to raise, the Panel acted in manifest disregard of the law.

Moreover, Capgemini has not demonstrated that the legal principle it argues the Panel ignored-that prejudgment interest for damages involving restricted stock should be calculated from the dates that the stock could be sold-is well defined, explicit, and clearly applicable to the arbitration. The only case Capgemini cites in its papers to support its claim is *Lucente,* which, as described above, supports the legal principle that damages should be calculated from the time of the breach. *Lucente,* 310 F.3d at 262. Because Capgemini has failed to show that the Panel chose to ignore a well defined, explicit, and clearly applicable principle of law, Capgemini has failed to demonstrate that the Award of prejudgment interest was in manifest disregard of the law.

E.

Sorensen moves to modify the Award to value the stock price based on the price on the date of the breach, January 11, 2002. He submits new evidence with his application to show that the value of each share should be increased from $67.44 per share to $76.58 per share. (*See* Respondent's Memorandum of Law in Opposition to Petitioner's Petition to Vacate, Modify, or Correct Arbitration and in Support of Respondent's Cross-Petition to Modify or, Alternatively, to Confirm Arbitration Award, dated

Case 1:08-cv-04885-JGK    Document 7-3    Filed 07/08/2008    Page 97 of 204

Not Reported in F.Supp.2d                                                    Page 11
Not Reported in F.Supp.2d, 2005 WL 1560482 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1560482 (S.D.N.Y.))**

Oct. 25, 2004 at 24; Petrella Decl., Ex. I.)

However, a party may not fail to submit evidence to an arbitration panel and then ask that the resulting award be modified for failure to take into account the evidence that the party withheld. *Pike v. Freeman,* 266 F.3d 78, 89 (2d Cir. 2001). Capgemini's claim that the Panel's failure to account for evidence it did not have and a legal argument that was not made is manifest error requiring modification.

### F.

The respondent also requests post-award, prejudgment interest at an annual rate of 9% from the date of the award. (Letter from Sean F. O'Shea dated June 15, 2005.) Because this is a diversity case, prejudgment interest is governed by New York law. *See Northrop Corp. v. Triad Int'l Marketing S.A.,* 842 F.2d 1154, 1155 (9th Cir.1988) (per curiam) (finding state law determines rate of post-award, pre-judgment interest in diversity action enforcing arbitration award under Federal Arbitration Act); *Commonwealth Assocs. v. Letsos,* 40 F.Supp.2d 170, 177 n. 42 (S.D.N.Y.1999); *Coastal Power Intern Ltd. v. Transcontinental Capital, Corp.,* 10 F.Supp.2d 345, 371 (S.D.N.Y.1998). Under New York law, interest shall be recovered on an arbitration award. *See* CPLR § 5002; *Glantz v. Nationwide Mut. Ins. Co.,* 641 N.Y.S.2d 136 (App.Div.1996); *Kavares v. Motor Vehicle Acc. Indemnification Corp.,* 285 N.Y.S.2d 983, 986 (App.Div.1967), *aff'd, McEntee v. Motor Vehicle Accident Indemnification Corp.,* 271 N.E.2d 915 (N.Y.1971). The proposed rate of 9% per annum is in accordance with CPLR § 5004. Therefore, the Court grants pre-judgment interest at a rate of 9% per annum on the amounts due from the date of the award to the date judgment is entered in this matter.

### CONCLUSION

**\*12** For the reasons stated above, Capgemini's motion to vacate, modify, or correct the arbitration award is denied, and the arbitration award is con-

firmed. Sorensen's cross-petition to modify the arbitration award is denied. Sorensen's request for post-award, prejudgment interest in the amount of 9% is granted. Therefore, the Clerk should enter a judgment in favor of the respondent in the amount of $687,955 plus $163,248 in interest for the period January 1, 2002, to August 21, 2004, and an additional 9% interest on $687,955 for the period August 22, 2004, to the date judgment is entered. The Clerk is directed to enter Judgment in accordance with this Opinion and to close this case.

SO ORDERED.

S.D.N.Y.,2005.
Capgemini v. Sorensen
Not Reported in F.Supp.2d, 2005 WL 1560482 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 8

LEXSEE 2000 US DIST LEXIS 556

**DOROTHY CONIGLIARO, Plaintiff, -against- HORACE MANN SCHOOL, Defendant.**

**95 Civ. 3555 (CSH)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2000 U.S. Dist. LEXIS 556; 141 Lab. Cas. (CCH) P34,105; 78 Empl. Prac. Dec. (CCH) P40,090*

**January 18, 2000, Decided
January 19, 2000, Filed**

**DISPOSITION:** [*1] Motion for summary judgment granted. Plaintiff's Title VII and *New York Executive Law § 296* claims dismissed.

**COUNSEL:** For DOROTHY CONIGLIARO, plaintiff: Craig T. Dickinson, Garrison, Phelan, Levin-Epstein, Chimes, Richardson, P.C., New Haven, CT.

For HORACE MANN SCHOOL, defendant: Peter N. Hillman, Marjorie L. Cohen, Aime L. Hendricks, Chadbourne & Parke LLP, New York, NY USA.

**JUDGES:** CHARLES S. HAIGHT, JR., SENIOR UNITED STATES DISTRICT JUDGE.

**OPINION BY:** CHARLES S. HAIGHT, JR.

**OPINION**

*MEMORANDUM OPINION AND ORDER*

*HAIGHT, Senior District Judge:*

Plaintiff, a long-time employee in the Development Office of Horace Mann School, a private school in the Bronx, brought this case asserting claims of sex-based wage discrimination pursuant to the Equal Pay Act of 1963, *29 U.S.C. § 201 et seq.* ("EPA"), Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.*, and the New York State Executive Law *§ 296 et. seq.* The complaint originally asserted claims against the school and three individuals in their personal and representative

capacities: Philip Foote, then Head of School; Michael Hess, Chairman of the Board of Trustees; and Lawrence Lowenstein, then Director of Development [*2] and Alumni Affairs whose higher salary sparked Conigliaro's disparate wage claim. The claims against Foote, Hess and Lowenstein were dismissed with prejudice pursuant to a Stipulation and Order entered August 12, 1998. Horace Mann thereafter filed the motion for summary judgment which the Court considers in this opinion. For the reasons that follow, I conclude that plaintiff has not shown that she and Lowenstein performed substantially equal work, and therefore grant the motion.

I.

A. *Summary Judgment Standards*

Under familiar and well-established principles, "summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *D'Amico v. City of New York, 132 F.3d 145, 149* (2d Cir.), *cert. denied, 524 U.S. 911, 118 S. Ct. 2075, 141 L. Ed. 2d 151 (1998)*. In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. America Piles, Inc., 138 F.3d 81, 87 (2d Cir. 1998)* [*3] (citing *Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*). The party seeking summary judgment bears the initial burden of showing that no genuine issue

2000 U.S. Dist. LEXIS 556, *3; 141 Lab. Cas. (CCH) P34,105;
78 Empl. Prac. Dec. (CCH) P40,090

of material fact exists. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).*

Once such a showing is made, the party opposing the motion must come forward with "specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e).* In so doing, the "non-moving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).* Moreover, while the party resisting summary judgment must show a dispute of fact, it must also be a material fact in light of the substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* However, "the mere existence of a scintilla of evidence in support of the [non-movant's] [*4] position will be insufficient" to defeat a properly supported motion for summary judgment. *Anderson, 477 U.S. at 252.* Instead, the non-movant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Id. at 256.* Summary judgment should only be granted if no rational factfinder could find in favor of the non-moving party. *Heilweil v. Mount Sinai Hospital, 32 F.3d 718, 721 (2d Cir. 1994).*

In the employment context where discriminatory animus is at issue, a trial court must be "cautious" about granting summary judgment, given that direct evidence supporting a plaintiff's claim of intentional discrimination is rare. *Gallo v. Prudential Residential Services Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir. 1994); Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994).* However, summary judgment is not necessarily precluded in an employment discrimination case, even when the employer's intent or state of mind is at issue. *Chambers, 43 F.3d at 40; Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).* [*5]

B. *EPA Standards*

With some exceptions not applicable here, the Equal Pay Act subjects employers to essentially strict liability for paying female employees less than their male counterparts performing equal work. To prevail on an Equal Pay Act claim, a plaintiff need not prove intentional gender discrimination. *Belfi v. Prendergast, 191 F.3d 129, 136 (2d Cir. 1999).* Instead, she must prove that: "i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions." *Tomka v. Seiler Corp., 66 F.3d 1295, 1310 (2d Cir. 1995), abrogated on other grounds by Burlington Indus. Inc., v. Ellerth, 524 U.S. 742, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998).* Once a plaintiff has established the elements of a *prima facie* case, a defendant may prevent a finding of liability by demonstrating that the wage disparity resulted from one of four permissible factors delineated in the Act: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity [*6] or quality of production; or (iv) a differential based on any factor other than sex." *29 U.S.C. § 206(d)(1).* If an employer relies on the fourth factor to justify the pay differential, the employer must also show that "it had a legitimate business reason for implementing the gender-neutral factor that brought about the wage differential." *Belfi, 191 F.3d at 136.* In other words, the employer must show that the qualification is "job-related." *Tomka, 66 F.3d at 1312.*

Although intent is not part of a *prima facie* EPA case, if the employer brings forward proof of a permissible non-discriminatory explanation for the wage differential, a plaintiff may rebut it by producing evidence showing that the reasons the employer advances are a pretext for sex discrimination. "The appropriate inquiry to determine if the factor put forward is a pretext, is whether the employer has used the factor reasonably in light of the employer's stated purpose as well as its other practices." *Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 526 (2d Cir. 1992)* (internal quotation marks omitted; alteration in *Aldrich*).

Turning to [*7] the case at bar, two of the three elements of the *prima facie* case are not seriously in dispute. The only male employee whose salary Conigliaro unfavorably compares to her own is Lawrence Lowenstein. It is uncontested that Lowenstein's salary was considerably higher than Conigliaro's during their entire overlapping tenure at Horace Mann and that the two worked in the same office under essentially the same working conditions. The principal point of contention between the parties is the second factor: the equality of their work. In its motion, Horace Mann argues that Conigliaro cannot establish a *prima facie* case because while she may have been paid less than Lowenstein, she cannot show that it was for equal work. Alternatively,

2000 U.S. Dist. LEXIS 556, *7; 141 Lab. Cas. (CCH) P34,105;
78 Empl. Prac. Dec. (CCH) P40,090

Horace Mann contends that even if plaintiff were able to demonstrate an issue of fact with respect to that element, her EPA claim must nonetheless be dismissed because Horace Mann can justify paying Lowenstein more than Conigliaro because of a gender-neutral factor directly related to his position in the Development Office -- his deep involvement with the Horace Mann community.

II.

The facts of this case, considered in the light most favorable to plaintiff [*8] as the non-moving party, are as follows.

Plaintiff graduated from State Teachers College at New Paltz in 1958. For a number of years after graduation and after taking some time off to raise her children, plaintiff worked as a teacher, a librarian and a secretary in various public and private schools. In 1977, she joined Horace Mann as a secretary to Russell Ames, the school's newly hired Director of Development, with whom she had worked for several years at Riverdale Country School and who asked her to join him at Horace Mann. In 1980, Conigliaro's title at Horace Mann was changed from secretary to Assistant Director of Development. Her duties as such included collaborating on and implementing fundraising plans, acting as assistant editor of the yearly school magazine and working on other publications. *See* Deposition of Dorothy Conigliaro ("Conigliaro Aff."), attached as Ex. 1 to Affidavit of Craig T. Dickinson dated October 5, 1998 ("Dickinson Aff."), at pp. 39, 65; *see also* Plaintiff's Memorandum of Law ("Pl. Mem.") at 5. Plaintiff continued in this position reporting to Ames until 1992 when Ames retired from Horace Mann. At that time, plaintiff's title became Associate [*9] Director of Development, a position she kept until she resigned in January of 1998.

Lawrence Lowenstein graduated from Horace Mann in 1939 and from Cornell University in 1943. In the years between his graduation and 1981, when Horace Mann offered him a paid position, Lowenstein was involved on a voluntary basis in a variety of positions with Horace Mann and its alumni association. He served as a Trustee of Horace Mann for eleven non-consecutive years, was elected President of the Horace Mann Alumni Association for three separate three-year terms, and participated in Horace Mann fundraising efforts and alumni activities while serving as a class and decade agent in connection with many annual funds. During this time, Lowenstein was also involved in alumni relations and fundraising for Cornell University, serving as a class agent for over thirty-five years, and played a fundraising role in various other philanthropic organizations. In his professional life Lowenstein was involved in the restaurant business, owning and operating a succession of New York City restaurants from 1946 to 1981.

In 1981, after his last restaurant venture failed, Lowenstein was hired by Horace Mann as Director [*10] of Alumni Affairs, reporting to Russell Ames who was then head of the Development Office. When Ames left in 1992, Lowenstein became the Director of Development and Alumni Affairs. [1] In that position, Lowenstein reported to the Head of School and the Board of Trustees, and Conigliaro and the three other Development Office employees reported to him. Lowenstein's responsibilities and activities in that position, which were comparable to those involved in his previous position as Director of Alumni, included attending and speaking at in-town and out-of-town reunions, networking regularly with alumni, reviewing potential donor lists, participating in phone-a-thons, writing and signing solicitation letters to potential donors, attending lunches with actual and potential donors, and attending industry conferences. After Ames left and Lowenstein became the Director of Development and Alumni Affairs, Lowenstein's additional responsibilities included preparing the Development Office budget and exercising primary overall responsibility for fundraising activities and for administering the Development Office. *See* Affidavit of Dr. Eileen Mullady, Head of Horace Mann School, dated December 7, 1998 ("Mullady [*11] Aff.") at P 3.

1 Lowenstein held this position until July of 1997 when he became Special Assistant to the Head of School for capital campaign and Director of Gift Planning at a reduced salary.

Lowenstein described his work substantially as follows:

The main duties were to run the development office, to direct the fund raising and alumni activities, to supervise anything in the area of alumni and development, to interface with trustees, to deal with major donors, to solicit, cultivate and keep happy people who made gifts. When somebody's made a major gift we

2000 U.S. Dist. LEXIS 556, *11; 141 Lab. Cas. (CCH) P34,105;
78 Empl. Prac. Dec. (CCH) P40,090

like to make them feel they are important
and visit with them. I felt responsible for
anything that was done in our office,
whether it would be a mailing piece or
magazine or letter or any activity that we
did I was responsible for it will [sic] as the
director, and so instructed others as to how
to carry out what I felt should be done.

Deposition of Lawrence Lowenstein ("Lowenstein
Dep."), attached as Exhibit 3 to Dickinson Aff., at 22-23.

[*12] For Conigliaro's part, the tasks she performed
as Associate Director of Development (a title bestowed
upon her in 1992) included planning and writing
solicitation letters for the annual fund; overseeing the
production of alumni directories; helping Lowenstein
write foundation proposals; planning and assisting in
phone-a-thons; designing reunion invitations and
Christmas cards; writing thank-you letters; coordinating
the conversion of the office computer system; interacting
with parents, trustees and alumni in connection with
phone-a-thons, reunions, production of the school
magazine and other special projects; and overseeing
publication of the school magazine as its Editor. Before
Ames left, Conigliaro also spearheaded an effort to
incorporate the female alumni from Horace Mann's
affiliated girls' school into the school's development
efforts. *See* Conigliaro Dep. at 102-05; Pl. Mem. at 5-6.
Plaintiff also testified that she absorbed many of the
scheduling, meeting planning and coordination work that
Lowenstein should have been doing as Director of
Development, and therefore oversaw the "effective
running of the office." Conigliaro Dep. at 72, 95.

Conigliaro's complaint avers that [*13] since 1981
she has been paid considerably less than Lowenstein. The
complaint puts a figure on a specific wage disparity only
for the academic years of 1992-93 in which Lowenstein's
salary was allegedly $ 30,000 higher, and 1993-94 in
which it was allegedly $ 31,800 higher. Complaint at P
14. The parties' briefs and deposition testimony reveal
that the gap in their salaries persisted for the academic
year 1995-96 of approximately $ 46,000, and 1996-97 of
approximately $ 47,000. Conigliaro Dep. at 9. To the
Court's knowledge, neither the briefs nor the deposition
testimony speak to the salary differential for any other
year.

III.

A. *Equal Work*

What comes through clearly from a thorough reading
of plaintiff's brief and deposition testimony is her
argument that she was more experienced professionally,
more competent and worked harder than Lowenstein in a
job in which she performed many of the same tasks as he
did and, indeed, took over some of the tasks he should
have undertaken. Conigliaro maintains that despite
Lowenstein's higher title and nominal responsibility for
running the Development Office, it was Conigliaro who
in reality ran the office and did so more effectively [*14]
than Lowenstein could have done. Essentially,
Conigliaro's argument is that her talents, hard work,
experience and worth were not recognized or fairly
remunerated, while Lowenstein's relatively lower worth,
less professional experience and inefficiency were
inappropriately rewarded.

These arguments, even if the facts on which they are
founded are true, do not establish a *prima facie* case
under the EPA. The EPA does not mandate equal pay for
equal competence, effort or intrinsic worth. It mandates
equal pay for equal *work*. In order to establish that aspect
of an EPA *prima facie* case, Conigliaro must demonstrate
that she and Lowenstein performed "substantially equal"
work. *Lambert v. Genesee Hospital, 10 F.3d 46, 56 (2d
Cir. 1993)* (internal quotation marks omitted). Under this
standard the positions need not be identical in all
respects, but "jobs which are merely comparable are
insufficient to satisfy" this showing. *Tomka, 66 F.3d at
1310* (internal quotation marks omitted). In assessing the
substantial equality of two positions, one must not focus
rigidly on titles or job description; it is the content of the
job that controls. *Id.* [*15] "This determination is, by its
nature, necessarily a particularized one not amenable to
the application of broad job classifications or reliance on
job title nomenclature." *Waterman v. New York Tel. Co.,
1984 U.S. Dist. LEXIS 19093*, No. 82 Civ. 1512, 1984
WL 1482, *2 (S.D.N.Y. Feb. 24, 1984).

The evidence in this case does not bear out plaintiff's
assertion that she and Lowenstein performed equal work.
Plaintiff's own deposition testimony demonstrates
precisely the contrary -- that the work they performed
was dissimilar in many material respects.

Plaintiff testified that the basis for her allegation in
the complaint that she and Lowenstein performed
substantially similar "functions" for Horace Mann was
that:

both he and I were interested in, or at least supposedly interested in improving the financial welfare of the school. That was our number 1 goal. *He may have done it through contacting alumni and soliciting funds. I did it through my own methods of making friends with the school with publications and doing -- sort of overseeing the annual fund. And also working with the alumni.* As I said, I worked to reincorporate the girls' school into the Horace Mann alumni body. And that has [*16] resulted in a lot of contributions from women graduates.

Conigliaro Dep. at 175-76 (emphasis added). When asked whether there were any other reasons for her assertion, she responded, "No, that's all." *Id. at 176*. Later, Conigliaro reiterated that the basis for her allegation that there was "substantial similarity" between their positions was "that both of our positions were aimed toward raising money for the school, raising money and -- as they like to say, friend-raising and fund-raising for the school." *Id. at 230*. This testimony undercuts any claim that the jobs were substantially similar because it confirms that she and Lowenstein performed markedly different tasks in working toward the same goal. In particular, Lowenstein's focus was on personally networking with alumni and major donors. As Conigliaro testified, "Russ [Ames] and Larry [Lowenstein] were out visiting trustees and visiting parents [and] alumni. I was keeping the home fires burning, so to speak." Conigliaro Dep. at 135-36. Conigliaro confirmed that she did not possess the extensive alumni contacts that Lowenstein had developed over the years:

> Q: In 1992 when you became associate director [*17] and Mr. Lowenstein became director, did you have the contacts with the alumni at that point?
>
> A: Did I have any contacts?
>
> Q: Did you have the contacts that Mr. Lowenstein had with the alumni at that point?
>
> A: No, I did not.

Conigliaro Dep. at 172-73.

As all this testimony suggests, plaintiff does not and could not dispute that she and Lowenstein performed different tasks in working toward a shared goal. Indeed, plaintiff admitted that their roles were different in numerous respects in the following interchange:

> Q: Did you report to the head of the school?
>
> A: No, I did not.
>
> Q: Did Mr. Lowenstein report to the head of the school?
>
> A: Yes, he did.
>
> Q: Who prepared the budget for the development and alumni office?
>
> A: Mr. Lowenstein did.
>
> Q: So you did not prepare the budget?
>
> A: I did not.
>
> Q: Did you make presentations to alumni for fund-raising activities?
>
> A: Yes.
>
> Q: In what instances?
>
> A: I'm sorry, could you repeat -- what do you mean by "presentations"?
>
> Q: Did you make presentations to groups of alumni?
>
> A: No, I did not.
>
> Q: Did you network with alumni?
>
> A: On certain matters I did.
>
> Q: [*18] For example, what are those matters?
>
> A: For example, I correspond with alumni authors because I did synopses of their books in the alumni magazine. So I maintained a correspondence with them and their publicists.

2000 U.S. Dist. LEXIS 556, *18; 141 Lab. Cas. (CCH) P34,105;
78 Empl. Prac. Dec. (CCH) P40,090

I also -- further back, I initiated the reincorporation of the girls' school, which meant that all those records which were sort of dwindling were now reinstated. I initiated a great effort to reincorporate them into the Horace Mann School.

Conigliaro Dep. at 104-05.

The substantial equality of their work is further belied by Conigliaro's disclosure that she did not desire Lowenstein's position. In her deposition testimony, after she judged Lowenstein as an incompetent Director of Development because he was "late in doing things," "spent inordinate amounts of time on the phone," and "did not know how to either delegate responsibilities or direct [or] manage the office," she was asked point blank:

Q: Did you want his job?

A: No.

Q: Were you qualified for his job?

A: Yes.

Q: On what basis?

A: *I could have done all the things he did. I could have done them all. And I could have done them better.*

Conigliaro [*19] Dep. at 171-72 (emphasis added). Implicit in this testimony is plaintiff's recognition by plaintiff that the jobs were different in substantive respects -- not just in title. Plaintiff admits that she "could have done all the things he did," reflecting that there were tasks that Lowenstein performed that she did not. Moreover, if there were no material differences between the two jobs in terms of overall content they should logically have been basically interchangeable to plaintiff, but according to her testimony they were not.

Plaintiff's brief contains a similarly telling argument. After describing Lowenstein's responsibilities as a paid Horace Mann staff member, plaintiff concludes that:

Simply put, the school decided to pay [Lowenstein] for things he had done in the past voluntarily. Thus, his work on and attendance at reunions was similar to his participation as a member and officer of the Alumni Association. The fact that he did this out of state, as well as locally was as much a perk to Mr. Lowenstein as it was a benefit to the school. Likewise, his attendance at meetings and worked [sic] on the budget was comparable to his duties as a trustee. Indeed, he was required [*20] to attend fewer meetings and work on a departmental rather than school-wide budget.

Pl. Mem. at 8. The important point is that Lowenstein's work, described by Conigliaro in dismissive and disparaging terms, was in fact work that Conigliaro herself did not do. Thus, in trying to make the point that Lowenstein was unworthy of his salary because he had previously served the same functions for free, Conigliaro serves to highlight the differences in the nature of their work. Yet this undercuts her EPA claim, which requires Conigliaro to show that the work they performed was substantially equal, not, as she argues here, that the school assigned an unfair relative value to their different functions. Whether Lowenstein was incompetent, a poor manager, or was being paid for work he previously performed gratuitously is meaningless for EPA purposes, as is plaintiff's argument that she was more qualified, worked harder and provided more value to the Development Office than Lowenstein. Again, the test is whether the work was substantially equal. Conigliaro has not provided any facts that show that their work meets this standard. As outlined above, at nearly every turn her testimony belies [*21] that claim.

While it is undisputed that there was much common ground in their general job tasks such as participating in phone-a-thons, work on annual appeals, writing solicitation letters and contacting and interfacing with parents, alumni and trustees, the performance of some common tasks does not make jobs substantially equal when material differences also exist. *See Doria v. Cramer Rosenthal McGlynn, Inc.*, 942 F. Supp. 937, 942 (S.D.N.Y. 1996) ("When the additional tasks of one job in comparison to another job are substantial, then jobs are

2000 U.S. Dist. LEXIS 556, *21; 141 Lab. Cas. (CCH) P34,105;
78 Empl. Prac. Dec. (CCH) P40,090

not congruent and the work is not equal."); *Kellett v. Glaxo Ent., Inc., 1994 U.S. Dist. LEXIS 17021*, No. 91 Civ. 6237, 1994 WL 669975, *7 (S.D.N.Y. Nov. 30, 1994) ("small degree of overlap" did not establish substantial equality); *DiNolfo v. Rochester Tel. Corp., 972 F. Supp. 718, 723 (W.D.N.Y. 1997)* (no substantial equality between jobs where plaintiff claimed that some of her duties were similar to those of higher paid male employees but did not deny that some of her duties were not shared by them); *Koster v. Chase Manhattan Bank, 609 F. Supp. 1191, 1194 (S.D.N.Y. 1985)* ("Certain areas of overlap" did [*22] not make jobs substantially equal; "it is the overall job, not its individual segments, that must form the basis of comparison") (internal quotation marks omitted).

Conigliaro described her additional responsibilities as chiefly including coordinating the conversion of a new computer system in the Development Office; reincorporating female alumni in development efforts; overseeing the production of and editing the school magazine and other school publications; ensuring the smooth operation of the Development Office by setting the schedule for the annual fund and initiating internal meetings; and other ancillary activities such as printing invitations and preparing a brochure for the admissions office. Conigliaro made it clear that Lowenstein did not share in these efforts.

On the other hand, Lowenstein performed a number of activities that Conigliaro did not take part in, either in substance or to the same degree as Lowenstein did. Lowenstein attended and made presentations at nearly every Horace Mann reunion held since 1981. He had regular and extensive personal interaction with alumni and donors in an effort to solicit donations. These interactions included phone calls, lunches [*23] and personal visits. Lowenstein also had daily contact by telephone or in person with members of the Board of Trustees to discuss development efforts and other matters, and attended and made presentations at Trustee meetings. He attended numerous out-of-town development conferences; determined who mailings should go to and set goals for solicitations from individual donors; prepared the Development Office budget and carried the responsibility of supervising all four other Development Office employees. He reported directly to the Head of School and the Trustees.

Construing the evidence in the light most favorable

to her, Conigliaro did not have these activities or responsibilities in common with Lowenstein. Although she dealt with alumni and parents, she did so not in personal solicitation efforts but in connection with details attendant to phone-a-thons, publications and other special projects. Thus, unlike Lowenstein, she did not have regular personal meetings with them in an effort to solicit donations and maintain relationships. In fact, Conigliaro testified that she did not have a single one-on-one meeting with an alumnus until after 1990 when she had occasional meetings with [*24] individual alumni regarding school publications. Moreover, she attended at most one reunion and one development conference from 1992 to 1997 and never attended a Trustee meeting, while Lowenstein attended and delivered speeches and presentations at all reunions and attended and gave reports at many Trustee meetings.

To Conigliaro, these are distinctions without a difference because in her view both she and Lowenstein worked toward the greater good of development efforts, whatever the difference in their independent tasks. I cannot agree, at least within the governing context of the EPA. It is inescapable that Lowenstein's activities, taken together, reflect a focus on overall planning and strategy, a depth of contact with alumni and a level of accountability that Conigliaro, for all her manifest worth and experience, did not have. The distinction between Lowenstein's and Conigliaro's overall roles is reinforced by Eileen Mullady, the current Head of School:

> As Director, Lowenstein was in charge of the Development and Alumni Office and reported to me and to the Trustees. Lowenstein, an alumnus, was responsible for the fund-raising activities of the School and for administering [*25] the office. Lowenstein networked with alumni, attended almost every reunion and many Trustee meetings and had extensive contacts with alumni. Lowenstein had been a Trustee for eleven years, President of the Alumni Association three separate times and was known by alumni of all decades. He had lunch with significant donors of the School, where large amounts were at times pledged to the School. . . .

> On the other hand, Conigliaro, as Associate Director, prepared certain

Case 1:08-cv-04885-JGK    Document 7-3    Filed 07/08/2008    Page 106 of 204

Page 8
2000 U.S. Dist. LEXIS 556, *25; 141 Lab. Cas. (CCH) P34,105;
78 Empl. Prac. Dec. (CCH) P40,090

solicitation materials, edited the Horace Mann Magazine and performed other functions. Conigliaro did not have the contacts with the Horace Mann alumni that Lowenstein had over the years.

Mullady Aff. at PP 3-4.

Conigliaro does not substantially dispute that Lowenstein performed the additional tasks described above. She instead takes issue with Lowenstein's contention that he "ran" the office, had control over Conigliaro's work and performed his job competently. But as noted above, it is not enough under the EPA for plaintiff to raise an issue of fact as to these matters. Conigliaro cannot prevent summary judgment on her EPA claim by creating an issue of fact as to whether she worked harder or more diligently [*26] than Lowenstein. *See, e.g., Kellett*, 1994 WL 669975, *6 ("Congress could not have intended . . . that every hardworking employee be compensated at the same rate as their supervisor."); *Gibson v. Jacob K. Javits Conv. Ctr., 1998 U.S. Dist. LEXIS 3717*, No. 95 Civ. 9728, 1998 WL 132796, *3 (S.D.N.Y. Mar. 23, 1998) (proof that higher paid male was unqualified for job and female was overqualified and underpaid for hers did not establish substantial equality of jobs, nor did claims that male superiors delegated their own job tasks to lower paid females). Even if Conigliaro did perform more of the day-to-day scheduling and coordination work and pulled a stronger laboring oar than Lowenstein, she has presented no evidence rebutting Horace Mann's showing that Lowenstein performed significantly different work than Conigliaro did, which is the salient issue in an EPA action.

Conigliaro's argument that their jobs were substantially equivalent because she and Lowenstein were working towards the same end (improving the financial welfare of the school) and were equally important in that respect, is also unavailing. Possessing interrelated job functions or comparatively equivalent job worth [*27] is not the same as performing substantially equal work. *See Kellett*, 1994 WL 669975, *6 ("The Court holds that language of interdependency does not speak to the issue of substantial equality."); *Waterman*, 1984 WL 1482, *4 (rejecting plaintiff's assertion that equal value to employer of services of two employees rendered their positions substantially equal). Indeed, Conigliaro readily admits that she and Lowenstein pursued their common goal through separate means. *See*

Conigliaro Dep. at 175 ("He may have done it through contacting alumni and soliciting funds. I did it through my own methods of making friends with the school with publications and doing -- sort of overseeing the annual fund. And also working with the alumni.").

Another uncontested distinction between the positions held by Conigliaro and Lowenstein which cannot be overlooked is the fact that Lowenstein had responsibility for supervising four employees including Conigliaro, and reported directly to the Head of School and the Trustees; whereas Conigliaro supervised at most one employee [2] and reported to Lowenstein, not directly to the Head of School. Plaintiff argues that Lowenstein [*28] did not in fact exercise any control over her work and disputes whether he "ran" the office. But she does not dispute the accuracy of this hierarchical structure or that Lowenstein was accountable -- in the view of the Trustees and the Head of School -- for supervising Conigliaro and the rest of the Development Office. This difference in the relative responsibilities and accountability of Conigliaro and Lowenstein lends further support to defendant's contention that the two jobs were substantially dissimilar. *See DiNolfo, 972 F. Supp. at 723* (court held that one of the factors which made jobs not substantially equal was fact that lower paid female supervised no employees while higher paid males each had "reportables"); *Grubb v. Broadcast Music, Inc., 699 F. Supp. 382, 385 (E.D.N.Y. 1987)* (jobs were not substantially equal where in addition to performing different tasks, female worked under higher paid male's supervision).

> 2    Conigliaro testified that she supervised one employee, a secretary in the office, prior to 1992. Conigliaro Dep. at 46. It is unclear from her testimony whether that employee officially reported to Conigliaro or to Ames in the office hierarchy.

[*29] In light of her own testimony which concedes numerous differences between her job and Lowenstein's, and the testimony of Lowenstein and the affidavit of Eileen Mullady which corroborate and expand upon those differences in their overall roles, I conclude that defendant has adequately demonstrated that the two positions did not entail substantially equal work and that plaintiff has not demonstrated any facts that would allow a rational factfinder to conclude that their overall positions were substantially equal. As a result, plaintiff

Case 1:08-cv-04885-JGK    Document 7-3    Filed 07/08/2008    Page 107 of 204

Page 9

2000 U.S. Dist. LEXIS 556, *29; 141 Lab. Cas. (CCH) P34,105;
78 Empl. Prac. Dec. (CCH) P40,090

has not established a *prima facie* case of unequal pay for equal work under the EPA and that claim must accordingly be dismissed.

B. *Gender-Neutral Justification*

Even assuming arguendo that Conigliaro has established a *prima facie* case, her EPA claim is deficient because she has failed to rebut defendant's supported affirmative defense that factors other than sex justify Lowenstein's higher pay. Horace Mann contends that even if Conigliaro and Lowenstein could rationally be found to have performed equal work, any wage differential between the two was attributable to Lowenstein's long and extensive association with Horace Mann alumni and [*30] fundraising efforts which affected his ability to network with alumni and solicit funds. In support of this contention, defendant submits the testimony of Lowenstein which explains that as a result of his association with the school community he developed extensive donor contacts, ready access to alumni and experience in soliciting funds from them. Defendant also offers the affidavit of Eileen Mullady who attests that Lowenstein's "strong and long-standing association with the School enhanced his ability to contact donors and raise substantial funds for the School." Mullady Aff. at P 3. Mullady further explains that "based upon the significant differences in their responsibilities, experience and involvement in the Horace Mann community, there were clear legitimate reasons to pay Lowenstein a higher salary than Conigliaro." *Id.* at P 5.

Conigliaro does not dispute the factual details of Lowenstein's connection to the school and indeed admits that he had greater contacts with the alumni than she had. *See* Conigliaro Dep. at 173. Moreover, she implicitly confirms the accuracy of Lowenstein's asserted connection to the school by contending in her brief that "simply put, the school [*31] decided to pay him for things he had done in the past voluntarily." Pl. Mem. at 8. She does not offer any evidence to call into doubt defendant's assertion that the strength and duration of Lowenstein's connection to the school and its alumni affected his ability to raise funds and foster alumni relationships. Nor does she argue that this was not a significant aspect of his job. Instead, Conigliaro contends that this justification should be rejected as untenable because it was inconsistently applied, given that Conigliaro herself had "contacts and interaction with

parents on the phone-a-thons and other projects" and successfully reincorporated the female alumni into development efforts, and yet was paid less. Pl. Mem. at 14.

This argument fails because it compares apples to oranges. Conigliaro admits that the depth and nature of Lowenstein's relationship with alumni was different than hers. Lowenstein is a Horace Mann alumnus who developed significant potential donor contacts over years of involvement with the school and its alumni association. He also spent a great deal of time in his paid position fostering and using those relationships to solicit funds. The school has demonstrated [*32] through Lowenstein's testimony and Mullady's affidavit that this aspect of his background was valuable to the school in that it afforded Lowenstein a volume of contacts and a level of access to alumni and potential donors that Conigliaro's interactions through the school publications and phone-a-thons did not. Although Conigliaro also seems to argue that the justification should be rejected because Lowenstein's background did not "improve" his job performance, Pl. Mem. at 14, that is not a requirement of the test. To prevail on its affirmative defense Horace Mann must show that it paid Lowenstein according to a gender-neutral factor which was job related, *Tomka, 66 F.3d at 1312*, not that the factor measurably improved the performance of the male comparator's job. Conigliaro has not shown through credible evidence that Lowenstein's contacts did not have any *bona fide* relationship to his job. Indeed, it is almost inconceivable that the Director of Development and Alumni Relations' ability to network with alumni and potential donors would *not* be related to his position.

What one senses in this particular contention by the defendant school is a manifestation of [*33] the "Old School Tie Network," that cultural and social tradition of mutual facilitation that nineteenth-century American private schools, primarily in the northeast, imported from such English models as Eton and Harrow. Lowenstein is an alumnus of Horace Mann, and the school regards that as an advantage in raising money (the sole *raison d'etre* of the more elegantly named "Development Office"). There is nothing unusual in that perception. I may judicially notice that graduates of private schools and universities are not infrequently found working in their *alma* mater's Development Offices, engaged in the never-ending quest for financial support from the greater school community (graduates, past and present parents of

Case 1:08-cv-04885-JGK    Document 7-3    Filed 07/08/2008    Page 108 of 204

Page 10

2000 U.S. Dist. LEXIS 556, *33; 141 Lab. Cas. (CCH) P34,105;
78 Empl. Prac. Dec. (CCH) P40,090

students, and assorted friends of the institution).

Whether an Old School Tie Network is on balance benign or malignant is a favorite subject of controversy among social and political historians and commentators, who debate, *inter alia*, whether the system elevates class connections over individual merit. Indeed, one may also sense in plaintiff's argument her belief that the school should not place such a high value on the contacts and experience of Lowenstein, [*34] in derogation of her own contributions, unassisted and unvarnished by Network affiliation.

The difficulty for Conigliaro is that these considerations, while debatable on other levels of social discourse, have no relevance to the evaluation of a claim under the Equal Pay Act. Thus it may very well be that the Development Office could not have functioned without Conigliaro and that she played an irreplaceable role in fundraising and "friend-raising" for Horace Mann, one that Horace Mann did not adequately compensate and perhaps took for granted. And it may well be that Conigliaro and Lowenstein were equally valuable to Horace Mann in their different ways. But plaintiff's assessment of their relative worth, even if true, is beside the point. The uncontested evidence shows that Lowenstein possessed contacts and a connection to the school to an extent and in respects that Conigliaro did not, and that such connection was related to the performance of his job as Director of Development and Alumni Relations. These facts establish, according to the standard set forth above, the school's legitimate gender-neutral explanation for the wage differential. Whether or not the school should have chosen [*35] to put a premium on Lowenstein's extensive personal contacts and networking ability, a gender-neutral job related factor, is not relevant to an EPA analysis. So long as the school used the factor "reasonably in light of [its] stated purpose," *Aldrich, 963 F.2d at 526*, it is not for this Court to judge the wisdom of its decision. *Cf. Fallon v. State of Ill., 882 F.2d 1206, 1212 (7th Cir. 1989)* ("Employers may prefer and reward experience, believing it makes a more valuable employee, for whatever reason. And it is not [the court's] province to second-guess employers' business judgment.") (citations omitted).

Since there are no factual issues related to the merits of Horace Mann's affirmative defense, plaintiff's EPA claim cannot survive.

IV.

Plaintiff's Title VII and *New York Executive Law § 296* wage discrimination claims also fail to withstand summary judgment. Claims of unequal pay for equal work under Title VII and *§ 296* are evaluated under essentially the same standards as an EPA claim. *Tomka, 66 F.3d at 1312-13.* To establish a *prima facie* case under Title VII, a plaintiff must demonstrate that "(1) she is a member of [*36] protected class; and (2) she was paid less than non-members of her class for work requiring substantially the same responsibility." *Belfi, 191 F.3d at 139.* In addition, a Title VII claimant must prove that the pay differential resulted from intentional sex discrimination. [3] *Id.*

> 3   Title VII analysis applies to claims under *New York Executive Law § 296. See Mauro v. Orville, 259 A.D.2d 89, 697 N.Y.S.2d 704, 707 n.3* (N.Y.A.D. 3d Dep't 1999); *Allen v. Argenbright Security, Inc., 1999 U.S. Dist. LEXIS 18579,* No. 97 Civ. 5123, 1999 WL 1129058, *3 (E.D.N.Y. Oct. 6, 1999).

As discussed above, plaintiff has not established a *prima facie* case under the EPA because she cannot show that she and Lowenstein performed substantially similar work. Her concomitant Title VII and *§ 296* claims necessarily fail for the same reason. Moreover, even assuming she were able to make out the elements of a *prima facie* EPA claim and therefore satisfy the first two elements of a Title VII claim, her Title VII and *§ 296* [*37] claims would still be fatally deficient because she has produced no credible evidence giving rise to an inference of discriminatory animus on the part of Horace Mann.

Plaintiff argues that Horace Mann's discriminatory intent may be inferred from the fact that she and another female in the Development Office, whom she asserts also performed work substantially similar to Lowenstein, were both paid less than him. The Second Circuit has explained that such evidence is not sufficient to support a finding of discriminatory animus. In *Tomka,* the Second Circuit dismissed a Title VII claim where the plaintiff's only evidence of intentional gender-based wage discrimination was the fact that three male employees were paid higher salaries than she was. The Court of Appeals held that the plaintiff had failed to produce any evidence that the employer was motivated in part by her gender, concluding that the more fact that she was paid less than the men "do[es] not support an inference that

2000 U.S. Dist. LEXIS 556, *37; 141 Lab. Cas. (CCH) P34,105;
78 Empl. Prac. Dec. (CCH) P40,090

Seiler acted with discriminatory intent." *66 F.3d at 1313*. Similarly, Conigliaro has failed to adduce any evidence other than the disparity itself to suggest that the differential between her [*38] pay and Lowenstein's was the result of purposeful gender discrimination. As a result, plaintiff's Title VII and *New York Executive Law § 296* claims must be dismissed.

V.

For the reasons discussed above, I hold that plaintiff has not established that she performed work substantially equal to that of her higher-paid male comparator, and that even assuming she had, her failure to adequately rebut defendant's showing that any wage disparity was due to a gender-neutral job related qualification requires dismissal of her EPA claim. For the same reasons, and because

plaintiff has failed to offer evidence demonstrating that the wage disparity resulted from discriminatory animus, I also dismiss her Title VII and *New York Executive Law § 296* wage-based discrimination claims.

The Clerk of the Court is directed to dismiss the complaint in its entirety with prejudice.

It is SO ORDERED.

Dated: New York, New York

January 18, 2000

CHARLES S. HAIGHT, JR.

SENIOR UNITED STATES DISTRICT JUDGE

# EXHIBIT 9

Westlaw.

Not Reported in F.Supp.2d                                                                              Page 1
Not Reported in F.Supp.2d, 2004 WL 1824126 (W.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 1824126 (W.D.N.Y.))**

Fears v. Heritage Centers
W.D.N.Y.,2004.
Only the Westlaw citation is currently available.
United States District Court,W.D. New York.
Pamela FEARS, Plaintiff,
v.
HERITAGE CENTERS, Defendant.
**No. 02-CV-639S.**

Aug. 15, 2004.

R. Lynette Copeland, Law Office of R. Lynette
Copeland and Associates, Buffalo, NY, for
Plaintiff.
Louise E. Carey, Buffalo, NY, for Defendant.

DECISION AND ORDER

SKRETNY, J.
**\*1** 1. On September 4, 2002, Plaintiff Pamela Fears
filed her Complaint in this action alleging that she
was terminated from her position of employment
with Defendant Heritage Centers on account of her
race in violation of Title VII of the Civil Rights Act
of 1964, as amended, 42 U.S.C. § 2000e*et seq.*
("Title VII"). Presently before this Court is Defend-
ant's Motion for Summary Judgment. For the fol-
lowing reasons, Defendant's motion is granted.

2. Unless otherwise noted, the following relevant
facts are not in dispute. Plaintiff is an African-
American female. She began working for Defend-
ant on or about July 13, 1987, as a secretary for
Mary Jo Malinowski, who was the Director of Hu-
man Resources. The two worked together amicable
for many years.

3. On August 9, 1999, Barbara Kaczmarek became
Plaintiff's direct supervisor. In addition, Cathy Glo-
gan was hired in August of 1999 as a new employee
in the Human Resources Department. On August
23, 1999, Malinowski issued a written reprimand to
Plaintiff because she refused to train Glogan. Sev-
eral months later, on December 7, 1999, Kaczmarek

reported to Malinowski that Plaintiff refused to at-
tend a Job Fair scheduled for January 4, 2000 from
4:00 p.m. to 7:00 p.m. Malinowski spoke to
Plaintiff about the Job Fair and Plaintiff reiterated
that she would not attend. The next day, December
8, 1999, Malinowski terminated Plaintiff's employ-
ment by letter. The letter stated as follows: "Your
employment with Heritage Centers is terminated ef-
fective immediately due to your continued unwill-
ingness to perform the required essential functions
of your position."

4. Plaintiff alleges that she was not terminated be-
cause of her unwillingness to perform her job duties
(*e.g.,* attend the Job Fair), but rather, was termin-
ated because she is black. She also appears to allege
that she was misadvised about a promotion and giv-
en increased job duties because she was black. Each
of these claims is premised on a single, disputed
event. Plaintiff alleges that in April of 1999, Malin-
owski called her a nigger. Plaintiff stated in her af-
fidavit that she cannot remember the substance of
the conversation, "but that 'nigger' thing really
stands out in my mind."Malinowski categorically
denies referring to Plaintiff in this manner. This in-
cident is the only race-related incident alleged in
this case, and the only race-related incident
Plaintiff relies on in support of her claim that she
was fired because of her race.[FN1]

> FN1. In her memorandum of law,
> Plaintiff's counsel advises that "a very
> careful examination of the record is re-
> quired."She then makes several passing
> statements (without any corresponding
> citation to the record) that white employ-
> ees were not required to attend after-hours
> job fairs. However, counsel fails to identi-
> fy any white employees who were simil-
> arly situated, nor does her Rule 56 State-
> ment of Facts or Plaintiff's Affidavit even
> mention similarly situated white employ-
> ees. If counsel is under the impression that
> it is this Court's obligation to mine the re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cord in support of Plaintiff's position, she is mistaken. It is not this Court's duty or function to search the record in support of a litigant's suggested arguments. *See Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("[Rule 56] does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."); *Smith v. Ward Leonard Elec. Co., Inc.,* No. 00 Civ. 3703, 2004 WL 1661098, at *3 n. 2 (S.D.N.Y. July 23, 2004) ("It is the job of Plaintiff's counsel, not the Court, to identify evidence sufficient to avoid summary judgment."). Accordingly, this Court finds that Plaintiff has failed to present sufficient evidence to avoid summary judgment on this basis. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986); FED. R. CIV. P. 56(e) ("an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial"); *Wyler v. United States,* 725 F.2d 156, 160 (2d Cir.1983) (plaintiff cannot rely on conclusory statements in the pleadings or unsupported allegations).

5. Federal Rule of Civil Procedure 56 provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under governing law." *Id.*

**\*2** 6. In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." *Addickes v. S.H. Kress and Co.,* 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

7. The United States Court of Appeals for the Second Circuit has explicitly cautioned district courts to use extra care when deciding whether to grant summary judgment in employment discrimination cases because "the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication." *Eastmer v. Williamsville Cent. Sch. Dist.,* 977 F.Supp. 207, 212 (W.D.N.Y.1997) (quoting *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994)). Nonetheless, "[t]he summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). Indeed, the Second Circuit has noted that "the salutary purposes of summary judgment-avoiding protracted, expensive and harassing trials-apply no less to discrimination cases than to commercial or other areas of litigation." *Id.*

8. Under Title VII of the Civil Rights Act of 1964, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1); *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 2150, 156 L.Ed.2d 84 (2003). It is now well settled that discrimination

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 3
Not Reported in F.Supp.2d, 2004 WL 1824126 (W.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 1824126 (W.D.N.Y.))**

claims brought under Title VII are analyzed under the burden-shifting analysis first set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).*SeeReeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142-43, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000).

9. The burden-shifting test first requires that the plaintiff establish a *prima facie* case of discrimination by showing that (1) she is a member of a protected class, (2) she is qualified for her position, (3) she suffered an adverse employment action, and (4) the circumstances of the adverse action give rise to an inference of discrimination. *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir.2000) (citing *McDonnell Douglas,* 411 U.S. at 802).

10. If the plaintiff meets this initial burden and establishes a *prima facie* case, a rebuttable presumption of discrimination arises, and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action. *Texas Dep't of Comt'y Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)). If the defendant succeeds in making this showing, "the presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture."*Weinstock,* 224 F.3d at 42 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510-11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

**\*3** 11. Assuming that the defendant meets its burden at the second stage, the burden returns to the plaintiff to prove that the defendant's discrimination was intentional. In this regard, the plaintiff must produce "evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination."*Weinstock,* 224 F.3d at 42. "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination."*Id.* However, "[i]t is not enough ... to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of in-

tentional discrimination."*Id.* (quoting *St. Mary's,* 509 U .S. at 519).

12. For purposes of this motion, this Court will assume that Plaintiff has established a prima facie case, and that Defendant has articulated a legitimate, non-discriminatory reason for terminating Plaintiff's employment, to wit: Plaintiff's continued unwillingness to perform the required essential functions of her position. Proceeding directly to the ultimate question of whether Plaintiff has presented sufficient evidence from which a reasonable jury could find racial discrimination, this Court finds that she has not.

13. In support of her race discrimination claim, Plaintiff relies exclusively on the single, isolated incident wherein Malinowski allegedly called her a nigger. Even assuming that this incident occurred, and drawing all inferences in Plaintiff's favor, Plaintiff's claim still fails as a matter of law. "Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff."*Schreiber v. Worldco, LLC.,* No. 02 Civ. 4049, 2004 WL 1535562 (S.D.N.Y. July 9, 2004). However, "stray remarks, even if made by a decision maker, do not constitute sufficient evidence [to support] a case of employment discrimination."*Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 56 (2d Cir.1998) (discussing *Woroski v. Nashua Corp.,* 31 F.3d 105, 109-110 (2d Cir.1994) and noting that a single stray remark by a decisionmaker, without more, cannot get a discrimination suit to a jury); *seealsoCarlton v. Mystic Trans., Inc.,* 202 F.3d 129, 136 (2d Cir.2000) (one stray comment by itself is ordinarily insufficient proof of discrimination).

14. When determining whether a comment is a "stray remark," courts consider (1) who made the remark, whether a decision maker, supervisor or coworker, (2) the point in time when the remark was made in relation to the employment decision at issue, (3) whether a reasonable person could view the

Not Reported in F.Supp.2d, 2004 WL 1824126 (W.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 1824126 (W.D.N.Y.))**

remark as discriminatory, and (4) whether the re-mark was related to the decisionmaking process. See *Schreiber,* 2004 WL 1535562.

15. This case presents the classic, non-actionable "stray remark ." Assuming that Malinowski, who was the decision maker, made the remark, she did so at least eight months prior to Plaintiff's termina-tion in a context that Plaintiff cannot recall. Moreover, Plaintiff's receipt of a written reprimand for failing to train Glogan and her refusal to attend the Job Fair both occurred after Malinowski's com-ment. Further, it is undisputed that Malinowski's comment was *not* related to the decision to termin-ate Plaintiff's employment. Indeed, both the isolated nature of the comment and the intervening, unre-lated reprimands suggest a considerable, if not total, disconnect between the comment and the ter-mination. Accordingly, there is simply no evidence of any nexus between Malinowski's comment and Plaintiff's termination.

**\*4** 16. Because this single stray remark is the only evidence of racial discrimination that Plaintiff has offered, her claim fails as a matter of law. *See Dan-zer,* 151 F.3d at 56;*Woroski,* 31 F.3d at 109-110;*seealsoSoliman v. Deutsche Bank AG,* No. 03 Civ. 104, 2004 WL 1124689, at \*9 (S.D.N.Y. May 20, 2004) (comments to an Egyptian American male that he was a "sand nigger," that he was like an "Arab selling in a bazaar," and that "all blacks are good for is dancing" were held to be non-actionable stray remarks, insufficient to raise an in-ference of discrimination); *Alexander v. Turner Corp.,* No. 00 Civ. 4677, 2001 WL 225049, at \*3 (S.D.N.Y. Mar.2, 2001) ("A single comment made in the course of ten years employment does not come close to satisfying plaintiff's burden.").

17. Accordingly, for the reasons stated above, this Court finds that there is insufficient evidence in the record from which a reasonable jury could find that Defendant terminated Plaintiff's employment on ac-count of her race. Defendant is therefore entitled to summary judgment.

IT HEREBY IS ORDERED, that Defendant's Mo-tion for Summary Judgment (Docket No. 20) is GRANTED.

FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.

W.D.N.Y.,2004.
Fears v. Heritage Centers
Not Reported in F.Supp.2d, 2004 WL 1824126 (W.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 10

Not Reported in F.Supp.2d　　　　　　　　　　　　　　　　　　　Page 1
Not Reported in F.Supp.2d, 2002 WL 449723 (E.D.N.Y.), 23 NDLR P 78
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 449723 (E.D.N.Y.))**

Georgy v. O'Neill
E.D.N.Y.,2002.

United States District Court,E.D. New York.
Loren GEORGY, Plaintiff,
v.
PauL H. O'NEILL, Secretary of the Treasury, Defendant.
**Case No. 00-CV-0660 (FB).**

March 25, 2002.

Loren Georgy, Brooklyn, NY, pro se.
Alan Vinegrad, Esq., United States Attorney, by:
Kathleen A. Mahoney, Esq., Assistant United States
Attorney, Eastern District of New York, Brooklyn,
NY, for Defendant.

*MEMORANDUM AND ORDER*

BLOCK, District Judge.
**\*1** *Pro se* plaintiff, Loren Georgy ("Georgy"),
brings suit against the Secretary of the Treasury
(the "Treasury"), claiming wrongful termination of
employment, unequal terms and conditions of employment,
retaliation, harassment and discrimination
based on national origin, age and disability.
*See* Title VII of the Civil Rights Act of 1964 ("Title
VII"), as codified, 42 U.S.C. §§ 2e to 2000e-17;
Age Discrimination in Employment Act of 1967
("ADEA"), as codified, 29 U.S.C. §§ 621-634;
Americans with Disabilities Act of 1990 ("ADA"),
as codified, 42 U.S.C. §§ 12112-12117. The Treasury
moves for summary judgment pursuant to Rule
56 of the Federal Rules of Civil Procedure.[FN1] For
the reasons stated below, the motion is granted.

> **FN1.** The Treasury has complied with Local
> Civil Rule 56.2, which requires special
> notice to *pro se* litigants on summary judgment
> motions.

FACTUAL BACKGROUND

Unless otherwise indicated, the following facts are
undisputed. Georgy was born in Romania on May
5, 1937. On December 15, 1997, at the age of sixty,
he obtained employment on a probationary basis
with the United States Customs Service
("Customs") at John F. Kennedy International Airport
("JFK") as a Customs Aid in the Fines, Penalties
& Forfeiture ("FPF") division. *See* Def. 56.1
Stmt. ¶ 3; Mahoney Decl. Ex. L at PG 230
(attaching union agreement stating that employees
serve a probationary period of one year). A Customs
Aid is an administrative support staffer responsible
for "maintaining records, filing, photocopying
and answering telephones."Def. 56.1 Stmt.
¶ 4. Georgy, under the supervision of William
Hever ("Hever"), was initially assigned to aid the
paralegals and paralegal specialists in the Passenger
Processing and Trade Compliance section of FPF.
Georgy's responsibilities included clerical duties
and coverage of the Public Response window during
the lunch hour. *See id.* at ¶ 8. Hever knew that
Georgy spoke with a Romanian accent but did not
consider it a problem when answering the telephone
as many employees were of different national origins
and spoke with non-American accents. *See*
Mahoney Decl. Ex. G (attaching Hever affidavit).

Shortly after Georgy started working, Hever received
complaints from Georgy's coworkers that
Georgy was misfiling documents, incorrectly photocopying,
and failing to answer the telephones or
relay messages accurately. *See* Def. 56.1 Stmt. ¶ 10.
In January 1998, "Hever spoke informally with
[Georgy] and asked him to be more attentive to his
work."*Id.* at ¶ 11.Around the same time, two
coworkers complained to Hever about Georgy's
body odor. On January 29, 1998, Hever, in the presence
of a union representative, met with Georgy
and spoke with him about the body odor complaints.
Georgy stated that he had gingivitis, which
might cause odor; however, he showered twice
daily and otherwise did not have a problem. *See id.*
at ¶ 13.On February 17, 1998, Hever told Ronald

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 449723 (E.D.N.Y.), 23 NDLR P 78
(Cite as: Not Reported in F.Supp.2d, 2002 WL 449723 (E.D.N.Y.))

Simon ("Simon"), the FPF Division Director, that Georgy was not performing satisfactorily. Hever received further complaints, via email, from Georgy's coworkers regarding Georgy's inability to relay phone messages. Hever again spoke with Georgy informally about these complaints on February 20, 1998.

**\*2** Hever and a union representative met with Georgy again, on March 3, 1998, to discuss his poor work performance and additional recent complaints about his body odor. *See id.* at ¶ 18.Hever made a note regarding the body odor problem on Georgy's 7B card. Georgy again responded that he did not have a body odor problem. On March 10, 1998, Georgy gave Hever a note from Dr. Robert Miller stating that he had "contact reaction of axilla" and was "unable to use deodorants ... due to the chemicals in those products."Mahoney Decl. Ex. G at PG 155. Georgy also gave Hever a note from his dentist, Dr. Eugenia Zimbler, stating that he was in treatment for "cronical [sic] periodontal disease." *Id.* at PG 156. Georgy did not request an accommodation or change in work assignments due to these problems. Thereafter, the notation on Georgy's 7B card regarding his body odor problem was removed. Sometime in March, 1998, management discussed the possibility of terminating Georgy; however, due to a need for help in the Seized Property Section, Georgy was reassigned to that division, under the supervision of Deborah Space ("Space").*See* Def. 56.1 Stmt. ¶ 22. Space was aware of the prior complaints concerning Georgy's performance; however, she knew nothing of the complaints regarding his body odor problem. Space instructed Georgy how to improve his telephone skills; she did not have any difficulties communicating with him or understanding him because of his accent. On May 7, 1998, Space and a union representative met with Georgy to review his duties. At that time, Space spoke with Georgy about his "tendency to argue with coworkers who give him tasks [ ] to perform."*Id.* at ¶ 27.Another meeting took place on July 8, 1998, during which Georgy was counseled regarding taking breaks

early, sleeping at his desk, failing to follow instructions and being argumentative, and his inability to handle telephone duties. *See id.* at ¶ 28.The meeting was noted on Georgy's 7B card. Thereafter, Space continued to document problems with Georgy taking breaks at the wrong time and not performing his duties. In September 1998, Georgy was assigned to a large document project. Space observed that the project was not performed satisfactorily; documents were out of order, misfiled or improperly pulled.

On October 14, 1998, Space and a union representative again met with Georgy to discuss his deficiencies in four areas: (1) inability to accurately take and relay phone messages; (2) inability to file in numerical order; (3) being argumentative, and (4) failing to follow instructions given by supervisors. For the first time, Georgy stated that he was having personal problems. *See id.* at ¶ 32.Georgy did not connect the problems to his work performance; rather, he told Space that his performance was not poor. Mahoney Decl. Ex. I at PG 141. Also on this day, as a result of numerous conversations with Space, Simon wrote to Edmund Siejka, Labor Relations Specialist, to seek assistance in removing Georgy. *See id.* at ¶ 33.

**\*3** On November 16, 1998, Georgy met with Equal Employment Opportunity ("EEO") counselor Gregory Holder for approximately one hour. Because Georgy did not ask for permission to leave work, Space noted Georgy's one-hour absence on his 7B card. *See id.* at ¶ 35.On November 19, 1998, Hever, acting as Division Director during Simon's absence from the office, gave Georgy a letter notifying him that his probationary appointment was being terminated effective November 23, 1998. *See* Mahoney Decl. Ex. B at PG 13-15. The letter, signed by Area Director Robert Martuge, stated that the basis for termination was, *inter alia,* arguing with other employees regarding office procedures and work assignments; sleeping on the job; inability to accurately take and relay telephone messages; taking unscheduled breaks; and performing filing tasks too slowly, out of order and contrary to in-

Not Reported in F.Supp.2d                                                      Page 3
Not Reported in F.Supp.2d, 2002 WL 449723 (E.D.N.Y.), 23 NDLR P 78
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 449723 (E.D.N.Y.))**

structions.

Georgy accuses Hever and Space of subjecting him to a "well orchestrated campaign of intimidation, humiliation, harassment, discrimination and violations of civil and human rights."Mahoney Decl. Ex. A at 44. Georgy states that Hever harassed him by not "understand[ing] my problem about my disability," and requiring that he work the Public Response window and answer the telephones for a period of two weeks in March, 1998. *Id.* at 47.Once he was transferred to Seized Property, Georgy contends he "was thrust under a microscope." *Id.* He states that Space treated him as an inferior human beingshe yelled at him, and scrutinized his work and every movement he made. *See id.* at 45.Specifically, Georgy recalled a day when he signed out at 4:30 p.m. but Space noted on Georgy's attendance paper that Georgy left at 4:25 p.m. Furthermore, Georgy contends Space yelled at him and she was not able to "talk with [him] in a manner which a supervisor should talk with an employee."*Id.* at 47.

Georgy contends that any alleged performance problems stem from the fact that the atmosphere in the section where he worked was "bad ... disharmonious [and] so intolerable." Pl. Decl. Ex. 18. As evidence of his capabilities, Georgy submits the affidavits of three fellow employees: Kevin O'Keefe ("O'Keefe"), Laureen M. Zizzo ("Zizzo") and Rosemary J. Spezzano ("Spezzano"). O'Keefe, a Seized Property specialist, stated that Georgy's "job performance wasn't that good when [he] first arrived ... [but] did improve though as time went on."Pl. Decl. Ex. 19 at PG 164. O'Keefe also stated in his affidavit that several times he had observed Georgy at his desk with his eyes closed and was aware that Georgy had some difficulties taking telephone messages and trouble photocopying. Zizzo, a Seized Property specialist and acting supervisor in Space's absence, stated that she found Georgy to be a "very intellectual individual;" "in the beginning his performance was not quite adequate ... but, eventually he did catch on and his performance improved."*Id.*

at PG 162. Furthermore, Zizzo found Georgy's "interaction with management and other co-workers to be of a professional, courteous manner."*Id.* However, Zizzo also stated that Georgy was argumentative at times, she witnessed him sleeping at his desk, and he was unable to properly record telephone messages. Spezzano, an FPF paralegal specialist, "found Mr. Georgy to be pleasant to work with and a quiet fellow."Pl. Decl. Ex. 20 at PG 174. She also noted that he "had difficulty in answering the telephones ... some messages had inverted or incomplete numbers."*Id.* at PG 174-75.

**\*4** Georgy asserts that Hever had a "crusade" about his body odor problem. In the first three months of his employment, Georgy states that he was involved in "heavy physical activity, which caused him to sweat heavily, creating a body odor-although he ... practiced good daily hygiene."Pl. 56.1 Stmt. at 4. Georgy states that upon being transferred to Seized Property he was no longer doing heavy lifting, thus eliminating any body odor problem and, furthermore, Space was unaware of any body odor problem. Georgy concludes that this was "evidence that plaintiff was harassed and discriminated [against by Hever] based on a physical disability."*Id.* at 5. Georgy testified that his skin condition did not affect his ability to do his job, nor did he request a change in job duties. *See* Mahoney Decl. Ex. A at 55. Georgy admits that he "didn't require any accommodation for [his] physical disability."Pl. Decl. Ex. 18.

Georgy also contends that when he was reprimanded by Space for sleeping at his desk, he tried to explain the serious personal problems he was experiencing, but Space "cut him off and angrily told him that she doesn't care about his personal problems."Pl. 56.1 Stmt. at 8. According to Georgy, "such a vile and disgusting attitude ... makes clear the hateful feelings she had for Mr. Georgy. Because other employees were not treated the same as Mr. Georgy, he believes Ms. Space's attitude reflects her prejudice for him and his National Origin."*Id.* At his deposition, Georgy testified that in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 4
Not Reported in F.Supp.2d, 2002 WL 449723 (E.D.N.Y.), 23 NDLR P 78
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 449723 (E.D.N.Y.))**

April 1998 he had a conversation with Space wherein she made a comment about his Romanian nationality and asked him if he has "some knowledge about Dracula;" "she made this remark[ ] because Dracula was recognized very tough person [sic]." Mahoney Decl. Ex. A at 72-73.

Sometime in September or October 1998, Georgy requested permission from Space to work overtime. Space stated that she did not have such authority; however, Simon subsequently authorized overtime work. Georgy states that Space's refusal to permit overtime is proof of "age bias" and "cast[s] doubts on the ... reason for plaintiff's dismissal. Age Discrimination was the major reason for his dismissal."Pl. 56.1 Stmt. at 9. Georgy testified that Space would make comments to him about his age as she passed his desk on her way out the door. Georgy stated that Space would say "be careful not to work too hard at your age and it is too demanding."Mahoney Decl. Ex. A at 66.

Georgy believes he was treated unequally in his termination because other probationary employees were terminated for perjury or false declarations; "nobody was discharged from the U.S. Customs for misconduct like me [sic]."*Id.* at 36.Furthermore, he alleges that the conditions of his employment were unequal because he did not have a desk for his first month in Seized Property, and that once he got a desk it was placed in the middle of the room with a stereo two feet behind him, which was "not too comfortable." *Id.* Georgy also states that while on a work assignment he was forced to ride in a van in the middle of July when it was hot and uncomfortable and there was nowhere to sit. *See id.*Georgy testified at his deposition that he was reprimanded for eating at his desk while others were not reprimanded for doing so, and that the filing of hundreds of pages of documents that he was required to do was repetitive. One day Georgy thought there was something wrong with the fax machine; when he asked Space if he could look at the manual to fix the machine, she refused. *See id.* at 41.

*5 On December 15, 1998, Georgy filed an EEO

complaint alleging discrimination based on national origin, age, physical disability (contact reaction of axilla), and retaliation for his contact with an EEO officer on November 16, 1998. An investigation was conducted in February 1999, and a copy of the file was sent to Georgy on March 1, 1998. Determining that the file was sufficiently complete to make a decision, the EEO gave Georgy and Customs an opportunity to respond. The Complaint Center determined that there was no discrimination and advised Georgy of his right to request a final agency determination, which he did. *See* Mahoney Decl. Ex. O. A final agency determination, finding that Georgy had not been subjected to discrimination or retaliation, was issued on December 8, 1999. *See id.*This action was timely filed on January 28, 2000.

## DISCUSSION

A motion for summary judgment may not be granted unless the Court determines that there is no genuine issue of material fact to be tried and that the moving party is entitled to judgment as a matter of law. *See*Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Brown v. Henderson,* 257 F.3d 246, 251 (2d Cir.2001)."[T]he moving party bears the initial burden of establishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.' " *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986)). A genuine factual issue exists if there is sufficient evidence to allow a jury to find in favor of the nonmovant.*Anderson,* 477 U.S. at 250. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *see Brown,* 257 F .3d at 252. "[T]he non-moving party [must] go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admission on file,' designate 'specific facts showing that there is a

Not Reported in F.Supp.2d                                                                 Page 5
Not Reported in F.Supp.2d, 2002 WL 449723 (E.D.N.Y.), 23 NDLR P 78
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 449723 (E.D.N.Y.))**

genuine issue for trial.' " *Celotex,* 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(e)); *see Santos v. Murdock,* 243 F.3d 6781, 683 (2d Cir.2001). If the non-movant proffers evidence of a genuine issue of material fact, its "allegations [will be] taken as true, and [it] will receive the benefit of the doubt when [its] assertions conflict with those of the movant." *Samuels v. Mockry,* 77 F.3d 34, 36 (2d Cir.1996). Despite the caution exercised by courts in granting summary judgment in employment discrimination cases involving intent, a "plaintiff [still] must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997); *see Brown,* 257 F.3d at 252. In addition, the Court is mindful that *pro se* plaintiffs are entitled to have their pleadings held to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520 (1972). Thus, a *pro se* plaintiff's papers should be interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (internal quotations omitted).

A. Title VII Claim

**\*6** Georgy claims that he was fired because of his Romanian origin. Under Title VII, it is unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... national origin." 42 U.S.C. § 2000e2a. A plaintiff in a Title VII case claiming discrimination in termination must first establish a *prima facie* case by "demonstrating [1] membership in a protected class, [2] qualification for the position, [3] adverse employment action, and [4] circumstances giving rise to an inference of discrimination." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 567 (2d Cir.2001); *see also Swierkiewicz v. Sorema N.A.,* 122 S.Ct. 992, 994 (2002); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973); *Farias v. Instructional Systems, Inc.,* 259 F.3d 91, 98 (2d

Cir.2001). The Second Circuit has "characterized the evidence necessary to satisfy this initial burden as minimal and *de minimis* ." *Zimmermann v. Associates First Capital Corp.,* 251 F.3d 376, 381 (2d Cir.2001) (internal quotation marks and citation omitted); *see Abdu-Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 467 (2d Cir.2001).

To meet the third prong, that he was qualified for the position, a plaintiff need only "establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer ." *Slattery v. Swiss Reinsurance America Corp.,* 248 F.3d 87, 91-92 (2d Cir.2001) (cautioning against co-mingling job performance with qualification prong of *prima facie* case); *Owens v. New York Hous. Auth.,* 934 F.2d 405, 409 (2d Cir.1991) (plaintiff only needs to demonstrate that he or she "possesses the basic skills necessary for performance of [the] job")."Especially where discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw." *Slattery,* 248 F.3d at 92.

In determining whether plaintiff has raised an inference of discrimination, a court must consider "whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." *McLee v. Chrysler Corp.,* 109 F.3d 130, 135 (2d Cir.1997) (affirming grant of summary judgment for failure to state a *prima facie* case). Although "direct evidence of an employer's discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.' " *Schwapp,* 118 F.3d at 110 (quoting *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir.1994)). "[S]ummary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee,* 109 F.3d at 135.

Georgy has failed to state a *prima facie* claim for discrimination based on national origin. Though he

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 449723 (E.D.N.Y.), 23 NDLR P 78
(Cite as: Not Reported in F.Supp.2d, 2002 WL 449723 (E.D.N.Y.))

is in a protected class, was qualified for the position, and was terminated, he has not made the requisite minimal showing that his discharge was discriminatorily motivated. Georgy has not referred to any statements by supervisors or co-workers, nor pointed to any documentary evidence, linking his termination to the alleged discrimination. Space's alleged reference to Georgy's Romanian origin, made more than six months before Georgy's termination, is the kind of isolated and stray remark insufficient, without more, to raise an inference of discrimination and defeat summary judgment. *See, e.g., Abdu-Brisson,* 239 F.3d at 468 (stray remarks without more cannot prove a claim of employment discrimination); *Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 545 (3d Cir.1992) ("Stray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."). Space's comment appears to be unrelated to the decision to terminate Georgy's employment. Furthermore, Georgy's allegations that Space and Hever were biased against him because of his accent and national origin are simply conclusory. *See Schwapp,* 118 F.3d at 110 (plaintiff must provide more than "conclusory allegations"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (plaintiff can not rely on "unsupported allegations"); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985) ("conclusory allegations of discrimination are insufficient to satisfy the requirements of Rule 56(e)"). There is nothing in the record to permit a trier of fact to rationally infer that Georgy's termination was discriminatorily motivated.

**\*7** Even assuming, *arguendo,* that Georgy has met his minimal burden of establishing a *prima facie* case of discrimination, the Treasury has "easily met its burden of demonstrating a legitimate, non-discriminatory reason" for his discharge, which Georgy has failed to show was pretextual. *Slattery,* 248 F.3d at 93;*see Weinstock,* 224 F.3d at 42 (once defendant proffers legitimate non-discriminatory

reason, "plaintiff must then come forward with evidence that the defendant's proffered non-discriminatory reason is a mere pretext for actual discrimination."). Georgy's poor work performance is well documented. Both Hever and Space had numerous informal and formal conversations with Georgy wherein they advised him of the areas that needed improvement. Various notations were made on Georgy's 7B card regarding his inability to answer the phone and relay messages properly, sleeping on the job, misfiling papers, and generally not following instructions and being argumentative. The documentation was made by his supervisors, contemporaneous with the complaints and counseling of Georgy. As noted by the Second Circuit, "[i]n determining whether an employee's job performance is satisfactory, courts may-as they often must-rely on the evaluations rendered by supervisors."*Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir.1985). Although Georgy submits affidavits attempting to show that his work performance improved, those same affidavits explain that Georgy continued to have trouble completing assigned tasks and performing his duties satisfactorily. Georgy's conclusions that the work atmosphere was "intolerable" and "disharmonious" does not address the issue of his job performance. Furthermore, his own disagreement with his supervisors regarding the accuracy of his work does not create a genuine issue of material fact since "an employee's disagreement with his employer's perception of his work does not satisfy his burden of showing that the employer's proffered reason for termination was a pretext for discrimination."*Abouzied v. Mann,* 2000 WL 1276635 at \*4 (E.D.N.Y.2000) (Block, J.) (citing *McLee,* 109 F.3d at 135).

**B. ADEA Claim**

In addition to his national origin claim, Georgy contends that he was terminated because of his age. The Age Discrimination in Employment Act (ADEA) makes it "unlawful for an employer ... to discharge an individual or otherwise discriminate against any individual with respect to his compens-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 449723 (E.D.N.Y.), 23 NDLR P 78
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 449723 (E.D.N.Y.))**

ation, terms, conditions or privileges of employment, because of such individual's age."29 U.S.C. § 623(a)(1); *see Reeves v. Sanderson Plumbing Products, Inc ., 530 U.S. 133, 140 (2000).* To establish a *prima face* case of discrimination based on age, as with Title VII discharge cases, a plaintiff must show "(1) that he was within the protected age group, (2) that he was qualified for the position, (3) that he was discharged, and (4) that the discharge occurred under circumstances giving rise to an inference of age discrimination."*Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir.2000).*

**\*8** For the same reason Georgy has failed to establish a *prima facie* case under Title VII, he has failed under the ADEA. He has not pointed to any statements or evidence linking his termination to discrimination based on age. Space's casual remark that Georgy shouldn't work too hard is insufficient to raise an inference of discrimination. *See, e.g., Carlton v. Mystic Transp., Inc., 202 F.3d 129, 136 (2d Cir.2000)* (stray comment by itself usually insufficient to infer discrimination). Again, even if the Court were to assume that Georgy met his *prima facie* burden, he has not shown that the legitimate, non-discriminatory reason for termination-his poor work performance-was pretextual.

### C. ADA Claim

Georgy also contends that he was terminated because of his contact axilla condition in violation of the ADA. The ADA prohibits discrimination by covered entities "against a qualified individual with a disability because of the disability of such individual in regard to ... discharge of employees."42 U.S.C. § 12111(2); *see Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir.2001).* In order to state a *prima facie* case under the ADA, a plaintiff must show " '(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability.'

" *Giordano,* 274 F.3d at 747 (quoting *Heyman v. Queens Vill. Comm. for Mental Health,* 198 F.3d 68, 72 (2d Cir.1999)). Under the ADA, a disability is:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment

42 U.S.C. § 12102(2).

### *1. § 12102(2)(A)*

The Supreme Court has established a three-step approach to analyzing a claim under § 12102(2)(A). First, the Court must determine whether a condition is an impairment; second, the Court must identify the major life activity the plaintiff relies upon; third, the Court must determine whether the impairment substantially limits a major life activity. *See Bragdon v. Abbott,* 524 U.S. 624, 630-31 (1998). A physical or mental impairment is a "physiological disorder, or condition that affects one of the major body systems" such as the skin. *Giordano,* 274 F.3d at 747;29 C .F.R. § 1630.2(h)(1). Georgy does not identify which major life activity is substantially limited by his skin impairment. Because he is proceeding *pro se,* the Court gives Georgy the benefit of all reasonable inferences and construes his claim as alleging that he is substantially limited in the major life activities of working, caring for oneself, and interacting with others. *See, e.g., Colwell v. Suffolk County Police Dept.,* 158 F.3d 635, 643 (2d Cir.1998) (ability to work is substantially limited if plaintiff is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to average person having comparable training, skill, and abilities.") (quoting EEOC regulation 29 C.F.R. § 1630.2(j)(3)(i)); *Ryan v. Grae & Rybicki,* 135 F.3d 867, 871-72 (2d Cir.1998) (caring for oneself encompasses the normal, quotidian activities of daily

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 449723 (E.D.N.Y.), 23 NDLR P 78
(Cite as: Not Reported in F.Supp.2d, 2002 WL 449723 (E.D.N.Y.))

living, including grooming); *McAlindin v. County of San Diego,* 192 F.3d 1226, 1235 (9th Cir.1999) (interacting with others is a major life activity within the ADA); *Jacques v. DiMarzio, Inc.,* ---F.Supp.2d ----, 2002 WL 336966, *4-5 (E.D.N.Y. Feb. 27, 2002) (Block, J.) (agreeing with *McAlindin* that interacting with others is a major life activity).

**\*9** A limitation in the ability to interact with others requires a showing that "relations with others were characterized on a regular basis by severe problems, for example, consistently high levels of hostility, social withdrawal, or failure to communicate when necessary."*McAlindin,* 192 F.3d at 1235 (internal quotation marks and citation omitted). A plaintiff must show more than "[m]ere trouble getting along with coworkers."*Id.* at 1235;*see also Steele v. Thiokol Corp.,* 241 F.3d 1248, 1255 (10th Cir.2001). Merely "cantankerous" persons will not be deemed substantially limited in the major life activity of interacting with others. *McAlindin,* 192 F.3d at 1235.

"The determination of whether an individual is substantially limited in a major life activity must be made on a case-by-case basis."*Toyota Motor Mfg. Kentucky, Inc. v. Williams,* 122 S.Ct. 681, 685 (2002) (internal quotation marks omitted)."The determination ... is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual."*Id.* at 692 (internal quotation marks omitted).

According to ADA regulations, "substantially limited" means "[u]nable to perform a major life activity that the average person in the general population can perform; or significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."*Id* . at 690 (quoting 29 C.F.R. § 1630.2(j)) (internal quotation marks omitted). The plaintiff must show that he was " 'substantially limited dur-

ing ... the time span when he [was hired and fired by the defendant].' " *Horwitz v. J.G. Stickley, Inc.,* 122 F.Supp.2d 350, 355 (N.D.N.Y.2000) (quoting *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 308 (3d Cir.2000)).

Georgy has submitted insufficient evidence to support his claim that he suffers from a disability within the meaning of the ADA. Georgy testified at his deposition that his body odor problem did not "affect [his ability] to do [the] job of Customs aide" or affect his ability to care for himself, "because [he] took care of [his] ... hygiene."Mahoney Decl. Ex. A at 55. Georgy also alleged that he worked in a disharmonious office where people were rude to him and did not get along; however, such general allegations are not enough to establish a substantial limitation in the major life activity of interacting with others. There is no evidence of "consistent high levels of hostility, social withdrawal, or failure to communicate when necessary."*McAlindin,* 192 F.3d at 1235. Furthermore, there is nothing in the record to suggest that Georgy's impairment is severe. Most importantly, the record shows that the alleged disability ceased being a problem once Georgy was transferred to a position where he was no longer performing heavy lifting. Georgy himself stated that the problem disappeared when he was not doing manual labor; thus, it had no permanent or long term impact. *See, e.g., Santiago Clemente v. Executive Airlines, Inc.,* 213 F.3d 25, 31 (1st Cir.2000) (temporary restrictions generally not substantially limiting); *Williams v. Salvation Army,* 108 F.Supp.2d 303, 312-313 (S.D.N.Y.2001) ("temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities") (internal quotation marks and citations omitted).

### 2. § 12102(2)(B)

**\*10** An employee can show that he has a disability within the meaning of the ADA under § 12102(2)(B)"if a record relied on by an employer indicates that the individual has or has had a sub-

Not Reported in F.Supp.2d                                                                      Page 9
Not Reported in F.Supp.2d, 2002 WL 449723 (E.D.N.Y.), 23 NDLR P 78
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 449723 (E.D.N.Y.))**

stantially limiting impairment.... The impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities.... The record must be one that shows an impairment that satisfies the ADA; a record reflecting a plaintiff's classification as disabled for other purposes or under other standards is not enough."*Colwell v. Suffolk County Police Dept.,* 158 F.3d 635, 645 (2d Cir.1998) (citations omitted). No such record exists in regard to Georgy's claimed disability.

### 3. § 12102(2)(C)

Under § 12102(2)(C), "the decisive issue is the employer's *perception* of his or her employee's alleged impairment."*Giordano,* 274 F.3d at 748. To sustain this claim, Georgy "must show not only that the defendant[ ] regarded [him] as somehow disabled, but that [it] regarded [him] as disabled *within the meaning of the ADA.*" *Id.* Nothing in the record suggests that Georgy was regarded as disabled. The notation on his 7-B card about his body odor was removed as soon as he offered a note from his doctor, thus it is not linked to the decision to terminate. Furthermore, no complaints were made after Georgy was transferred, and there is no evidence to suggest that anyone was aware of the alleged disability after that time.

### D. Hostile Work Environment Claim

Georgy's hostile work environment claim is based on the general allegation that he was subjected to a "well orchestrated campaign of intimidation, humiliation, harassment [and] discrimination."Mahoney Decl. Ex. B at 44. Georgy alleges that his supervisors were waging a campaign against him by disciplining him, yelling at him and not being sympathetic to his disability. He also contends that the general work atmosphere was disharmonious and intolerable. Even if these general statements be deemed to specifically relate to Georgy's claims of discrimination based on national origin, age or disability, they nonetheless would not rise to the level of an actionable hostile work environment claim.

A hostile work environment exists " 'when the workplace is permeated with discriminatory intimidation, ridicule and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment.' " *Torres v. Pisano,* 116 F.3d 625, 630-31 (2d Cir.1997) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)); *see also Galdieri-Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 289 (2d Cir.1998). To make this determination, courts should consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767-68 (2d Cir.1998). "Conduct that is 'merely offensive' and 'not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview.' " *Torres,* 116 F.3d at 631 (quoting *Harris,* 510 U.S. at 21). Thus, as a general rule, episodic, isolated incidents of harassment do not give rise to a Title VII claim; rather, the incidents " 'must be sufficiently continuous and concerted in order to be deemed pervasive.' " *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997) (quoting *Harris,* 510 U.S. at 17);*see also Torres,* 116 F.3d at 631 ("[W]e agree with the principle that isolated, minor episodes of harassment do not merit relief under Title VII."); *Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("The incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief"). "However, where the conduct is sufficiently severe, it may alter the plaintiff's conditions of employment without repetition." *Quinn,* 159 F.3d at 768.

*11 Georgy's general allegations do not establish the type of continuous, pervasive conduct necessary to create a hostile work environment. *See, e.g.,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 10
Not Reported in F.Supp.2d, 2002 WL 449723 (E.D.N.Y.), 23 NDLR P 78
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 449723 (E.D.N.Y.))**

*Curtis v. Airborne Freight Corp.,* 87 F.Supp.2d 234, 250 (S.D.N.Y.2000) (plaintiff must show more than generic harassment). Furthermore, he has not pointed to a singular comment or incident which, standing alone, was severe enough to alter the conditions of his employment. The comment regarding Dracula is nothing more than the sort of occasional brief comment that "reflect [s] a clash of personalities more than discriminatory animus."*Shabat v. Blue Cross Blue Shield of the Rochester Area,* 925 F.Supp. 977, 982 (W.D.N.Y.1996), *aff'd sub nom., Shabat v. Billotti,* 108 F.3d 1370 (2d Cir.1997) (table opinion). Lastly, Georgy has not established how any of the alleged discriminatory conduct unreasonably interfered with his work performance.

E. Unequal Terms and Conditions of Employment

Construing Georgy's *pro se* papers liberally, he has also alleged that he was subjected to unequal terms and conditions of employment because he was "treated different than other employees" due to his national origin, age and disability. Mahoney Decl. Ex. A at 36; *see* Compl. ¶ 4. The standard for establishing a *prima facie* case in this regard is the same as the four-pronged discrimination in termination standard, with a slight variation on the third and fourth prongs of the test. The third prong is met if the plaintiff can show, rather than termination, that he " 'suffered a materially adverse change in the terms or conditions of [his] employment because of [his] employer's discriminatory conduct.' " *Medwid v. Baker,* 752 F.Supp. 125, 136-37 (S.D.N.Y.1990) (quoting *Spring v. Sheboygan Area Sch. Dist.,* 865 F.2d 883, 885 (7th Cir.1989)). The fourth prong, inference of discrimination, can be met by showing that "the employer treated a similarly situated employee [not in the relevant protected group] differently." *McGuinness v. Lincoln Hall,* 263 F.3d 49, 53 (2d Cir.2001).

"To be materially adverse[,] a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.' " *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (quoting *Crady v. Liberty Nat'l Bank and Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993)). " 'A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.' " *Id.* (quoting *Crady,* 993 F.2d at 136).

Georgy's claim in this regard is based specifically on (1) not having a desk right away, (2) having to travel in a van on a work assignment without a place to sit, (3) not being allowed to eat at his desk or look at the fax manual, (4) getting repetitive, voluminous filing assignments, and (4) complaints about his general job duties. Even drawing all reasonable inferences in Georgy's favor, none of these assertions establish that he suffered a materially adverse change in the terms and conditions of his employment-he was not demoted or docked in pay, his title was not diminished nor were his responsibilities significantly reduced. Furthermore, as noted above, Georgy has not established an inference of discrimination. There is nothing in the record showing that other similarly situated employees were treated differently than Georgy.

F. Retaliation Claim

**\*12** It is unlawful for an employer to discriminate against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."42 U.S.C. § 2000e-3(a). To establish a *prima facie* case for retaliation, a plaintiff must demonstrate " 'participation in protected activity known to the defendant, an employment action disadvantaging the person engaged in the protected activity, and a causal connection between the protected activity and the adverse employment.' " *Cruz,* 202 F.3d at 566 (quoting *Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.19991)). The causal connection can be established one of three ways: (1) "Indirectly by showing that the protected activity

Not Reported in F.Supp.2d, 2002 WL 449723 (E.D.N.Y.), 23 NDLR P 78
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 449723 (E.D.N.Y.))**

was followed closely by discriminatory treatment; or (2) through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or (3) directly through evidence of retaliatory animus directed against a plaintiff by the defendant." *DeCintio v. Westchester County Medical Ctr.,* 821 F.2d 111, 115 (2d Cir.1987) (internal citations and quotation marks omitted); *see also Cifra v.. General Elec. Co.,* 252 F.3d 205, 217 (2d Cir.2001).

Georgy has not established the requisite causal connection. As previously noted, Georgy has not shown that there was disparate treatment of fellow employees, nor does the record reflect any direct evidence of retaliatory animus. Furthermore, though it is true that Georgy was terminated only three days after contacting the EEO counselor on November 16, 1998, the termination process was in place *before* that meeting. *See, e.g., McNair v. NYC Health & Hosp. Co.,* 160 F.Supp.2d 601, 604-05 (S.D.N.Y.2001) (retaliation claim fails where, *inter alia,* "most of the retaliatory conduct alleged ... occurred *before* the date of [the] protected activity"). On October 14, 1998, Simon had requested assistance in terminating Georgy; the actual termination letter was not issued until November 19, 1998. *See* Mahoney Decl. Ex. B. Therefore, the fact that Georgy met with the EEO counselor sometime after October 14 had no bearing on the decision to terminate him. Furthermore, the fact that Space made a notation on Georgy's 7B card regarding his absence while meeting with the EEO counselor is not evidence of retaliation since Georgy admitted that he did not seek authorization to be excused from work. *See* Mahoney Decl. Ex. A at 92.

### CONCLUSION

The complaint is dismissed in its entirety.

SO ORDERED.

E.D.N.Y.,2002.
Georgy v. O'Neill

Not Reported in F.Supp.2d, 2002 WL 449723 (E.D.N.Y.), 23 NDLR P 78

END OF DOCUMENT

# EXHIBIT 11

Not Reported in F.Supp.2d                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 3152393 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 3152393 (E.D.N.Y.))**

Hansberry v. Father Flanagan's Boys' Home
E.D.N.Y.,2004.
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
Wellington HANSBERRY, Plaintiff,
v.
FATHER FLANAGAN'S BOYS' HOME, Defendant.
**No. CV-03-3006(CPS).**

Nov. 28, 2004.

Jay M. Weinstein, Woodmere, NY, for Plaintiff.
Jennifer Beth Courtian, Jackson Lewis, LLP, New York, NY, for Defendant.

MEMORANDUM AND ORDER

SIFTON, Senior J.

**\*1** Wellington Hansberry brings this action against Father Flanagan's Boys' Home ("Father Flanagan") alleging that his employment was terminated in violation of Title VII, New York State Executive Law § 290*et seq.,*[FN1] and New York City Administrative Code § 8-101*et seq.*[FN2] Hansberry also alleges a common law claim-that he was wrongfully discharged in violation of Father Flanagan's employee handbook. Presently before the Court is Father Flanagan's motion for summary judgment on all claims pursuant to Federal Rule of Civil Procedure 56.

FN1.New York Executive Law § 296 provides:

It shall be an unlawful discriminatory practice

a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, genetic predisposition or carrier status, or marital status of any individual, to refuse to hire

or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

FN2.New York City Administrative Code § 8-107 provides:

It shall be an unlawful discriminatory practice

(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

For the reasons that follow, the motion for summary judgment is granted in its entirety.

BACKGROUND

Unless otherwise noted, the following facts are taken from the parties' depositions, affidavits, and Local Rule 56.1 statements. Disputes are noted. FN3

FN3. Hansberry's response to Father Flanagan's Local Rule 56.1 statement of material facts consists largely of denials unsupported by citation to the record or denials made on "information and belief." Local Rule 56.1 requires the non-moving party to cite to admissible evidence to controvert the moving party's supported assertion of material fact.*Soriano ex rel. Garcia v. Bd. of Educ. of City of New York,* 2004

Not Reported in F.Supp.2d    Page 2
Not Reported in F.Supp.2d, 2004 WL 3152393 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 3152393 (E.D.N.Y.))**

WL 2397610, at *2 n. 5 (E.D.N.Y. Oct.27, 2004). To the extent that the Court is able to ascertain the basis for the denial from the record, the Court will do so. Some of the unsupported denials are, however, inexplicable. For example, Hansberry denies, without citation to evidence, that Father Flanagan provides shelter to "at risk" youths, but then makes this factual assertion in his memo in opposition to summary judgment. *Compare* Plaintiff's Rule 56.1 Statement ¶ A1 *with* Plaintiff's Memo. 5.

Father Flanagan operates shelters in New York City for "at risk" youth. Father Flanagan hired Hansberry, an African American, in February, 1998, to be as a Youth Care Worker ("YCW") during the overnight shift in its Bergen Street Shelter. At the time he was hired and periodically throughout his employment, Hansberry received copies and updates of Father Flanagan's employee handbook. Father Flanagan did not tell Hansberry that he was to be employed for a specific duration or that he would not be terminated. Nor did the parties enter into an employment contract. During the duration of his employment with Father Flanagan, Hansberry worked a second job during the day as a welfare fraud investigator for the City of New York.

In June, 2000, Hansberry was promoted to the position of Shift Supervisor. Of the three other shift supervisors at the shelter, two were Hispanic and one was African American.

Hansberry's shift at the shelter ran from about 10:00 P.M. to 8:00 A.M. His primary responsibility was to ensure the safety of the children occupying the shelter. In addition, Hansberry was required to ensure that two logbooks and a checklist were maintained during each shift.

Anthony DiLauro, who was white, was Hansberry's supervisor from October, 2001, until Hansberry was fired.

In response to a report that youth had engaged in sexual activity while shelter workers were sleeping on the job in its Bronx shelter, Father Flanagan's management in Nebraska decided to conduct an internal audit of the overnight shift operations and staff at its shelters throughout the country.

On August 7, 2002, Father Flanagan's program directors conducted a surprise inspection of the overnight staff at the Brooklyn shelters. Lyn Corbett, the African American Program Operations Manager assigned DiLauro the task of inspecting the shelter at which Hansberry worked. (Corbett Aff. ¶ 11.) Meanwhile, Lyn and Marcus Corbett inspected another of Father Flanagan's shelters. (Corbett Aff. ¶ 11.) The events that occurred during the inspection of Hansberry's shelter are in dispute.

DiLauro testified that when he approached the shelter, he observed that the window to the conference room was slightly ajar. (DiLauro Dep. 133-34.) The lights were off in the conference room, and there was a figure slumped over in a chair with a blanket over his head. (DiLauro Dep. 134-37.) DiLauro stated that he observed the figure for over two minutes. (DiLauro Dep. 137.) He then entered the building, setting off an initial alarm and deactivating it. (DiLauro Dep. 139.)

*2 After entering the building, DiLauro observed Hansberry in the hallway between the entrance to the shelter and the conference room. DiLauro asked Hansberry why he was in a dark room with the lights out, to which Hansberry replied, "That's where I be at." DiLauro stated, "I don't understand that, what do you mean? Why are you in there with the lights off? And it looks like you were sleeping."According to DiLauro, Hansberry's response was to hang his head and look embarrassed. (DiLauro Dep. 140.)

In his affidavit in opposition to summary judgment, Hansberry states that he entered the conference room and observed someone peering through the window. Hansberry became concerned that the person might be a potential intruder. "In an effort to dissuade the potential intruder from entering,"

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3152393 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 3152393 (E.D.N.Y.))**

Hansberry states, "I grabbed a blanket and covered myself."(Hansberry Aff. ¶ 9.) He then didn't move until he heard the alarm go off. (Hansberry Aff. ¶ 9.)

At his deposition, Hansberry testified that before DiLauro arrived, he was sitting in a chair in the conference room with the lights out. (Hansberry Dep. 119.) Although Hansberry testified that the alarm would go off if someone opened the shelter door, he did not recall it going off when DiLauro entered. (Hansberry Dep. 121.) In an internal grievance form filed with Father Flanagan, Hansberry stated that he was in the conference room with the lights out, but he was not asleep.

After confronting Hansberry, DiLauro inspected the remainder of the shelter. On the third floor, he found YCW Robert Spenser, an African American, alert with his log accurately completed. On the fourth floor, YCW Dan Coaxum, an African American, was sitting in the dark watching a DVD player. Coaxum's log was not filled out.

DiLauro conferred with Program Operations Manager Lyn Corbett, an African American, who arrived at the shelter shortly thereafter, and they decided to send Hansberry home. Corbett states in his affidavit that later that morning, he, Marcus Corbett, and DiLauro reported the results of the inspections to Father Flanagan's management team in Nebraska, which included Director of Human Resources Randolph Scott, an African American, Jerry Staffeld, Diane Schmidt, and Corbett's supervisor Mr. Kiesling. (Corbett Aff. ¶ 14.) Corbett recommended that Hansberry be terminated and that Coaxum be given a written warning. (Corbett Aff. ¶ 15.) DiLauro agreed with the recommendation.[FN4]

> [FN4]. Corbett Aff. ¶ 15. As of June 1, 2001, Father Flanagan's employee handbook stated that sleeping on the job was grounds for immediate termination. (Lauri Aff. Ex. J at D00407-08.) As a result of having two jobs, Hansberry slept on average about three to three-and-a-half hours a

night. (Hansberry Dep. 238.) When prior to the surprise inspection, DiLauro questioned Hansberry about his ability to stay awake during the overnight shift, Hansberry assured him that he could do it. (DiLauro Dep. 61.)

In the first of two reports to John Daniel, the then Associate Director who is also African American, on August 9, 2002, Mr. Staffeld, Mr. Kiesling, and Ms. Schmidt made certain disciplinary recommendations, including that plaintiff and other shift supervisors be discharged. (Lauri Aff. Ex. R at D00234.) A report dated August 16, 2002, addressed to Mr. Daniel summarizes the final employment actions taken. (Lauri Aff. Ex. U at D00238.) Mr. Scott, the Director of Human Resources for Defendant and an African American, reviewed and approved the discipline decisions, including the decision to terminate plaintiff and to give written or verbal feedback to three other African American shift supervisors.[FN5] (Scott Aff. ¶ 10.)

> [FN5]. Neither party states what disciplinary action was taken with respect to the fifth African American Shift Supervisor.

**\*3** On August 16, 2002, Corbett met with Hansberry and informed him that he was being terminated. During the course of his employment with Father Flanagan, Hansberry never complained that DiLauro was discriminating against him because of his race. In his internal grievance form, plaintiff did not allege that DiLauro or anyone else discriminated against him. (Lauri Aff. Ex. X at D00221.) Neither side presents evidence of who, if anyone, replaced Hansberry.

## DISCUSSION

### Jurisdiction

The Court has jurisdiction over this action under 28 U.S.C. § 1331, which grants district courts jurisdic-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3152393 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 3152393 (E.D.N.Y.))**

tion over civil actions arising under federal law and principles of pendent jurisdiction.

### Summary Judgment Standard

A court must grant a motion for summary judgment if the movant shows that "there is no genuine issue as to any material fact" and that "the moving party is entitled to a judgment as a matter of law." FED. R. CIV. PRO. 56(c). Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

"An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elec. Inspectors, Inc. v. Village of East Hills,* 320 F.3d 110, 117 (2d Cir.2003). A fact is material when it "might affect the outcome of the suit under the governing law." *Id.*

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.1987). In order to defeat such a motion, the non-moving party must raise a genuine issue of material fact. Although all facts and inferences therefrom are to be construed in the light most favorable to the non-moving party, the non-moving party must raise more than a "metaphysical doubt" as to the material facts. *See Matsushita,* 475 U.S. at 586; *Harlen Assocs. v. Vill. of Mineola,* 273 F.3d 494, 498 (2d Cir.2001). The non-moving party may not rely on conclusory allegations or unsubstantiated speculation. *Twin Labs., Inc. v. Weider Health & Fitness,* 900 F.2d 566, 568 (2d Cir.1990). Rather, the non-moving party must produce more than a scintilla of admissible evidence that supports the pleadings. *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 289-90, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Niagara Mohawk Power Corp. v. Jones Chem. Inc.,* 315 F.3d 171, 175 (2d Cir.2003).

"The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.,* 221 F.3d 394, 398 (2d Cir.2000).

### Title VII

The burden-shifting test articulated by the Supreme Court in *McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), provides the elements of plaintiff's prima facie case of discrimination under Title VII.[FN6] *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). To meet his initial burden, Hansberry must provide evidence: (1) that he is a member of a protected class; (2) he applied and was qualified for the job from which he was terminated; (3) that the termination constituted an adverse employment action; and (4) circumstances surrounding the adverse employment action that raise an inference of discrimination. *McDonnell Douglas,* 411 U.S. at 802; *Brown v. Coach Stores, Inc.,* 163 F.3d 706, 709 (2d Cir.1998); *Meiri v. Dacon,* 759 F.2d 989 (2d Cir.1985). Father Flanagan concedes that Hansberry has established the first three elements of his prima facie case.

> FN6. Liability for purposes of Title VII and New York State and City human rights laws is essentially identical. *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 n. 4 (2d Cir.1995); *McCoy v. City of New York,* 131 F.Supp.2d 363, 375-76 (E.D.N.Y.2001). Consideration of claims brought under New York State and City Human Rights Laws parallels the *McDonnell Douglas* framework applied to Title VII claims. *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 565 n. 1 (2d Cir.2000); *Landwehr v. Grey Adver., Inc.,* 211 A.D.2d 583, 622 N.Y.S.2d 17 (N.Y.App.Div.1995). Accordingly, conclusions reached on the federal

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2004 WL 3152393 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 3152393 (E.D.N.Y.))**

claims may resolve the corresponding state claims.

**\*4** Once a plaintiff offers evidence establishing a prima facie case, the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for the adverse employment action. *Mario v. P & C Food Mkts., Inc.,* 313 F.3d 758, 767 (2d Cir.2003). The plaintiff must then offer evidence sufficient to support a finding that the defendant's true motivation was discriminatory.*Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 221 (2d Cir.2004). The plaintiff must show that defendant's stated reason was merely a pretext for the discrimination. *Tex. Dep't of Cmty Affairs v. Burdine,* 450 U.S. 248, 252, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Mc-Donnel Douglass,* 411 U.S. at 804;*Schnabel v. Ab-ramson,* 232 F.3d 83, 88 (2d Cir.2000) (citing *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). Plaintiff retains the ultimate burden of persuading the trier of fact that the defendant has intentionally discriminated against him.*Schnabel,* 232 F.3d at 88 n. 2. Despite the fact that intent is the issue in a Title VII claim, summary judgment is available to reject discrimination claims that do not present genuine issues of material fact. *See Chambers v. TRM Copy Cent. Corp.,* 43 F.3d 29, 40 (2d Cir.1994); *Ngwu v. Salvation Army,* 1999 WL 2873, at \*3 (S.D.N.Y. Jan.4, 1999). The Court of Appeals has said that "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases. This court has stated that: 'the salutary purposes of summary judgment ... apply no less to discrimination cases than to ... other areas of litigation."*Abdu-Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.2001) (quoting *Meiri,* 759 F.2d at 998).

*Circumstances Giving Rise to an Inference of Dis-crimination*

The inference of discriminatory intent sufficient to establish a prima facie case can be drawn in several circumstances, including, but not limited to:

the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.

*Abdu-Brisson,* 239 F.3d at 468 (age discrimination case) (citing *Chambers,* 43 F.3d 29, 37-38 (noting circumstances creating inferences of discriminatory intent).FN7

> FN7. In *Abdu-Brisson,* the Court of Appeals reversed a district court's decision that an acquired airline's pilots failed to meet their initial burden of showing that acquiring airline Delta discriminated against them through its integration and benefits policies. The Court held that while stray remarks of a decision-maker, without more, cannot prove an employment discrimination claim when other indicia of discrimination were properly presented, the remarks were no longer stray and the jury could conclude that the remarks had a discriminatory significance. *Id.* at 468.
>
> The Court of Appeals held that stray comments about the pilots' age when viewed against a background of other evidence showing Delta's interest in the age and projected retirement rates of the pilots would satisfy plaintiffs' initial burden which was de minimus. *Id.* at 467-68. The Court of Appeals held that given this evidence (stray comments plus other evidence) the inference of age discrimination was raised because Delta's actions may have been motivated by age-based animus. *Id.* at 468.

Hansberry presents no evidence concerning the identity much less the race of any person hired to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

take his position.[FN8] The only evidence that Hansberry presents to raise an inference that his termination was the product of a discriminatory motive on the part of his employer are a series of disconnected comments allegedly made by DiLauro.[FN9]

> FN8. In his brief, Hansberry does not argue that any of the four elements of his prima facie case has been satisfied. Instead, he merely attempts to show that Father Flanagan's reason for terminating him was pretextual.

> FN9. Hansberry also states in his affidavit that an African American former co-worker of his would testify about bad experiences with DiLauro and that DiLauro said that DiLauro was "uneasy and apprehensive" about being near the co-worker and commented on the co-worker's dress and carriage. (Hansberry Aff. ¶ 11.) Hansberry's testimony about what another employee has told him is hearsay and inadmissible. *See, e.g., Howley v. Town of Stratford,* 217 F.3d 141, 155 (2d Cir.2000) (in Title VII action, testimony by plaintiff that other firefighters told her of certain statements by her supervisor would be not admissible for fact that statements were made because not based on personal knowledge); *Taylor v. Potter,* 2004 WL 1811423, at *17 (S.D.N.Y. August 16, 2004). Plaintiff's lawyer informs the court that an affidavit from this witness could be provided *in camera* without disclosure of the identity to defendant because the witness fears reprisal from defendant. (Weinstein Affirmation ¶ 3.)

> I decline to consider evidence submitted by one party *in camera* in ruling on a summary judgment motion. *See, e.g., Vining v. Runyon,* 99 F.3d 1056, 1057 (11th Cir.1996) (adversarial legal system does not generally sanction *ex parte* determinations on the merits of a civil case

unless submissions involve compelling security concerns or the statute granting the cause of action provides for *in camera* resolution of the dispute). In *Vining,* plaintiff sought to compel the production of certain personnel files and defendant opposed the motion claiming the information was protected. The defendant moved for summary judgment, and the district court ordered production of the files for *in camera* consideration. The 11th Circuit reversed the lower court and held that an individual's right to due process includes a party's right to be aware and refute evidence against the merits of his case. *Id.* at 1057. Other circuit and lower courts have similarly concluded that *in camera* consideration of evidence is not appropriate in the absence of special circumstances not present here. See *Abourezk v. Reagan,* 785 F.2d 1043, 1060-61 (D.C.Cir.1986) (district court's reliance on *in camera ex parte* evidence submitted by government inappropriate in its granting of summary judgment for government; it is a firmly held main rule that a court may not dispose of the merits of a case on the basis of *ex parte, in camera* submissions); *Kinoy v. Mitchell,* 67 F.R.D. 1, 15 (S.D.N.Y.1975) (in *camera* exhibits submitted by government in connection with government's motion for summary judgment in civil case may not be considered except to determine privilege, and are either privileged or they should be disclosed at least to the parties).

Those comments consist of: (1) DiLauro is said to have stated that graffiti was criminal mischief and that those that engage in the practice should be prosecuted. (Hansberry Aff. ¶ 6.) (2) DiLauro allegedly asked shift supervisors at a staff meeting, "Do I have to slap one of you all to get things in order in this house?" (Hansberry Dep. 192-93.) (3) At

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 7
Not Reported in F.Supp.2d, 2004 WL 3152393 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 3152393 (E.D.N.Y.))**

another meeting, DiLauro allegedly stated that the meeting was "like a Puerto Rican battlefield." (Hansberry Dep. 186.) (4) DiLauro allegedly remarked about a young man to whom Hansberry was talking "let him go on to school" and that "what's going to happen he's going to get up here, do his time, go back to home, probably live in the projects or something like that, and he probably going to wind up back here again."(Hansberry Dep. 187-88.) Finally, (5) in his deposition, Hansberry describes a comment made by DiLauro on September 11, 2001, "that he shouldn't have let his 'brother with the rag on his head, fly the plane' ". (Hansberry Dep. 190.) In his affidavit, Hansberry describes the same incident and states that DiLauro said that "all dark skinned people" were responsible for the attack on the World Trade Center.[FN10]

> [FN10]. Hansberry Aff. ¶ 7. Comments (1) and (5) are to some extent corroborated by an affidavit of Adonis McDowell, an African American who worked with DiLauro and plaintiff.

**\*5** As a general rule, isolated and disconnected derogatory remarks by a decision maker are by themselves insufficient to raise an inference of discrimination. *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 56 (2d Cir.1998); *Hayes v. Compass Group USA, Inc.,* 2004 WL 2471640, at \*7 (D.Conn. Oct.8, 2004). The remarks must either be accompanied by additional evidence of discrimination, or the plaintiff must demonstrate a nexus between the remarks and the adverse employment action that he suffered. *Schreiber v. Worldco, LLC,* 324 F.Supp.2d 512, 518 (S.D.N.Y.2004). In deciding whether this nexus is established, a court should consider whether the person who made the remarks had some connection to the employment decision, when the remarks were made in relation to the employment decision, and the context and content of the remarks. *Id.; see Turner v. N. Am. Rubber, Inc.,* 979 F.2d 55, 59 (5th Cir.1992); *O'Connor v. Viacom, Inc.,* 543 Pa. 730, 673 A.2d 336, 1996 WL 104299, at \*5 (S.D.N.Y. April 23, 1996) (three isol-

ated remarks by supervisor insufficient to establish pretext; stray remarks without a demonstrated nexus to the personnel actions complained of will not defeat employer's summary judgment motion), *aff'd,*104 F.3d 356 (2d Cir.1996);.

As an initial matter, it is difficult to interpret DiLauro's comment that graffiti was a crime and should be prosecuted as evidence that DiLauro harbored a discriminatory animus toward African Americans. Defacing property with graffiti is in fact illegal. N.Y. PENAL LAW § 145.60 (criminalizing "making graffiti"). The City and State of New York have taken substantial steps to curb its production. *See* N.Y. CITY CODE § 10-117.1 (creating community-based anti-graffiti task forces); N.Y. CITY CODE § 10-117.2 (permitting police commissioners to offer rewards to persons providing tips that lead to the arrest of graffiti artists). Advocating the enforcement of such race-neutral laws does not betray an animus against African Americans, much less raise an inference that DiLauro's behavior towards Hansberry was racially motivated.

Nor can DiLauro's threat to slap shift supervisors be construed as evidence of racial animus however boorish and unprofessional the statement may have been.

The "Puerto Rican battlefield" comment may illustrate a discriminatory animus towards Puerto Ricans but not towards African Americans. *See Richardson v. N.Y. State Dept. of Correctional Service,* 180 F.3d 426, 440 (2d Cir.1999) (noting in hostile work environment case brought by African American that from three comments by a co-worker, one about Native Americans, another about Blacks, and a third about Jews, only one involved plaintiff's protected racial category and the sum of the three failed to establish that she was discriminated against because of her race); *Krystek v. University of Southern Mississippi,* 164 F.3d 251 (5th Cir.1999)(for comments to provide sufficient evidence of discrimination, they must relate to the protected class of which plaintiff is a member).

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3152393 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 3152393 (E.D.N.Y.))**

Page 8

**\*6** DiLauro's statements about the young man living in the projects and winding up at the shelter again does not mention race or suggest a causal connection or correlation between being African American and criminal activity. Such comments are too ambiguous to be probative. *See Wyvill v. United Co. Life Ins. Co.,* 212 F.3d 296, 304 (5th Cir.2000) (age discrimination) (for age-based comment to be probative of discriminatory intent, must be direct and unambiguous); *Fernandez v. Costa Bros. Masonry, Inc.,* 199 F.3d 572 (1st Cir.1999) (mixed motive analysis) (statements open to several interpretations are not direct evidence of racial discrimination).

Finally, DiLauro's alleged comments on September 11, 2001, even if intepreted to display a discriminatory animus towards African Americans, are both temporally remote from the adverse employment action (which took place almost a year later in August, 2002) and unrelated to the decision process.

Stray offensive remarks with a minimal nexus to the adverse employment action cannot raise an inference of discrimination, even when made by a decision maker.[FN11] *See, e.g., Danzer,* 151 F.3d at 56;*Soliman v. Deutsche Bank AG,* (S.D.N.Y. May 20, 2004) (comments to an Egyptian-American that he was a "sand nigger," that he was "like an Arab selling in a bazaar," and that "all blacks are good for is dancing" are insufficient to raise an inference of discrimination); *Ahmad v. Nassau Health Care Corp.,* 234 F.Supp.2d 185, 193 (E.D.N.Y.2002) (verbal comments are evidence of discrimination when they are related to race, proximate in time to the adverse decision, made by an individual with authority over the decision and related to the employment decision).

> FN11. Defendant assumes without explanation or citation to authority that DiLauro was not a decision maker. (Def.'s Mem. Supp. Summ. J. at 19, 24, 26.) Courts have generally considered immediate supervisors who make recommendations to other supervisors or management about work actions such as terminations to be decision makers. *See, e.g., Bickerstaff v. Vassar Coll.,* 196 F.3d 435 (2d Cir.1999) ("[T]he impermissible bias of a single individual at any stage of the [terminating] process may taint the ultimate employment decision in violation of Title VII... This is true even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the [termination] process."); *Chiaramonte v. Fashion Bed Group, Inc.,* 129 F.3d 391, 397 (7th Cir.1997) (test is whether low-level supervisor influenced decision); *Penta v. Sears Roebuck, Co.,* 2003 WL 21143071, at \*6 (E.D.N.Y.2003) (if plaintiff's direct supervisor's report of event leading to decision to terminate plaintiff was tainted by racial animus, finder of fact could conclude the entire decision making process was tainted); *Ngwu,* 1999 WL 2873, at \*5 (while both [immediate supervisor] and [higher supervisor] had the power to terminate the Plaintiffs or to recommend termination). Assuming that DiLauro was a decision maker because he had input into the termination decision via his observations and report and recommendation into the employment action, the comments made by DiLauro and offered as evidence of impermissible racism by Hansberry are not at all related to the termination decision and still fall under the rubric of stray comments analysis. A stray remark can be either a remark made by a non-decision maker or a remark made by a decision maker unrelated to the decision process. *See, e.g., Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (mixed motive) (overruled in part by the 1991 Civil Rights Act) (O'Connor, J., concurring); *see also* discussion of stray remarks *infra.*

Not Reported in F.Supp.2d, 2004 WL 3152393 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 3152393 (E.D.N.Y.))**

*Defendant's Reason for Termination*

Even assuming that plaintiff established a prima facie case of race discrimination, defendant has articulated a legitimate, non-discriminatory reason for the termination and plaintiff has failed to show that this reason was pretextual. *See Griffin v. Ambika Corp.,* 103 F.Supp.2d 297, 302 (S.D.N.Y.2000) ("Any legitimate non-discriminatory reason will rebut the presumption triggered by the prima facie case. The defendant need not persuade the Court it was motivated by the proffered reasons.") Unsatisfactory job performance as indicated in defendant's policies and procedures includes sleeping on the job and is a stated ground for immediate termination. (Lauri Aff. Ex. J. at D00408.)

*Hansberry's Evidence of Pretext*

Once defendant has articulated a non-discriminatory reason, plaintiff must show that the explanation offered by the defendant is false and that discrimination was the true reason for the employment decision. *Burdine,* 450 U.S. at 253; *Norton v. Sam's Club,* 145 F.3d 114, 119 (2d Cir.1998) ( "[P]laintiff's] very weak prima facie case, combined with an at best highly dubious showing of pretext, that in itself does not implicate discrimination, is simply not enough ..."); *Brennan v. Metro. Opera Ass'n.,* 192 F.3d 310, 317 (2d Cir.1999) (plaintiff's evidence must allow a factfinder to reasonably conclude that employer's reason was pretextual and the real reason was discrimination); *Ahmad,* 234 F.Supp.2d at 196.

*7 Here plaintiff's showing that the defendant's reason for terminating him was false is exceedingly weak. In one of his several inconsistent accounts of his behavior, plaintiff concedes that on the night of the surprise inspection, he was sitting in the conference room, in the dark, covered by a blanket.[FN12] His explanation for this behavior is implausible. In his affidavit, Hansberry states that he entered the conference room, which was dark, and saw a person peering through the window from the outside. "[I]n

an effort to dissuade the potential intruder from entering, I grabbed a blanket and covered myself. I then did not move until I heard the front door alarm go off."(Hansberr Aff. ¶ 9.)

> FN12. In his deposition, taken on May 18, 2004, Hansberry testified that he told Di-Lauro when questioned about what he was doing in the conference room, that he was on his "downtime." (Hansberry Dep. 127.) In his grievance form, Hansberry did not mention the intruder but instead described the events as him sitting in the conference room with the lights out and telling Di-Lauro upon meeting him in the hallway that he (Hansberry) was on his lunch break. (Lauri Aff. Ex. X at D00222.)

DiLauro's explanation of his behavior that evening is both consistent and compelling. He reported his observations made from 3:50 a.m. to 5:00 a.m. on August 7, 2002, to Lyn Corbett the night of the inspection and wrote up his notes the next morning and then typed them. (Def.'s Rule 56.1 Stat. ¶ G.) The notes stated that "Shift Supervisor Wellington Hansberry was observed in the front conference room sitting slouched forward with a blanket on his head in the dark. He was still and did not move for over 2 minutes ... 4th Floor ... log not filled out since 11 p.m." (Lauri Aff. Ex. S at D00090-91.) Lyn Corbett recommended termination to the management team in Nebraska and the reason stated was "Program Director caught him sleeping in conference room with blanket over head."(Lauri Aff. Ex. R. at D00235.)

At the same time, plaintiff's evidence of discriminatory animus is weak in the extreme. As discussed above in reference to plaintiff's prima facie case, the disconnected and isolated remarks by DiLauro, and the absence of evidence that non-African American employees were treated differently, add little if anything to plaintiff's pretext argument. *Abdu-Brisson,* 239 F.3d at 468 ("[T]he stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination");

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 3152393 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 3152393 (E.D.N.Y.))**

Page 10

*Schnabel,* 232 F.3d at 90-91 (court must examine "entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff' "); *Danzer,* 151 F.3d at 56 (remarks not stray when other indicia of discrimination are presented); *Ngwu,* 1999 WL 2873, at *5 (isolated discriminatory comments insufficient to defeat summary judgment); [FN13] *Burrell v. Bentsen,* 1993 WL 535076, at *8 (S.D.N.Y. Dec.21, 1993) (stray remarks in workplace, statements by decision makers, and statements by decision makers unrelated to decisional process do not satisfy plaintiff's burden of proving pretext). As noted above, the allegedly discriminatory remarks attributed to DiLauro were either not about African Americans, ambiguous, removed in time from the termination, or without a connection in subject matter to the employment decision.

> **FN13.** In *Ngwu,* the plaintiffs, who were Nigerian, worked the night shift at a group home. A fire occurred during their shift and their supervisor questioned plaintiffs when investigating the fire. According to the supervisor, plaintiffs admitted they were sleeping when the fire occurred. Plaintiffs later denied they were sleeping. The supervisor reported the incident to her supervisor and to other managers of the defendant, the Salvation Army. The supervisor recommended probation or suspension but the higher supervisor directed termination based on the Salvation Army's written policy of immediate termination for an employee's sleeping while on duty. Plaintiffs later argued that their immediate supervisor had made discriminatory comments about Nigerians, including calling them "fucking Nigerians" on the morning after the fire. The court, noting that the supervisor had not recommended termination, found that her remarks did not support an inference of discrimination on the part of the Salvation Army. Although in

this case, DiLauro recommended termination, some of the same logic relied on by the district court in *Ngwu* is persuasive-there is no evidence that any of DiLauro's stray remarks-influenced his decision to recommend termination and certainly no evidence that his stray remarks had any input on the other decisionmakers' rationale for terminating plaintiff. In fact, Scott, Daniels and Corbett, all involved in the decision to terminate plaintiff, are African Americans themselves. *See, e.g., Connell v. Consolidated Edison Co. of N.Y.,* 109 F.Supp.2d 202, 209 (S.D.N.Y.2000) (inference against discriminatory intent when decision makers in same protected class as plaintiff).

**\*8** In sum, I conclude that this record would not allow a rational fact finder to infer that Father Flanagan's decision to terminate Hansberry was motivated by a proscribed racial animus rather than by its stated reason that Hansberry was not fulfilling the duties of his position.

### State Law Claims

Because the same analysis applies to plaintiff's state discrimination claims as does to the Title VII claim, summary judgment is also granted for defendant on those claims.

In his remaining state claim, plaintiff asserts that he was discharged in violation of the policies and procedures in the employee handbook and that defendant had breached the contract of employment. (Compl.¶¶ 52-54.) However, plaintiff was an at-will employee of defendant as indicated in his employment application signed by plaintiff on January 12, 1998. *See* Ex. H at D00037. Further, plaintiff admits that he never entered into an employment contract with defendant or was told at any time that his employment would be for a specific period of time. (Hansberry Dep. 31-32, 35-36.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 3152393 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 3152393 (E.D.N.Y.))**

In New York, employment for an indefinite term is "presumed to be a hiring at-will which may be freely terminated by either party at any time for any reason or even no reason." *Murphy v. Am. Home Prods. Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983); *see also Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987). New York courts decline to infer terms in at-will contracts. *Id.* Plaintiff admits that no employment agreement for a fixed duration existed between himself and Father Flanagan's. Accordingly, plaintiff's claim for breach of contract fails. Plaintiff does not identify the existence of any contract upon which any liability could be predicated.

In his opposition papers, plaintiff does not address the argument that plaintiff's breach of contract claim fails because there was no employment contract. Plaintiff only contends without making any legal argument that defendant failed to follow its policies that require that any termination occur only following review by the "Associate Executive Director and the Director of Human Resources, or their designees". (Lauri Aff. Ex. G at D00406.) Plaintiff alleges in his affidavit that John Daniels did not review the termination decision and did not designate anyone to do so in his place. (Hansberry Aff. ¶ G.) Plaintiff has no personal knowledge of this event and offers no evidence that the review did not take place. In fact, defendant's evidence suggests that John Daniels did review the personnel action recommendations summarized in a memo to John Daniels prior to the final actions taking place. *See* Scott Aff. ¶¶ 10-11, Lauri Aff. Exs. R and U.

To the extent plaintiff argues that Father Flanagan's employee handbook created a contract of employment that limited Father Flanagan's right to discharge plaintiff, this argument fails. An employee handbook that lists certain grounds for termination but does not expressly exclude others, does not limit the employer's right to terminate the employee. *See, e.g., Marvin v. Kent Nursing Home,* 153 A.D.2d 553, 544 N.Y.S.2d 210, 211-12

(N.Y.App.Div.1989).

CONCLUSION

**\*9** For the aforementioned reasons, defendant's motion for summary judgment is granted in its entirety.

The Clerk is directed to enter judgment dismissing the complaint and to furnish a filed copy of the within to all parties and to the magistrate.

SO ORDERED.

E.D.N.Y.,2004.
Hansberry v. Father Flanagan's Boys' Home
Not Reported in F.Supp.2d, 2004 WL 3152393 (E.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 12

Slip Copy                                                                                                    Page 1

Slip Copy, 2007 WL 2584662 (S.D.N.Y.), 101 Fair Empl.Prac.Cas. (BNA) 1311, 90 Empl. Prac. Dec. P 42,958
**(Cite as: 2007 WL 2584662 (S.D.N.Y.))**

Longmire v. Wyser-Pratte
S.D.N.Y.,2007.

United States District Court,S.D. New York.
Eric A. LONGMIRE, Plaintiff,
v.
Guy P. WYSER-PRATTE and Wyser-Pratte Manage-
ment Co., Inc., Defendants.
**No. 05 Civ. 6725(SHS).**

Sept. 6, 2007.

*OPINION & ORDER*

SIDNEY H. STEIN, U.S. District Judge.

TABLE OF CONTENTS

I.      **FACTS** ...................... .. 2

        A.      Longmire's Racial Back- 3
                ground ...............

        B.      Longmire's Employment 5
                at Prudential Bache Secur-
                ities, Inc. ..........

        C.      Longmire's Employment 5
                at WPMC ...................

        D.      Alleged Use of Racial Epi- 8
                thets and Ra- cial Discrim-
                ination at WP- MC ..........

        E.      Wyser-Pratte's Divorce Pro- 11
                ceedings ...................

        F.      The Termina- tion of Long- 12
                mire's Em-

Slip Copy, 2007 WL 2584662 (S.D.N.Y.), 101 Fair Empl.Prac.Cas. (BNA) 1311, 90 Empl. Prac. Dec. P 42,958
**(Cite as: 2007 WL 2584662 (S.D.N.Y.))**

|       |      | ployment at WPMC .......... |                          |     |
|-------|------|-----------------------------|--------------------------|-----|
|       | G.   | History of this Action ...................... |        | 14  |
| II.   | **SUMMARY JUDGMENT STANDARD.............** |  |                    | 14  |
| III.  | **DISCUSSION** ...................... . |  |                    | 15  |
|       | A.   | Longmire's Employment Discrimination Claims .......... |  | 15  |
|       |      | 1.  | ***The Threat To Disclose Longmire's "Racial Secret"........*** | 17. |
|       |      |     | a. | *Longmire's Race Was Not a "Secret".* | 17 |
|       |      |     | b. | *Disclosure of Longmire's Race Is Not Actionable Conduct.* | 18 |
|       |      | 2.  | ***Hostile Work Environment*** ............ | 19. |
|       |      |     | a. | *Legal Standard.* | 19 |
|       |      |     | b. | *Timeliness.* | 20 |
|       |      |     | c. | *Discussion.* | 22 |
|       |      | 3.  | ***Disparate Pay*** .................... | 24. |
|       |      |     | a. | *Legal Stand-* | 24 |

Slip Copy, 2007 WL 2584662 (S.D.N.Y.), 101 Fair Empl.Prac.Cas. (BNA) 1311, 90 Empl. Prac. Dec. P 42,958
**(Cite as: 2007 WL 2584662 (S.D.N.Y.))**

|   |   |   |   | *ard.* |   |
|---|---|---|---|---|---|
|   |   |   | b. | *Timeliness.* | 25 |
|   |   |   | c. | *Discussion.* | 25 |
|   |   | 4. | **Retaliation** |   | 28. |
|   |   |   | a. | *Legal Stand-ard.* | 28 |
|   |   |   | b. | *Discussion* | 29 |
|   | B. | Longmire's Common Law Tortious Interference with Contract Claim......... |   |   | 31 |
|   |   |   | a. | *Legal Stand-ard.* | 31 |
|   |   |   | b. | *Timeliness.* | 32 |
|   |   |   | c. | *Discussion.* | 32 |
| IV. | **CONCLU-SION** |   |   |   | 34 |

**\*1** This litigation concerns an employment relationship gone badly awry. Plaintiff Eric A. Longmire alleges that over the course of more than a decade he was the victim of race-based discrimination and harassment by his former boss, defendant Guy P. Wyser-Pratte, and Wyser-Pratte's financial services company, Wyser-Pratte Management Co., Inc. ("WPMC"). Longmire's allegations include that Wyser-Pratte threatened to-and eventually did-publicly disclose Longmire's "dual race" background, which Longmire claims was a "closely guarded secret"; that he was subjected to a hostile work environment in the course of his employment at WPMC; that he was the victim of disparate compensation on the basis of his race; and that he was retaliated against by defendants. Longmire brings those discrimination claims pursuant to 42 U.S.C. § 1981, section 296 of the New York State Executive Law (the "New York Human Rights Law," or "NYHRL") and section 8-107 of the New York City Administrative Code (the "New York City Human Rights Law," or "NYCHRL"). In ad-

dition, Longmire contends that Wyser-Pratte tortiously interfered with plaintiff's oral employment contract at WPMC.

Following the conclusion of discovery proceedings, defendants have now moved pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment in their favor. As set forth more fully below, plaintiff's claims are either not legally actionable or plaintiff has failed to adduce any genuine issue of material fact that prevents the Court from deciding this action as a matter of law. The motion for summary judgment is granted in favor of defendants and this action is dismissed with prejudice.

**I. FACTS**

The following facts are either undisputed or the Court has resolved any ambiguities in the record and drawn all factual inferences in Longmire's favor, as it must.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2584662 (S.D.N.Y.), 101 Fair Empl.Prac.Cas. (BNA) 1311, 90 Empl. Prac. Dec. P 42,958
**(Cite as: 2007 WL 2584662 (S.D.N.Y.))**

A. *Longmire's Racial Background*

Longmire's father is African-American and his mother is Caucasian. (Defendants' Local Rule 56.1 Statement of Undisputed Material Facts ("Def.'s 56.1") ¶ 6; Plaintiff's Reponses to Defendants' Local Rule 56.1 Statement ("Pl.'s Rep. 56.1") ¶ 6.) Longmire describes himself as a person of "dual race" who has "the appearance of one who is Mediterranean or Semitic," Declaration of Eric Longmire dated Oct. 25, 2006 ("Longmire Decl.") ¶ 3, and whose "features are not notably those of one from the African race," Plaintiff's Statement of Material Facts Defendants May Dispute ("Pl.'s 56.1") ¶ 1. Longmire also asserts that "to avoid racial discrimination on Wall Street" he decided "decades ago" to live his life as a "passer"-i.e., "a black/white biracial person" who self-identifies as "white" at his place of employment-rather than self-identifying as "black" or "biracial." (Pl.'s 56.1 ¶ 3; Longmire Decl. ¶ 3.)

Despite claiming that he has self-identified as "white" for "decades," Longmire identified himself as "black" on his application for admission to the Stanford Graduate School of Business in 1985. (Def.'s 56.1 ¶ 7; Deposition of Eric Longmire dated Feb. 16, 2006 ("Longmire Dep.") at 71:9-25, Ex. 2 to Affidavit of Margo G. Ferrandino dated Oct. 6, 2006 ("Ferrandino Aff."), Ex. A to Declaration of Avi Lew dated Oct. 26, 2006 ("Lew Decl.").) Despite this, Longmire contends that he kept his racial background "closely guarded" in his professional life and did not disclose it to any "white" person on Wall Street, with the exception of Wyser-Pratte, although he did disclose it to non-whites with whom he worked. (Def.'s 56.1 ¶¶ 10, 12; Pl.'s Rep. 56.1 ¶¶ 10, 12; Longmire Decl. ¶¶ 4, 6.)

**\*2** It is undisputed, however, that Longmire publicly disclosed his racial background in other situations. For example, Longmire sued the board of his cooperative apartment in 1995 for discriminating against him on the grounds that the board had failed to take appropriate action against his neighbors who had been intentionally "making excessive noise." Longmire claimed in publicly filed court documents that both the intentional noise-making and the failure of the board to act were racially motivated. (Def.'s 56.1 ¶ 13; Pl.'s Rep. 56.1 ¶ 13;

Supplemental Response to First Set of Interrogatories of Defendant Great Neck Terrace Owners Corp. dated July 11, 1995, Ferrandino Aff. Ex. 9.) Indeed, the first paragraph of the complaint that Longmire filed with the New York State Division of Human Rights (the "SDHR")-which subsequently became part of the public record-reads simply: "I am black." (Def.'s 56.1 ¶ 13; Pl.'s Rep. 56.1 ¶ 13; SDHR Complaint of Eric Longmire dated Feb. 3, 1995, Ferrandino Aff. Ex. 11 ¶ 1.) Longmire's complaint was dismissed by the SDHR, which found no probable cause to believe that Longmire had been discriminated against by the board on the basis of race or color. (Lew Decl. Ex. H at EL 0794.) In connection with his subsequently filed Article 78 petition in New York state court seeking judicial review of that determination, Longmire prepared an affidavit in which he again identified himself as "black." (Affidavit of Eric Longmire dated May 22, 1997, Ferrandino Aff. Ex. 10 ¶ 2.) Longmire further asserted that the board knew that he was a person of color because he had told them he was. (Def.'s 56.1 ¶ 13; Pl.'s Rep. 56.1 ¶ 13; Longmire Dep. at 161:3-24; Longmire's Reply Memorandum of Law in Support of his Petition to Reverse the Order and Determination of the SDHR dated July 18, 1997, Ferrandino Aff. Ex. 12.)

In 2000, WPMC hired two African-American consultants-Deborah Draughan and Michael Gefferd. (Pl.'s 56.1 ¶ 19.) Despite the allegedly "secret" nature of his racial background, Longmire disclosed it to Draughan. (Def.'s 56.1 ¶ 12; Pl.'s Rep. 56.1 ¶ 12.) The record does not indicate whether Longmire asked Draughan to keep that information secret. Longmire testified at his deposition in this action that in general he was not "trying to keep [his 'secret'] from blacks" because they were not the source of the discrimination against him. (Longmire Dep. at 155:16-25.)

In addition, Longmire began receiving e-mails at his WPMC e-mail account from the Stanford Business School Black Alumni Association in August 2003. (Def.'s 56.1 ¶ 14; E-mails to Longmire dated Aug. 25, 2003 to Feb. 14, 2006, Ferrandino Aff. Ex. 13; Pl.'s Rep. 56.1 ¶ 14.) Longmire testified that he was contacted because he had "expressed an interest to help other

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2584662 (S.D.N.Y.), 101 Fair Empl.Prac.Cas. (BNA) 1311, 90 Empl. Prac. Dec. P 42,958
**(Cite as: 2007 WL 2584662 (S.D.N.Y.))**

blacks [from Stanford Business School] who wanted to get on Wall Street."(Def.'s 56.1 ¶ 14; Longmire Dep. at 157:4-17.)

B. *Longmire's Employment at Prudential Bache Securities, Inc.*

**\*3** In 1989, Wyser-Pratte hired Longmire to work at Prudential Bache Securities, Inc. as a research analyst in the Risk Arbitrage Department, which Wyser-Pratte managed. (Def.'s 56.1 ¶ 3; Pl.'s Rep. 56.1 ¶ 3; Pl.'s 56.1 ¶ 4.) Although Longmire did not disclose his racial identity to Wyser-Pratte while they were at Prudential, he did disclose it to Praveen Sharma, who also worked there for Wyser-Pratte. (Def.'s 56.1 ¶ 10; Pl.'s Rep. 56.1 ¶ 10; Longmire Decl. ¶ 6.) Longmire alleges that Wyser-Pratte frequently made "ethnically offensive epithets." (Longmire Decl. ¶ 6.) Wyser-Pratte also allegedly frequently told Longmire to "check for niggers in the woodpile" when referring to the need to identify risks in an investment.[FN1] (*Id.*) Longmire claims that he never lodged a formal complaint because he feared retaliation. (Pl.'s Rep. 56.1 ¶ 3; Pl.'s 56.1 ¶ 4.) Wyser-Pratte and Longmire each left Prudential in 1990. (Longmire Decl. ¶ 7.)

> FN1. It should be noted that Wyser-Pratte denies making that remark-or ever using that racial epithet-at Prudential or WPMC. (Deposition of Guy Wyser-Pratte dated Feb. 23, 2006 ("Wyser-Pratte Dep.") at 98:21-99:4, 100:12-25, Ferrandino Aff. Ex. 3, Lew Decl. Ex. B.) For purposes of this motion, the Court assumes that he used that language.

C. *Longmire's Employment at WPMC*

In 1991, Longmire accepted an invitation from Wyser-Pratte to join WPMC, an independent risk arbitrage company started by Wyser-Pratte. (Def.'s 56.1 ¶ 4; Pl.'s Rep. 56.1 ¶ 4.) Wyser-Pratte is the sole owner, President, and Chief Executive Officer of WPMC. (Def.'s 56.1 ¶ 2; Pl.'s Rep. 56.1 ¶ 2.) Longmire began as Research Analyst at a base salary of $85,000 plus "incentive compensation" of 7.5% of the incentive fees that WPMC

would earn on funds raised and managed for third party investors. (Pl.'s 56.1 ¶ 5; Longmire Decl. ¶ 8.) That agreement was oral and was not memorialized in writing. (Pl.'s Rep. 56.1 ¶ 5.) Longmire's initial supervisor was Phoebe Yen, WPMC's Director of Research, whose base salary was $95,000, plus incentive compensation of 10% of the incentive fees. (Pl.'s 56.1 ¶ 36.)

At some point during his long tenure at WPMC-which lasted for 13 years from 1991 until his termination in March 2004-Longmire became the only person at WPMC (aside from Wyser-Pratte) with investment decision-making responsibilities and its most senior employee. (Pl.'s 56.1 ¶ 8; Longmire Decl. ¶ 28.) It is undisputed that Longmire earned approximately $5.5 million in compensation during his thirteen-year tenure at WPMC. (Def.'s 56.1 ¶ 16; Pl.'s Rep. 56.1 ¶ 16.) Although his annual compensation fluctuated depending on the performance of the business-and his corresponding share of the incentive fees-Longmire received average annual compensation in excess of $400,000. Indeed he earned in excess of $800,000 in 2000, more than anyone else at WPMC other than Wyser-Pratte himself. (Def.'s 56.1 ¶ 18; Pl.'s Rep. 56.1 ¶ 18; Longmire Dep. at 226:8-25.)

Nonetheless, Longmire contends that once he disclosed his racial identity to Wyser-Pratte shortly after starting at WPMC-as discussed below-he was not compensated fairly. (Pl.'s 56.1 ¶ 35; Longmire Decl. ¶ 27.) For example, Longmire became Director of Research-the position previously held by Yen-in 1991, but his base salary remained set at $85,000 with a 7.5% incentive fee share. (Pl.'s 56.1 ¶ 36; Longmire Decl. ¶ 31.) In 1995, Longmire took on the additional responsibility of Assistant Portfolio Manager, replacing Neil O'Hara in that role. (Pl.'s 56.1 ¶ 37; Longmire Decl. ¶ 31.) O'Hara, who is white, had been paid $120,000 with an incentive fee share of 10%, but Longmire's base salary was increased to only $100,000 in April 1995 and his incentive fee share remained at 7.5%-even though by November 1995 Longmire was acting as both Director of Research and Assistant Portfolio Manager.[FN2] (Pl.'s 56.1 ¶ 37; Longmire Decl. ¶ 31.)

> FN2. During his tenure at WPMC, Longmire

Slip Copy, 2007 WL 2584662 (S.D.N.Y.), 101 Fair Empl.Prac.Cas. (BNA) 1311, 90 Empl. Prac. Dec. P 42,958
**(Cite as: 2007 WL 2584662 (S.D.N.Y.))**

also held the positions of Vice President, Managing Director, and, as of 1998, Senior Managing Director. (Longmire Decl. ¶ 38; Wyser-Pratte Dep. at 38:1-14, 39:19-21; Lew Decl, Ex. I at WP 0458.)

**\*4** In 2000, Wolfgang Armbruster, another white WPMC employee, resigned; Armbruster had been paid a salary of $120,000-a higher base salary than Longmire's, even though Armbruster in fact reported to him-and an incentive fee share of 2.5%. (Pl.'s 56.1 ¶ 39; Longmire Dep. at 113:4-15.) Longmire took on Armbruster's responsibilities and received an increase in base salary from $100,000 to $150,000-effective December 2000-and an increase in his incentive fee share from 7.5% to 10% at the start of 2001. (Pl.'s 56.1 ¶ 42; Longmire Decl. ¶ 31; Longmire Dep. at 112:12-17, 113:4-17, 224:16-21, 226:11-20.)

With the exception of Kurt N. Schacht, WPMC's Chief Legal Officer, no WPMC employee earned more total compensation than Longmire from 2001 until January 2004. (Def.'s 56.1 ¶ 18; Longmire Dep. at 217:19-24.) Schacht is white. (Def.'s 56.1 ¶ 19 .) Following the loss of a major client in 2003, Schacht's base salary was decreased from $170,000 to approximately $125,000 and Longmire's base salary was temporarily decreased to approximately $130,000, albeit with a promise from Wyser-Pratte to Longmire that he would "make up the difference at the end of the year."(Def.'s 56.1 ¶ 19; Pl.'s 56.1 ¶ 42; Longmire Dep. at 215:2-216:7.) At some point, Wyser-Pratte allegedly told his wife, Vivien Wyser-Pratte, that he could underpay Longmire because it would be difficult for Longmire-because of his race-to obtain alternative employment on Wall Street.[FN3] (Longmire Decl. ¶ 27.)

> **FN3.** Wyser-Pratte denies that he ever made that statement. (Wyser-Pratte Dep. at 171:10-15.) Longmire has failed to substantiate the allegation by any evidence whatsoever, including from Vivien Wyser-Pratte's deposition.

In sum, Longmire's base salary was increased only twice during his thirteen years at WPMC, during which time he earned approximately $5.5 million in compens-

ation and was, during his final four years at WPMC, one of its highest paid employees. (Def.'s 56.1 ¶ 16; Pl.'s Rep. 56.1 ¶ 16; Pl.'s 56.1 ¶ 48.)

### D. *Alleged Use of Racial Epithets and Racial Discrimination at WPMC*

Shortly after he commenced working at WPMC in 1991, Longmire claims that he requested that Wyser-Pratte cease using racial epithets in his presence and "control the racist behavior of other employees."(Pl.'s 56.1 ¶ 14; Longmire Decl. ¶ 12.) Longmire also contends that at that time, he disclosed his racial background to Wyser-Pratte, who allegedly agreed to keep that information private. (Pl.'s 56.1 ¶ 16; Longmire Decl. ¶¶ 12-13.)[FN4] However, Wyser-Pratte and WPMC employees allegedly continued to use racial and ethnic slurs in Longmire's presence, and, in particular, Wyser-Pratte continued to use the epithet "Pollack" to refer to his Polish housekeepers-a term to which Longmire raised a specific objection because of Polish members of his own family.[FN5] (Pl.'s 56.1 ¶ 15; Longmire Decl. ¶ 13.) It is undisputed that WPMC-a relatively small firm-never adopted any internal anti-discrimination policy or procedures. (Pl.'s 56.1 ¶ 10; Wyser-Pratte Dep. at 128:12-15.)

> **FN4.** Guy Wyser-Pratte and Vivien Wyser-Pratte each testified that Longmire first disclosed his racial background to Guy Wyser-Pratte in 1993 in the context of allegations by a female co-worker at WPMC that Longmire had sexually harassed her. (Wyser-Pratte Dep. at 125:18-128:3; Deposition of Vivien Wyser-Pratte dated Mar. 2, 2006 ("Vivien Wyser-Pratte Dep.") at 52:20-53:24, Ferrandino Aff. Ex. 4, Lew Decl. Ex. C.)

> **FN5.** At his deposition in this action, Wyser-Pratte stated that he only once used the term "Pollack"-in a deposition taken in connection with a Securities and Exchange Commission investigation-but that he does not consider the term a racial epithet. (Wyser-Pratte Dep. at 102:17-103:13.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2584662 (S.D.N.Y.), 101 Fair Empl.Prac.Cas. (BNA) 1311, 90 Empl. Prac. Dec. P 42,958
**(Cite as: 2007 WL 2584662 (S.D.N.Y.))**

Furthermore, Longmire conclusorily alleges-without any detail or support whatsoever-that Wyser-Pratte began actively discriminating against him after he disclosed his racial background. (Pl.'s 56.1 ¶ 25; Longmire Decl. ¶ 14.) Longmire asserts that Wyser-Pratte's "disdain for plaintiff 'trickled down' to other employees" and cites an incident in 1995 when Longmire was "punched ... in the face" by Carl Weiss, WPMC's Chief Financial Officer at that time, in full view of other employees. (Pl.'s 56.1 ¶ 34; Wyser-Pratte Dep. at 168:21-171:3.) Longmire claims that out of racial animus Wyser-Pratte refused to take any action in response.FN6(Pl.'s 56.1 ¶ 34.)

> FN6. Wyser-Pratte testified that he offered to speak with Weiss regarding the incident, but that Longmire specifically requested that he not get involved. (Wyser-Pratte Dep. at 169:3-21.)

**\*5** As a further example of the allegedly racist atmosphere at WPMC, Longmire recalls that when the acquittal in the O.J. Simpson murder trial was announced in 1995, Longmire found the "racist comments" made by Wyser-Pratte and WPMC employees "unbearable" and he was "forced ... to hide in the bathroom" to avoid hearing them. (Longmire Decl. ¶ 21.) Longmire does not state what those comments were. Longmire also alleges that his race was a topic of conversation and rumor among WPMC employees, particularly at company functions that Longmire attended with his wife-who is a Turkish national-and child. (Pl.'s 56.1 ¶ 11; Longmire Decl. ¶¶ 17, 19.) However, he gives absolutely no substantiation or support for that allegation.

Longmire also alleges that one WPMC employee-Neil O'Hara-complained to him that "niggers had a bad smell." (Pl.'s 56.1 ¶ 24.) Another WPMC employee-George Dudla-allegedly once stated that "it should not be a crime when you hit a black man on the head with a baseball bat because you're doing him a favor by improving his intelligence."(*Id.*) Longmire contends that many employees, as well as Wyser-Pratte, laughed at that remark and expressed agreement. (*Id.*) Longmire further contends that several employees frequently used the word "nigger," sometimes in the presence of Wyser-Pratte. (*Id.*)

In response to those allegations by Longmire, Wyser-Pratte testified at his deposition that he never saw any WPMC employee exhibit racist behavior and that he did not recall O'Hara or Dudla making the alleged remarks. (Wyser-Pratte Dep. at 125:3-16, 152:3-23 .) In addition, defendants submitted affidavits from WPMC employee Michael Kelly and former employee Kurt N. Schacht in which each stated that he "never witnessed racial slurs or epithets made toward or in front of Mr. Longmire" at WPMC. (Affidavit of Michael M. Kelly dated Oct. 3, 2006 ("Kelly Aff.") ¶ 6; Affidavit of Kurt N. Schacht dated Oct. 3, 2006 ("Schacht Aff.") ¶ 7.) By contrast, Longmire has not submitted any deposition testimony from either O'Hara or Dudla-or anyone else-to corroborate his allegations concerning the specific alleged statements by O'Hara and Dudla or any other alleged racist remarks.

Longmire also asserts that Wyser-Pratte discriminated directly against him out of racial animus. In particular, Longmire contends that Wyser-Pratte told him that "blacks did not project the appropriate Wall Street image" and that, with the exception of one client, Wyser-Pratte never permitted Longmire to accompany him on marketing calls to meet potential investors.FN7(Longmire Decl. ¶ 25.) Longmire cites a specific instance in which Wyser-Pratte allegedly told him-with reference to Kurt N. Schacht-that "he wanted to show a white face to potential investors" and that Longmire "had to make a sacrifice for the franchise."(Longmire Decl. ¶ 39.)

> FN7. At his deposition, Wyser-Pratte cited at least four times that Longmire traveled with Wyser-Pratte on marketing trips to visit investors. (Wyser-Pratte Dep. at 153:13-154:24.)

Longmire further contends that Wyser-Pratte refused due to racial animus to assist Longmire with sponsorship for purposes of becoming a registered broker with the National Association of Securities Dealers, even though he did sponsor Wolfgang Armbruster for that purpose. (Pl.'s 56.1 ¶ 45; Longmire Decl. ¶¶ 26, 35.) In addition, Longmire asserts that Wyser-Pratte refused-again on the basis of racial animus-a request for a two-week honeymoon in 1997. (Pl.'s 56.1 ¶ 26; Longmire

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2584662 (S.D.N.Y.), 101 Fair Empl.Prac.Cas. (BNA) 1311, 90 Empl. Prac. Dec. P 42,958
**(Cite as: 2007 WL 2584662 (S.D.N.Y.))**

Decl. ¶ 41.) Wyser-Pratte allegedly told Longmire that "[p]eople like you don't deserve honeymoons."(Pl.'s 56.1 ¶ 26.) Finally, in December 2002 Longmire suffered a serious shoulder injury while vacationing in Utah. (Pl.'s 56.1 ¶ 30; Longmire Decl. ¶ 42.) Wyser-Pratte refused to give him time off to recover, even though white employees were allegedly allowed time off for medical procedures.[FN8](Pl.'s 56.1 ¶¶ 31-33; Longmire Decl. ¶¶ 43-44, 46.)

> [FN8]. Wyser-Pratte did recall Longmire's shoulder injury at his deposition, but testified that he gave Longmire the option of working from home. (Wyser-Pratte Dep. at 162:9-21; 166:19-167:1.) Other than defendants' assertion that WPMC "allowed its employees adequate leave time when warranted and as required by law," there is no proof in the record regarding the particular leave treatment of specific employees. (Ans. to Sec. Am. Compl. ¶ 70.)

E. *Wyser-Pratte's Divorce Proceedings*

**\*6** During the course of his employment at WPMC, Longmire developed a friendship with Wyser-Pratte's wife, Vivien Wyser-Pratte. (Def.'s 56.1 ¶ 20; Pl.'s Rep. 56.1 ¶ 20.) Mrs. Wyser-Pratte learned of Longmire's mixed race in the early 1990s from her husband. (Def.'s 56.1 ¶ 11; Pl.'s Rep. 56.1 ¶ 11; Vivien Wyser-Pratte Dep. at 52:2-53:3.) In October 2003, Wyser-Pratte filed for a divorce from his wife. (Def.'s 56.1 ¶ 22.)

Longmire asserts that during the December 2003-January 2004 period, Wyser-Pratte demanded that Longmire testify falsely in those divorce proceedings in order to impugn Mrs. Wyser-Pratte's credibility. (Pl.'s 56.1 ¶ 53; Longmire Decl. ¶ 47.) Longmire contends that Wyser-Pratte was afraid that his wife would reveal incriminating information in connection with a then underway Securities and Exchange Commission ("SEC") insider trading investigation of Wyser-Pratte and WPMC. (Pl.'s 56.1 ¶ 53.) Although the nature of the proposed perjury is unclear, Wyser-Pratte and his legal counsel are alleged to have asked Longmire to testify falsely regarding matters related to the SEC investigation in order to contradict Mrs. Wyser-Pratte.[FN9](Def.'s

56.1 ¶ 23; Pl.'s Rep. 56.1 ¶ 23; Pl.'s 56.1 ¶¶ 55, 71; Longmire Decl. ¶ 53.) The alleged conversations between Longmire and Wyser-Pratte regarding his potential testimony did not include references to Longmire's race or racial background. (Def.'s 56.1 ¶ 23; Pl.'s Rep. 56.1 ¶ 23.)

> [FN9]. In contrast, defendants assert that Wyser-Pratte asked Longmire to testify in the divorce proceedings because of statements that Mrs. Wyser-Pratte had allegedly made to Longmire regarding the financial prospects of WPMC. (Def.'s 56.1 ¶¶ 21-23; Wyser-Pratte Dep. at 177:14-18.)

Nonetheless, Longmire describes Wyser-Pratte's demand as "an illegal job assignment" for which he was "specifically targeted" because of his race. (Pl.'s 56.1 ¶¶ 53, 55.) Specifically, Longmire contends that because Wyser-Pratte was privy to Longmire's purported racial "secret," Wyser-Pratte sought to use that information as leverage to blackmail Longmire and compel his false testimony. (Pl.'s 56.1 ¶ 55.) Ultimately, Longmire refused to testify on Wyser-Pratte's behalf in the divorce proceedings, despite Wyser-Pratte's alleged statement to Longmire that "[i]f you don't hold the line, you'll go down," Pl.'s Rep. 56.1 ¶ 23; Longmire Decl. ¶¶ 48, 52, and Wyser-Pratte's alleged statement on January 9, 2004 that "[i]f you don't testify the way I want you to, I'm going to 'out' you. If you don't lie for me, you're dead. Think of your family."[FN10](Pl.'s 56.1 ¶ 60; Longmire Decl. ¶ 54.)

> [FN10]. Although the Court assumes that those statements were made for purposes of this motion, Wyser-Pratte testified at his deposition that he never made them or "anything of the kind." (Wyser-Pratte Dep. at 216:5-16.)

F. *The Termination of Longmire's Employment at WPMC*

After the alleged January 9, 2004 interaction, Wyser-Pratte and Longmire were no longer speaking to each other and Longmire began working from home in late January 2004. (Def.'s 56.1 ¶ 25; Pl.'s Rep. 56.1 ¶ 25;

Slip Copy, 2007 WL 2584662 (S.D.N.Y.), 101 Fair Empl.Prac.Cas. (BNA) 1311, 90 Empl. Prac. Dec. P 42,958
**(Cite as: 2007 WL 2584662 (S.D.N.Y.))**

Pl.'s 56.1 ¶¶ 61, 66; Longmire Decl. ¶¶ 56, 60.) He was terminated as of January 31, 2004 and then reinstated on March 1-ostensibly to facilitate settlement discussions of the parties' disputes. Finally, he was terminated a second time on March 31. (Pl.'s 56.1 ¶¶ 73-76; Wyser-Pratte Dep. at 233:9-15.)

**\*7** In April 2004, Wyser-Pratte informed Laurent Guillome, a mutual professional acquaintance of Longmire and Wyser-Pratte, of plaintiff's racial background. (Def.'s 56.1 ¶ 26; Pl. Rep. 56.1 ¶ 26; Pl. 56.1 ¶ 80.) Longmire claims that he sent Guillome to Wyser-Pratte as a "tester" to see whether Wyser-Pratte would disclose plaintiff's racial background to Guillome. (Pl. Rep. 56.1 ¶ 26.) Wyser-Pratte claims that Longmire sent Guillome to him in order to urge Wyser-Pratte to reach a settlement with Longmire and that it was in the context of Wyser-Pratte discussing the earlier sexual harassment charge involving Longmire that Wyser-Pratte referred to Longmire's race. (Wyser-Pratte Dep. at 216:24-219:12.) No testimony from Guillome was submitted by either party. Longmire contends that Wyser-Pratte also disclosed the information to his own lawyers who were present. (Def.'s 56.1 ¶ 27; Pl.'s 56.1 ¶ 80; Longmire Decl. ¶ 67.)

Finally, Longmire asserts that defendants ignored his requests for access to both his 401(k) account and to deferred compensation held in a Bank of Bermuda account. (Longmire Decl. ¶ 68.) Longmire construes the continued refusal of defendants to grant him access to those funds for a brief period after his termination as retaliation for his refusal to commit perjury. (Pl.'s 56.1 ¶ 83.) However, Longmire was able to access his 401(k) account in May 2004, a mere two months after his termination. (Def.'s 56.1 ¶ 29; Pl.'s Rep. 56.1 ¶ 29; Pl.'s 56.1 ¶ 84.)

In regard to the deferred compensation, Longmire claims he was owed approximately $600,000 by WP-MC; that the terms of his deferred compensation agreement permitted withdrawal on demand; and that defendants allegedly refused to give him access to those funds on the basis that he had agreed in writing not to withdraw the money until 2005. (Pl.'s 56.1 ¶¶ 85-86.) However, Longmire received the balance of the funds

owed to him in December 2004. (Def.'s 56.1 ¶ 30; Letter from Wyser-Pratte to Longmire dated Dec. 21, 2004, Ferrandino Aff. Ex. 21.)

### G. *History of this Action*

In November 2004, Longmire filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the SDHR. In March 2005, the EEOC dismissed the charge for lack of jurisdiction-WP-MC employed fewer than fifteen employees-and issued a "right to sue" letter to Longmire. Plaintiff then sought to have his SDHR petition dismissed and to have his election of remedies annulled; that request was granted in May 2005.

Plaintiff then brought this action on July 26, 2005, and, as noted above, after extensive discovery proceedings and motion practice, defendants have now moved pursuant to Fed.R.Civ.P. 56 for summary judgment dismissing the second amended complaint.

## II. **SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate only if the evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995). In determining whether a genuine issue of material fact exists, the Court "is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004).

**\*8** "Moreover, as discrimination will seldom manifest itself overtly, courts must be alert to the fact that employers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law." *Bickerstaff v. Vassar College,* 196 F.3d 435, 448 (2d Cir.1999) (internal quotation marks omitted). "However, they must also carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2584662 (S.D.N.Y.), 101 Fair Empl.Prac.Cas. (BNA) 1311, 90 Empl. Prac. Dec. P 42,958
**(Cite as: 2007 WL 2584662 (S.D.N.Y.))**

to mere speculation and conjecture."*Id.*"[E]ven in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment,"*Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997), and "instead must offer some hard evidence showing that [his] version of the events is not wholly fanciful,"*Golden Pacific Bancorp. v. Fed. Deposit Ins. Co.,* 375 F.3d 196, 200 (2d Cir.2004) (quoting *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998)).

## III. **DISCUSSION**

A. *Longmire's Employment Discrimination Claims*

Longmire claims that defendants discriminated against him on the basis of race in violation of 42 U.S.C. § 1981, which protects the right to "make and enforce contracts"-including "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"-against "impairment by nongovernmental discrimination." 42 U.S.C. § 1981. Longmire also alleges discrimination on the basis of race in violation of the NYHRL and the NYCHRL. Specifically, Longmire asserts that the racial discrimination in this case took the form of (1) Wyser-Pratte's threat to disclose Longmire's "racial secret"; (2) a hostile work environment; (3) Longmire's disparate compensation compared to his non-black colleagues at WPMC; and (4) retaliation against Longmire.

To establish a racial discrimination claim pursuant to section 1981, a plaintiff must show that (1) he is a member of a racial minority group, (2) defendants intended to discriminate against him on the basis of race, and (3) this discrimination concerned one of the activities enumerated in the statute.*Brown v. City of Oneonta,* 221 F.3d 329, 339 (2d Cir.1999). New York courts apply the same standards as those applied by federal courts when assessing discrimination and retaliation claims. *See Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 n. 1 (2d Cir.2000); *Bandhan v. Lab. Corp. of Am.,* 234 F.Supp.2d 313, 317 (S.D.N.Y.2002).

It is undisputed that Longmire has established the first

element of a racial discrimination claim-he is African-American and is therefore entitled to the protections of 42 U.S.C. § 1981, the NYHRL, and the NYCHRL. A plaintiff's efforts to establish the second element of a section 1981 claim are subject to the same burden-shifting analysis as intentional discrimination claims brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq. See Gant ex rel. Gant v. Wallingford Bd. Of Educ.,* 195 F.3d 134, 146 (2d Cir.1999). Under that framework, a plaintiff must first make out a prima facie case of discrimination; the defendant must then produce a legitimate, nondiscriminatory reason for its actions; if such a reason is offered, the final burden rests with the plaintiff to prove that, despite the proffered nondiscriminatory reason, the defendant intentionally discriminated against the plaintiff on the basis of race. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**\*9** However, the timeliness of Longmire's claims is also at issue. Claims brought pursuant to 42 U.S.C. § 1981 are subject to a "catch-all" four-year statute of limitations prescribed by 28 U.S.C. § 1658, *Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369, 382-83, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004), and discrimination claims brought pursuant to the NYHRL and the NY-CHRL are governed by three-year statutes of limitations, N.Y. CPLR § 214(2); N.Y.C. Admin. Code § 8-502(d); *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714 (2d Cir.1996); *Lambert v. Genesee Hosp.,* 10 F.3d 46, 59 (2d Cir.1993).

The Court will consider each of Longmire's allegations of racial discrimination in turn, including whether those claims are timely.

1. *The Threat To Disclose Longmire's "Racial Secret"*

Longmire contends that Wyser-Pratte threatened to-and eventually did-expose his "dual race" background, which Longmire claims was a "closely guarded secret." This claim must fail, however, because Longmire's racial background was *not* secret and, even if it had been, the conduct complained of is not legally actionable pursuant to state or federal employment discrimination law.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### a. *Longmire's Race Was Not a "Secret"*

It is undisputed that Longmire is "black" in the sense that his father is African-American. It is also undisputed that Longmire described himself as "black" in documents publicly filed in a lawsuit alleging racial discrimination against the board of his apartment cooperative in 1995. Accordingly, Longmire's self-classification as "black" was already a matter of public record as of January 9, 2004-the date on which Wyser-Pratte allegedly threatened to disclose that information to others.

In addition, Longmire concedes that he personally disclosed his racial background to various individuals in the financial services industry, including-at a minimum-Wyser-Pratte, Deborah Draughan-an African-American consultant to WPMC-and, many years earlier, Praveen Sharma, a colleague at Prudential. It is also undisputed that Longmire "expressed an interest" to the Stanford Business School Black Alumni Association "to help other blacks" seeking employment on Wall Street.

Even if Longmire's description of his race was not in fact widely known in his own professional circles, the above facts prevent the Court from accepting Longmire's contention that his racial background was a "secret" that Wyser-Pratte could meaningfully exploit.

### b. *Disclosure of Longmire's Race Is Not Actionable Conduct*

Even if the facts told a different story, however, plaintiff has failed to demonstrate that 42 U.S.C. § 1981, the NYHRL, or the NYCHRL create liability for the unauthorized, public disclosure of a person's race or racial background.[FN11] Rather than relying on those statutes, plaintiff instead asserts that a constitutional "zone of privacy" prohibits the disclosure or dissemination of private information, *see Whalen v. Roe,* 429 U.S. 589, 599, 97 S.Ct. 869;51 L.Ed.2d 64 (1977), and, in turn, that threats to violate that privacy by a non-governmental employer-at least where the information relates to race-are therefore actionable under state and federal employment discrimination laws.

FN11. That failure is not surprising; no federal

statute expressly extends privacy protection to factual information regarding a person's race. *See* Anita L. Allen, *Equal Citizenship: Race and Ethnicity: Race, Face, and Rawls,* 72 Fordham L.Rev. 1677, 1686 (2004).

**\*10** In *Whalen,* the constitutionality of a New York statute which required the state to be provided with a copy of prescriptions for certain drugs was challenged by physicians and patients. The United States Supreme Court upheld the statute, but also found that the constitutional right to privacy extends to "the individual interest in avoiding disclosure of personal matters,"*id.* at 598-99, a principle reaffirmed one year later in *Nixon v. Administrator of General Servs.,* 433 U.S. 425, 457, 97 S.Ct. 2777;53 L.Ed.2d 867 (1977).*See also United States Dep't of Justice v. Reporters Comm. For Freedom of the Press,* 489 U.S. 749, 770, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989).

In his attempt to extrapolate that principle to his own case, Longmire points to the holdings of *Sterling v. Borough of Minersville,* 232 F.3d 190 (3d Cir.2000), *Doe v. Town of Plymouth,* 825 F.Supp. 1102 (D.Mass.1993), and *CBS, Inc. v. Partee,* 556 N.E.2d 648 (Ill.App.Ct.1990). Not only are all three of those decisions from beyond this Circuit, but those actions each arose either in response to conduct by government officials or to statutes or regulations requiring the disclosure of information. Here, defendants are not government officials or private parties acting under color of state law and plaintiff has not challenged any statute or regulation.[FN12] Accordingly, this Court finds that Longmire has not established that Wyser-Pratte's alleged threat to disclose Longmire's race-and his eventual disclosure of that information-constitutes employment discrimination that is actionable pursuant to 42 U.S.C. § 1981, the NYHRL, or the NYCHRL. As a result, that claim must be dismissed.

FN12. The only case cited by Longmire regarding the conduct of non-state actors is *119-121 East 97th Street Corp. v. New York Comm'n on Hum. Rts.,* 220 A.D.2d 79, 642 N.Y.S.2d 638 (1st Dep't 1996). There, an intermediate New York appellate court upheld a finding of dis-

Slip Copy, 2007 WL 2584662 (S.D.N.Y.), 101 Fair Empl.Prac.Cas. (BNA) 1311, 90 Empl. Prac. Dec. P 42,958
(Cite as: 2007 WL 2584662 (S.D.N.Y.))

crimination in violation of the NYCHRL where a tenant's landlord notified other tenants and the tenant's employer that the tenant was homosexual and HIV-positive. 220 A.D.2d at 81, 86. Longmire contends that this supports the proposition that disclosure of membership in *any* protected class may serve as the basis for a NYCHRL claim. This Court cannot accept that argument. First, *119-121 East 97th Street Corp.* did not involve the disclosure of information relating to race; medical condition is not equivalent to race. Second, that case arose in the context of housing-not employment-discrimination. Third, there is no indication that the tenant's sexual orientation and HIV status had already been publicized by the tenant himself. In sum, *119-121 East 97th Street Corp.* does not support Longmire's position.

### 2. *Hostile Work Environment*

#### a. *Legal Standard*

To sustain a claim for hostile work environment, the plaintiff must demonstrate "(1) that his workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer."*Schwapp,* 118 F.3d at 110 (internal quotation marks, citations, and brackets omitted); *see also Alfano v. Costello,* 294 F.3d 365, 373 (2d Cir.2002). That standard is essentially the same whether the claim is brought pursuant to federal or New York law.[FN13] *See Weinstock,* 224 F .3d at 42 n. 1;*Lederer v. BP Prods. N. Am.,* No. 04 Civ. 9664, 2006 U.S. Dist. LEXIS 87368, at *29 (S.D.N.Y. Dec. 1, 2006).

> FN13. However, "the standards for imputing liability to the employer are different."*Huaman v. Am. Airlines, Inc.,* No. 00-CIV-6336, 2005 U.S. Dist. LEXIS 21777, at *5 (E.D.N.Y. Sept. 29, 2005). On a federal claim, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or suc-

cessively highly) authority over the employee."*Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)."Under § 296 of the [NYHRL] and § 8-107 of the NYCHRL an employer cannot be held liable ... for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it."*Huaman,* 2005 U.S. Dist. LEXIS 21777, at *12 (citation and internal quotations omitted).

"The first element of a hostile work environment claim has both an objective and subjective component: the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive."*Petrosino v. Bell Atlantic,* 385 F.3d 210, 221 (2d Cir.2004) (internal quotation marks and citations omitted). With respect to the objective component, the Court must examine "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."*National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 116, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (internal citations and quotation marks omitted)."Whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs,"*Schwapp,* 118 F.3d at 110-11 (internal quotation marks and citations omitted), and "there must be more than a few isolated incidents of racial enmity,"*id.* at 110 (quoting *Snell v. Suffolk County,* 782 F .2d 1094, 1103 (2d Cir.1986)) (internal quotation marks omitted). Indeed, "instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments."*Id.* at 110 (internal citations and quotation marks omitted).

#### b. *Timeliness*

**\*11** Longmire alleges that Wyser-Pratte and WPMC employees made derogatory comments regarding Longmire's race and ethnicity over a period of approximately

Slip Copy, 2007 WL 2584662 (S.D.N.Y.), 101 Fair Empl.Prac.Cas. (BNA) 1311, 90 Empl. Prac. Dec. P 42,958
**(Cite as: 2007 WL 2584662 (S.D.N.Y.))**

thirteen years, dating back to 1991. Defendants contend that because Longmire's hostile work environment claim pursuant to 42 U.S.C. § 1981 is subject to a four-year statute of limitations, any conduct alleged to have taken place more than four years prior to the date of the last act of discrimination is not actionable. That argument, however, misinterprets the statute of limitations on hostile work environment claims.

The U.S. Supreme Court has made clear-in the closely related context of Title VII claims-that "[h]ostile work environment claims are different in kind from discrete acts" in that "their very nature involves repeated conduct."*Morgan,* 536 U.S. at 115. Accordingly, "[p]rovided that an act contributing to the claim" takes place within the limitations period, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."*Id. at 117.See Milani v. IBM Corp.,* 322 F.Supp.2d 434, 452-53 (S.D.N.Y.2004) (applying *Morgan* to NYHRL and NYCHRL claims); *Staff v. Pall Corp.,* 233 F.Supp.2d 516, 527 (S.D.N.Y.2002) (applying *Morgan* to section 1981 and NYHRL claims); *Huaman v. Am. Airlines, Inc.,* No. 00-CIV-6336, 2005 U.S. Dist. LEXIS 21777, at *13-14 (Sept. 29, 2005) (applying *Morgan* to section 1981, NYHRL and NYCHRL claims). Accordingly, Longmire need only show that some conduct contributing to the alleged hostile work environment took place within the four years (or, for purposes of his state law claims, the three years) prior to July 26, 2005, the date of the initial complaint in this action.

In that respect, it is not entirely clear that Longmire has succeeded-i.e., that he has alleged specific actionable conduct within that period of time; most of the specific offensive conduct alleged by Longmire occurred prior to 2001. Nonetheless, the Court need not wrestle with that question; even after considering all of the alleged conduct, the Court finds that Longmire relies exclusively on his own conclusory allegations-which are wholly and uniformly uncorroborated-and therefore has failed to demonstrate a sufficient factual basis to support a hostile work environment claim.

c. *Discussion*

For purposes of this motion, the Court accepts the general allegation that Wyser-Pratte and other WPMC employees made racist and offensive comments in the workplace from 1991 to 2004. The specific comments attributed to Wyser-Pratte and WPMC employees O'Hara and Dudla regarding African-Americans are without doubt inappropriate and offensive. In addition, the allegation that Wyser-Pratte refused to bring Longmire to meetings with clients because he wanted "to show a white face to potential investors" and "blacks did not project the appropriate Wall Street image" is deeply troubling.[FN14] (Longmire Decl. ¶¶ 25, 39.) Furthermore, it may well have been distasteful for WPMC employees to speculate about Longmire's racial heritage-or his wife's-behind his back.

> FN14. The comments are also confusing in the context of this case. If, as Longmire contends, he does not appear to be "black," it is unclear why Wyser-Pratte would have feared that Longmire would not present an "appropriate" image.

**\*12** Nonetheless, the Court finds that Longmire has failed to allege comments, incidents, or other conduct that are "severe and pervasive enough," Petrosino, 385 F.3d at 221, to require a trial on the hostile work environment claim. Because Longmire points to fewer than a dozen specific incidents over a thirteen-year period, the Court cannot conclude that "the frequency of the discriminatory conduct,"*Morgan,* 536 U.S. at 116, amounted to "a steady barrage of opprobrious racial comments."*Schwapp,* 118 F.3d at 110. Indeed, Longmire has identified relatively few specific incidents-as offensive as each particular allegation might be-given the fact that his allegations span more than a decade. Furthermore, there is no credible suggestion that the offensive conduct was "physically threatening,"[FN15]*Morgan,* 536 U.S. at 116, or-setting aside the subsequent alleged disclosure of Longmire's "racial secret"-that Longmire was publicly humiliated by the sporadic alleged racist jokes and comments. In a sense, Longmire's assertion that his race was *not* generally known undermines his claims here; even if Longmire was offended or hurt by the alleged remarks, none of those remarks

Slip Copy, 2007 WL 2584662 (S.D.N.Y.), 101 Fair Empl.Prac.Cas. (BNA) 1311, 90 Empl. Prac. Dec. P 42,958
**(Cite as: 2007 WL 2584662 (S.D.N.Y.))**

were directed at him-indeed, they could not have been if WPMC employees (other than Wyser-Pratte) did not know that he was black. In short, there is no indication that WPMC employees viewed those offensive jokes and remarks as a means of humiliating Longmire specifically. Finally, Longmire has not produced a single statement from any witness that corroborates his hostile work environment claims, despite the fact that numerous WPMC employees would likely have witnessed some of the alleged conduct at one time or another and in the face of extensive and explicit denials by Wyser-Pratte and others. (Wyser-Pratte Dep. at 98:21-99:4, 100:12-25, 125:3-16, 152:3-23, 169:3-21, 171:10-15, 216:5-16; Kelly Aff. ¶ 6; Schacht Aff. ¶ 6.)

> FN15. As noted above, Longmire alleges one incident in which he was "punched" by a WP-MC employee, but he has not offered facts to even suggest that racial animus was at play.

Furthermore, the Court is not persuaded by Longmire's hypothesis that other comments-which make no mention of Longmire's race-were motivated by racial animus. For example, Wyser-Pratte's alleged comment to Longmire that "[p]eople like you don't deserve honeymoons" bears no racial animus on its face. That type of comment-while certainly not reflective of a good working relationship between Longmire and Wyser-Pratte-provides scant support for a hostile work environment claim. *See Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 295, 312, 786 N.Y.S.2d 382, 819 N.E.2d 998 (2004)* ("sheer rudeness" is "irrelevant" where racial discrimination cannot be established). Furthermore, Longmire himself testified that Wyser-Pratte's alleged statement to him in January 2004 that "you'll go down" for refusing to testify was "not a race-based threat." (Longmire Dep. at 169:18-21.)

Finally, the threat to disclose Longmire's alleged "racial secret" similarly fails to support Longmire's hostile work environment claim. A hostile work environment claim "cannot be said to occur on any particular day," *Morgan, 536 U.S. at 115,* but that is essentially what Longmire would have this Court find-that Wyser-Pratte's explicit threat to disclose Longmire's "racial secret" transformed a deteriorating employer-employee

relationship into a hostile work environment permeated by racial animus. Simply put, even accepting the unsupported allegations as true, the Court cannot reach that conclusion. As such, the Court need not reach the secondary question of whether the alleged conduct of WPMC employees can, in turn, be imputed to defendants. In sum, plaintiff has failed to set forth sufficient facts to withstand defendants' motion for summary judgment in their favor on the hostile work environment claim.

### 3. *Disparate Pay*

**\*13** Longmire contends that after he disclosed his racial background to Wyser-Pratte in 1991, Wyser-Pratte engaged in a pattern of gradually giving Longmire greater responsibility at WPMC, but refusing to increase his compensation accordingly. Longmire attributes that pattern of conduct to racial animus.

#### a. *Legal Standard*

To evaluate a disparate pay claim premised on racial discrimination, federal courts apply the burden shifting analysis of *McDonnell Douglas* set forth above. *See Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir.2000).* The same analysis applies to claims brought pursuant to the NYHRL and the NYCHRL. *See Forrest, 3 N.Y.3d at 305 n. 3.*

In order to make out a prima facie case of disparate pay pursuant to *42 U.S.C. § 1981,* a plaintiff must show (1) he is a member of a protected class; (2) he was paid less than similarly situated nonmembers of his protected class; and (3) evidence of discriminatory animus. *Belfi v. Prendergast, 191 F.3d 129, 139 (2d Cir.1999).* In order to be considered "similarly situated, the individuals with whom [plaintiff] attempts to compare [himself] must be similarly situated in all material respects." *Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir.1997)* (internal citation and quotation marks omitted). "[T]here should be a reasonably close resemblance of facts and circumstances. What is key is that they be similar in significant respects." *Lizardo v. Denny's, Inc., 270 F.3d 94, 101 (2d Cir.2001)* (internal citations omitted).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2584662 (S.D.N.Y.), 101 Fair Empl.Prac.Cas. (BNA) 1311, 90 Empl. Prac. Dec. P 42,958
**(Cite as: 2007 WL 2584662 (S.D.N.Y.))**

#### b. *Timeliness*

The U.S. Supreme Court has recently explained that "[b]ecause a pay-setting decision is a 'discrete act,' " the period for filing a claim "begins when the act occurs." *Ledbetter v. Goodyear Tire & Rubber Co., Inc.,* 550 U.S. ----, 127 S.Ct. 2162, 2165, 167 L.Ed.2d 982 (2007). In contrast to a hostile work environment, each discriminatory pay-setting decision is deemed "a separate actionable 'unlawful employment practice' ... that is temporally distinct." *Id.* at 2175 (quoting *Morgan,* 536 U.S. at 114, 117). In light of *Ledbetter,* this Court may consider only those pay-setting decisions that were made during the four-year statute of limitations period for actions brought pursuant to 42 U.S.C. § 1981-i.e., pay-setting decisions made during the four years prior to July 26, 2005, the date this action was filed.

#### c. *Discussion*

Looking only to the period from July 26, 2001 to March 31, 2004-the date Longmire was terminated-the Court finds that Longmire alleges only one discrete pay-setting decision for purposes of his disparate pay claim: the decrease in his base salary from $150,000 to approximately $130,000 during 2003. Longmire's 10% share of the incentive fees remained the same throughout the 2001-2004 period.

With respect to that pay-setting decision-and to his general level of compensation during the 2001-2004 period-Longmire compares himself to Kurt N. Schacht-the Chief Legal Officer at the relevant time.[FN16] As described above, Schacht-who is white-received an annual base salary of $170,000. (*See* Employment Agreement of Kurt N. Schacht, Esq., dated May 14, 2001, Ferrandino Aff. Ex. 17.) Schacht was also entitled to an annual incentive bonus of the greater of $320,000 or 5% of WPMC's net profits generated from assets under WPMC management.[FN17] (*Id.*) By comparison, Longmire was paid an annual base salary of $150,000 during 2001. Longmire's 10% incentive fee share at that time was greater than Schacht's 5% share, but Longmire lacked a guaranteed minimum bonus. In addition, Schacht was entitled to 25 vacation days per year.(*Id.*)

By contrast, Longmire alleges that he was allowed only 10 vacation days per year. (Compl.¶ 86.) Finally, as noted above, the base salaries of both Longmire and Schacht were each reduced in 2003 following the loss of a major client-Schacht's to $125,000 and Longmire's to $130,000.

> FN16. Longmire also compares his compensation in various roles to the compensation of his non-black predecessors in those roles-including former Director of Research Phoebe Yen, former Assistant Portfolio Manager Neil O'Hara, and former Research Analyst Wolfgang Armbruster-but those pay-setting decisions were made prior to July 26, 2001 and are not actionable here. Nonetheless, it bears noting that, for example, although Armbruster's $120,000 base salary was higher than Longmire's for most of 2000, Longmire earned over $800,000 in overall compensation that year-more than Armbruster received. (Def.'s 56.1 ¶ 18; Pl.'s 56.1 Rep. ¶ 18.)

> FN17. Schacht also stood to receive a 10% incentive fee share of any profits derived from the assets of new clients brought to WPMC by Schacht. (*See* Ferrandino Aff. Ex. 17.)

**\*14** Notwithstanding this comparison, the Court finds that Longmire has failed to demonstrate that he and Schacht were "similarly situated" employees. Although both Longmire and Schacht reported to Wyser-Pratte, Schacht allegedly played an important role in attracting new investors to WPMC, and Schacht's status as a registered trader gave him an advantage over Longmire in that respect. And, of course, Schacht, as Chief Legal Officer, had legal functions to perform that Longmire did not. By contrast, Longmire's responsibilities included investment-making decisions-a role that Schacht did not play at WPMC.

Although both Longmire and Schacht were high-ranking employees at WPMC, Longmire has failed to provide the Court with a fact-based comparison of their responsibilities; he instead relies on titles. The fact that Schacht was perhaps more responsible for generating

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2584662 (S.D.N.Y.), 101 Fair Empl.Prac.Cas. (BNA) 1311, 90 Empl. Prac. Dec. P 42,958
**(Cite as: 2007 WL 2584662 (S.D.N.Y.))**

new business and that Longmire was perhaps more in-volved in the day-to-day investment decisions of the firm suggests that their roles were distinct. Longmire has failed to show that he and Schacht were similarly situated "in all material respects." *Shumway,* 118 F.3d at 64. *See also Kent v. Papert Cos., Inc.,* 309 A.D.2d 234, 244-45, 764 N.Y.S.2d 675 (1st Dep't 2003).

Longmire has also failed to address other potential factors such as differences in past work experience, education, or other credentials. *See DeJesus v. Starr Tech. Risks Agency, Inc.,* No. 03 Civ. 1298, 2004 U.S. Dist. LEXIS 19213, at *29-30 (S.D.N.Y. Sept. 27, 2004); *Quarless v. Bronx-Lebanon Hosp. Center,* 228 F.Supp.2d 377, 383 (S.D.N.Y.2002). For example, Schacht held a law degree-which Longmire did not-and came to WPMC after spending years at other financial institutions. (WPMC biography of Kurt N. Schacht, Fer-randino Aff. Ex. 18.) In addition to their different roles at WPMC, their different types of experience make clear that Schacht and Longmire were not similarly situated for purposes of a disparate pay claim.

Furthermore, Longmire has not submitted any evidence regarding what a person with responsibilities similar to his at a comparable investment company of similar size and activity might have earned-absent race-based dis-crimination-during the relevant period. *See Quarless,* 228 F.Supp.2d at 384-85 (rejecting plaintiff's disparate pay claim in part by comparing plaintiff's salary to those of people holding the same type of position "in New York and around the country").

Because Longmire has failed to satisfy the second prong of the test for an unequal pay claim-that he was paid less than similarly situated nonmembers of his protected class-the Court need not examine whether Longmire has raised a genuine issue of fact regarding the alleged dis-criminatory animus, the third prong of any claim based on disparate pay.

**4. *Retaliation***

Longmire asserts that he was retaliated against in four ways: (1) he was pressured by Wyser-Pratte to commit

perjury in Wyser-Pratte's divorce proceedings; (2) he was threatened with the disclosure of his racial back-ground; (3) he was terminated on January 31, 2004, briefly reinstated, and finally terminated on March 31, 2004; and (4) he was denied access to his 401(k) ac-count until May 2004 and to certain deferred compensa-tion until December 2004. All of the alleged retaliation took place in 2004.

*a. Legal Standard*

**\*15** A retaliation claim may be brought pursuant to 42 U.S.C. § 1981, but the retaliation alleged must have taken place in response to the claimant's assertion of rights that are protected by that statute. *Hawkins v. 1115 Legal Serv. Care,* 163 F.3d 684, 693 (2d Cir.1998). Similarly, the NYHRL makes it "unlawful" for an em-ployer to "discriminate against any person because he or she has opposed any practices forbidden under this art-icle ...,"N.Y. Exec. L. § 296(e), and the NYCHRL for-bids retaliation against an employee who challenges an act of unlawful discrimination in his employment. N.Y .C. Admin. Code § 8-107(1). Even if the retaliation does "not result in an ultimate action with respect to employ-ment" or "a materially adverse change in the terms and conditions of employment," the retaliatory act may be actionable if it was "reasonably likely to deter a person from engaging in protected activity."*Id.*

Again, Longmire's state and federal retaliation claims are evaluated pursuant to the tripartite burden shifting framework established in *McDonnell Douglas.See Terry v. Ashcroft,* 336 F.3d 128, 141 (2d Cir.2003) To estab-lish a prima facie case of retaliation Longmire must show: (1) that he engaged in protected activity; (2) his employer was aware of this activity; (3) an employment action was taken disadvantaging him; and (4) a causal connection between the protected activity and the ad-verse employment action. *See id.* (quoting *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir.1998)).

An employment action "disadvantag[es] the plaintiff" if it constitutes "a materially adverse change in the terms and conditions of employment."*Sanders v. New York

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2584662 (S.D.N.Y.), 101 Fair Empl.Prac.Cas. (BNA) 1311, 90 Empl. Prac. Dec. P 42,958
**(Cite as: 2007 WL 2584662 (S.D.N.Y.))**

*City Human Resources,* 361 F.3d 749, 755 (2d Cir.2004) (internal quotation marks omitted). To meet this standard, "a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities," but rather includes the "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguishable title, a material loss of benefits, [or] significantly diminished material responsibilities ...." *Id.*(internal quotation marks omitted). The requisite "causal connection" can be demonstrated by showing "that the protected activity was followed closely by discriminatory treatment." *DeCintio v. Westchester County. Med. Ctr.,* 821 F.2d 111, 115 (2d Cir.1987).

b. *Discussion*

Longmire has failed to establish a prima facie retaliation claim because none of the alleged retaliatory acts were taken in response to "protected activity"-complaints of discrimination-engaged in by Longmire. *Terry,* 336 F.3d at 141. For example, Longmire does not-and cannot reasonably-contend that his request in the early 1990s that Wyser-Pratte and WPMC employees cease using racial epithets was the basis for the alleged retaliation in 2004, and he has not otherwise presented credible evidence of more recent informal complaints that provoked retaliation.[FN18] Longmire did not file any formal complaints with state and federal authorities until November 2004-eight months *after* he was terminated. To the extent Longmire asserts that he was retaliated against for refusing to testify on behalf of Wyser-Pratte, that refusal does not fall into the category of "protected activity" envisaged by the relevant federal and state employment discrimination statutes; neither Longmire's refusal to testify-nor the request that he do so-has anything to do with race or racial discrimination. Even if the Court accepts Longmire's allegation that Wyser-Pratte demanded false testimony from him, the basis for that demand was not Longmire's race, but rather his relationship with Mrs. Wyser-Pratte.

> FN18. Longmire does allege that he complained to Wyser-Pratte and Deborah Draughan about the "discriminatory circumstances" sur-

rounding the hire of Kurt N. Schacht in May 2001. (Pl.'s 56.1 ¶ 43.) However, Longmire has neither substantiated those claims in any way nor drawn any connection between the alleged complaints and any retaliatory act.

**\*16** Moreover, to the extent Longmire asserts that Wyser-Pratte's alleged threat and the subsequent disclosure of his racial background constitutes unlawful retaliation, Longmire has not asserted any material disadvantage as a result of the disclosure. For example, Longmire has failed to adduce credible evidence that he has been prevented from finding employment for that reason; indeed, Longmire testified that prospective employers to whom he has applied remain unaware of his racial background. (Longmire Dep. at 247: 6-17.) Similarly, Longmire has failed to show that he suffered a material disadvantage based on the brief period of time during which he did not have access to his 401(k) account or his deferred compensation. These delays more closely resemble a "mere inconvenience" than a "material loss of benefits." *Sanders,* 361 F.3d at 755.

The only employment action taken against Longmire that materially disadvantaged him was his final termination on March 31, 2004. However, because Longmire has failed to demonstrate that he was retaliated against for engaging in a "protected activity" and, for that matter, any "causal connection" between a protected activity and his termination, *Terry,* 336 F.3d at 141, the claim must be rejected. In brief, Longmire has not shown that he engaged in activity-prior to the alleged retaliatory conduct-that is protected by the statutes pursuant to which he brings this action. Accordingly, Longmire has failed to demonstrate even a prima facie case of retaliation and summary judgment must be granted in defendants' favor on this claim.

B. *Longmire's Common Law Tortious Interference with Contract Claim*

Longmire also contends that Wyser-Pratte tortiously interfered with the contractual employment relationship between Longmire and WPMC by threatening to disclose Longmire's racial background, subsequently dis-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2584662 (S.D.N.Y.), 101 Fair Empl.Prac.Cas. (BNA) 1311, 90 Empl. Prac. Dec. P 42,958
**(Cite as: 2007 WL 2584662 (S.D.N.Y.))**

closing that information, and demanding that Longmire testify falsely in his divorce litigation. Because that conduct directly preceded the termination of Longmire's employment at WPMC, Longmire construes Wyser-Pratte's conduct as tortious interference with his employment contract.

a. *Legal Standard*

"Under New York law, the elements of a tortious interference with contract claim are: (a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff."*Albert v. Loksen,* 239 F.3d 256, 274 (2d Cir.2001) (quoting *Finley v. Giacobbe,* 79 F.3d 1285, 1294 (2d Cir.1996)); *see also Antaeus Enters. v. SD-Barn Real Estate, L.L.C.,* 480 F.Supp.2d 734, 740 (S.D.N.Y.2007) (quoting *Lama Holding Co. v. Smith Barney,* 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996)).

Longmire never signed a written employment contract with defendants and was therefore an at-will employee at WPMC. *See Albert,* 239 F.3d at 274 (citing *Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 333, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987)); *Lobosco v. N.Y. Tel. Company/NYNEX,* 96 N.Y.2d 312, 316, 727 N.Y.S.2d 383, 751 N.E.2d 462 (2001). In New York, "an employee serving purely at will, by definition, has no contractual right to avoid dismissal."[FN19]*Finley,* 79 F.3d at 1294-95. Accordingly, an at-will employee may maintain a tortious interference claim only if he can establish that a "third party used wrongful means to effect the termination such as fraud, misrepresentation, or threats, that the means used violated a duty owed by the defendant to the plaintiff, or that the defendant acted with malice."*Albert,* 239 F.3d at 274 (internal citations and quotations omitted).

> FN19. Furthermore, New York does not recognize the tort of wrongful discharge, *Lobosco,* 96 N.Y.2d at 316, and "has adamantly refused to allow employees 'to evade the employment at-will rule and relationship by recasting [a]

cause of action in the garb of tortious interference with ... employment.' " *Albert,* 239 F.3d at 274 (quoting *Ingle v. Glamore Motor Sales, Inc.,* 73 N.Y.2d 183, 189, 538 N.Y.S.2d 771, 535 N.E.2d 1311 (1989)).

b. *Timeliness*

*\*17* In New York, the statute of limitations for a tortious interference with contract claim is three years. *See*N.Y. C.P.L .R. § 214(4); *Norris v. Grosvenor Marketing Ltd.,* 803 F.2d 1281, 1287 (2d Cir.1986); *Cohane v. National Collegiate Athletic Assoc.,* No. 04 Civ. 181 S, 2005 U.S. Dist. LEXIS 44123, at \*20-21 (W.D.N.Y. Sept. 27, 2005); *Four Finger Art Factory, Inc. v. DiNicola,* No. 99 Civ. 1259, 2000 U.S. Dist. LEXIS 1221, at \*18 (S.D.N.Y. Feb. 9, 2000). Because Longmire was terminated on March 31, 2004-within the three-year period preceding the July 26, 2005 complaint-the claim is timely.

c. *Discussion*

Accordingly, Longmire's tortious interference claim hinges on whether Wyser-Pratte was a "third party" to Longmire's at-will employment agreement and, if so, whether Wyser-Pratte engaged in "wrongful means to effect the termination."Longmire cites *Albert* for the proposition that a "co-employee" may be treated as a third party for purposes of tortious interference "by showing that the co-employee acted outside the scope of [his] authority."239 F.3d at 275 (internal quotations and citation omitted); *see also Finley,* 79 F.3d at 1295;*Antaeus Enders,* 480 F.Supp.2d at 741 (citing *Feigen v. Advance Capital Mgmt. Corp.,* 150 A.D.2d 281, 283, 541 N.Y.S.2d 797 (1st Dep't 1989)) ("[T]he director of a corporation ordinarily is not personally liable for causing the corporation to breach its contracts unless grounds exist to pierce the corporate veil."); *Kosson v. Algaze,* 203 A.D.2d 112, 113, 610 N.Y.S.2d 227 (1st Dep't 1994). Longmire essentially contends that Wyser-Pratte was an agent of WPMC who acted outside the scope of his authority, with malice, and in only his personal interest-not in the interest of WPMC-and therefore should be deemed a third party to Longmire's em-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2584662 (S.D.N.Y.), 101 Fair Empl.Prac.Cas. (BNA) 1311, 90 Empl. Prac. Dec. P 42,958
**(Cite as: 2007 WL 2584662 (S.D.N.Y.))**

ployment contract.

However, Wyser-Pratte was not Longmire's co-employee. On the contrary, Wyser-Pratte was the Chief Executive Officer of WPMC, its sole owner, and Longmire's direct supervisor. He was also the person who originally hired Longmire to work at WPMC. "[U]nder New York law, a party cannot be held liable for interfering with [his] own contract." *Campbell v. Grayline Air Shuttle, Inc.,* 930 F.Supp. 794, 804 (E.D.N.Y.1996); *see also Israel v. Wood Dolson Co.,* 1 N.Y.2d 116, 120, 151 N.Y.S.2d 1, 134 N.E.2d 97 (1956) (plaintiff bringing tortious interference claim must show that defendants were not parties to the contract); *Winicki v. City of Olean,* 203 A.D.2d 893, 894, 611 N.Y.S.2d 379 (4th Dep't 1994) (only "a stranger to a contract" may be liable for tortious interference.) In this case, it would be nonsensical to find that Wyser-Pratte induced his wholly owned corporation to terminate Longmire's employment where it was Wyser-Pratte himself-Longmire's only supervisor-who had the sole authority to make that decision. *See* Schacht Aff. ¶ 4; *see also Finley,* 79 F.3d at 1295 (dismissal of tortious interference with employment claim upheld based in part on finding that defendant "had the authority to hire and fire" plaintiff). Simply put, the Court cannot construe Wyser-Pratte as a "third-party" to Longmire's employment arrangement for purposes of this claim.

**\*18** Furthermore, to the extent Longmire construes Wyser-Pratte's alleged conduct-i.e., the demand that Longmire testify falsely in his divorce proceedings-as a "threat" which constituted the "wrongful means" to induce his termination, that interpretation misunderstands the nature of tortious interference. Rather than pointing to the threats that were allegedly directed at him, Longmire would need to point to evidence showing that Wyser-Pratte's threats were directed *against WPMC*-i.e., against the party that allegedly breached the contract-to establish his tortious interference claim. He has failed to do so. As a consequence, Longmire has not established sufficient facts to allow his tortious interference with contract claim against Wyser-Pratte to proceed, and that claim must also be dismissed.

## IV. **CONCLUSION**

In sum, plaintiff has failed to demonstrate that any genuine issue of material fact requires that this action proceed to trial. Even resolving ambiguities in the record in favor of plaintiff where reasonable and drawing all permissible factual inferences in favor of plaintiff in the many instances where the testimony is in conflict, the Court finds that defendants are entitled to summary judgment on each of plaintiff's claims as a matter of law.

Accordingly, the motion for summary judgment is granted in favor of defendants. The Clerk of Court is directed to enter judgment dismissing plaintiff's claims with prejudice.

SO ORDERED.

S.D.N.Y.,2007.
Longmire v. Wyser-Pratte
Slip Copy, 2007 WL 2584662 (S.D.N.Y.), 101 Fair Empl.Prac.Cas. (BNA) 1311, 90 Empl. Prac. Dec. P 42,958

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 13

Not Reported in F.Supp.2d                                                                          Page 1
Not Reported in F.Supp.2d, 2006 WL 2067739 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2067739 (S.D.N.Y.))**

Nelson v. Beechwood Organization
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Anthony B. NELSON, Plaintiff,
v.
BEECHWOOD ORGANIZATION, Defendant.
**No. 03 Civ. 4441(GEL).**

July 26, 2006.

Anthony B. Nelson, pro se, Plaintiff.
Michael V. De Santis, Kaufman, Schneider & Bianco, LLP, Jericho, NY, for defendant.

### OPINION AND ORDER

GERARD E. LYNCH, District Judge.
**\*1** Plaintiff Anthony B. Nelson ("Nelson"), an African-American man, brings this employment discrimination action alleging that he was subjected to a hostile work environment, and subsequently terminated, on the basis of his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"). Defendant Beechwood Organization ("Beechwood") moves for summary judgment pursuant to Fed.R.Civ.P. 56, contending that (1) there is no evidence that Nelson was discriminated against on the basis of race; and (2) Beechwood was not Nelson's employer. For the following reasons, Beechwood's motion will be granted, and the case will be dismissed.

### BACKGROUND

Beechwood is a construction company that develops housing projects. Nelson drove tucks for DMP Contracting ("DMP"), a Beechwood subcontractor, and for two-and-a-half to three years he worked almost exclusively on projects for Beechwood, reporting directly to Beechwood personnel. *Nelson v. Beechwood Org.*, No. 03 Civ. 4441, 2004 WL 2978278, at \*1 (S.D.N.Y. Dec. 21, 2004). DMP receives at least 90% of its work from Beechwood. (De Santis Aff. Ex. E, Nelson Dep., at 56-57). During Nelson's time at DMP he became their "number one driver," took on substantial managerial-type duties such as hiring and dispatching drivers, and received job site instructions directly from Beechwood supervisors. (De Santis Aff. Ex. F.)

Taking the evidence in the light most favorable to Nelson, the events leading up to Nelson's dismissal are as follows. On June 21, 2002, Dean Hennedy, an assistant supervisor for Beechwood, asked Nelson to remove scrap metal from one of Beechwood's Bronx sites along with a coworker. Although leery about the legality of the work and the potential for damage to his truck, Nelson eventually accepted and completed this task. (Nelson Dep. 87-96.) Back at the site, while awaiting another load, Nelson allowed a curious coworker to examine the inside of his truck's cab, in which Nelson left his cellular phone.[FN1] A short time later Nelson noticed that his cell phone was missing from the cab, and he suspected it had been stolen by that coworker. *Nelson,* 2004 WL 2978278, at \*1; (Nelson Dep. 99-102.)

> FN1. Nelson testified that his truck is a "show truck," which "is exactly what it means. It looks better than your Lexus."(Nelson Dep. 90.) He claims that after viewing the interior of the truck, the coworker told Nelson that "your ... truck is dope inside." (*Id.* at 98.)

Nelson reported the incident to Hennedy, who initially was skeptical that the coworker had taken the phone. (Lerner Letter 1.) But when Nelson approached him days later, Hennedy told Nelson that the coworker, who had since disappeared and had not returned to the job site, was also suspected of stealing a supervisor's phone, and that Nelson should speak to Jack Kennedy, Beechwood's head supervisor, about the situation (Nelson Dep. 102-03), which Nelson did on June 26, 2002.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2067739 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2067739 (S.D.N.Y.))**

Kennedy responded "as usual" by being "dismissive" (Lerner Letter 2), "rude and abrasive" (*id.;*Nelson Dep. 103), and, after an initial confrontation, staring at Nelson "challengingly" (Lerner Letter 2). After Nelson told Kennedy that he suspected the coworker of taking his phone when the coworker was inside Nelson's truck, the following heated exchange ensued:

**\*2** Kennedy: What the fuck is anybody doing up in your truck? [FN2]

> **FN2.** Kennedy asserts that he informed Nelson that applicable Commercial Drivers License rules prohibited individuals other than certified drivers from entering trucks like Nelson's, (Kennedy Aff. ¶ 9). Nelson does not admit that Kennedy referred to this rule, but he does acknowledge that CDL rules prohibit unauthorized individuals in trucks like Nelson's. (Nelson Dep. 104.)

Nelson: You know, Jack, for three years you have had a chip on your shoulder. You have been screaming and been very abusive. My phone was stolen and I'm just trying to ask some questions here.

Kennedy: Don't come back to my motherfucking job sites anymore.

Nelson: Listen snapper head, don't come back to my neighborhood anymore either.

(Nelson Dep. 104-08; Lerner Letter 2.) As Nelson walked away he threw his cup of coffee to the ground in disgust. (*Id.*)

Kennedy, in his affidavit, claims that after he raised the fact that Nelson should not have allowed other workers in his truck, Nelson "accosted me with raised voice and menacing behavior," upon which Kennedy asked Nelson to leave the site. He also claims that Nelson threw down the coffee cup in his direction "and continued to exhibit menacing behavior."(Kennedy Aff. ¶ 9.) Nelson left the jobsite, and apparently was not permitted by Kennedy to return to any Beechwood site.

Nelson reported this incident to Danny Pirraglia, DMP's owner, as well as Les Lerner, Beechwood's owner. After approximately one week, during which time Nelson worked at the DMP yard and did not return to any Beechwood site, Pirraglia fired Nelson. (Nelson Dep. 80-84.) Nelson believes that although Pirraglia wanted to retain Nelson as an employee, he could not do so because DMP worked primarily, if not exclusively, for Beechwood, and Kennedy would not allow Nelson back at any Beechwood sites. (Lerner Letter 2-3; Nelson Dep. 76-77.) Nelson alleges that Pirraglia went to speak to Kennedy about taking Nelson back, but that Kennedy refused, telling Pirraglia that Nelson had been smoking marijuana with the coworker who allegedly stole Nelson's phone, which Nelson vehemently denies.[FN3](Nelson Dep. 79-80, 83.)

> **FN3.** In response to Beechwood's citation of medical records indicating that Nelson did use marijuana (De Santis Aff. Ex. G., at 1), Nelson correctly notes that "what I have admitted to in my personal medical records or what activity or unlawful consumption of occasional pot smoking on a vacation or in a hot tub with gorgeous young women" is irrelevant to this case. (Nelson Mem. 9.)

In addition to the June 26, 2002, incident, Nelson recounts numerous instances of mistreatment by Beechwood supervisors in support of his claims:

• "Constant" comments from "Michael," a Beechwood supervisor, to Nelson, who speaks English, regarding the inability of certain Hispanic coworkers to speak English. (*Id.* 109-10.)Nelson concedes, however, that he did not hear anyone at Beechwood ever use a racial epithet, against him or anyone else. (*Id.* 125-26, 129.)

• An incident where a coworker of Hispanic origin,

Case 1:08-cv-04885-JGK    Document 7-3    Filed 07/08/2008    Page 162 of 204
Not Reported in F.Supp.2d                                                                        Page 3
Not Reported in F.Supp.2d, 2006 WL 2067739 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2067739 (S.D.N.Y.))**

Fidel Cruz, who could not speak English, was stranded at a jobsite. When Nelson explained that the problem could have been avoided had the supervisor had certain directions translated into Spanish for Cruz, "[t]he supervisor responded that '[t]his is not the United Nations.' " Nelson suffered some blame in connection with this incident, for reasons that are unclear. (*Id.* 110-11.)

• Excessive criticism of the work performance of workers including Nelson by Kennedy, "Mike," and other supervisors, and unwarranted complaints to Pirraglia. (Nelson Dep. 114-16, 123.) For instance, Nelson explains that the supervisors would "call [Pirraglia] and complain and say oh, they [Nelson and coworkers] left the job three minutes to 3 [close of business]. What difference does it make. We dumped our load. We did our things for the day there. It is three minutes to 3 or not you are cleaning the job up. You have no use for us so they would take little things and try to make a mountain out of a mole hill."(*Id.* 115-16.)

**\*3** • Being reprimanded by "Mike" for talking too much to people, where all Nelson was doing was giving morning greetings and being polite. (*Id.* 121-23.)

• General allegations of improper work procedures *(e.g.,* overloading the trucks) and of frustrating Nelson's ability to work (e.g., changing the locks to Beechwood sites so that Nelson's keys, given to him by Pirraglia, would not work, preventing him from working early in the morning and on Sundays).(*Id.* 119-21, 125.)

• Rude, insulting, and abrasive treatment, including "screaming about nothing" from Kennedy. (*Id.*)

After being terminated, Nelson filed a charge against Beechwood with the Equal Employment Opportunity Commission, and received a right to sue letter.*Nelson,* 2004 WL 2978278, at * 1. He then filed this action. Beechwood subsequently moved for judgment on the pleadings, arguing that Beechwood was not Nelson's employer, and thus

could not be held liable under Title VII, and that the allegations of racial discrimination were insufficient. The Court rejected both of these arguments, holding that while Beechwood was not Nelson's direct employer, the complaint contained sufficient allegations that Beechwood and DMP jointly employed Nelson, *Nelson,* 2004 WL 2978278, at \*4-\*5, and that it sufficiently alleged race discrimination, *id.* at \*5. Following discovery, Beechwood moved for summary judgment, making essentially the same arguments it made at the pleadings stage.FN4

> FN4. After the motion was fully briefed, it came to the Court's attention that Beechwood had failed to comply with Local Rule 56.2 ("Notice To Pro Se Litigant Opposing Motion For Summary Judgment"), which required Beechwood to provide Nelson, a pro se litigant, with a copy of Rule 56 and an explanation of the nature of a motion for summary judgment and how to respond to it. The Court issued an order incorporating such a notice, with a copy of Rule 56 attached, and provided Nelson with an opportunity to submit, after reviewing the notice and Rule 56, additional materials in response to Beechwood's motion. Nelson submitted supplemental materials, and the Court has reviewed them along with the rest of the parties' submissions.

## DISCUSSION

I. *Legal Standards*

A. *Summary Judgment*

Summary judgment shall be granted if the Court determines that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). To survive a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the ma-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

terial facts,"*Kelly v. Lex, Inc.,* No. 03 Civ. 2778, 2004 WL 1752596, at *3 (S.D.N.Y. Aug. 4, 2004), or rely on "mere speculation and conjecture," *Western World Insurance v. Stack Oil,* 922 F.2d 118, 121 (2d Cir.1990). Instead, he must offer "concrete evidence from which a reasonable juror could return a verdict in his favor."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). In deciding a summary judgment motion, the Court must "resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion."*Cifarelli v. Babylon,* 93 F.3d 47, 51 (2d Cir.1996).

### B. *Hostile Work Environment*

To prevail on a Title VII hostile work environment claim, a plaintiff must demonstrate that his workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."*Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993) (citations and quotation marks omitted)."Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview."*Id.* at 21.In addition, the plaintiff must prove that the hostile environment is the result of discrimination "because of" a protected ground, in this case, Nelson's race. 42 U.S.C. § 2000e-2(a)(1) (prohibiting only discrimination against an individual "because of such individual's race, color, religion, sex, or national origin"). The plaintiff must also prove that that hostile environment can be attributed to his employer.

### C. *Adverse Employment Action*

**\*4** To make out an adverse employment action claim under Title VII for discrimination, the plaintiff must first make a prima facie showing that (1) he is a member of a protected group; (2) quali-

fied for his job; (3) suffered an adverse employment action; and that (4) the circumstances surrounding that action permit an inference of discrimination. *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir.2004); *accord McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).

If the plaintiff makes the necessary showing, the burden then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142 (2000). After the defendant articulates a non-discriminatory reason for its actions, the plaintiff bears the burden of proving that the non-discriminatory ground is pretext for discrimination, that is, that the reason is false *and* that discrimination on a protected ground, in this case race, was the real reason for the adverse employment action. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 515-16 (1993) (noting that "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason").

### II. *The Standards Applied*

### A. *Hostile Work Environment*

It is doubtful whether Nelson has provided sufficient evidence to permit a reasonable factfinder to find a hostile work environment. The standard for such a showing is demanding. *See, e.g., Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (noting that "conduct must be extreme to amount to a change in the terms and conditions of employment"), *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993) (noting plaintiff must prove that workplace is permeated with discriminatory intimidation, ridicule, and insult ... that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." (internal quotation marks omitted)); *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir.2000) ("[E]ither a single incident [that] was ex-

traordinarily severe, or ... a series of incidents ... sufficiently continuous and concerted to have altered the conditions of the working environment."); *Carrero v. New York City Housing Auth.,* 890 F.2d 569, 577-78 (2d Cir.1989) ("The incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."); *see also Ogbo v. New York State Dept. of Finance,* No. 99 Civ. 9387, 2001 WL 986546, at *7 (S.D.N.Y. Aug. 28, 2001) ("[P]laintiff must present evidence of racially vicious epithets, physically threatening or humiliating actions, or a pattern of such reprehensible behavior over an extended period of time."(citations omitted)); *Rianola v. Bratton,* 243 F.3d 610, 617 (2d Cir.2001) (collecting cases holding same); *Castro v. Local 199,* 964 F.Supp. 719, 727-28 (S.D.N.Y.1997) (same). Taking all of Nelson's evidence together, and at face value, it would be difficult for a factfinder to conclude that there were more than scattered incidents of rude or abrasive conduct, and not the sort of severe or continuous incidents that the law requires.

**\*5** Indeed, there is a real question as to whether Nelson himself perceived the working environment to be hostile. *See Harris,* 510 U.S. at 22 ("[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."). In the letter he wrote to Beechwood's Les Lerner after he was dismissed, Nelson wrote: "Except for Jack [Kennedy], and minor problems with Mike, I have not had any problems with any of your other supers who are very courteous and easy to work with."(Lerner Letter 3.) When faced with this statement at his deposition, Nelson stated that "Everything was minor until it turned into a job-until it turned into the situation it turned into.... It's a serious problem but I don't want to look at it that way. It only became a serious problem when the problem became serious, when it turned into the loss of employment. That's when it became serious."(Nelson Dep. 141. *But see id.* 142 ("Let's just say [characterizing the problems

with Mike as 'minor'] is a poor choice of words. It was a problem, whether it was minor or not."))

However, the Court need not decide whether the record is sufficient to require a trial on this issue, for even assuming that a hostile work environment existed, Nelson has failed to produce evidence that that hostility was attributable to discrimination on the basis of his race.[FN5] The only incidents suggestive of discrimination of any kind are the instances where comments were directed against certain of Nelson's Hispanic coworkers based on their inability to speak English. These incidents, involving Nelson's coworkers and related to *their* national origin, are at best minimally relevant to Nelson's claim of a hostile work environment on the basis of *his* race. *See Smith v. AVSC Int'l, Inc.,* 148 F.Supp.2d 302, 310 (S.D.N.Y.2001) ( "[A]llegations of harassing actions against other employees may be relevant to a hostile work environment claim[; h]owever, the other employees targeted must be in the same protected class as the plaintiff for the hostile work environment claim to withstand a motion to dismiss.").

> FN5. Indeed, it is not entirely clear that *Nelson* believes that the alleged conduct was racially motivated. At least with respect to the overloading of the trucks, Nelson himself admits that "I never said to you that the loading of the trucks was racially motivated."(Nelson Dep. 132.)

While Nelson has unquestionably produced evidence from which a reasonable factfinder could conclude that Kennedy and other Beechwood supervisors were mean-spirited, petty, and hot tempered, that they did not particularly like Nelson, and that, in general, Beechwood jobsites were not welcoming or friendly places to work, Title VII is not a "general civility code." *Faragher,* 524 U.S. at 788. To prove that these conditions constituted a hostile work environment actionable under Title VII, Nelson must prove that they were a result of discrimination on the basis of his race. Because Nelson has failed to satisfy this requirement, his hostile work

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2067739 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2067739 (S.D.N.Y.))**

Page 6

environment claim fails.

B. *Adverse Employment Action*

Nelson's claim regarding adverse employment action also fail on the merits. Beechwood argues that it was not Nelson's "employer" as that term is defined in Title VII, and that therefore it cannot be said to have taken any adverse employment action against Nelson. However, it is unnecessary for the Court to address that issue. Assuming, arguendo, that Beechwood is Nelson's employer under a joint-employer theory, and that Nelson's dismissal from the Beechwood site on June 26, 2006, constitutes an adverse employment action, Nelson's claim of discriminatory firing fails for the same reason as his hostile work environment claim-the lack of any evidence tending to show a discriminatory basis for the action.

**\*6** Regardless of whether Nelson has made out a prima facie case for discrimination, Beechwood has articulated a legitimate nondiscriminatory reason for firing Nelson-Kennedy's claim that during the June 26, 2002, cell phone incident, Nelson exhibited menacing behavior and threw a coffee cup in his direction.[FN6] In response to Beechwood's justification, Nelson has completely failed to produce evidence from which a reasonable finder of fact could conclude that racial discrimination was the real reason behind Nelson's dismissal. While Nelson explains that Kennedy did not like Nelson (Nelson Dep. 78), and was typically rude, abrasive, and a screamer-not only to Nelson, but to others (*id.* 129) ("I watched Jack be loud and boisterous and try to let everybody know he was insecure with himself.... I can tell you about incidents with Jack and other people.")-he does not produce any fact suggesting, indirectly or directly, that Kennedy's vitriol was motivated by racial animus. Kennedy is not alleged to have ever uttered racial slurs or other discriminatory comments against anyone, including Nelson, or engaged in other conduct suggestive of racial bias. Nelson points to no evidence that Kennedy's temper was directed more often or more

aggressively toward black employees as compared to white employees. The mere fact that Kennedy, who perhaps had a short fuse, picked on Nelson more than others (*id.* 130) is insufficient to support a claim of discriminatory firing under Title VII. Kennedy's dismissal of Nelson may have been precipitate, mistaken, unfair, or the product of personal hostility, but it is not actionable unless it was based on racial animus. There is no evidence whatsoever to support a finding that the action was racially motivated.

> FN6. Although Nelson disputes Kennedy's version of this incident, he acknowledges having a hostile confrontation with Kennedy and tossing his coffee cup down in Kennedy's proximity. Thus, even accepting Nelson's testimony that he did not intend to be threatening, there is no dispute that Nelson (who was disliked by Kennedy in any event) exchanged harsh words with him, and engaged in behavior that a reasonable person could have perceived as threatening.

For this reason, Nelson's adverse employment action claim fails.

**CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment (Doc. # 37) is granted, plaintiff's motion in opposition of summary judgment (Doc. # 43) is denied, and the complaint is dismissed with prejudice.

SO ORDERED.

S.D.N.Y.,2006.
Nelson v. Beechwood Organization
Not Reported in F.Supp.2d, 2006 WL 2067739 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 14

LEXSEE 2003 US APP LEXIS 22732

**FRANCES NEWSOM-LANG, Plaintiff-Appellant, v. WARREN INTERNATIONAL, INC., Defendant-Appellee.**

**No. 03-7372**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

*80 Fed. Appx. 124*; *2003 U.S. App. LEXIS 22732*; *92 Fair Empl. Prac. Cas. (BNA) 1792*

**November 4, 2003, Decided**

**NOTICE:**        [**1] RULES OF THE SECOND CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:**    Appeal from the United States District Court for the Southern District of New York (Laura Taylor Swain, Judge).
*Newsom-Lang v. Warren Int'l, Inc., 249 F. Supp. 2d 292, 2003 U.S. Dist. LEXIS 2993 (S.D.N.Y., 2003)*

**DISPOSITION:**    Affirmed.

**COUNSEL:**    APPEARING FOR APPELLANT: LEONARD BUDDINGTON, JR., Law Office of Leonard Buddington, Jr., Yonkers, New York.

APPEARING FOR APPELLEE: MARSHALL BEIL, McGuire Woods LLP (Rodney A. Satterwhite, Ruth L. Goodboe, on the brief), New York, New York.

**JUDGES:** PRESENT: HON. WILFRED FEINBERG, HON. AMALYA L. KEARSE, HON. REENA RAGGI, Circuit Judges.

**OPINION**

[*125] **SUMMARY ORDER**

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the district court's judgment entered on March 11, 2003, is

AFFIRMED.

Plaintiff-Appellant Frances Newsom-Lang appeals from an award of summary judgment in favor of her former employer, Defendant-Appellee Warren International, Inc. ("WI"), on her claim of age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), *29 U.S.C. § 621 (2000) et seq.* Specifically, Ms. Newsom-Lang asserts that the district court erred [**2] in ruling that there were no genuine issues of material fact with respect to her claims that WI's failure to promote her to the position of Director of Research and its ultimate decision to terminate her were impermissibly motivated by the fact that she was then 49-years old. [1]

1    Because Ms. Newsom-Lang has not challenged on appeal the district court's award of summary judgment on her claim of discriminatory job assignments in the summer of 1999, we do not here address it.

We review the district court's grant of summary judgment *de novo*, drawing all factual inferences in favor of the non-moving party. *See Mario v. P & C Food Markets, Inc., 313 F.3d 758, 763 (2d Cir. 2002).* ADEA claims are analyzed using the familiar three-step framework established in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). See Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 91 (2d Cir. 2001).* Under this analytic scheme, even if [**3] we, like the district court, were to assume that Ms. Newsom-Lang has carried the "not heavy" burden of establishing a *prima facie* case with respect to both her promotion and termination claims,

80 Fed. Appx. 124, *125; 2003 U.S. App. LEXIS 22732, **3;
92 Fair Empl. Prac. Cas. (BNA) 1792

*Carlton v. Mystic Transportation, Inc., 202 F.3d 129, 134 (2d Cir. 2000)*, that, by itself, would not suffice to defeat summary judgment in this case. Because WI [*126] has satisfied its burden to proffer non-discriminatory reasons for the challenged employment actions, the presumption of discriminatory motivation triggered by the *prima facie* case is effectively rebutted, *Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir. 2000)*, and plaintiff must come forward with sufficient admissible evidence to permit a reasonable juror to find in her favor on the essential element of discriminatory motivation, *id. at 91*.

1. *Promotion Claim*

With respect to Warren International's failure to promote her to Director of Research in October 1999, Ms. Newsom-Lang attempts to establish a material issue of fact regarding WI's discriminatory motivation by conclusorily denying evidence proffered by her employer about (1) the unwillingness of certain colleagues to [**4] work with Ms. Newsom-Lang, (2) the degree of disruption she caused in the workplace, and (3) the superior qualifications of Denise Rubino, the 33-year old fellow Researcher who actually received the challenged promotion.

As to the last, although Ms. Newsom-Lang insists that her work experience surpassed that of Ms. Rubino, she does not - and cannot - deny that her younger colleague had a longer work history with WI than did Ms. Newsom-Lang and held a graduate degree, which plaintiff did not. The law is well-established that federal courts hearing discrimination claims do not "sit as a super-personnel department" to reexamine a firm's business decisions about how to evaluate the relative merits of education and experience in filling job positions. *Scaria v. Rubin, 117 F.3d 652, 655 (2d Cir. 1997)* (per curiam) (internal quotation marks omitted). Under such circumstances, at the third stage of *McDonnell Douglas* analysis, more than an age gap between the promoted and rejected employee is required to raise a triable issue of fact regarding discriminatory motivation. *See generally Stern v. Trustees of Columbia University, 131 F.3d 305, 310 (2d Cir. 1997).* [**5]

In any event, the difference in qualifications between Ms. Rubino and Ms. Newsom-Lang went beyond education and experience. Notably, Ms. Rubino had never been the subject of employee discipline. By contrast, Ms. Newsom-Lang's perceived unprofessional conduct toward her supervisor - the then-Acting Director

of Research - on September 17, 1999, only a few weeks before a permanent successor was selected, resulted in a formal reprimand. Because this incident is the crux of WI's proffered reason for denying Ms. Newsom-Lang promotion, we focus on it and do not address disputed claims of other disruptive conduct or poor work relations.

Ms. Newsom-Lang does not dispute that she had a disagreement with her supervisor on September 17, 1999, or that she was reprimanded as a consequence. Neither does she assert that this reprimand was discriminatorily motivated. Thus, it hardly qualifies as a pretextual reason for denying promotion that masks age discrimination. Further, Ms. Newsom-Lang offers no other evidence, such as age-hostile remarks by persons involved in the promotion decision, *see, e.g., Slattery v. Swiss Reinsurance America Corp., 248 F.3d at 92-93*, that might [**6] otherwise indicate that WI's choice of Ms. Rubino over the plaintiff was discriminatorily motivated.

On this record, summary judgment was appropriately entered in favor of WI on the promotion claim.

2. *Termination*

As its non-discriminatory reason for terminating Ms. Newsom-Lang, WI [*127] points to her subsequent unprofessional behavior on December 15, 1999, which immediately followed review of a written performance evaluation that, while generally favorable, criticized Ms. Newsom-Lang's past disruptive and discourteous conduct and warned that "any further behavior such as this will result in your dismissal." Once again, Ms. Newsom-Lang disputes the degree to which her past conduct can fairly be described as disruptive, but she does not deny the unprofessional actions ascribed to her on December 15. Instead, she explains those actions as the product of a panic attack. This explanation, however, at most suggests that WI's decision to carry out its written termination warning may have been severe; it does not indicate that the decision was a pretext for age discrimination.

Indeed, the undisputed evidence showed that WI similarly terminated a 28-year old employee the previous year for [**7] unprofessional conduct.

In sum, because Ms. Newsom-Lang failed to adduce evidence sufficient to raise a triable issue of fact on her claim of age discrimination in termination, summary judgment was properly entered in favor of WI.

80 Fed. Appx. 124, *127; 2003 U.S. App. LEXIS 22732, **7;
92 Fair Empl. Prac. Cas. (BNA) 1792

For the reasons stated, the district court's March 11, 2003
judgment is hereby AFFIRMED.

# EXHIBIT 15

167 Fed.Appx. 232                                                                              Page 1
167 Fed.Appx. 232, 2006 WL 156879 (C.A.2 (N.Y.))
**(Cite as: 167 Fed.Appx. 232, 2006 WL 156879 (C.A.2 (N.Y.)))**

Ramirez v. New York City Health & Hospitals, Corp.
C.A.2 (N.Y.),2006.
This case was not selected for publication in the Federal Reporter.
United States Court of Appeals,Second Circuit.
Norma RAMIREZ, Plaintiff-Appellant,
v.
NEW YORK CITY HEALTH & HOSPITALS, CORP. d/b/a Gouverneur Hospital, Defendant-Appellee.
**No. 05-0906-CV.**

Jan. 19, 2006.

**Background:** Former city hospital employee brought suit charging discrimination in violation of Title VII. The United States District Court for the Southern District of New York, 2004 WL 2222147,Denny Chin, J., granted summary judgment to the employer, and the employee appealed.

**Holdings:** The Court of Appeals held that:
(1) employee failed to prove that employer's proffered legitimate reasons for its challenged actions were pretextual, and
(2) the employee failed to prove a causal connection between activities allegedly protected by the First Amendment and alleged retaliatory acts.

Affirmed.

West Headnotes

**[1] Civil Rights 78 ⟜1544**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1543 Weight and Sufficiency of Evidence
            78k1544 k. In General. Most Cited Cases
Former city hospital employee's conclusory assertions of discrimination and her hearsay proffers were insufficient to demonstrate that her former employer's proffered legitimate reasons for its challenged actions were pretextual, thus defeating her employment discrimination claims.

**[2] Constitutional Law 92 ⟜1954**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(P) Public Employees and Officials
            92k1954 k. Health Care Workers. Most Cited Cases
        (Formerly 92k90.1(7.2))

**Health 198H ⟜266**

198H Health
    198HI Regulation in General
        198HI(C) Institutions and Facilities
            198Hk259 Officers and Employees
                198Hk266 k. Adverse Employment Action; Wrongful Discharge. Most Cited Cases
        (Formerly 92k90.1(7.2))

**Municipal Corporations 268 ⟜218(3)**

268 Municipal Corporations
    268V Officers, Agents, and Employees
        268V(C) Agents and Employees
            268k218 Removal, Discharge, Transfer or Demotion
                268k218(3) k. Grounds. Most Cited Cases
Former city hospital employee failed to prove a causal connection between activities allegedly protected by the First Amendment, opposing the employer's alleged discrimination and corruption and championing various community concerns, and alleged retaliatory acts, including a transfer, thus defeating her retaliation claim. U.S.C.A. Const.Amend. 1.

**\*233** Appeal from the United States District Court for the Southern District of New York (Denny Chin, Judge).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

167 Fed.Appx. 232
167 Fed.Appx. 232, 2006 WL 156879 (C.A.2 (N.Y.))
**(Cite as: 167 Fed.Appx. 232, 2006 WL 156879 (C.A.2 (N.Y.)))**

Case 1:08-cv-04885-JGK     Document 7-3     Filed 07/08/2008     Page 172 of 204     Page 2

Norma Ramirez, New York, New York, for Appellant, pro se.

Susan B. Eisner, Assistant, Corporation Counsel, for Michael A. Cardozo, Corporation Counsel of the City of New York, New York, New York, for Appellee.

PRESENT: Honorable AMALYA L. KEARSE, Honorable REENA RAGGI, Circuit Judges, and Honorable JANE A. RESTANI, Chief Judge, U.S. Court of Int'l Trade.FN1

> FN1. The Honorable Jane A. Restani, Chief Judge of the United States Court of International Trade, sitting by designation.

**SUMMARY ORDER**

**\*1** UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DE-CREED that the judgment of the district court, entered on November 3, 2004, is hereby AF-FIRMED.

Plaintiff-appellant Norma Ramirez sued her long-time former employer, defendant-appellee New York City Health & Hospitals Corp. d/b/a Gouverneur Hospital ["Gouverneur"], under various federal and state statutes alleging, *inter alia*, that Gouverneur (1) discriminated against her on the basis of her race, national origin, and age; (2) transferred her as retaliation for her speech and political activity; and (3) pressured her to accept an early retirement package to deprive her of her pension benefits. We assume the parties' familiarity with the facts and the record of prior proceedings, which we reference only as necessary to explain our decision.

We review the district court's award of summary judgment *de novo. See Forsyth v. Federation Employment & Guidance Serv.,* 409 F.3d 565, 569 (2d Cir.2005). We resolve all factual ambiguities and credit all inferences in favor of Ramirez, and we will affirm only if there is no material issue of fact

warranting trial and if defendant is entitled to judgment as a matter of law. *See Woodman v. WWOR-TV, Inc.,* 411 F.3d 69, 75 (2d Cir.2005).

1. *Discrimination Claims*

[1] Although Ramirez's employment discrimination claims are based on a variety of statutes, on a motion for summary judgment, all her claims are subject to review pursuant to the three-step, burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 123 (2d Cir.2004) (applying *McDonnell Douglas* analysis to discrimination claims brought pursuant to 42 U.S.C. § 1983); *Terry v. Ashcroft,* 336 F.3d 128, 138 (2d Cir.2003)**\*234** (same for claims under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*); *Lizardo v. Denny's, Inc.,* 270 F.3d 94, 103 (2d Cir.2001) (same for claims under 42 U.S.C. § 1981); *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 n. 1 (2d Cir.2000) (same for claims under the New York State Human Rights laws). Under this framework, a plaintiff bears the initial burden of showing that "(1)[s]he is a member of a protected class; (2)[s]he is competent to perform the job or is performing [her] duties satisfactorily; (3)[s]he suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on [her] membership in the protected class." *Dawson v. Bumble & Bumble,* 398 F.3d 211, 216 (2d Cir.2005). Once the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant, "who must proffer a legitimate, nondiscriminatory reason for the challenged employment action." *Woodman v. WWOR-TV, Inc.,* 411 F.3d at 76 (internal quotation marks omitted). If the defendant articulates such a reason, the plaintiff "must prove that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* (internal quotation marks omitted).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

167 Fed.Appx. 232, 2006 WL 156879 (C.A.2 (N.Y.))
**(Cite as: 167 Fed.Appx. 232, 2006 WL 156879 (C.A.2 (N.Y.)))**

**\*\*2** Having carefully reviewed the record, we agree with the district court that Ramirez's discrimination claims lack sufficient evidentiary support to withstand a motion for summary judgment. Her conclusory assertions of discrimination and her hearsay proffers are insufficient to demonstrate that Gouverneur's proffered legitimate reasons for its challenged actions are pretextual, much less to satisfy plaintiff's " 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against' " her for reasons prohibited by law. *Schnabel v. Abramson,* 232 F.3d 83, 90 (2d Cir.2000) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

To the extent Ramirez argues on appeal that she did not have sufficient time to take discovery or to present admissible evidence to the district court, the record is to the contrary. In sum, because Ramirez failed to adduce admissible evidence from which a reasonable jury could find that she had been the victim of an adverse employment action based on race, national origin, or age, the district court properly entered judgment in favor of Gouverneur.

### 2. *Retaliation Claim*

[2] In addition to alleging that defendant transferred her to Bellevue Hospital because of her Hispanic origin and age, Ramirez asserts that the transfer was in retaliation for her protected First Amendment activities in opposing Gouverneur's alleged discrimination and corruption and in championing various community concerns. A public employee who alleges retaliation for protected speech must demonstrate that "(1) [her] speech addressed a matter of public concern, (2)[she] suffered an adverse employment action, and (3) a causal connection existed between the speech and the adverse employment action, so that it can be said that [her] speech was a motivating factor in the determination." *Feingold v. New York,* 366 F.3d 138, 160 (2d Cir.2004) (internal quotation marks omitted).

Assuming *arguendo* that Ramirez could satisfy the first two elements, we conclude, like the district court, that summary judgment was properly entered in favor of Gouverneur because Ramirez has failed to adduce admissible evidence of a causal connection between Ramirez's protected activity and the alleged retaliatory acts. *See, e.g.,***\*235***Garcia v. S.U.N.Y. Health Sciences Ctr.,* 280 F.3d 98, 106-07 (2d Cir.2001).

### 3. *ERISA Claim*

Finally, Ramirez alleges that the defendant pressured her to accept an early retirement package to prevent her from receiving her pension benefits in violation of § 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140. Once again, the claim fails for lack of admissible evidence. Indeed, as the district court noted, Ramirez herself conceded in her deposition testimony that she has "no proof" to support her ERISA claim. *SeeDister v. Continental Group, Inc.,* 859 F.2d 1108, 1111-14 (2d Cir.1988).

We have considered all of Ramirez's remaining arguments and conclude that they are without merit.

**\*\*3** The judgment of the district court, entered on November 3, 2004, is hereby AFFIRMED.

C.A.2 (N.Y.),2006.
Ramirez v. New York City Health & Hospitals, Corp.
167 Fed.Appx. 232, 2006 WL 156879 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 16

LEXSEE 2002 US APP LEXIS 22338

**GLORIA ROA, Plaintiff-Appellant, -v.- NORMAN MINETA, Secretary of Transportation, Defendant-Appellee, HUGH MCGINLEY, FAA Human Resources Management, STEPHEN P. BRIENZA, Employee Development Team Leader, Defendants.**

**No. 01-6216**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

*51 Fed. Appx. 896*; *2002 U.S. App. LEXIS 22338*

**October 23, 2002, Decided**

**NOTICE:** [**1] RULES OF THE SECOND CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the Eastern District of New York (Eugene F. Nickerson, Judge).

**DISPOSITION:** Affirmed.

**COUNSEL:** Appearing for Plaintiff-Appellant: Irene D. Thomas, New York, NY.

Appearing for Defendant-Appellee: Sandra L. Levy, Assistant United States Attorney (Alan Vinegrad, United States Attorney, on the brief; Deborah B. Zwany, Assistant United States Attorney, of counsel), Eastern District of New York, Brooklyn, NY.

**JUDGES:** PRESENT: HON. JAMES L. OAKES, HON. CHESTER J. STRAUB, Circuit Judges. HON. LORETTA A. PRESKA, Judge. *

 * The Honorable Loretta A. Preska, United States District Judge for the Southern District of New York, sitting by designation.

**OPINION**

[*897] SUMMARY ORDER

AFTER ARGUMENT AND UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment of the District Court is hereby **AFFIRMED**.

Plaintiff-Appellant Gloria Roa appeals from a judgment of the United States District Court for the Eastern District of New York (Eugene F. Nickerson, *Judge*) granting [**2] summary judgment against Roa on all claims. We affirm.

I.

In July 1991, Roa, a thirty-eight-year-old Hispanic female of Puerto Rican origin, began work in the Federal Aviation Administration ("FAA"), Eastern Region as a part-time Clerk-Typist in the Human Resources Management Division, Employee Benefits and Classification Branch. This position was classified as Grade 4.

By November 1994, Roa had been promoted to Program Assistant, Grade 6, and had been reassigned to the Employee Development Branch. In that position, Roa performed tasks primarily connected with the administration of the "After-Hours" program, a tuition reimbursement program for FAA employees in the Eastern Region.

In November 1996, Roa asked her supervisor, Stephen Brienza, for an "accelerated promotion" pursuant to a recently enacted FAA personnel reform that eliminated "time in grade" restrictions on employee promotions. This change in policy meant that the

51 Fed. Appx. 896, *897; 2002 U.S. App. LEXIS 22338, **2

promotion of a FAA employee to an available position at a higher grade level was no longer conditioned on that employee having attained at least one year's previous experience in the next lowest grade level. The procedures adopted by the FAA to implement the [**3] new accelerated promotions ("AP") program made such promotions applicable only to employees in developmental career-ladder positions that permitted non-competitive promotions to higher grades in the same series. Because Roa was not in a developmental career-ladder position that permitted non-competitive promotions to higher grades in the same series, she was [*898] not eligible for promotion under the AP program.

In any event, Brienza responded to Roa's promotion request by telling her that she would not receive a promotion because the department was downsizing and that no one in the department would be receiving a promotion any time soon.

Three months later, Brienza assisted Roa in preparing a list of her duties for purposes of applying for an "accretion-of-duties" ("AOD") promotion--a promotion based on an employee's assumption of additional duties and responsibilities. An AOD promotion does not require that the employee be in a developmental career-ladder position. This list of duties was submitted to Classification Specialist Tonya Syphrett, who after reviewing it over the course of two months deemed Roa's duties equivalent to that of a Grade 7 Employee Development Assistant or a Grade [**4] 7 Employee Development Specialist. Although the titles are different, the salaries for the two positions are equivalent.

Syphrett's evaluation was in turn reviewed by Gloria Quay, Branch Manager of the Employee Development section. Quay decided to classify Roa as an Employee Development Assistant due to the "downsizing goals" of the National Partnership for Reinventing Government, which instructed the heads of executive departments and agencies to prepare plans for a reduction of at least 252,000 employees from the federal workforce. The Employee Development Branch was forced to reduce its budget and responsibilities accordingly. Roa was promoted to Grade 7 in March 1997.

However, because Roa believed that she was performing work higher than Grade 7, she informally sought another opinion. Through Julia Oyewo, a Regional Associate Program Manager, Roa sent a description of her duties to Carolyn McKinney, a Personnel Information Manager at the FAA Technical Center. McKinney replied, also through Oyewo, that she considered Roa's duties to be equivalent to Grade 11 or 12.

On April 17, 1997, after learning that another employee supervised by Brienza had received an AOD promotion to Grade [**5] 11, Roa filed a formal Equal Employment Opportunity Commission ("EEOC") complaint. This was actually the third EEOC complaint that Roa had filed; the prior two were resolved by a settlement agreement executed May 19, 1997. In her third complaint, Roa claimed that she requested a promotion in November 1996 and was denied it for a reason that she learned later was "false." Roa alleged that the FAA had illegally discriminated against her on the basis of national origin, race and age, and had also illegally retaliated against her for filing previous EEOC complaints.

On July 10, 1997, the FAA dismissed Roa's third complaint on the ground that the issues raised had been resolved by the May 1997 settlement agreement. Roa appealed to the EEOC, and on January 6, 1998, 149 days after filing her appeal to the EEOC, Roa filed an action in federal court. The EEOC appeal was dismissed on June 18, 1998.

The District Court, in a memorandum and order dated August 9, 2001, granted the FAA's motion for summary judgment on all of Roa's claims. The District Court reached the merits of Roa's claim because it found that Roa was not procedurally barred from bringing the action. The memorandum and order [**6] was amended on October 3, 2001 to correct a typographical error. Judgment was entered on October 16, 2001, and this timely appeal followed.

We review a district court's grant of summary judgment *de novo* and apply the [*899] same standard as the district court. *Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000)*. Summary judgment should only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Fed. R. Civ. P. 56(c)*. While all evidence is viewed in the light most favorable to the non-moving party, *Roge v. NYP Holdings, Inc., 257 F.3d 164, 165 (2d Cir. 2001)*, the non-moving party cannot evade summary judgment by asserting that unspecified disputed material facts exist or through speculation or conjecture. *W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d*

51 Fed. Appx. 896, *899; 2002 U.S. App. LEXIS 22338, **6

*118, 121 (2d Cir. 1990).*

II.

The District Court granted the FAA's motion for summary judgment on Roa's race and national origin claims after concluding that the facts did not support an inference of discrimination and thus Roa had failed to [**7] establish the fourth element of a prima facie case. We agree.

In order to establish a prima facie case of discriminatory failure to promote, the plaintiff must show, *inter alia,* that the circumstances of the adverse employment action give rise to an inference of discrimination. *Stern v. Trs. of Columbia Univ., 131 F.3d 305, 311-12 (2d Cir. 1997).* An inference of discrimination may be drawn from a showing that a similarly situated individual that is not in the plaintiff's protected class was more favorably treated. *Hargett v. Nat'l Westminster Bank, USA, 78 F.3d 836, 839 (2d Cir. 1996), cert. denied, 519 U.S. 824, 136 L. Ed. 2d 41, 117 S. Ct. 84 (1996).* To be deemed similarly situated, individuals must be similarly situated in all material respects. *Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997).* What constitutes "all material respects" varies from case to case but requires a "reasonably close resemblance of facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Graham, 230 F.3d at 39.*

Roa advances two failure-to-promote [**8] claims. Her first claim is based on the FAA's failure to promote her pursuant to the AP program. But because that program applied only to employees in developmental career-ladder positions that permitted non-competitive promotions to higher grades in the same series, and because Roa was not in such a position at the time she sought promotion, no inference of discrimination is permissible.

Roa's second failure-to-promote claim is based on her AOD promotion from Grade 6 to 7. Roa claims that although she and Lisa Luke--an African-American woman eighteen years her junior--were similarly situated, Luke received an AOD promotion to a grade higher than that to which Roa was promoted. Although whether two individuals are indeed similarly situated is ordinarily a question of fact for a jury, *Graham, 230 F.3d at 39,* there is simply no genuine issue of material fact in this instance. Even though Roa and Luke worked in the same department and reported to the same supervisor, they were not similarly situated because their duties and responsibilities were materially different. Roa's duties were significantly less complex than Luke's and the scope of her position was much narrower. [**9] Because Roa presents no evidence that contradicts the description of the duties that she and Luke respectively performed, we affirm the District Court's grant of summary judgment against Roa on her race and national origin claim.

[*900] III.

Roa next challenges the District Court's grant of summary judgment against Roa on her retaliation claim. The District Court found that Roa had not established a causal connection between Roa's prior filing of EEOC complaints and the FAA's denial of her promotion requests--the fourth element of a prima facie case of retaliatory discrimination, *Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993), cert. denied, 522 U.S. 1004, 139 L. Ed. 2d 417, 118 S. Ct. 578 (1997).* Again, we agree.

Although courts may infer a causal connection when an adverse action takes place shortly after the protected activity, *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988),* we have affirmed summary judgment against the plaintiff when there was no evidence of causation other than timing. *Hollander v. Am. Cyanamid Co., 895 F.2d 80, 85-6 (2d Cir. 1990),* [**10] *cert. denied, 528 U.S. 965, 145 L. Ed. 2d 311, 120 S. Ct. 399 (1999).* Roa's two previous EEOC complaints, filed in December 1994 and April 1995, occurred well before she was denied promotion at the end of 1996. The lengthy delay between the protected activity and the adverse employment action serves to negate any causal connection. Roa's third complaint, filed in April 1997, occurred after she was denied promotion. Because there is no other evidence of retaliatory animus, we agree with the District Court's grant of summary judgment against Roa on her retaliation claim.

IV.

Finally, the District Court granted the FAA's motion for summary judgment on Roa's age discrimination claim on the ground that Roa failed to present evidence giving rise to an inference of discrimination. A plaintiff may fulfill the requirements of a prima facie case of age

51 Fed. Appx. 896, *900; 2002 U.S. App. LEXIS 22338, **10

discrimination by showing that (1) she was a member of a protected class at the relevant time; (2) she applied and was qualified for an open position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination, such as being [**11] replaced by someone substantially younger. *Norton v. Sam's Club, 145 F.3d 114, 118 (2d Cir. 1998), cert. denied, 525 U.S. 1001, 142 L. Ed. 2d 424, 119 S. Ct. 511 (1998)*. Although Roa arguably demonstrates the first three elements of the prima facie case, she fails to submit evidence sufficient to give rise to an inference of discrimination. The mere fact that Luke, a younger woman of a different race in her department, was promoted to a higher grade is insufficient, without more, to defeat summary judgment. *Id. at 119.* As previously discussed, Roa and Luke were not similarly situated. Because there is no other evidence, either concrete or circumstantial, that supports Roa's claim of age discrimination, we affirm the District Court's grant of summary judgment.

V.

For all the reasons set forth above, the judgment of the District Court is hereby **AFFIRMED.**

# EXHIBIT 17

LEXSEE 2006 US DIST LEXIS 14253

**JOSEPH SHANNON, Plaintiff, -v- JIM NICHOLSON, Secretary of Department of Veterans Affairs, Defendant.**

**05 CIV. 3604 (DLC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2006 U.S. Dist. LEXIS 14253*

**March 31, 2006, Decided
March 31, 2006, Filed**

**COUNSEL:** [*1] For Plaintiff: Andrew A. Rowe, Brooklyn, NY.

For Defendant: Pierre G. Armand, Assistant United States Attorney, United States Attorney's Office for the Southern District of New York, New York, NY.

**JUDGES:** DENISE COTE, United States District Judge.

**OPINION BY:** DENISE COTE

**OPINION**

*ORDER & OPINION*

DENISE COTE, District Judge:

Plaintiff Joseph Shannon brings this action alleging that his discharge from employment at the Bronx VA Medical Center (the "Bronx VA") was motivated by discrimination on the basis of his race or color. Defendant moves for summary judgment, arguing that Shannon has failed to make a *prima facie* case of discrimination and that there was a legitimate, nondiscriminatory reason for his discharge. Defendant's motion is granted.

*Background*

The following facts are based on the uncontroverted evidence, as summarized in the defendant's statement of facts submitted pursuant to *Local Civil Rule 56.1*. Because Shannon has not submitted any response as required by the rule, all of the facts set forth in defendant's statement that are supported by admissible

evidence are deemed admitted. *See* Local Civil Rule 56.1; *see also Giannullo v. City of New York, 322* [*2] *F.3d 139, 140 (2d Cir. 2003)*. Indeed, Shannon has submitted no affidavit or other admissible evidence that would support a genuine dispute with defendant's proffered facts.

From November 4, 2002 to July 17, 2003, Shannon worked as a probationary police officer for the United States Department of Veteran Affairs (the "VA") at the Bronx VA. He was interviewed by Chief of Police Albert Aviles, who recommended that he be hired. All probationary VA police officers must successfully complete a mandatory Basic Police Officer Training Course (the "Course") as a condition of their continued employment. The Course is administered at the VA Law Enforcement Training Center in Little Rock, Arkansas (the "LETC").

Before the Course begins, though, students take a pretraining course offered at their station of origin. Completion of the pre-training is mandatory and students must certify that they have completed all pre-training before reporting to the LETC. The Course begins with an entry exam which tests students' knowledge of the material covered in the pre-training. Students must maintain an average of 75 or higher to remain in the Course; those with a cumulative average of less than 75 after [*3] the first two weeks are dismissed. Students must also pass the final exam with a score of at least 75 percent. The Course includes physical fitness and side-handle baton (also known as "PR-24") training, as well as classroom instruction. The PR-24 training includes a written exam, also requiring a score of at least

Case 1:08-cv-04885-JGK     Document 7-3     Filed 07/08/2008     Page 181 of 204

Page 2
2006 U.S. Dist. LEXIS 14253, *3

75 percent, and a physical proficiency exam requiring a score of 95 percent.

All probationary officers must successfully complete all portions of the Course in order to have law enforcement and arrest authority. Before October 1, 2002, the VA allowed students who passed academically but failed the physical fitness or PR-24 portions of the Course to retake those portions at their stations of origin. A new policy, effective October 1, 2002, requires students to pass all portions of the Course at the LETC. [1]

> 1   The LETC PR-24 training manual states that officers who fail PR-24 "will be re-trained and re-tested." According to Christopher Price, Deputy Director of the LETC, the training manual was last updated in 2000 and does not reflect current VA policy. Since the policy change, the LETC has dismissed all students who have failed to pass all portions of the Course.

[*4] The VA may terminate the probationary employment of any officer who fails the Course. When this happens to a Bronx VA officer, Chief Aviles may submit a recommendation to the Bronx VA Human Resources Department ("HR") that the employment of the probationary officer be terminated. An HR specialist initiates the termination process after verifying that termination is appropriate and consistent with applicable regulations. A termination letter sent from a Human Resources Officer officially discharges the officer from the VA.

In exceptional circumstances, Aviles may decline to recommend termination and instead recommend that the officer be permitted to retake the Course. Both decisions, to discharge a probationary employee, and to permit re-enrollment in the Course, are made by the VA station of origin, not the LETC.

Shannon attended the Course in May and June 2003. He failed the entry exam, passed the first and second week tests, and failed the third. After three weeks in the Course, Shannon had a borderline passing average of 75 percent. He scored a 93 on the physical exam in PR-24 training, two points shy of the passing score. He was dismissed from the Course on June 18, 2003, and [*5] did not complete the remaining academic portion.

As is his practice when a Bronx VA officer fails the Course, Aviles spoke with the Deputy Director of the LETC, Christopher Price, about Shannon's performance. Price told Aviles that Shannon's performance at LETC had been mediocre, and that he doubted that Shannon would be able to pass the Course if given a second opportunity. At no point during the Course or immediately afterward did Aviles become aware of any exceptional circumstances that might have explained his poor performance.

Aviles recommended to HR that Shannon's employment at the Bronx VA be terminated. HR Specialist Gerda Lloyd reviewed the recommendation and agreed that termination was appropriate. Shannon was informed by a letter dated July 1, 2003 that his discharge would be effective July 17.

Two other students from the Bronx VA were given opportunities to retake portions of the Course. [2] One was Reynaldo Mendez. Mendez, an Hispanic male, attended the Course at the LETC in April and May 2002. He passed academically but failed the PR-24 test. Aviles recommended that Mendez's employment be terminated following his return to the Bronx VA, but this recommendation was [*6] overruled as inconsistent with VA policy at the time, which allowed students a second opportunity to retake the non-academic portions of the Course at their home stations. [3] Mendez retook the PR-24 exam and passed.

> 2   Shannon's complaint references a third student, Gerald Lavigne, who attended the Course at the LETC at the same time as Shannon. Although Lavigne was also dismissed for failing PR-24, Shannon alleges in his complaint that Lavigne would be given a second opportunity to retake the exam. Shannon appears to have abandoned his comparison to Lavigne, as there is no mention of him in Shannon's papers opposing the motion. Even if Shannon had not done so, however, the comparison is unavailing. Decisions to allow an officer to retake the Course are made by the officer's station of origin, which for Lavigne was Manchester, New Hampshire. Because Aviles had no input in any decisions regarding Lavigne's employment, any comparison between Shannon and Lavigne is not probative of whether Shannon was the victim of race-based discrimination. *See Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997)* (holding that employees with different supervisors were not similarly

situated for purposes of disparate treatment claim).

[*7]

3   Shannon takes issue in his opposition brief with defendant's statement that this fact is undisputed. Shannon states that he "does not concede this whatsoever," but has offered no evidence to contradict it.

Another student was given a second opportunity to retake the academic portion of the Course. Leslie Torres, an Hispanic female, attended the Course in August 2003. She had an average of 81 going into the final exam, but failed the final exam by two points. Prior to taking the exam, Torres learned that her father had suffered a stroke. When Aviles and Price spoke later, Price informed the Chief that Torres was a very good student; that she had no difficulties learning the material; that she worked diligently and attended study groups and after-hours training; and that she had an overall passing score but had failed the final exam by two points after learning of her father's condition. Aviles believed that Torres presented an exceptional case and deserved a second opportunity to attend the Course. Torres re-enrolled in the Course in February 2004 but withdrew after the second week to attend [*8] to her father, whose health had deteriorated further. In light of her strong performance at the time of withdrawal (she had a 90 percent average) and the circumstances of her father's illness, Torres was permitted to enroll for a third time in the Course in September 2004. She passed with an 85 percent average.

*Discussion*

Summary judgment is appropriate only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 465 (2d Cir. 2000).* The same standard is applied in employment discrimination cases as in all others. *Id.* (citing *Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)).* Thus, even though the evidence must be viewed in the light most favorable to the non-moving party, with all reasonable inferences drawn in its favor, "the test for summary judgment" even in discrimination cases "is whether the evidence can reasonable support a verdict in the plaintiff's favor." *James v. N.Y. Racing Ass'n, 233 F.3d 149, 157 (2d Cir. 2000); see also Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 102 (2d Cir. 2001)* ("A court is [*9]

to examine the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." (citation omitted)).

Shannon's claims of discrimination on the bases of race are analyzed under the burden-shifting framework first established in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).* The initial burden falls onto the plaintiff to establish a *prima facie* case of discrimination. *Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).* If the plaintiff succeeds, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. The defendant's burden is one of production, not persuasion. *Id.* If the employer meets its burden, "the *McDonnell Douglas* presumptions disappear from the case," *James, 233 F.3d at 156,* and "the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven that the defendant intentionally discriminated against him because of his race." *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).* [*10]

To establish a *prima facie* case of discriminatory discharge, a plaintiff must establish that he (1) is a member of a protected class; (2) was qualified for the position; (3) was discharged; and (4) that his discharge occurred under circumstances giving rise to an inference of discrimination on the basis of membership in the protected class. *Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 91 (2d Cir. 2001).* The burden of establishing a *prima facie* case to support a claim of employment discrimination is minimal. *McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001).* The parties do not dispute that Shannon is a member of a protected class with respect to his race discrimination claim, nor that he was discharged. There is significant dispute, however, regarding the second and fourth elements of his *prima facie* case.

To satisfy the qualification prong of a *prima facie* case, a plaintiff "must show only that he possesses the basic skills necessary for performance of the job." *Slattery, 248 F.3d at 92* (citation omitted). The Second Circuit has warned that district courts are not to interpret this prong in such a way "as to shift onto the plaintiff [*11] an obligation to anticipate and disprove, in his *prima facie* case, the employer's proffer of a legitimate,

non-discriminatory basis for its decision." *Id.* Consequently, "the qualification necessary to shift the burden to defendant . . . is minimal." *Id.*

Although the plaintiff's burden is minimal, his qualifications must still be assessed by reference to "the criteria *the employer* has specified for the position." *Thornley v. Penton Publ'g, 104 F.3d 26, 29 (2d Cir. 1997)* (emphasis added). Shannon argues that was qualified by virtue of his experience as a former New York City corrections officer and that he had "no problem at all in the day-to-day functions at the Bronx facility." Yet he also admits that he did have a problem passing the PR-24 exam and that he had no experience working with this instrument. [4]

> 4   Shannon suggests in his brief, without any evidentiary support, that his failure was due in part to the lack of proper training he received at the VA. The only evidence regarding the amount of training he received demonstrates to the contrary. Shannon certified to the VA in his Initial Entry Training Certification that he had received all 80 hours of pre-training, and he specifically initialed to indicate completion of 12 hours of PR-24 training.

[*12] Shannon's admitted failure of the test required for all new hires to proceed beyond probationary status is itself evidence that he did not possess the basic skills necessary for the performance of his job. [5] His suggestion that successful completion of PR-24 is not a qualification for this position is contradicted by all of the relevant evidence. Deputy Director Price and Chief Aviles both stated that VA policy, effective at the time Shannon enrolled in the Course, required students to complete all portions of the Course at the LETC, and to be dismissed if they failed to do so. Their affidavits establish that successful completion of the PR-24 at the LETC was among the VA's "honestly-held expectations" for qualified probationary officers. *Thornley, 104 F.3d at 30.* [6] In light of his failure to prove his qualification, Shannon cannot carry his burden with respect to the second element of his *prima facie* case.

> 5   It is true that "where discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw." *Slattery, 248 F.3d at 92.* But this does not mean that nothing beyond the fact of hiring need be shown; otherwise, this requirement would

be completely superfluous in all discharge cases. In any event, an inference of minimal qualification is less readily available in cases such as this where the employee is hired on a probationary basis. As civil service regulations reflect, the very purpose of a probationary period is "to determine the fitness of the employee" and allow him to "demonstrate fully his qualifications for continued employment." *5 C.F.R. § 315.803.* The Second Circuit similarly recognizes that while the showing required to make a *prima facie* case should be minimal, an employee who fails to prove his qualifications during a probationary period may not be able to carry this burden. *See Gregory v. Daly, 243 F.3d 687, 697 n.7 (2d Cir. 2001)* (citing with approval *McLee v. Chrysler, 109 F.3d 130, 135 (2d Cir. 1997)).*

[*13]
> 6   Shannon's attempt in his motion papers to question the authenticity of the document announcing the policy change is unavailing. Price and Aviles both provided sworn statements that this is VA policy and there is no admissible evidence to the contrary.

With respect to the fourth element of the *prima facie* case, a plaintiff may carry his burden "by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000).* In order to raise an inference of discrimination, the plaintiff must be "similarly situated in all material respects" to the individuals with whom he seeks to compare himself. *Shumway v. United Parcel Serv., 118 F.3d 60, 64 (2d Cir. 1997)* (affirming finding that plaintiff failed to present *prima facie* evidence of discrimination). "A plaintiff is not obligated to show disparate treatment of an *identically* situated employee" when presenting *prima facie* evidence of discrimination, but the object of comparison [*14] "must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *McGuinness, 263 F.3d at 54.* A plaintiff meets this standard by demonstrating that the employees to whom he compares himself "were subject to the same workplace standards" as the plaintiff and had engaged in conduct of "comparable seriousness." *Graham, 230 F.3d at 40.*

Shannon supports his claim of disparate treatment by pointing to Mendez and Torres, both of whom were permitted to retake segments of the Course after failing them. Mendez enrolled in the Course at a time when VA policy explicitly allowed students to retake PR-24 at their stations of origin if they failed it at the LETC. Because this policy had been modified by the time Shannon enrolled in the Course, the two were plainly not subject to the same workplace standard and therefore are not similarly situated for the purposes of a disparate treatment claim.

Torres, on the other hand, was subject to the same workplace standard. Whether she and Shannon were similarly situated thus depends on the comparability of their conduct. "The determination that [*15] two acts are of comparable seriousness requires -- in addition to an examination of the acts -- an examination of the context and surrounding circumstances in which those acts are evaluated." *Graham, 230 F.3d at 40*. While Torres and Shannon did both fail to complete the Course successfully, they in fact failed in quite different ways. Shannon failed two of the three tests he took, had a borderline passing average, and failed the PR-24 requirement before he was able to move on to the final examination. Torres, in contrast, passed every exam except for the last, and finished the Course with an overall passing average. Furthermore, the circumstances surrounding the two failures are markedly different. Torres had been informed before taking her final exam that her father, already in poor health, had suffered a stroke. Shannon had not introduced evidence of any similar emergency that might have distracted his attention from his studies. Given these significant differences in the experiences of Torres and Shannon at the LETC, it cannot be said that there is "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases" such that the two could be [*16] considered similarly situated in all material respects. *Id. at 40*. O'Neal has therefore failed to carry his burden with respect to the fourth element of his *prima facie* case as well.

Even assuming *arguendo* that he had made out a *prima facie* case of discrimination, though, the VA has met its burden of production of evidence that Shannon was fired for a legitimate, non-discriminatory reason. Aviles and HR Specialist Gerda Lloyd both submitted affidavits stating that Shannon was terminated solely because of his poor performance at the LETC. Having

met its burden, the VA is entitled to judgment as a matter of law unless Shannon offers sufficient admissible evidence that would enable a reasonable factfinder to conclude that the VA's proffered justification is pretextual and that the true reason for his discharge is discrimination. *See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993)*. ("It is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.").

Shannon has failed to raise a genuine issue of fact as to whether the VA intentionally discriminated against him on the basis of [*17] his race. As discussed in the context of his *prima facie* case, Shannon has not demonstrated that he was qualified for continued employment at the Bronx VA, and he has not shown that his discharge occurred under circumstances giving rise to an inference of discrimination. His unsupported allegations that Aviles has discharged only black officers, while two Hispanic officers have been permitted to re-enroll in training are simply not probative of whether he himself was the victim of discrimination, particularly in light of uncontroverted evidence that he did not meet his employer's pre-existing qualifications for employment and that he was not similarly situated to those to whom he compares himself. *See Byrnie, 243 F.3d at 101* ("[A] non-moving party may not rely on conclusory allegations or unsubstantiated speculation." (citation omitted)).

Furthermore, Shannon makes his claim under circumstances that "strongly suggest that invidious discrimination was unlikely." *Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997)*. Aviles interviewed Shannon, recommended that he be hired, and then recommended that he be terminated only eight months later. The Second Circuit [*18] considers such circumstances "highly relevant." *Schnabel v. Abramson, 232 F.3d 83, 91 (2d Cir. 2000)*. For "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire. This is especially so when the firing has occurred only a short time after the hiring." *Grady, 130 F.3d at 560*. Shannon has not submitted any evidence, or given reason to believe that any exists, that would enable a reasonable factfinder to conclude that the same actor who hired him was suddenly motivated by racial animus to let him go.

He argues that there is circumstantial evidence of

2006 U.S. Dist. LEXIS 14253, *18

discrimination to be found in the VA's participation in a "Hispanic Employment Initiative." To support this argument, he refers to a printout of an Office of Personnel Management website to which the VA website provides a link. Even if this printout were admissible, it is does not raise a reasonable inference of discrimination. There is no evidence that the VA participates in this program (or any equivalent program), and indeed the printout shows that the VA website explicitly disclaims [*19] any endorsement of its linked sites.

*Conclusion*

Shannon has not demonstrated his qualifications for employment beyond the probationary period, or that his discharge occurred under circumstances that would support a reasonable inference of discrimination based on his membership in a protected class. For these reasons, he has failed to establish a *prima facie* case of discrimination, and the VA is entitled to judgment as a matter of law. Moreover, even if Shannon had succeeded in carrying this minimal burden, the VA's proffered nondiscriminatory reason for Shannon's discharge "is dispositive and forecloses any issue of material fact." *Back v. Hastings On Hudson Union free School Dist., 365 F.3d 107, 124 (2d Cir. 2004)* (citation omitted). The VA's motion for summary judgment is granted; the Clerk of Court shall close the case.

SO ORDERED:

Dated: New York, New York

    March 31, 2006

    Denise Cote

    United States District Judge

# EXHIBIT 18

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.))**

Simpson v. Metro-North Commuter R.R.
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Darryll SIMPSON, Plaintiff,
v.
METRO-NORTH COMMUTER RAILROAD, Moe
Kiniry, Sherry Herrington, and Gus Meyers, in their
official and personal capacities, Defendants.
**No. 04 Civ. 2565(PAC).**

July 20, 2006.

Becky Tung, Robert John Valli, Jr., Rick Ostrove,
Leeds Morelli & Brown, P.C., Carle Place, NY, for
Plaintiff.
Sheryl Beth Galler, Hoguet, Newman and Regal,
New York, NY, for Defendants.

### OPINION & ORDER

Honorable PAUL A. CROTTY, District Judge.
**\*1** Plaintiff Darryll Simpson, an African-American
male, sues his former employer Metro North Com-
muter Railroad and three of its employees, alleging
that Defendants discriminated against him because
of his race and then retaliated against him when he
complained of race discrimination, in violation of
Title VII and 28 U.S.C. § 1983.[FN1] Specifically,
Simpson alleges disparate treatment with regards to
pay, hostile work environment, and retaliation in
violation of Title VII, and denial of equal protec-
tion in violation of § 1983.

> FN1. Plaintiff also brings claims under
> N.Y. Executive Law § 296 and the New
> York City Human Rights Law, both of
> which are subject to the same substantive
> analysis as Plaintiff's federal claims. *See
> Cruz v. Coach Stores, Inc.,* 202 F.3d 560,
> 565 n. 1 (2d Cir.2000).

Defendants now move for summary judgment pur-
suant to Rule 56(c) of the Federal Rules of Civil

Procedure on two grounds: (1) Simpson fails to
make out the *prima facie* case of disparate treat-
ment with regard to pay, hostile work environment,
and retaliation and therefore all of Simpson's dis-
crimination claims must be dismissed as a matter of
law; and (2) Defendants are entitled to qualified im-
munity on Simpson's § 1983 claims. For the reasons
discussed below, the Court grants Defendants' mo-
tion for summary judgment on the first ground, and
does not rule on Defendants' claim of qualified im-
munity.

### BACKGROUND

Plaintiff Darryll Simpson ("Simpson"), an African-
American male, began working for Defendant
Metro North Railroad ("Metro North") in March
1988 as an Assistant Conductor. (Compl. ¶ 12; Dep.
of Pl. Darryll Simpson, Mar. 8, 2005 ("Simpson
Dep.") 10:18-20.) He was promoted to the position
of Conductor in March 1989 and Special Duty
Trainmaster sometime in the late 1990s. (Simpson
Dep. 22:6-24.) In August 1999, Simpson was pro-
moted to the management position of Trainmaster
at Grand Central Terminal ("Grand Central").
(Compl. ¶ 15; Simpson Dep. 23:3-9, 25:2-3.)

### STATEMENT OF CLAIMS

*Disparate Pay Claim*

Simpson's salary as a Trainmaster was approxi-
mately $71,000 or $72,000 per year (Simpson Dep.
55:10-13.), but less than that of other Trainmasters,
who started at around $83,000.[FN2] (*Id.* 57:8-19.)
Simpson complained to David Schanoes, his super-
visor, and to Sherry Herrington, Metro North's
Chief of Operations services, about this disparity in
salary and requested a raise to bring his salary "up
to par" with the salary of other Trainmasters. (*Id.*
53:4-7, 57:20-24, 62:10-17) Despite these com-
plaints, Simpson did not get the salary increase he

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.))**

wanted.[FN3] (*Id.*)

> **FN2.** Simpson provides no evidence, apart from his own self-serving deposition testimony, to prove that other Trainmasters actually received salaries as high as $83,000. When asked during his deposition how he knew other Trainmasters were making more than he was, he merely stated: "Because one or two may have told me what they were making," and referred to one colleague, Mr. Schiefelbein, as a potential example. (Simpson Dep. 53:20-23, 56:15-22, 57:12-16.)

> **FN3.** Simpson admits that he did receive annual cost of living and merit increases, but claims that these increases were not sufficient to bring his salary in line with his non-African-American colleagues. (Simpson Dep. 55:14-25.) The only non-African-American colleagues to which Plaintiff refers are Paul Hirsch and Bill Schilling, both of whom had worked for Metro North longer than Simpson and held different and higher titles. *See infra* n. 6.

Metro North's restructured its job titles in 2000,[FN4] and Simpson's title changed from Trainmaster to Operations Manager/Capital Projects. (Simpson Dep. 70:13-24; Herrington Aff. ¶ 7; Herrington Dep. 76:20-23.) In this capacity, Simpson coordinated capital projects in and around Metro North, which included up to 17 different capital projects at any given time. (Simpson Aff. ¶ 5; Simpson Dep. 86:18-19; Herrington Dep. 17:2-8.) While Simpson thought the new title included an increase in salary, it did not. (Simpson Dep. 5-11.) First, Simpson claims that all of the individuals who performed the Capital Projects job before him were Lead Trainmasters,[FN5] and therefore received a higher salary for performing comparable work. (Simpson Dep. 72:14-73:19.) Second, Simpson claims that Paul Hirsh and Bill Schilling, the two employees who assumed the Capital Projects positions at Harmon and New Haven (Metro North's other major termin-

als), received higher salaries.[FN6] (Simpson Dep. 74:24-75:5.)

> **FN4.** In January 2000, Metro North created the Operations Services Department, which combined Metro North's Transportation Department with other departments that handled fleet management, stations, car cleaning, and mechanicals functions of the railroad. (Compl. ¶ 17; Herrington Aff. ¶¶ 2-4; Herrington Dep. 66:9-25.) A number of positions within the merged departments were renamed after the reorganization. (Herrington Aff. ¶ 2.)

> **FN5.** The position of Lead Trainmaster is at least one pay grade above the position of Trainmaster.

> **FN6.** Simpson alleges that his job is identical to the job performed by Hirsh and Schilling, and therefore Hirsh and Schilling are "similarly situated" employees for purposes of determining salary. (Simpson Dep. 76:17-21.) The evidence suggests that Simpson's job is comparable to the job performed by Hirsh and Schilling. Both the Harmon and the New Haven terminals, where Hirsh and Schilling work, have positions titled Assistant Director of Capital Projects (the positions held by Hirsh and Schilling). Grand Central, where Simpson works, does not have such a position. Instead, Simpson's position (Operations Manager/Capital Projects) is the closest thing to the Assistant Director position. Defendants could not explain why Harmon and New Haven have such a position, while Grand Central does not, except to suggest that because Hirsh and Schilling had higher titles than Simpson prior to the reorganization, they took higher titles after the reorganization. (Kiniry Dep. 87:13-22.)

>     The evidence also reveals, however, that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.))**

both Hirsh and Schilling are far more senior than Simpson, both in number of years on the job and job title. Hirsh began working for Metro North in the 1960s and Schilling began working for Metro North in 1971. Simpson started more than two decades after Hirsh and 17 years after Schilling. (Herrington Aff. ¶ 6.) Moreover, Hirsh and Schilling were both Lead Trainmasters at the time of the reorganization; Simpson, by contrast, was still only a Trainmaster, which is a lower position at a lower pay grade. (*Id.*) Upon reorganization, Hirsh and Schilling became Assistant Directors for Capital Projects; Simpson took on the position of Operations Manager/Capital Projects. Simpson does not challenge these facts, but instead dismisses them as irrelevant, arguing that because all three employees performed comparable job tasks, they should be paid comparable salaries.

**\*2** Simpson complained to his supervisors, Moe Kiniry and Shelly Herrington, about his failure to receive a salary increase, but to no avail. Kiniry approved a salary increase, and convinced his boss, George Walker, to approve the increase, but someone else in the chain of command vetoed the request. (Kiniry Dep. 22:4-23:24.) Simpson also complained to Gregory Bradley, Metro North's Director of Workplace Diversity, about this unequal pay. Bradley never investigated or filed a complaint on Simpson's behalf.

*Other Allegations of Discrimination*

Simpson alleges other instances of discrimination during his employment with Metro North.[FN7] Particularly, Simpson alleges that in the early 1990s Metro North denied his request for tuition reimbursement to attend courses in transportation management, even though around the same time a white employee was granted tuition reimbursement for much less relevant course work. (Simpson Dep.

31:20-48:23.) Simpson does not provide any concrete evidence documenting his request for tuition reimbursement or Metro North's denial, however; and none of the Defendants had any knowledge of this. Simpson also claims that he was denied lateral promotions to the training department on two separate occasions, and both times less qualified white applicants were hired for the job. (*Id.*) Again, Simpson does not provide any concrete evidence to support this claim. Simpson complained to Stephen Mitchell, who appears to have been an EEOC employee and to Bradley, in his capacity as Director of Workplace Diversity, about these incidents, but neither Mitchell nor Bradley ever investigated or filed a complaint on Simpson's behalf. (*Id.*)

> FN7. All of these allegations of discrimination occurred more than three years prior to the filing of the complaint in this action, and are therefore time-barred under Title VII, § 1983, the New York Executive Law, and the New York City Human Rights Law. None of these allegations of discrimination are mentioned in the complaint. Apparently, they are presented only to provide additional support for his claim that Defendants' discriminated against him with respect to pay.

*Simpson's Problems with Supervisors (Hostile Work Environment)*

Simpson had a history of strained relations with senior supervisors. First, while working as a Conductor, Simpson had problems with Dave Schanoes ("Schanoes"), his direct supervisor. Their disagreements appear to have been about train operations. (Simpson Dep. 25:13-15, 26:21-24.) Simpson's relationship with Schanoes got so bad that the two men got into an argument in front of other employees on the Grand Central platform. (*Id.* 14:4-25-18:23.) Simpson criticized Schanoes to Defendant Moe Kiniry on multiple occasions. (Kiniry Dep. 34:7-22.) Kiniry admits, however, that Simpson was not the only employee that had troubles with Schanoes. (Kiniry Dep. 34:15-18.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.))**

Many employees complained about Schanoes's people skills, to the point that Schanoes was eventually removed from his supervisory position due to his inability to work with others. (Kiniry Dep. 34:23-35:3.)

Notwithstanding the dispute, Simpson was promoted to Operations Manager/Capital Projects in 2000. Thereafter, Simpson had problems with two different supervisors. Shortly after he assumed the position, Simpson complained that Fred Sterman gave him so much operations work that he could not adequately perform his duties for capital projects [FN8] (Simpson Dep. 88:16-93:2.) Simpson complained to Sherry Herrington about it, and she went to speak with Sterman. (*Id.*) Simpson admits that his complaints about Fred Sterman did not involve race discrimination.

> FN8. Sherry Herrington explains that "the basic operations of the railroad take priority over capital projects," and therefore "the Operations Manager/Capital Projects is expected to be on-call to assist with Field Operations when needed."(Herrington Aff. ¶ 9.) Field Operations means running the railroad. Simpson, Herrington's subordinate, disagreed. He preferred not to have Field Operations jobs. (Simpson Dep. 88:16-93:2.)

**\*3** In April 2002, Gus Meyers transferred into Grand Central and became Simpson's direct supervisor. (Meyers Dep. 5-6.) Simpson and Meyers clashed from the start. According to Simpson, Meyers micromanaged his work, spoke to him in a demeaning tone, and yelled at him over insignificant things like answering the telephone during a conversation. (Simpson Dep. 123:15-126:13, 128:4-25, 134:15-20.)

Again, Simpson complained to Kiniry. (Simpson Dep. 19-23.) As Meyers was the third supervisor that Simpson griped about to Kiniry, Kiniry began to get annoyed. (Kiniry Dep. 33:11-34:6, 40:5-10, 41:11-23.) Kiniry explained:

At first I took [Simpson's complaints] as off the record friendly, but then [Meyers] was kind of like strike three, in my mind. Why is it ... this is the third person [Simpson's] working for that he finds or feels compelled to bring some issue, what he feels may be shortcomings to my attention.
... I would call it complaining.

(Kiniry Dep. 41:11-23.) "I questioned in my mind at that point whether the real issue was that Darryll had a problem with authority ."(Kiniry Dep. 40:8-10.) Simpson's complaints to Kiniry focused on Meyers's behavior; Simpson never complained that Meyers used racial epithets or raised concerns that Meyers's treatment of Simpson was racially motivated. (Kiniry Dep. 46:16-47:6.)

Simpson also asked Herrington to intervene. As with Fred Sterman, Simpson believed that Meyers was unfairly demanding that he handle Field Operations tasks, even though his primary obligation was capital projects, and therefore Simpson thought that Herrington could speak to Meyers, as she had done previously with Fred Sterman. (Simpson Dep. 132:9-23.) This time Herrington refused to get involved and told Simpson that he should do whatever Meyers told him to do. (*Id.*) Herrington explains:

At no time did Simpson ever tell me that he believed that Meyers or any of his other supervisors harrassed him or discriminated against him due to his race.... Thus, as far as I was concerned, the trouble between Simpson and Meyers was a basic conflict over the scope of Simpson's responsibilities and his willingness to follow Meyers' directives.

(Herrington Aff. ¶ 12.)

Upset at Herrington's response, Simpson went to Gregory Bradley. Accordingly to Simpson, Bradley did not take his complaint seriously, nor did he ask Simpson to write it up. (Simpson Dep. 142: 18-20, 146:7-9.) Instead, Bradley told Simpson that he was being "cantankerous" and told Simpson that he would speak with Herrington and sort it out.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.))**

(Simpson 142:22-23, 146:7-16.) Again, Simpson's complaints never referred to race, but instead focused on the unfairness of both Meyers's and Herrington's actions. (Bradley Dep. 32:10-23, 34:4-25.)

*Simpson's Transfer to Harmon and Resulting Retaliation Claim*

Sometime in July 2002, not long after Simpson's conversation with Bradley, Sherry Herrington told Simpson that she was reassigning him to the position of Operations Manager/Field Operations at Harmon station. (Herrington Dep. 103:18-105:25; Simpson Dep. 141:16-142:3.) While Simpson refers to this lateral transfer as a "demotion," there was no reduction in pay, benefits, or seniority.[FN9] (Simpson Dep. 169:6-10, 175:18-22.)

> FN9. Simpson claims that the new position was a demotion because it was less prestigious and the work was less interesting. Simpson also claims that the transfer was burdensome, and the longer commute from his home in the Bronx would make caring for his ailing mother more difficult. The latter reasons are surely personal and cannot be the basis for any legal redress.

**\*4** When Simpson inquired about why he was being transferred, Herrington explained that Simpson needed to work on his team-building skills and thought that the position at Harmon was more team-oriented. (Simpson Dep. 142:2-10; 144:2-6.) Herrington also told Simpson that he needed to learn not "to talk to Greg Bradley all the time."[FN10] (Simpson Dep. 142:8-10.) Herrington explained during her deposition:

> FN10. Simpson contends that this comment is direct evidence of race discrimination. Herrington argues, however, that Simpson is now taking the comment out of context. Herrington explained during her deposition:

> I had a conversation with [Simpson] ex-

plaining to [him] that he should feel comfortable to come to me if he has a problem, that I have an open door policy and I'm more than willing to resolve issues he has, that he does not have to go to [Bradley] because the process is that [Bradley] will got to [Kiniry] and [Kiniry] will come to me and I will be sitting across from [Simpson] discussing the issue any way so he should feel free to come on up and talk to me. (Herrington Dep. 98:14-24.)

This was a request for direct communication. It certainly was not a direction that Simpson not use the existing EEO procedures. Simpson never filed an EEO complaint, or sought to make use of any of the EEO procedures available at Metro North.

I felt that [Simpson] had problems with his communication and team building skills and I felt putting him in a less autonomous position, where he would have to work with other team members and communicate effectively with them, to be successful in his position would help improve his skills in that area.
(Herrington Dep. 105:12-21.) Herrington viewed the transfer as a lateral shift, not a demotion.

Simpson's transfer was not out of the ordinary. As part of the Metro North reorganization started in 2000, Herrington and Kiniry made many reassignments in the Operations Services Department. Herrington explained:

[A]fter the reorganization there was constant movement of positions where I was trying to put teams together that could work effectively together in terms of skills, personality types, management skills.

So many, many managers were moved. [Simpson] was involved in the move with two other individuals that I had other reasons for moving ... and Har-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.))**

mon became the position and I thought [Simpson] would be a good fit in Harmon.

(Herrington Dep. 104:20-105:7; Herrington Aff. ¶ 13.) Overall, at least twelve different managers and superintendents-of all races-were transferred to different district locations between 2001 and 2002. (Herrington Aff. ¶ 14.)

Simpson challenged Herrington about the transfer. When this did not work, he escalated his objections to Kiniry and Walker. (Simpson Dep. 144:15-19; Herrington Aff. ¶ 22.) In one memorandum to Kiniry, Simpson wrote: "Ms. Herrington's actions are bias, unwarranted, and retaliatory.... [T]he fact remains that I have been singled out and treated different than my counterparts."(Simpson Aff., Ex. B.) Despite his objections, Simpson was told that he had to transfer to Harmon.[FN11]

> **FN11.** When Simpson was transferred to Harmon, his position as Operations Manager/Capital Projects at Grand Central was filled by Trevor Forde, an African-American employee. (Herrington Dep. 123:2-14.)

Simpson was originally scheduled to start at Harmon on approximately September 3, 2002. (Simpson Dep. 175:2-14; Herrington Aff. ¶ 23.) He postponed his start date twice, and finally reported to Harmon on September 10, 2002. (Simpson Dep. 175:23-25, 186:3-5; Herrington Aff. ¶ 23.) Paul Hirsh, Assistant Director for Capital Projects at Harmon, gave Simpson a tour of the station and gave Simpson his telephone number in case is needed assistance during his first shift. (Simpson Dep. 176:3-18.) Simpson never attempted to call, but later complained that he was unable to properly perform at Harmon due to lack of adequate training. (Simpson Aff., Ex. C.)

After his first shift, Simpson wrote to Walker, complaining that Herrington "has not assigned anyone to guide [him] through Harmon's work process," in contrast to other reassigned employees, to whom other employees were assigned to ensure proper training. (Simpson Aff., Ex. C.) Simpson suggested that this disparate training was just another instances in a long history of disparate treatment. Again he did not refer to race. He wrote: "How else I'm supposed to understand or look at this situation other than as a bias and harassing action by Ms. Herrington.... [T]his is another example of the continuing bias and harassing actions towards me."(*Id.*)

**\*5** September 10, 2002 was Simpson's one and only work day at Harmon. For the next three days, he called in sick (Simpson Dep. 186:21-187:12; Simpson Aff., Ex. D.); but never identified a physical illness or provided a doctor's note. Instead, he said that he had "personal reasons" for failing to come to work. (Herrington Dep. 112:18-23; Simpson Dep. 195:12-13; Simpson Aff., Exs. D & E.) During this period, Herrington met with Walker, Bradley, and Shirley Joshua, Metro North's Director of Human Resources, to discuss Simpson's complaints about transferring to Harmon. On September 16, 2002, Bradley and Joshua met with Simpson and instructed him to tell them whether there was anything preventing him from going to work at Harmon. Simpson denied that any particular reason for not returning to Harmon, though he complained that they did not train him there. Simpson did not mention harassment or discrimination at any time during the meeting.

After this meeting, Bradley took Simpson to another meeting with Walker and Herrington. Walker gave Simpson two options: either accept the position at Harmon or give up his management position and "exercise his rights" with the union. Simpson refused to work at Harmon, so Walker removed Simpson from his position and advised him to exercise his union rights. (Simpson Aff., Ex. E.) Simpson opted not to contact the union, thereby terminating his employment with Metro North. (*Id.*)

## DISCUSSION

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.))**

## I. STANDARD ON MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate if "the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact ..."Fed.R.Civ.P. 56(c). An issue of fact is "material" when it "might affect the outcome of the suit under the governing law."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of fact is "genuine" when the evidence permits a reasonable jury to find in favor of the nonmoving party. *Id.*

The burden of demonstrating that no genuine issue of material fact exists falls on the party seeking summary judgment. *Powell v. Nat'l Bd. of Med. Ex-am'rs,* 364 F.3d 79, 84 (2d Cir.2004) (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970)). If the moving party establishes the absence of a genuine issue of material fact, "a limited burden of production shifts to the nonmovant, who must ... come forward with 'specific facts showing that there is a genuine issue for trial.' " *Id.* (quoting *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993)). If the nonmoving party fails to establish a genuine issue of material fact, summary judgment should be granted. *Id.*

In determining whether a genuine issue of material fact exists, the Court must examine all evidence in the light most favorable to the nonmoving party.*Anderson,* 477 U.S. at 255;*Make the Road by Walking, Inc. v. Turner,* 378 F.3d 133, 142 (2d Cir.2004)."Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."*Jeffreys v. City of New York,* No. 03-257, 426 F.3d 549, 553 (2d Cir.2005). Consequently, summary judgment on an issue of fact is not appropriate "if there is *any* evidence in the record that could reasonably support a jury's verdict for the nonmoving party."*Lucente v. Int'l Bus. Machs. Corp.,* 310 F.3d 243, 254 (2d Cir.2002) (emphasis added).

*6 Despite the Court's obligation to review all evidence in favor of the nonmoving party, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff."*Jeffreys,* 426 F.3d at 554 (quoting *Anderson,* 477 U.S. at 252). Mere "[c]onclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact."*Niagara Mohawk Power Corp. v. Jones Chemical, Inc.,* 315 F.3d 171, 175 (2d Cir.2003). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts,"*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), he "must offer some *hard evidence* showing that [his] version of the events is not wholly fanciful."*D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998) (emphasis added). The Court must grant summary judgment for defendant where plaintiff's evidence is "merely colorable, conclusory, speculative, or not significantly probative."*Anderson,* 477 U.S. at 249-50. Plaintiff cannot create a disputed issue of fact by offering "conclusory allegations, conjecture, and speculation."  *Niagara Mohawk Power Corp. v. Jones Chem., Inc.,* 315 F.3d 171, 175 (2d Cir.2003). Instead, to survive summary judgment, Plaintiff's facts "must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions."*Contemporary Mission v. U.S. Postal Serv.,* 648 F.2d 97, 107 n. 14 (2d Cir.1981) (internal citations and quotation marks omitted).

## II. PLAINTIFF'S CLAIMS OF DISCRIMINATION ON THE BASIS OF HIS RACE

The Court analyzes Simpson's discrimination claims under the three-part burden-shifting test set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir.1995). First, plaintiff must establish a *prima facie* case that he suffered from a discriminatory employment action on the basis of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-04885-JGK    Document 7-3    Filed 07/08/2008    Page 194 of 204

Not Reported in F.Supp.2d                                                           Page 8
Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.))**

his race, "by either direct, statistical or circumstantial evidence."*Bickerstaff v. Vassar Coll.,* 196 F.3d 435 (2d Cir.1999); *McDonnell-Douglas,* 411 U.S. at 802. This burden is minimal. *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 134 (2d Cir.2000). The burden then shifts to defendant to provide a legitimate, nondiscriminatory reason for its actions. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 (1993); *McDonnell Douglas,* 411 U.S. at 802;*Dawson v. Bumble & Bumble,* 398 F.3d 211, 216 (2d Cir.2005).[FN12] If an employer articulates a nondiscriminatory reason for its conduct, the inference of discrimination raised by plaintiff's *prima facie* case "simply drops out of the picture," and the burden shifts back to plaintiff to prove that the employer's nondiscriminatory explanation is pretextual. *St. Mary's Honor Ctr.,* 509 U.S. at 507-08, 511.

> FN12. The defendant's burden of production also is not a demanding one; defendant need only offer such an explanation for the employment decision. Although the burden of production shifts to the defendant, the ultimate burden of persuasion remains always with plaintiff. *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 447 (2d Cir.1999).

*7 The *McDonnell Douglas* framework applies to both employment discrimination claims brought under Title VII and equal protection claims arising out of the same conduct brought under 42 U.S.C. § 1983. *See Demoret v. Zegarelli,* No. 05-1831, slip op. at 13 (2d Cir. June 8, 2006); *Feingold v. New York,* 366 F.3d 138, 159 & n. 20 (2d Cir.2004)."The elements of one are generally the same as the elements of the other and the two must stand or fall together ."*Feingold,* 366 F.3d at 159. Therefore, the Court will review both Plaintiff's discrimination claims under Title VII and his equal protection claims under § 1983 simultaneously.

A. Plaintiff's Claim of Disparate Treatment with Respect to Pay

To establish a *prima facie* case of discrimination based on disparate pay, a plaintiff must show: (1) that he was a member of protected class; (2) that he was paid less than similarly situated employees who are not members of the plaintiff's protected class; and (3) evidence of discriminatory animus. *See Belfi v. Prendergast,* 191 F.3d 129, 139-40 (2d Cir.1999); *Quarless v. Bronx-Lebanon Hosp. Ctr.,* 228 F.Supp.2d 377 (S.D.N.Y.2002).

Defendants concede that, as an African American, Simpson is a member of a protected class. They also concede that Simpson was paid less than Hirsh and Schilling, white employees who performed comparable duties at other stations. Plaintiff erroneously argues that his racial status and the pay discrepancy is sufficient to establish a *prima facie* case of disparate pay.

To make out a claims for disparate pay, a plaintiff must establish that the individuals with whom he attempts to compare himself are "similarly situated" in all material respects. *See DeJesus v. Starr Technical Risks Agency, Inc.,* No. 03 Civ. 1298, 2004 WL 2181403, at *9 (S.D.N.Y. Sept. 27, 2004)."Employees are not 'similarly situated' merely because their [job responsibilities] might be analogized."*Quarless v. Bronx-Lebanon Hosp. Ctr.,* 228 F.Supp.2d 377, 383 (S.D.N.Y.2002). Instead, to be "similarly situated," employees must be substantially similar as to specific work duties, education, seniority, and performance history, all of which affect an employee's rate of pay. *See DeJesus,* 2004 WL 2181403, at *9;*Quarless,* 228 F.Supp.2d at 383-84. Plaintiff does not have to be identical to the employees with whom he compares himself, but "a valid comparison between employees can only be made if they shared 'sufficient employment characteristics ... so that they could be considered similarly situated.' " *Quarless,* 228 F.Supp.2d at 383 (quoting *McGuinness v. Lincoln Hall,* 263 F.3d 49, 53 (2d Cir.2001)).

Here, Simpson's similarity with Hirsch and Schilling is that all three had comparable job responsibilities, but that is not sufficient. To be

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.))**

"similarly situated," however, Hirsch and Schilling would also have to be similar to Plaintiff with regard to such factors as seniority and performance history. Both Hirsch and Schilling have far greater seniority and higher titles than Simpson. Hirsh joined Metro North in the 1960s and was promoted to Lead Trainmaster in 1989. Shilling joined Metro North in 1971 and was promoted to Lead Trainmaster in 1989. By way of contrast, Simpson began his career with Metro North in 1988, and was not promoted to Trainmaster (at least one level below Lead Trainmaster) until ten years later in 1999. As part of the 2000 Reorganization, Lead Trainmasters were retitled Assistant Directors, while Trainmasters were retitled Operations Managers. Simpson was never "similarly situated" to Hirsh or Schilling; he was employed at Metro North for a far shorter period than both Hirsh (at least two decades) and Schilling (seventeen years) and never reached the same job title as they held. Thus, Plaintiff's disparate pay claim fails as a matter of law.

**\*8** Further, there is no proof of animus. In order to prevail on a claim of disparate pay in violation of Title VII, Plaintiff bears the burden of proving that defendant acted with an intent to discriminate against plaintiff on the basis of his protected status. *Belfi v. Prendergast,* 191 F.3d at 140. Thus, Plaintiff must provide some evidence from which a reasonable jury could find that the reason for this discrepancy in pay was plaintiff's race. Simpson provides no such evidence.

In fact, Defendants offer a legitimate, nondiscriminatory explanation for the discrepancy in pay. Each position at Metro North is assigned a grade level that determines the applicable salary range. (Herrington Aff. ¶ 5.) Employee salaries increase with seniority, cost of living increases, and promotions to positions at higher grade levels with corresponding higher salaries. (*Id.*) Under such a seniority/title driven system, one would expect that both Hirsch and Schilling, who served far longer and with higher titles than Simpson, would have higher salaries.

Given this legitimate, nondiscriminatory explanation for the disparity in pay between Plaintiff and his non-African-American colleagues, Plaintiff had the burden to establish that Herrington's explanation was pretextual. Plaintiff fails to provide any evidence from which a reasonable jury could find that Herrington's explanation is false, or that the disparity in pay between Plaintiff and his non-African-American colleagues, was, even in part, motivated by race discrimination. Accordingly, the Court dismisses Plaintiff's claim for disparate treatment with respect to unequal pay as a matter of law.

B. Hostile Work Environment

To establish a *prima facie* case of hostile work environment, plaintiff must demonstrate that: (1) his workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his work environment, and (2) a specific basis exists for imputing the conduct that created the hostile work environment to the employer. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (quoting *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir.1996) (internal quotation marks omitted))."The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [his] employment were thereby altered."*Alfano v. Costello,* 294 F.3d 365, 373 (2d Cir.2002). The conduct alleged must be sufficiently severe and pervasive "to create an environment that 'would be perceived, and is perceived, as hostile or abusive.' " *Schwapp,* 118 F.3d at 110 (quoting *Harris v. Forklift Sys., Inc ., 510 U.S. 17, 22 (1993)*). "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.' Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness ." *Alfano,* 294 F.3d at 374 (internal citations omitted). The inquiry is fact specific and must be determined on a case-by-case basis. *Schwapp,* 118 F.3d at 110.

Not Reported in F.Supp.2d                                                                    Page 10
Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.))**

**\*9** Simpson does not allege that any of his supervisors used racial slurs or epithets or even referred to his race at any point during his employment; nor does Simpson allege that his supervisors subjected him to "discriminatory intimidation, ridicule, and insult ." Instead, Simpson merely alleges that his supervisors yelled at him unnecessarily, spoke to him in a disrespectful tone, and "micromanaged" his work. Even if the alleged incidents could be connected to Simpson's race (a conclusion wholly unsupported by the current record), these incidents were neither severe enough nor pervasive enough to alter the conditions of Simpson's employment, and therefore they are insufficient to support a claim for hostile work environment under existing case law.

This record is barren of any evidence from which a reasonable jury could find that the allegedly hostile incidents were connected to Simpson's race. In each case, a supervisor "yelled" or "talked down" to Simpson about the way he performed his work. Simpson does not allege that any of his supervisors made racially-suggestive comments, nor does he provide any evidence that the allegedly offending supervisors spoke to non-African-American employees differently. Instead, Plaintiff appears to suggest that the mere fact of the racial difference between him and his supervisors is sufficient to create a genuine issue of fact as to whether Plaintiff was criticized because of his race. This is an impermissible inference. Simply because (1) supervisors criticized Plaintiff's work, and (2) Plaintiff is African American, does not add up to the conclusion that (3) supervisors criticized Plaintiff because he is African American. "This is exactly the type of groundless speculation that summary judgment is designed to root out ."*Richardson v. Newburgh Enlarged City Sch. Dist., 984 F.Supp. 735, 744 (S.D.N.Y.1997).* Plaintiff must provide some evidence from which a reasonable jury could find that Defendants targeted Plaintiffs on account of his race. Such evidence is lacking in this case.

C. Retaliation

Along with the disparate pay and hostile work environment claims, Plaintiff's complaint alleges that Defendants retaliated against him for lodging complaints of race discrimination. To make out a *prima facie* case of retaliation, plaintiff must establish three elements: (1) that he participated in a protected activity known to defendants; (2) defendants subjected plaintiff to an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action. *Cruz, 202 F.3d at 566;Tomka, 66 F.3d at 1308.*

Plaintiff alleges retaliation in two forms: (1) his transfer to Harmon Terminal in retaliation for complaints about race discrimination; and (2) his termination in September 2002 in retaliation for complaining that his transfer to Harmon Terminal was racially discriminatory. The Court will address these two claims separately because the proof supporting each of these claims is slightly different.

*1. Retaliatory transfer*

*(a) Plaintiff's prima facie case*

**\*10** The first element that Plaintiff must prove in order to establish a claim for retaliatory transfer is that Plaintiff participated in a protected activity that was known to Defendants. "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination."*Cruz, 202 F.3d at 566* (citing 42 U.S.C. § 2000e-3). As the Second Circuit explained in *Cruz,*"opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection," and may include " 'making complaints to management' " or reporting a Title VII violation to human resources personnel. *Id.* (quoting *Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir.1990)).*

Plaintiff alleges that he participated in the protected activity of complaining to supervisors about race discrimination in this workplace. Evidence submit-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ted by both parties reveals that Plaintiff spoke with Gregory Bradley on a number of occasions about unfair treatment in the workplace, including complaining about unequal pay and about being treated poorly by Sterman and Meyers. Bradley is the Director of Workplace Diversity, which included monitoring compliance of equal employment opportunity ("EEO") laws. Bradley often spoke to Herrington or Kiniry about the things that Simpson said, so they had knowledge of Simpson's complaints. Simpson also complained to Herrington, Kiniry, and Walker about unequal pay and about inappropriate behavior by his supervisors, Schanoes, Sterman and Meyers.

There are two problems with Plaintiff's proof. First, while Simpson complained on a number of occasions to Bradley, the Director of Workplace Diversity, about unfair treatment, none of Plaintiff's complaints actually referred to race. Regardless, Plaintiff alleges that a reasonable jury could find that Plaintiff's complaints to Bradley were complaints about race discrimination simply because Bradley worked in the capacity of Director of Workplace Diversity, which included acted as an EEO compliance officer.

This inference is complicated, however, by the fact that Plaintiff and Bradley were more than work associates, they were friends. As Bradley explained during his deposition: "Darryll Simpson was an employee that I knew, I met at work, and he would often ask me his opinion-my opinion on various issues. And when Darryll spoke to me ... he was asking me as a friend."(Bradley Dep. 6:19-24.) Bradley further elaborated that while the two did not socialize regularly outside of work, Plaintiff came to speak with Bradley "about four times a week." (*Id.* 8:23-9:11.) Plaintiff would often discuss his personal problems with Bradley, such as how he got "a fellow Metro-North employee pregnant" and about "his mother being sick," and the two employees "talked about music a lot," since they were both music collectors. (*Id.* 7:24-8:18.) Thus, when Plaintiff complained to Bradley about unfair treat-

ment in the workplace, there is no reason to believe that Plaintiff complained to Bradley in his capacity as an EEO compliance officer. Certainly, Simpson never filed an official complaint, and Bradley never thought Simpson was complaining about racial discrimination.

**\*11** In fact, Bradley believed that Simpson's complaints were raised "as a friend," not "as an employee" (*id.* 6:16-24). This understanding was furthered by the fact that Plaintiff's complaints to Bradley were done in an informal manner: Plaintiff did not submit his complaint in writing or follow the proper procedure for filing an EEO complaint, though he had utilized the procedure in the past and knew how to do so. (Bradley Dep. 21:18-23:19.) In many instances Plaintiff did not even approach Bradley in his office, instead voicing his dissatisfaction with supervisors during friendly discussions in the terminal. (*Id.*) Bradley stated:

If someone walks into the office and they have a complaint ... They will be asked to put their complaint in writing. [Someone then investigates.] [Simpson] never did that at all ....

[Simpson] has utilized workforce diversity before. So he knows, if he wanted to complain about something officially, he could do that. I believe that Darryll now is using the fact that we were friends to allege that he complained to me, and he knows that he did not complain.

(Bradley Dep. 22:4-17 and 23:13-19.) Thus, no reasonable jury could find, on the record provided, that Simpson complained about a protected activity, *i.e.,* race discrimination, just because he talked with Bradley.

Nor did Plaintiff's memos to Herrington, Kiniry, and Walker ever expressly refer to race. Simpson claimed that Meyers micromanaged his work, spoke to him in a demeaning tone, and yelled at him over insignificant things. Simpson's complaint was that Meyers was being unfair, not that he was racially discriminatory. Further, Plaintiff's complaints about

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.))

Meyers were similar in form and content to his earlier comments about Sterman, which Plaintiff admits were not race-related complaints. Thus, it was reasonable for Defendants to believe that Plaintiff's nearly identical complaints about Meyers were also unrelated to race. Plaintiff's conclusory allegations, after the fact, that Plaintiffs must have known that his complaint were race-based, even though these complaints never mentioned race and were substantially similar to the non-race-related complaints about a prior supervisor, are unconvincing. Thus, even when examining all the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff's evidence insufficient to establish a genuine issue of fact.

Plaintiff also fails to establish that his transfer amounted to an adverse employment action. While Plaintiff characterizes his transfer to Harmon as a demotion, he provides no evidence to support this characterization. Plaintiff's move from Grand Central Terminal to Harmon Terminal was nothing more than a lateral shift in position, which does not amount to an adverse employment action under the current law.

"An 'adverse employment action' is one which is 'more disruptive than a mere inconvenience or an alteration of job responsibilities." *Terry v. Ashcroft,* 336 F.3d 128, 138 (2d Cir.2003) (quoting *Galabya v. New York City Bd. of Educ.,* 202 F .3d 636, 640 (2d Cir.2000)). Examples of an adverse employment action include " 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.' " *Id.* (quoting *Galabya,* 202 F.3d at 640). Plaintiff admits that his transfer from Grand Central Terminal to Harmon Terminal did not entail a reduction in pay, benefits or seniority; and Simpson retained his title as "Operations Manager."

**\*12** Regardless, Plaintiff contends that the transfer was a demotion, and therefore an adverse employment action, because the work at Harmon Terminal

was less prestigious and less interesting than the work at Grand Central. But Plaintiff bare assertions that the work at Harmon Terminal was "less interesting," without any evidence that the transfer resulted in "significantly diminished material responsibilities," cannot turn an otherwise legitimate transfer into an adverse employment action. Thus, the Court finds that Plaintiff fails to make out a *prima facie* case of retaliation based on his transfer to Harmon Terminal.

*(b) Defendants' legitimate, nondiscriminatory explanation*

Defendants proffer a legitimate, nondiscriminatory reason for transferring Plaintiff, namely, Plaintiff's inability to get along with his supervisors, which Plaintiff fails to rebut. Therefore, Plaintiff's claim of retaliatory transfer would fail even if Plaintiff made out a *prima facie* case.

Defendants decided to transfer Plaintiff after he complained about Gus Meyers, the third supervisor in two years with whom Plaintiff was having trouble. As Defendants explained, Plaintiff's problem with Meyers "was kind of like strike three," making Defendants realize that Plaintiff "had problems with his communication and team-building skills."(Kiniry Dep. 41:11-23; Herrington Dep.:12-21.) Defendants decided to place Plaintiff in a comparable position, "where he would have to work with other teams members and communicate effectively with them," hoping that such a transfer "would help improve [Plaintiff's] skills in that area."(Herrington Dep. 105:12-21.) Herrington believed the Operations Manager position at Croton Harmon was a good fit, and therefore decided to send Plaintiff there.

Defendants also explained that after the reorganization in 2000, "many managers were moved." (Herrington Dep. 104:20-105:7.) In fact, two other individuals were moved around the same time Plaintiff was transferred. (*Id.*) Thus, there was nothing suspicious or unique about Plaintiff's transfer;

Not Reported in F.Supp.2d                                                                                                    Page 13
Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.))**

transferring Plaintiff to Harmon seemed like a good way to both solve Plaintiff's teambuilding and communication problems and meet the staffing needs arising out of the reorganization.

Metro North is charged with the responsibility of running a large, complex commuter rail system; and providing prompt, efficient and effective service to the riding public. All of its employees must cooperate in this venture.Title VII does not strip an employer of its right to transfer an employee to further a legitimate business purpose. Here, Defendants had a number of legitimate reasons for transferring Plaintiff: not only to run the railroad but also to remedy the strained working relationship between Plaintiff and his supervisor; to move Plaintiff to a position that Defendants believed was better suited to provide the teambuilding and communication skills that Plaintiff needed in order to become a more effective manager; and, to meet the staffing needs of Metro North's recent reorganization.

**\*13** It is not the Court's role to question the propriety of these reasons, even if Plaintiff is a member of a protected class. The courts have explained:

Federal courts "do not sit as a super-personnel department that reexamines an entity's business decision. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firms managers, [Title VII] will not interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior."

*Das v. Our Lady of Mercy Med. Ctr.,* No. 00 Civ. 2574, 2002 WL 826877, at *12 (S.D.N.Y. Apr. 30, 2002) (quoting *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir.1991)). Defendants' explanation is both legitimate and nondiscriminatory, and therefore Defendant has met its burden.

*(c) Pretext*

Plaintiff fails to provide proof sufficient to rebut Defendants' explanation. Once a defendant profers

a legitimate, nondiscriminatory explanation for its actions, plaintiff must "point to evidence that reasonably supports a finding of prohibited discrimination" in order to withstand summary judgment. *Das v. Our Lady of Mercy Med. Ctr.,* No. 00 Civ. 2574, 2002 WL 826877 (S.D.N.Y. Apr. 30, 2002) (quoting *Ogbo v. New York State Dep't of Fin.,* No. 99 Civ 9387, 2001 Dist. LEXIS 12920, at *14 (S.D.N.Y. Aug. 24, 2001) (internal quotation marks omitted)."[T]he factual inquiry [at this stage] proceeds to a new level of specificity,"*St. Mary's Honors Ctr.,* 509 U.S. at 51, and Plaintiff's "initially vague allegations of discrimination" must be "increasingly sharpened and focused." *Meiri,* 759 F.2d at 995.

Plaintiff points to only one piece of evidence to support his argument that Defendants' explanations-Plaintiff's weak teambuilding and communication skills and the staffing needs of the Department-are pretextual: Plaintiff's satisfactory performance evaluation in April 2000, more than two full years prior to his transfer. But this evidence does nothing to rebut Defendants' explanation. Subsequent to the evaluation, Simpson's difficulties with his interacting with his superiors began to manifest themselves. Further, the reorganization of the Operations Division at Metro North commencing in 2000, (and on-going thereafter), changed the staffing needs of the organization, requiring employees to be transferred between terminals. Thus, the earlier evaluation to which Plaintiff refers does nothing to rebut Defendants' explanation for the transfer. On the facts of this case, the Court cannot find any evidence from which a reasonable jury could find that Defendants' presumptively valid reasons for transferring Plaintiff were pretextual, masking discrimination on the basis of race.

*2. Retaliatory termination*

*(a) plaintiff's prima facie case*

As to a *prima facie* case for retaliatory termination, Plaintiff aggressively protested his transfer to Har-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

mon, and complained on multiple occasions about the transfer to the individual Defendants. There is no doubt that Defendants knew of Plaintiffs' activities. But similar to Plaintiff's complaints about supervisors prior to his transfer, Plaintiff's complaints about the transfer never referred to race, so the question here is whether Plaintiff's complaints can reasonably be viewed as complaints about race discrimination, and therefore a "protected activity" for purposes of Plaintiff's retaliation claim.

**\*14** In two separate e-mails to the individual Defendants, Plaintiff referred to the transfer as "bias," "harassing," and "retaliatory," and alleged that he was being "singled out and treated different from [his] counterparts."(Simpson Dep., Ex. B & C.) While Plaintiff never referred to his status as an African American or alleged that the "bias" he referred to was race discrimination, there is some evidence-however minimal-from which a reasonable jury could infer that Plaintiff complained about race discrimination, and therefore that Plaintiff engaged in a "protected activity" for purposes of establish a *prima facie* case. Plaintiff also establishes that Defendants subjected him to an adverse employment action, as it is undisputed that termination of employment is an adverse employment action for purposes of a Title VII retaliation claim. See *Terry v. Ashcroft,* 336 F.3d at 138.

Finally, there is sufficient evidence from which a reasonable jury could find a causal connection between the Plaintiff's complaints and his termination. Initially, a plaintiff's burden to demonstrate a causal connection between the protected activity and the adverse employment action is de minimis. For purposes of establishing a *prima facie* case, a plaintiff ordinarily need demonstrate only that "the protected activity preceded the adverse action in order to satisfy the causation requirement,"*Raniola v. Bratton,* 243 F.3d 610, 624 (2d Cir.2001), and short intervals of time between the protected activity and the adverse employment action may be used as "indirect evidence from which causation could be found."*Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 217

(2d Cir.2001).

Plaintiff complained about the transfer repeatedly throughout July, August and September 2002. He sent a memorandum to Kiniry complaining of the transfer on August 22, 2002, and a similar memorandum to George Walker on September 10, 2002. Plaintiff was terminated on September 17, 2002. Thus, there is a clear temporal proximity between Plaintiff's complaints and his termination. This is sufficient to make out a *prima facie* case.

*(b) Defendants legitimate nondiscriminatory explanation*

Plaintiff's claim of retaliatory termination fails despite his *prima facie* case, as Defendants provide a legitimate nondiscriminatory reason for firing Plaintiff on September 17, 2002. After spending one day at Harmon Terminal on September 10, 2002, Plaintiff called in sick for three days in a row. When Herrington asked Plaintiff about his sickness, Plaintiff told her "he wasn't going to Harmon because two reasons ... he wasn't trained properly and second because personal reasons."(Herrington Dep. 112:18-23.) He did not cite any physical illness that would prevent him from returning to Harmon and never provided a doctor's note confirming that he was ill. (*Id.* 112:18-113:23, 115:23-116:5.) When asked if his "personal reasons" would prevent him from coming to work, Plaintiff said "no." (*Id.* 116:5-7, 15-18.) Finally, Defendants gave Plaintiff the option to accept the position at Harmon and return to work, or exercise his rights with the union to find a non-management position. (*Id.* 145:14-24.) Plaintiff chose not to return to Harmon, so his position was terminated. (*Id.* 146:10-21; Simpson Aff., Ex. E.) Clearly, Defendants did not want to fire Simpson. Indeed, they asked him to return to work. He refused. Moreover, Simpson could have stayed on the job, and filed a complaint about his transfer, as both discriminatory and retaliatory. He rejected that plain and obvious option and refused to return to work. He even rejected his option of returning to his underlying union

Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.))**

position. On this record, Simpson appears to be the architect of his own termination.

### (c) Pretext

**\*15** Again, Plaintiff claims that Defendants' explanation is pretextual, and that Plaintiff's termination was really motivated by a desire to punish Plaintiff for complaining about race discrimination. To support this position, Plaintiff points to four facts: (1) Plaintiff specifically stated that he would return to Harmon when he recovered from his unidentified illness; (2) Plaintiff had already commenced work at Harmon at the time he was fired; (3) Plaintiff had relocated to live within Harmon's district; and (4) Plaintiff stated in writing the Defendants that he would continue to work hard for Metro North. (Pl.'s Mem. Law Opp'n Mot'n Summ. J. 21.) Despite Plaintiff's urgings to the contrary, however, these "facts" do not save Plaintiff's case from summary judgment.

Plaintiff must prove not only that Defendants' "presumptively valid reasons" for its conduct were pretextual, but must also prove that "a motivating reason was discrimination." *McDonnell Douglas,* 411 U.S. at 805;*Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 447 (2d Cir.1999) (internal quotation marks and citations omitted)."The evidence as a whole must be sufficient to sustain an 'ultimate finding' of intentional discrimination."*Peterson,* 32 F.Supp.2d at 684 (citing *Fisher,* 114 F.3d 1338). Even if the Court believed that Plaintiff's evidence was sufficient to raise doubt about the truth of Defendant's explanation (and it does not), none of Plaintiff's evidence points to racial animus as the real reason for Defendants' conduct. Thus, no reasonable jury could find from Plaintiff's evidence that Defendant's explanation for its conduct was "in fact a coverup for a racially discriminatory decision."*St. Mary's Honor Ctr.,* 509 U.S. at 518 (quoting *McDonnell Douglas, 411 U.S. at 805).* Accordingly, Plaintiff's claim of retaliatory transfer fails as a matter of law.

### CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is GRANTED. There are no genuine disputed issues of fact as to disparate treatment, hostile work environment or retaliation on the basis of race. Accordingly, Plaintiffs claims of discrimination in violation of Title VII and § 1983 are hereby DISMISSED with prejudice. The Clerk of the Court is directed to enter judgment and close out this case.

S.D.N.Y.,2006.
Simpson v. Metro-North Commuter R.R.
Not Reported in F.Supp.2d, 2006 WL 2056366 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 19

LEXSEE 2005 US APP. LEXIS 23703

**SHEILA A. STONE, Plaintiff-Appellant, v. BOARD OF EDUCATION OF SARANAC CENTRAL SCHOOL DISTRICT, Defendant-Appellee.**

**No. 05-2480-cv**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

*153 Fed. Appx. 44*; *2005 U.S. App. LEXIS 23703*

**November 2, 2005, Decided**

**NOTICE:**    [**1] RULES OF THE SECOND CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**COUNSEL:** FOR APPELLANT: SCOTT LIEBERMAN, DeLorenzo Law Firm, LLP, Schenectady, NY.

FOR APPELLEE: EILEEN M. HAYNES, Bartlett, Pontiff, Stewart & Rhodes, P.C., Glen Falls, NY UP.

**JUDGES:** PRESENT: AMALYA L. KEARSE, ROGER J. MINER, JOSE A. CABRANES, Circuit Judges.

**OPINION**

[*45] $120

**SUMMARY ORDER**

**ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the District Court is **AFFIRMED.**

Plaintiff Sheila A. Stone appeals from an April 21, 2005 decision and order of the United States District Court for the Northern District of New York (Gary L. Sharpe, *Judge*) granting defendant's motion for summary judgment and dismissing her age discrimination claims brought pursuant to the Age Discrimination in Employment Act ("ADEA"), *29 U.S.C. §§ 621-634.*

In the District Court proceeding, plaintiff alleged that

in 2002 she was denied employment as a full-time elementary school teacher at Morrisonville Elementary School in the Saranac Central School District on the basis [**2] of being forty years of age or older. [1] In support of her claim, plaintiff asserted, *inter alia*, that (1) the two younger candidates who were hired in her place were substantially less qualified; (2) that the Morrisonville Elementary School had a statistical track record of favoring younger applicants; (3) that the hiring committee intentionally destroyed documents tending to show that she was the best candidate for the open positions; (4) that the hiring committee failed to include a former elementary school principal who would have championed plaintiff's application; and (5) that the hiring committee improperly used the date of plaintiff's teaching certification as a proxy for discriminating against her on the basis of age.

> 1  Plaintiff was fifty years old at the time of the challenged hiring decision.

Reiterating many of the same arguments on appeal, plaintiff contends that the District Court erred in granting summary judgment and refusing to allow plaintiff to proceed to a jury trial on a "mixed motive" [**3] theory of discrimination because she raised genuine issues of material fact as to whether defendant's purported age-neutral explanations for its hiring decision were merely pretextual. Plaintiff asks this Court to reverse the District Court's decision that she failed to present any evidence--either direct, statistical, or circumstantial--tending to establish that age discrimination was "more likely than not" a motivating factor in defendant's hiring decision.

We review appeals from a district court's grant of

153 Fed. Appx. 44, *45; 2005 U.S. App. LEXIS 23703, **3

summary judgment *de novo*, viewing the evidence in the light most favorable to the non-moving party. *See, e.g., James v. New York Racing Ass'n, 233 F.3d 149, 152 (2d Cir. 2000).* "Even where facts are disputed, in order to defeat summary judgment, the nonmoving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor." *Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 101 (2d Cir. 2001).* Accordingly, "'the non-moving party may not rely on conclusory allegations or unsubstantiated speculation.'" *Id.* (quoting *Scotto v. Almenas, 143 F.3d 105, 114 (2d. Cir. 1998)).*

Once plaintiff [**4] made out a prima facie case of age discrimination under the ADEA and defendant proffered valid age-neutral explanations for its hiring decision--namely, [*46] that plaintiff interviewed poorly and did not demonstrate sufficient familiarity with newer teaching methods--plaintiff was required to show that defendant's stated reasons were merely a pretext for age discrimination. *See, e.g., James, 233 F.3d at 154; Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224-25 (2d Cir. 1994).*

Upon our *de novo* review of the record, we agree with the District Court's conclusion that plaintiff failed to present sufficient evidence from which a reasonable factfinder could conclude both (1) that defendant's stated reason for selecting other qualified candidates is false and (2) that age discrimination was an animating force behind defendant's decision not to hire plaintiff. *See Gallo, 22 F.3d at 1225* (quoting *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 516-17, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)).* Even if plaintiff could establish that defendant somehow inaccurately assessed her public speaking and teaching skills or improperly selected [**5] other candidates on the basis of their previous ties to Morrisonville Elementary School, such allegations would not support a cause of action under the ADEA. Moreover, in reaching our conclusion we are mindful of the need to "respect the employer's unfettered discretion to choose among qualified candidates," *Byrnie, 243 F.3d at 103* (quoting *Fischbach v. D.C. Dep't of Corr., 318 U.S. App. D.C. 186, 86 F.3d 1180, 1183 (D.C. Cir. 1996),* and will not "act as a super personnel department that second guesses employers' business judgments," *id.* (quoting *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1330 (10th Cir. 1999))* (internal quotation marks omitted).

Regarding plaintiff's theory of "mixed motive" discrimination, it is well-settled that "to warrant a mixed-motive burden shift, the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment.'" *Raskin v. Wyatt Co., 125 F.3d 55, 61 (2d Cir. 1997).* Because plaintiff failed to present sufficient evidence to raise a genuine issue of material fact [**6] concerning whether defendant's decision was motivated, even in part, by age-related animus, the District Court properly granted summary judgment in relation to plaintiff's "mixed motive" claim.

* * * *

We have considered all of plaintiff's arguments and found each of them to be without merit. Accordingly, the judgment of the District Court is **AFFIRMED**.